No. 14-3271

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

       vs.

MARIANO A. MEZA-RODRIGUEZ,

    Defendant-Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
THE HONORABLE RUDOLPH T. RANDA, PRESIDING**

**DEFENDANT-APPELLANT'S BRIEF
AND REQUIRED SHORT APPENDIX**

Adam Stevenson, Esq.
Samuel Robins, student
Richard R. Staley, student
Clinical Associate Professor
Director, Oxford Federal and
      Federal Appeals Projects
Frank J. Remington Center
University of Wisconsin Law School
975 Bascom Mall
Madison, WI 53706
(608) 262-9233

Joseph A. Bugni
FEDERAL DEFENDER SERVICES
    OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53703
(608) 260-9900
joseph_bugni@fd.org
Lead Counsel for
      Mariano A. Meza-Rodriguez

**DISCLOSURE STATEMENT**

Pursuant to FED. R. APP. P. 26.1 and CIRCUIT RULE 26.1 (7th Cir.), Mariano A. Meza-Rodriguez's lawyer informs the Court that Federal Defender Services of Wisconsin, Inc., through Joseph A. Bugni and Julie K. Linnen, appeared for the Defendant-Appellant Mariano A. Meza-Rodriguez, who is a natural person, in the district court. On appeal, Joseph A. Bugni, Federal Defender Services of Wisconsin, Inc., 22 East Mifflin Street, Suite 1000, Madison, Wisconsin 53703, represents Mariano A. Meza-Rodriguez in this Court.

Dated: February 5, 2015   */s/ Joseph A. Bugni*
           Joseph A. Bugni
           Counsel for Defendant-Appellant
           Mariano A. Meza-Rodriguez

# TABLE OF CONTENTS

Page

Disclosure Statement

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -i-

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -iii-

Jurisdictional Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1.0   Questions Presented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2.0   Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

3.0   Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

4.0   Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4.1   The Second Amendment encompasses undocumented aliens
      because they are, and always have been, part of "the people". . . . . . . . . . . 8

4.2   If this court decides that not all documented aliens are covered by
      "the people" this Court should apply the Supreme Court's
      substantial connections test. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

4.3   *Portillo-Munoz* incorrectly found that the "the people" only includes
      citizens. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

4.4   Section 922(g)(5)(A) is unconstitutional because the Government has
      not and cannot satisfy strict scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

4.5   Even if this Court were to apply heightened scrutiny, § 922(g)(5)(A)
      is still unconstitutional. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

5.0   Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Circuit Rule 31(e) Certification

Certificate of Compliance

Certificate of Service

Appendix

Index to Short Appendix

# TABLE OF AUTHORITIES

Page

CASES

*Am.-Arab Anti-Discrimination Comm. v. Reno*,
    70 F.3d 1045 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Arizona v. United States*,
    132 S.Ct. 2492 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Boy Scouts of Am. v. Dale*,
    530 U.S. 640 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Citizens United v. FEC*,
    558 U.S. 310 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*District of Columbia v. Heller*,
    554 U.S. at 592. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

*Dred Scott v. Sandford*,
    60 U.S. 393 (1856). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Entmt Software Assn v. Blagojevich*,
    469 F.3d 641 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 25

*Fla. Dept. of Rev. v. Piccadilly Cafeterias, Inc.*,
    554 U.S. 33 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Fletcher v. Haas*,
    851 F. Supp. 2d 287 (D. Mass. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 18

*Hague v. Comm. for Indus. Org.*,
    307 U.S. 496 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*INS v. Lopez-Mendoza,*
  468 U.S. 1032 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Kachalsky v. Cnty. of Westchester,*
  701 F.3d 81 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Martinez-Aguero v. Gonzalez,*
  459 F.3d 618 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Massignani v. INS,*
  438 F.2d 1276 (7th Cir. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Nordyke v. King,*
  364 F.3d 1025 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Parker v. District of Columbia,*
  478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Plyler v. Doe,*
  457 U.S. 202 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 27

*Shaughnessy v. United States ex rel. Mezei,*
  345 U.S. 206 (1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Turner Broad. Sys., Inc. v. FCC,*
  512 U.S. 622 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Tyler v. Hillsdale Cnty. Sheriff's Dept,*
  No. 13-1876, 2014 WL 7181334 (6th Cir. Dec. 18, 2014). . . . . . . . . . . . 20, 21

*United States v. Bass,*
  404 U.S. 336 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Booker,*
  644 F.3d 12 (1st Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Cruikshank,*
    92 U.S. 542 (1875) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Emerson,*
    270 F.3d 203 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Marzzarella,*
    614 F.3d 85 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

*United States v. Masciandaro,*
    638 F.3d 458 (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Playboy Entmt Grp., Inc.,*
    529 U.S. 803 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Portillo-Munoz,*
    643 F.3d 437 (5th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . 5, 14, 16, 17, 18

*United States v. Quintana,*
    623 F.3d 1237 (8th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Sidwell,*
    440 F.3d 865 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Skoien,*
    614 F.3d 638 (7th Cir. 2010) (*en banc*) . . . . . . . . . . . . . . . . . . . 17, 25, 26, 27

*United States v. Yancey,*
    621 F.3d 681 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

*United States v. Williams,*
    616 F.3d 685 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 28

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Wong Wing v. United States,*
 163 U.S. 228 (1896). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Yick Wo v. Hopkins,*
 118 U.S. 356 (1886). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

STATUTES AND OTHER AUTHORITY

18 U.S.C. § 922(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 24, 25, 28

18 U.S.C. § 922(g)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

18 U.S.C. § 922(g)(5)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

18 U.S.C. § 922(g)(9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3742. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

First Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

Second Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

Fourth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

Fifth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Sixth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Ninth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Tenth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fourteenth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 18

Report of the Committee on Claims (Dec. 28, 1795),
 *reprinted in* 7 Documentary History of the First Federal Congress
 of the United States of America 76–78
 (Kenneth R. Bowling et al. eds.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Michael J. Wishnie, *Immigrants and the Right to Petition*,
 78 N.Y.U. L. Rev. 667 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Madison's Report on the Virginia Resolutions (1800)
 *reprinted in* 4 Elliot's Debates 556 (2d. ed. 1836). . . . . . . . . . . . . . . . . . . . . 12

The Honorable Karen Nelson Moore, *Aliens and the Constitution*,
 88 N.Y.U. L. Rev. 801 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Title VII of The Omnibus Crime Control and Safe Streets Act of 1968. . . . . . . . . 23

David T. Hardy, *The Firearms Owners' Protection Act:
 A Historical and Legal Perspective*,
 17 Cumb. L. Rev. 585, 600-601 n.79 (1986/1987)
 (citing 114 Cong. Rec. 14775). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Tim Wadsworth, *Is Immigration Responsible for the Crime Drop?
 An Assessment of the Influence of Immigration on Changes
 in Violent Crime Between 1990 and 2000*,
 Soc. Sci. Q., June 2010, at 534. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Rombaut & Ewing, *The Myth of Immigrant Criminality and the Paradox of
 Assimilation: Incarceration Rates Among Native and Foreign-born Men*
 1, 4 (American Immigration Law Foundation 2007). . . . . . . . . . . . . . . . . . . 27

Necaise, Christopher M., *Effects of Illegal Immigration Upon Crime
 In the United States*
 (May 2013) (unpublished Honors Thesis 164). . . . . . . . . . . . . . . . . . . . . . . . 27

President Barack Obama, national address (Nov. 20, 2014). . . . . . . . . . . . . . . . . 27

114 Cong. Rec. 16286. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

114 Cong. Rec. 16298. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# JURISDICTIONAL STATEMENT

This is a direct appeal from the judgment of conviction in a criminal case. The district court had jurisdiction under 18 U.S.C. § 922(g) and 18 U.S.C. § 3231. This Court has jurisdiction on appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. Meza appeals the district court's order denying his motion to dismiss entered on April 11, 2014. A final judgment of conviction was entered on October 7, 2014. He timely filed a notice of appeal on October 15, 2014.

# 1.0    Questions Presented

This appeal presents two issues:

The First, Second, and Fourth Amendments all use the term "the people." The First and Fourth Amendments apply to undocumented aliens. Does the concurrently passed and identically phrased Second Amendment also encompass undocumented aliens?

In order to completely restrict an individual's Second Amendment right, as Congress did in 18 U.S.C. § 922(g)(5)(A), the government must show at least a substantial relation to a compelling justification.  At its passage, Congress provided no findings or statistics with regard to the law's purpose, nor have they to date. Can the complete ban in § 922(g)(5)(A) survive strict or heightened scrutiny without congressional findings or a sufficient tie to an ongoing compelling government interest?

## 2.0    Statement of the Case

When he was four years old, Mariano Meza-Hernandez's family brought him to America, where he remained. (PSR ¶ 63.) For much of his childhood, he attended Milwaukee public schools, enrolling from elementary school, through middle school, and on to high school. (R.13:8.) He left school his senior year to support his girlfriend and young daughter. (PSR ¶ 67.) He worked odd jobs to support his young family. (PSR ¶ 68.)

Mr. Meza was not, however, a model citizen. Late in August 2013, Milwaukee police officers responded to a report of an armed man at a local bar. (R.48:2.) Surveillance video showed a man pointing an object in the bar doorway. (*Id.*) That man was later identified as Meza. (*Id.*)

Just under two hours later, officers responded to a new report of a fight at a nearby bar. (*Id.*) After breaking up the fight, officers recognized Meza as the man from the surveillance video, and took him into custody. (*Id.*) Drunk and testy, Meza repeatedly hit his head against the window, and issued outlandish threats against the officers. (PSR ¶ 44.)

During a pat-down search, officers found a single .22 caliber cartridge. (R.48:3.) While in custody, Meza told officers he found the cartridge a few days

before in an alley. (*Id*.) He also admitted waiving around a BB gun at the other bar. (*Id*.)

Although Meza did not have a clear record when officers found the cartridge, he did not have either a felony or a violent-misdemeanor conviction. (PSR ¶¶ 33-44.) Instead, because of his immigration status, Meza had committed a federal crime by carrying a single discarded cartridge. (PSR ¶¶ 61-63.)

Before trial, Meza moved to dismiss the one-count indictment because § 922(g)(5) violates the Second Amendment. (R.13.) He argued that since the First and Fourth Amendments use the phrase "the people" and they extend rights to undocumented aliens, the identical phrase "the people" in the Second Amendment also extends its protection to undocumented aliens. (R.13:3-5.) This line of reasoning is consistent with the Supreme Court's holding in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990). Thus, a statute categorically banning all illegal aliens from possessing a single cartridge is unconstitutional. (R.13:9.) It was, in other words, an impermissible restraint on Meza's Second Amendment rights. (R.13:9-10).

Since the Supreme Court removed rational basis review as an option for these constitutional challenges, Meza analyzed the statute under a heightened form of scrutiny and applied "something akin to intermediate scrutiny," but

reserved the right to argue for strict scrutiny on appeal. (R.13:11-12, n. 3.) Since Congress did not provide any statistics, data, or even debate in the congressional record on the subject of this particular subsection of the statute, absent evidence to the contrary, Meza assumed that the statute's objective was "suppressing armed violence." (R.13:15.) (citing *United States v. Yancey*, 621 F.3d 681, 684 (7th Cir. 2010)).

After briefing, the Magistrate Judge recommended that the district court deny Meza's motion. (R.27.) The recommendation explicitly rejected applying the Supreme Court's analysis in *Verdugo-Urquidez*, and instead relied on a recent Fifth Circuit case, *United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011). (R.27:7-8.) In doing so, the recommendation determined "illegal aliens, by definition, are neither 'virtuous' (in the historic, civically virtuous sense) nor 'citizens.'" (R.27:8.) Thus, the Second Amendment does not cover them, and the statute was a valid exercise of congressional authority. (*Id.*)

Relying on the principle that undocumented aliens are neither virtuous nor citizens, the recommendation did not find a particular governmental objective behind the statute or how it related to § 922(g)(5)(A). Apart from the information provided in Meza's motion with regard to his substantial connections to Milwaukee, the Magistrate Judge did not explore Meza's connections to the

country, or further develop whether he had substantial connections or accepted societal obligations.

In a one-page order, the district court adopted the recommendations and denied Meza's motion. (R.31.) Meza then pled guilty, was sentenced to time served, and preserved the issue for appeal. (R.48:9.)

### 3.0    Summary of the Argument

The Second Amendment extends the fundamental right to possess a firearm to "the people." "The people" is a term of art, used in the First, Second, and Fourth Amendments. Aliens are protected under the First and Fourth Amendments, and thus cannot be subjected to warrantless searches, nor forbidden from practicing their faith or speaking freely in public. The Bill of Rights broadly includes aliens as a part of "the people." Thus, it follows that aliens are also members of "the people" under the Second Amendment.

But if this Court declines to extend the Second Amendment to all members of "the people," the Court should follow the Supreme Court in *Verdugo-Urquidez* and apply the substantial-connections test. And here, Meza's voluntary presence and adoption of societal obligations establish substantial connections with his community and the country that he would be covered by the Second Amendment.

Section 922(g)(5) vitiates the Second Amendment rights of a protected group. It strips them of this right but does not substantially relate to an important government objective—at least none that has ever been stated. Regardless of the precise form of scrutiny this Court applies, this statute cannot survive even the lowest available form of heightened scrutiny. Thus, this Court should reverse the district court, and find that § 922(g)(5)(A) violates the Second Amendment.

**4.0    Argument**

This Court reviews a challenge to the constitutionality of federal statutes *de novo*. *United States v. Sidwell*, 440 F.3d 865, 870 (7th Cir. 2006).

**4.1    The Second Amendment encompasses undocumented aliens because they are, and always have been, part of "the people."**

"The people" has the same meaning in the Second Amendment as it does in the contemporaneously passed First and Fourth Amendments. Similar to the First and Fourth Amendments, the Second Amendment protects an individual right of "the people" that "shall not be infringed." *District of Columbia v. Heller,* 554 U.S. at 592. All three amendments protect rights that existed at common law, before the creation of the Bill of Rights. *Id*. The Constitution did not create the right to speak freely or to bear arms. Instead, "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right." *Id*. (emphasis in original). Over a century ago, the Supreme Court made the point well: the right to bear arms "is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence." *United States v. Cruikshank*, 92 U.S. 542, 553 (1875). It is because these rights existed before the Constitution, and the Bill of Rights enshrined them for "the people," that the First and Fourth Amendments protect the same "people" as the Second Amendment.

Looking at the Bill of Rights and the term "the people," the Supreme Court recognized that "'the people' seems to have been a term of art employed in select parts of the Constitution," referring to those who are "protected by the Fourth Amendment, and by the First and Second Amendments." *Verdugo-Urquidez*, 494 U.S. at 265. Courts draw that understanding from the Amendments' language, structure, and purpose. Ratified at the same time, the First, Second, and Fourth Amendments all serve the same purpose: to limit government infringement of a personal right that existed before the Constitution's ratification. *Heller*, 554 U.S. at 592. Each Amendment also recognizes who possesses that right—"the people."

> **The First Amendment:** "Congress shall make no law . . . abridging . . . the right of *the people* peaceably to assemble, and to petition the government for a redress of grievances."

> **The Second Amendment:** "[T]he right of *the people* to keep and bear Arms shall not be infringed."

> **The Fourth Amendment:** "The right of *the people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

As with any statute, the use of identical phrasing within the Constitution was purposeful. *See Parker v. District of Columbia*, 478 F.3d 370, 382 (D.C. Cir. 2007); *see also Fla. Dept. of Rev. v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 39 (2008) (noting "identical words used in different parts of the same act are intended to have the same meaning") (internal quotation omitted). And lower courts have interpreted

the use of "the people" in the Second Amendment synonymously with its use in the First and Fourth Amendments. *See Parker v. District of Columbia*, 478 F.3d 370, 381 (D.C. Cir. 2007); *Nordyke v. King,* 364 F.3d 1025, 1028–29 (9th Cir. 2004) (Gould, J., dissenting from denial of rehearing *en banc*); *United States v. Emerson*, 270 F.3d 203, 227–28 (5th Cir. 2001). In *Emerson*, the Fifth Circuit held that "[t]here is no evidence in the text of the Second Amendment, or any other part of the Constitution, that the words 'the people' have a different connotation within the Second Amendment than when employed elsewhere in the Constitution." 270 F.3d at 227.

Undocumented aliens are part of "the people" under the Fourth Amendment. *See INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984); *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010) ("the Fourth Amendment applies to arrests of illegal aliens"). And it is beyond dispute that undocumented aliens are protected under the First Amendment. *Massignani v. INS*, 438 F.2d 1276, 1278 (7th Cir. 1971) ("aliens fully enjoy our primary rights of free speech guaranteed by the First Amendment"); *see also Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1066 (9th Cir. 1995) "We reject the government's contention that we apply gradations of First Amendment protection … in determining which citizens and aliens may receive particular government benefits."). Similarly, the Supreme Court found that "the people" under the First Amendment applies without regard to citizenship. *See Hague*

*v. Comm. for Indus. Org.*, 307 U.S. 496, 519 (1939) (Stone, J., concurring) ("It has been explicitly and repeatedly affirmed by this Court, without a dissenting voice, that freedom of speech and of assembly for any lawful purpose are rights of personal liberty secured to all persons, without regard to citizenship, by the due process clause of the Fourteenth Amendment.") (citations omitted).[1] In sum, the First and Fourth Amendments protect "the people," and cover all undocumented aliens—extending the fundamental rights that predated the Constitution regardless of a person's immigration status.

The plain meaning of the text, principles of statutory interpretation, and logic compel finding the Bill of Rights covers undocumented aliens. Aliens, as people present in the United States, receive Constitutional protections. This is confirmed by the Founders' own words. Speaking on the rights of aliens, James Madison explained:

> it does not follow, because aliens are not parties to the Constitution, as citizens are parties to it, that whilst they actually conform to it, they have no right to its protection.

[1] Undocumented immigrants have exercised First Amendment rights for centuries. For example, immigrants had the right to petition the same First Congress that approved the use of "the people" in the First Amendment and its supplementary Petition Clause. *Fletcher v. Haas*, 851 F. Supp. 2d 287, 293 (D. Mass. 2012) (citing Report of the Committee on Claims (Dec. 28, 1795), *reprinted in* 7 Documentary History of the First Federal Congress of the United States of America 76–78 (Kenneth R. Bowling et al. eds.1998)). And at the time of founding, "[d]isenfranchised white males, such as prisoners and those without property, as well as women, free blacks, Native Americans, and even slaves, exercised their right to petition the government for redress of grievances." Michael J. Wishnie, *Immigrants and the Right to Petition*, 78 N.Y.U. L. Rev. 667, 688-89 (2003).

Madison's Report on the Virginia Resolutions (1800) *reprinted in* 4 Elliot's Debates 556 (2d. ed. 1836). *See also* The Honorable Karen Nelson Moore, *Aliens and the Constitution*, 88 N.Y.U. L. Rev. 801, 807 (2013).

Furthermore, the Supreme Court has consistently found that other constitutional rights extend to aliens, including undocumented aliens. Early on, the Supreme Court protected undocumented aliens under the Constitution in the context of equal protection. *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). In *Yick Wo*, the Supreme Court held that the Equal Protection Clause extends to aliens, reasoning: "[t]hese provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws." 118 U.S. at 369. Consistent with that reasoning, the Supreme Court then extended protections to undocumented aliens beyond the Equal Protection Clause by recognizing the Constitution included those individuals under the umbrella of the Fifth Amendment. *Wong Wing v. United States*, 163 U.S. 228, 237 (1896); *see also Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments."). The Supreme Court has also found that the Sixth Amendment protects undocumented aliens. *See Shaughnessy v.*

*United States ex rel. Mezei*, 345 U.S. 206, 212 (1953). It is not just select amendments that apply to aliens; rather, constitutional rights broadly apply to both documented and undocumented aliens.

These cases exhibit that the Bill of Rights and other constitutional rights apply to undocumented aliens. This protection is based on the Supreme Court's recognition that the Constitution's protections extend beyond citizens. "Whatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term," and therefore entitled to the protections of the Constitution. *Plyler*, 457 U.S. at 210. Therefore, the broadly applicable Bill of Rights and other constitutional rights protect undocumented aliens; this protection also extends to "the people" and the Second Amendment. By using the phrase "the people," which includes citizens and non-citizens alike, the Framers sought to apply these rights to a broader, more inclusive population.

### 4.2 If this court decides that not all documented aliens are covered by "the people" this Court should apply the Supreme Court's substantial connections test.

If this Court rejects the Framers' intended broad application of the Second Amendment to all immigrants present in the country, it should still apply the substantial connections test from *Verdugo-Urquidez*. Following that test, it should hold that Meza has substantial connections to the United States, and therefore is a

member of "the people." Alternatively, the Court should remand for a hearing to determine Meza's status as a part of "the people" and subject to the Second Amendment through developing a record with regard to his substantial connections.

In *Verdugo-Urquidez*, the Supreme Court examined "the people" in the context of a Fourth Amendment challenge brought by an undocumented alien forcibly brought into the United States. 494 U.S. at 264-65. Reviewing the scope of the amendment, the Supreme Court said,

> 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

*Id.* at 265. The Supreme Court did not form a definitive holding as to who qualified for constitutional protections, but the five-justice opinion stated, "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." *Id*. at 271. The test for substantial connections has courts analyze: (1) whether the immigrant is voluntarily present in the United States; and (2) whether the immigrant has accepted "some societal obligations." *Id*. at 273. *See Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 625 (5th Cir. 2006); (applying the test); *Portillo-Munoz*, 643 F.3d at 442-43 (Dennis, J.,

dissenting) (same). This Court has not addressed whether *Verdugo-Urquidez*'s substantial connections test should apply in analyzing the Second Amendment. Since the Supreme Court has not defined "the people" in the Second Amendment, if a court must apply a test to undocumented aliens to determine whether the Constitution affords them certain rights, it should be *Verdugo-Urquidez*'s substantial connections test.

It is without question that Meza is voluntarily in the country. The question then turns to his acceptance of "societal obligations." Meza presented the district court with several facts demonstrating substantial connections to the country. These include his residence in Milwaukee for over 20 years (R.13:8.); his attendance of elementary, middle, and high school in the Milwaukee Public Schools (*id.*); as well as relationships with his mother and other immediate family, all of whom live in Milwaukee (PSR ¶61-63), and his daughters, whom he has worked to support (*id.* at ¶ 67).

If, however, the Court views the record as insufficient on the question, then it should remand the case for further proceedings. The district court did not hold an evidentiary hearing to discuss the extent of Meza's voluntary presence in the United States and his adoption of societal obligations. At the very least then this Court

should remand the case to the district court for an evidentiary hearing on the extent of Meza's connections to the United States.

### 4.3 *Portillo-Munoz* incorrectly found that the "the people" only includes citizens.

This is not the first time a court has grappled with whether the Second Amendment extends to undocumented aliens. The Fifth Circuit in *Portillo-Munoz* held that the Second Amendment only includes citizens. 643 F.3d at 440. The Fifth Circuit based this decision on the idea that the First, Second, and Fourth Amendments are different in nature and, therefore, may protect different groups of people. *Id.* This view is inconsistent with *Heller*:

> [I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.'

554 U.S. at 592 (emphasis in original). And in dissent, Judge Dennis made the point well: "The majority's characterization of the Second Amendment as an affirmative right is contradicted by *Heller*." *Portillo-Munoz,* 643 F.3d at 444 (Dennis, J., dissenting).

Further, contrary to Supreme Court precedent, the Fifth Circuit reasoned that even if the Amendments protect the same people, *Heller* held that the Second Amendment only encompasses citizens. *Portillo-Munoz*, 643 F.3d at 440. The Fifth

Circuit's decision imputes the "citizens" dicta of *Heller* broadly to essentially reverse the foundational reading of "the people" and even *Verdugo-Urquidez*, which the Supreme Court has never done. *Portillo-Munoz*, 643 F.3d at 448 (Dennis, J. dissenting). In *Verdugo-Urquidez* the Supreme Court warned against just this kind of prooftexting of its opinions, stating that its job is often "to decide particular legal issues while assuming without deciding the validity of antecedent propositions … and such assumptions … are not binding in future cases that directly raise the questions." 494 U.S. at 272 (citations omitted). In fact, this Court has cautioned against the expansive reading of *Heller* taken by *Portillo-Munoz*. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (*en banc*). In *Skoien*, the government, relying on *Heller*, argued that the Second Amendment does not protect domestic violence misdemeanants because they are neither law abiding, nor responsible citizens. *Skoien*, 614 F.3d at 639. This Court rejected that argument, reasoning that the "law abiding citizen" language in *Heller* is just "precautionary language." *Skoien*, 614 F.3d at 640. *Skoien* indicated that a narrow reading of *Heller* is appropriate, and that the opinion "warns readers not to treat *Heller* as containing broader holdings than the [Supreme] Court set out to establish: that the Second Amendment creates individual rights." *Skoien*, 614 F.3d at 640. Therefore, *Heller* merely stands for the proposition

that the Second Amendment protects individual rights, and *Portillo-Munoz*'s reliance on the dicta explaining this disposition is unpersuasive.

In recounting the history of the Second Amendment, the *Heller* Court used a variety of amorphous terms to describe "the people," such as "citizens" and "members of the political community." The *Portillo-Munoz* court interpreted the reference to "citizens" to limit "the people" to only citizens. *See Portillo-Munoz*, 643 F.3d at 440. Yet, *Heller*'s use of the word "citizens" was not intended to refer literally to citizens of the United States. *See Fletcher,* 851 F. Supp. 2d at 297-98. And, of course, *Heller* did not amend the Bill of Rights—the Framers used the term "the people." In fact, only once has the Supreme Court addressed whether the terms have the same meaning, and in that case it noted: "The words 'people of the United States' and 'citizens' are synonymous terms, and mean the same thing." *Dred Scott v. Sandford*, 60 U.S. 393, 404 (1856); *see also id* at 410 ("But there are two clauses in the Constitution which point directly and specifically to the negro race as a separate class of persons, and show clearly that they were not regarded as a portion of the people or citizens of the Government then formed."). The Fourteenth Amendment thankfully wiped out that holding.

**4.4    Section 922(g)(5)(A) is unconstitutional because the Government has not and cannot satisfy strict scrutiny.**

The Second Amendment protects Meza because "the people" encompasses undocumented immigrants or because he has substantial connections to this country. A complete prohibition on Meza's Second Amendment rights, such as § 922(g)(5)(A), must satisfy some form of heightened scrutiny.

This court has left open what level of scrutiny should apply in Second Amendment cases. *See Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011). And it has noted that "the rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Id.*   The scrutiny question remains unanswered throughout the country. Circuits have applied different levels of scrutiny to laws that restrict Second Amendment rights. Some courts have applied intermediate scrutiny. *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010). Other courts have applied a heightened level of scrutiny that falls somewhere between intermediate and strict. *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 93 (2d Cir. 2012). Even more nuanced, some courts have applied intermediate scrutiny to laws applying outside the home and strict scrutiny to laws affecting the right to self-defense within the home. *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011).

Another circuit found strict scrutiny to be broadly applicable to Second Amendment cases. *Tyler v. Hillsdale Cnty. Sheriff's Dept*, No. 13-1876, 2014 WL 7181334, at *15 (6th Cir. Dec. 18, 2014). Because both *Tyler* and Meza's cases involve the infringement of fundamental Second Amendment rights, and in particular because of the broad application of the prohibition, this Court should follow the Sixth Circuit and apply strict scrutiny. Although courts do not always apply strict scrutiny when a fundamental right is involved, the Supreme Court has indicated that there should be a presumption in favor of strict scrutiny when the government infringes on such a right. *See Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (strict scrutiny applies to laws restricting a "fundamental" liberty). Therefore, a presumption that strict scrutiny applies in reviewing laws that wholly deny individuals Second Amendment rights.

Additionally, the Second Amendment scrutiny analysis is derived from the First Amendment scrutiny framework. *See Ezell*, 651 F.3d at 706-07 (noting "we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context"). The First Amendment scrutiny analysis gives a strong preference towards strict scrutiny, including when reviewing an infringement on political speech, freedom of association, or a content-based regulation. *See Citizens United v. FEC,* 558 U.S. 310, 340 (2010) (political speech); *Boy Scouts of Am. v. Dale,* 530

U.S. 640, 648 (2000) (freedom of association); *United States v. Playboy Entmt Grp., Inc.,* 529 U.S. 803, 813 (2000) (content-based speech). Since the First and Second Amendments protect rights of the same class of "people," it is reasonable to apply a similar form of scrutiny to laws restricting rights under those Amendments.

Similarly, the Second Amendment is an area in which the Supreme Court has "strongly indicated that intermediate scrutiny should *not* be employed." *Tyler*, 2013 WL 7181334, at *16 (emphasis in original). Many of the courts that apply intermediate scrutiny instead of strict scrutiny rely on *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622 (1994), to develop their Second Amendment scrutiny doctrine. *See, e.g., United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010). However, the majority in *Heller* explicitly rejected the portion of Justice Breyer's dissent in *Heller*, in which he argued for a balancing test based, in part, on *Turner*. *Heller,* 554 U.S. at 634-35. The Supreme Court reasoned, "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.* Intermediate scrutiny is, therefore, not appropriate for a Second Amendment analysis when reviewing a ban completely restricting an entire group of people from exercising a fundamental right.

A categorical ban on the right to possess firearms cannot satisfy strict scrutiny. Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest *and* is narrowly tailored to achieve that interest." *Citizens United*, 558 U.S. at 340 (internal quotations omitted) (emphasis added). A reviewing court looks to the government's objective in passing the law and the means the government used to achieve this objective. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). If the government's stated "interests could be achieved by narrower ordinances that burde[n] [the right] to a far lesser degree," then the law fails as it is the government's burden to show that the less burdensome alternatives are not feasible. *Id.*; *see also Entmt Software Assn v. Blagojevich*, 469 F.3d 641, 651 (7th Cir. 2006).

When it comes to the ban in § 922(g)(5)(A), the law fails to distinguish amongst undocumented immigrants, and treats all undocumented immigrants the same – just by virtue of their status. But undocumented aliens are not all the same; they also possess inherent differences that this statute fails to reflect. "Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime." *Arizona v. United States*, 132 S.Ct. 2492, 2499 (2012). Yet, this statute does not consider these differences, especially when tied to the alleged governmental objectives. Instead, this statute

categorizes all undocumented aliens uniformly, and Congress provided no record as to why.

Concerning a governmental interest, there is nothing in the legislative history that provides the Government with a legitimate, or frankly any, justification for distinguishing between documented and undocumented aliens. Congress passed a variation of § 922(g)(5)(A) as an amendment to Title VII of The Omnibus Crime Control and Safe Streets Act of 1968. It was not introduced with empirical data, or any data, establishing a connection between undocumented aliens and danger to society or firearms usage. Rather, the section came as a last-minute floor amendment proposed by Senator Russell Long (D-LA). In *United States v. Bass*, 404 U.S. 336, 344 (1971), the Supreme Court described Title VII as, "hastily passed, with little discussion, no hearings, and no report." Senator Long concluded what little explanation he provided with the command: "Several Senators: Vote! Vote!" David T. Hardy, *The Firearms Owners' Protection Act: A Historical and Legal Perspective*, 17 Cumb. L. Rev. 585, 600-601 n.79 (1986/1987) (citing 114 Cong. Rec. 14775). The bill's expedited passage is reflected in the fact that, "[t]he amendment received only passing mention in the House discussion of the bill, 114 Cong. Rec. 16286, 16298, and never received committee consideration or study in the House either." *Bass*, 404 U.S. at 344 n.11. Eventually, the ban found in Title VII was amended in 1986 with the

passage of the Firearms Owners' Protection Act, and all prohibited persons were consolidated into a single provision—§ 922(g). The legislative history of § 922(g)(5)(A) reflects that the government did not pass the law with any announced objective, and consideration was certainly not given to whether it was narrowly tailored. Additionally, to the extent that violence prevention is the objective, the Government has not, and cannot, show that undocumented aliens are, as a class, more violent than the population at large.

When Congress enacted § 922(g)(5)(A), it provided no statistics to show that undocumented aliens are more violent than documented aliens or the public at large. In part because of the absence of an adequate legislative record, Meza is unable to provide statistics speaking to crimes committed by undocumented immigrants when Congress passed the law in 1968. However, current statistics indicate that undocumented aliens do not commit violent crimes at a higher rate than documented aliens or the broad public, and there is no reason to believe that this would not have been true in the 1960's as well.

### 4.5 Even if this Court were to apply heightened scrutiny, § 922(g)(5)(A) is still unconstitutional.

While the Supreme Court has not provided a definitive standard to apply to Second Amendment challenges, this law is unconstitutional under any form of heightened scrutiny. This Court has noted that when the Supreme Court reviews

Second Amendment claims, "'any standard of scrutiny' means any *heightened* standard of scrutiny" *Ezell*, 651 F.3d at 701 (emphasis in original). If not applying strict scrutiny, then a heightened form of scrutiny—something akin to intermediate scrutiny—must be applied. In *Skoien*, this Court applied intermediate scrutiny, and noted that "[t]he United States concedes that some form of strong showing is essential, and that § 922(g)(9) is valid only if substantially related to an important governmental objective." 614 F.3d at 641 (*en banc*). This Court later said in *Ezell, "*a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end." 651 F.3d at 708.

In a challenge such as this, the analysis starts with the nature of the ban: what the government's objective in creating that ban is. *Williams*, 616 F.3d at 693. As in examining the other bans contained in § 922(g), courts must critically look and ask what is Congress' objective in prohibiting a particular class of person from possessing a gun. Then the court must ask, "why is Congress infringing that person's Second Amendment right?" If the reason for the specific ban is not an important governmental objective, then the ban cannot be constitutional; if the ban is not substantially related to an important governmental interest, then the ban cannot be constitutional.

In *Skoien* and *Williams*, this Court held the bans passed scrutiny because there was something inherently dangerous about felons and domestic violence offenders. While not every felon is violent or dangerous, as a general class, society was and is safer by keeping guns out of those persons' hands. *Williams*, 616 F.3d at 693; *Skoien*, 614 F.3d at 642 (*en banc*) ("[F]or no one doubts that the goal of § 922(g)(9), preventing armed mayhem, is an important governmental objective.") In that way, Congress sought to address a very real harm—armed mayhem—by placing a categorical ban on a class of persons that, in general, have posed a very real danger to society. The same cannot be said about undocumented immigrants or the ban in § 922(g)(5)(A).

Undocumented immigrants as a general class, just as the United States population as a whole, are not inherently violent. In fact, the empirical data shows the opposite.

- A 2010 study analyzed the relationship between immigration patterns in large cities and homicide and robbery rates in each city between 1990 and 2000. "[C]ities with the largest increases in immigration between 1990 and 2000 experienced the largest decreases in homicide and robbery during the same time period."[2]

---

[2] Tim Wadsworth, *Is Immigration Responsible for the Crime Drop? An Assessment of the Influence of Immigration on Changes in Violent Crime Between 1990 and 2000*, Soc. Sci. Q., June 2010, at 534.

- Even as the undocumented population doubled to 12 million from 1994 to 2007, the violent crime rate in the United States has declined 34.2 percent, and the property crime rate has fallen 26.4 percent.[3]

- Among men age 18-39, who comprise the vast majority of the prison population, the 3.5 percent incarceration rate of the native-born in 2000 was 5 times higher than the 0.7 percent incarceration rate of foreign-born individuals.[4]

- A study released in 2013 found illegal immigration had a clearly negative impact on crime rates in the United States from 2005–2008.[5]

The reality is that illegal immigrants are part of our society. *See Plyler*, 457 U.S. at 219, n.17. "[W]e are and always will be a nation of immigrants."[6] Immigrants are not any more a cause of armed mayhem than society at large, nor is criminalizing their possession of firearms a significant step towards preventing armed mayhem. *See Skoien*, 614 F.3d at 642 (*en banc*). Without some stated justification that accords with logic and reason, the Government cannot sustain its burden and establish that the

---

[3] Rombaut & Ewing, *The Myth of Immigrant Criminality and the Paradox of Assimilation: Incarceration Rates Among Native and Foreign-born Men* 1, 4 (American Immigration Law Foundation 2007) *available at* http://www.immigrationpolicy.org/sites/default/files/docs/Imm%20Criminality%20(IPC).pdf.

[4] *Id.*

[5] Necaise, Christopher M., *Effects of Illegal Immigration Upon Crime In the United States* (May 2013) (unpublished Honors Thesis 164) at 39 *available at* http://aquila.usm.edu/cgi/viewcontent.cgi?article=1124&context=honors_theses.

[6] President Barack Obama, national address (Nov. 20, 2014) *available at* http://www.whitehouse.gov/the-press-office/2014/11/20/remarks-president-address-nation-immigration.

regulation at issue is substantially related to an important governmental objective. *See Williams*, 616 F.3d at 692. There is nothing in the legislative history of § 922(g)(5)(A) that helps the Government meet that burden.

Nor can it be argued that all of the bans on firearm possession wrapped into § 922(g) have equal validity. Indeed, in *Heller,* the Supreme Court noted that some prohibitions are "presumptively lawful," but that list contains the obvious — felons and the mentally ill. 554 U.S. at 627, n.26. This Court in *Williams* noted the importance of the qualifying adverb "presumptively." "'[P]resumptively lawful' which, by implication, means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge." 616 F.3d at 692.

Applying heightened scrutiny to the present case, § 922(g)(5)(A) does not pass muster. Because the Second Amendment protects Meza, the Government cannot abridge those protections without being substantially related to an important government interest. Here, the Government cannot point to an important governmental interest for banning undocumented immigrants from owning firearms, nor can it establish that "its objective is advanced by means substantially related to that [important governmental interest]." *Williams*, 616 F.3d at 692. Thus, the statute fails to pass constitutional scrutiny under any heightened form.

## 5.0    Conclusion

Despite the length of this brief and the fact that this is a constitutional challenge to a 47 year-old federal statute, the analysis is straightforward. Applying the general rules of statutory construction or the substantial connections test, Meza has Second Amendment rights. Those rights can be abridged but not simply because the Magistrate Judge finds that "illegal aliens, by definition, are neither 'virtuous' (in the historic, civically virtuous sense) nor 'citizens.'" No. There has to be a compelling governmental interest that prohibits some five million people living here peacefully, albeit undocumented, from possessing a firearm or even a single bullet. Without that compelling governmental interest, this statute must be struck down and Meza's conviction reversed. And that is precisely what we ask this Court to do.

Dated at Madison, Wisconsin this 5th day of February, 2015.

Respectfully submitted,

*/s/ Adam Stevenson*
Adam Stevenson, Esq.
Samuel Robins, student
Richard R. Staley, student
Clinical Associate Professor
Director, Oxford Federal
        and Federal Appeals Projects
Frank J. Remington Center
University of Wisconsin Law School
975 Bascom Mall
Madison, WI 53706
(608) 262-9233

**CIRCUIT RULE 30(d) STATEMENT**

Pursuant to CIRCUIT RULE 30(d) (7th Cir.), counsel for Defendant-Appellant

Mariano A. Meza-Rodriguez states that he has bound all of the materials that

CIRCUIT RULES 30(a) and (b) require in the short appendix to this brief.


Dated: <u>February 5, 2015</u>         <u>*/s/ Joseph A. Bugni*            </u>
                                    Joseph A. Bugni
                                    Counsel for Defendant-Appellant
                                    Mariano A. Meza-Rodriguez

**CIRCUIT RULE 31(e) CERTIFICATION**

The undersigned hereby certifies that I have filed electronically, pursuant to

CIRCUIT RULE 31(e), a version of this brief in non-scanned PDF format.


Dated: <u>February 5, 2015</u>      <u>/s/ Joseph A. Bugni</u>
                                      Joseph A. Bugni
                                      Counsel for Defendant-Appellant
                                      Mariano A. Meza-Rodriguez

## CERTIFICATE OF COMPLIANCE

Pursuant to FED. R. APP. P. 32(a)(7), counsel for Defendant-Appellant certifies that this brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) and (C). This brief contains 6,184 words.

Dated: <u>February 5, 2015</u>       <u>*/s/ Joseph A. Bugni*       </u>
                                        Joseph A. Bugni
                                        Counsel for Defendant-Appellant
                                        Mariano A. Meza-Rodriguez

**CERTIFICATE OF SERVICE**

The undersigned counsel for the Defendant-Appellant Mariano A. Meza-Rodriguez, hereby certifies that on February 5, 2015, two copies of the Defendant-Appellant's brief, as well as a digital version of the brief via the Court's CM/ECF system, were delivered by first class mail, postage pre-paid, to AUSA Gail Hoffman, counsel for the government in this action.


Dated: February 5, 2015        */s/ Joseph A. Bugni*
                                               Joseph A. Bugni
                                               Counsel for Defendant-Appellant
                                               Mariano A. Meza-Rodriguez

# APPENDIX

# INDEX TO SHORT APPENDIX

Judgment in a Criminal Case
     Dated October 7, 2014. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 1 - App. 5


Recommendation on Defendant's Motions to Dismiss the Indictment
     and Motion to Suppress Statements
     Dated February 25, 2014. . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 6 - App. 25


Decision and Order
     Dated April 11, 2014. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 26 - App. 27