# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA<br>V.<br><br>**MARIANO ALEJANDRO MEZA-RODRIGUEZ** | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number: **13-Cr-192**<br>USM Number: **12952-089** |

**Julie K. Linnen / Juval O. Scott**
Defendant's Attorney

**Gail J. Hoffman**
Assistant United States Attorney

THE DEFENDANT:

☒ pleaded guilty to count(s) __One (1) of the Indictment__

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☐ was found guilty on count(s) _____
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| **18 U.S.C. §§ 922(g)(5) and 924(a)(2)** | **Possession of Ammunition by an Illegal Alien** | **August 24, 2013** | **1** |

The defendant is sentenced as provided in Pages 2 through __5__ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and the United States attorney of material changes in economic circumstances.

**October 2, 2014**
Date of Imposition of Judgment

_signature_
Signature of Judicial Officer

**Hon. Rudolph T. Randa, U. S. District Judge**
Name & Title of Judicial Officer

**October 7, 2014**
Date

AO 245B  (Rev. 09/11) Judgment in a Criminal Case:
        Sheet 2 - Imprisonment

Defendant:      **Mariano Alejandro Meza-Rodriguez**
Case Number: **13-Cr-192**

## IMPRISONMENT

     The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of : **Time-Served.**

**Defendant shall be given credit for time served as determined/calculated by the United States Bureau of Prisons.**

**The defendant is subject to deportation to Mexico**

☐ The court makes the following recommendations to the Bureau of Prisons:

☒ **The defendant is remanded to the custody of the United States Marshal.**

☐ The defendant shall surrender to the United States Marshal for this district.

    ☐ at _____ ☐ a.m.    ☐ p.m.   on _____

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons,

    ☐ before 12:00 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____     to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/11) Judgment in a Criminal Case:
      Sheet 3 - Supervised Release

---

Defendant: **Mariano Alejandro Meza-Rodriguez**
Case Number: **13-Cr-192**

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of : **NONE.**

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and two drug tests thereafter within one year.

☐   The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☐   The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

☐   The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐   The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐   The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or a restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without permission of the court or probation officer;
2) the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependents and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notification and to confirm the defendant's compliance with such notification requirement.

AO 245B (Rev 09/11) Judgment in a Criminal Case:
    Sheet 5 - Criminal Monetary Penalties

Defendant:          **Mariano Alejandro Meza-Rodriguez**
Case Number:        **13-Cr-192**

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **Totals:** | $100.00 | waived | none |

☐ The determination of restitution is deferred until _____ An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| **Totals:** | $ _____ | $ _____ | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\*Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev 09/11) Judgment in a Criminal Case:
    Sheet 6 - Schedule of Payments

Defendant:    **Mariano Alejandro Meza-Rodriguez**
Case Number:  **13-Cr-192**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

**A** ☐   Lump sum payment of $ _____ due immediately, balance due

       ☐  not later than _____ , or

       ☐  in accordance ☐ C, ☐ D, ☐ E or ☐ F below; or

**B** ☒   Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ **F**  **below**); or

**C** ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprison-ment to a term of supervision; or

**E** ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐   Special instructions regarding the payment of criminal monetary penalties:

      Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several
    Defendant and Co-Defendant Names, Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate:

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

   v.                               Case No. 13-CR-192

MARIANO A. MEZA,

        Defendant.

---

## RECOMMENDATION ON DEFENDANT'S MOTIONS TO DISMISS THE INDICTMENT AND MOTION TO SUPPRESS STATEMENTS

---

### I. BACKGROUND

On October 8, 2013, a federal grand jury sitting in this district returned a single-count indictment against Mariano A. Meza ("Meza"), charging Meza as an illegal alien in possession of ammunition, in violation of 18 U.S.C. § 922(g)(5). Meza was arraigned on November 8, 2013, and he pled not guilty to the above-mentioned charge. The matter is assigned to United States District Judge Rudolph T. Randa for trial and to this court for processing pretrial motions.

On November 25, 2013, this court granted Meza's motion seeking additional time to file pretrial motions. Thereafter, on December 6, 2013, Meza filed three motions: (1) to dismiss the indictment for failure to allege an element of the offense; (2) to dismiss the indictment on constitutional grounds; and (3) to suppress statements. Meza requested an evidentiary hearing with respect to his motion to suppress. On December 18, 2013, Judge Randa granted Meza's motion to adjourn the trial date; a new date has not yet been scheduled. The evidentiary hearing was initially set for December 19, 2013. However, the hearing was rescheduled at the request of Meza, who was set to appear in state court that same day on other charges.

The evidentiary hearing was held on January 7, 2014. At the conclusion of the hearing, the court set a briefing schedule for all three motions. On February 3, 2013, the government filed its consolidated response to all three motions. That same day, Meza filed a post-hearing brief in support of his motion to suppress. On February 10, 2013, the government filed a letter brief in opposition to Meza's motion to suppress. That same day, Meza filed his consolidated reply. Accordingly, the defendant's motions are now fully briefed and ready for resolution. For the reasons that follow, it will be recommended that the district judge deny all three of Meza's motions.

## II. DISCUSSION

Currently pending before this court are three motions: (1) to dismiss the indictment for failure to allege an element of the offense; (2) to dismiss the indictment on constitutional grounds; and (3) to suppress statements. The court will address Meza's motions *ad seriatim*.

## A. MOTION TO DISMISS THE INDICTMENT - ELEMENTS OF THE OFFENSE

Meza seeks an order dismissing the indictment under the Fifth and Sixth Amendments and Rules 7 and 12(a) of the Federal Rules of Criminal Procedure because the indictment fails to sufficiently allege an element of the offense. Specifically, Meza argues that the indictment fails to allege that he possessed the requisite *mens rea* as to the facts establishing his prohibited status. Rather, according to Meza, the indictment merely alleges that he knowingly possessed ammunition.

An "indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). As such, to be legally sufficient, an indictment must satisfy three distinct requirements:

> First, the indictment must state all of the elements of the crime charged; second, it must adequately apprise the defendant of the nature of the charges so that he may prepare a defense; and third, it must allow the defendant to plead the judgment as a bar to any future prosecutions for the same offense.

*United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000). In assessing the sufficiency of an indictment, courts are to review the document in its entirety, giving it a "practical," rather than a "hypertechnical," reading. *Id.*

"In setting forth the offense, it is generally acceptable for the indictment to 'track' the words of the statute itself, so long as those words expressly set forth all the elements necessary to constitute the offense intended to be punished." *Id.* (citing *United States v. Hinkle*, 637 F.2d 1154, 1157 (7th Cir. 1981)). "However, an indictment that tracks the statutory language can nonetheless be considered deficient if it does not provide enough factual particulars to 'sufficiently apprise the defendant of what he must be prepared to meet.'" *Id.* (quoting *Russell v. United States*, 369 U.S. 749, 763 (1962)).

Still, "[f]acial sufficiency is not a high hurdle. Indictments need not exhaustively describe the facts surrounding a crime's commission nor provide lengthy explanations of the elements of the offense." *United States v. Bates*, 96 F.3d 964, 970 (7th Cir. 1996). Rather, "[t]he defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved." *United States v. Kendall*, 665 F.2d 126, 135 (7th Cir. 1981)).

The indictment here alleges that, "[o]n or about August 24, 2013," Meza, "being an alien illegally and unlawfully in the United States, knowingly possessed ammunition which, prior to his possession of it, had been transported in interstate commerce." (Indictment 1.) The indictment further states that the ammunition consisted of "one .22 caliber cartridge containing the markings 'C' on the head-stamp." (*Id.*) Thereafter, the indictment indicates that Meza's conduct was in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2).

Title 18 U.S.C. § 922(g)(5) provides that "[i]t shall be unlawful for any person . . . who, being an alien[,] . . . is illegally or unlawfully in the United States." The mental state and penalty associated with a violation of this statute is found in 18 U.S.C. § 924(a)(2), which states that "[w]hoever

*knowingly* violates subsection . . . (g) . . . of section 922 [18 USCS § 922] shall be fined as provided in this title, imprisoned not more than 10 years, or both." (second alteration in original) (emphasis added).

Having reviewed the indictment, the court finds that it meets the threshold requirements of legal sufficiency. For one, the indictment generally "tracks" the language found in § 922(g)(5). Moreover, the indictment contains the elements of the offense charged, fairly informs the defendant of the nature of the charges against which he must defend, and enables him to plead the judgment as a bar to any future prosecution for the same offense. Nothing more is required.

With respect to the mental state associated with violations of § 922(g), the Seventh Circuit has held that "there is no reason to think Congress intended 'knowingly' to mean different things for different subsections of § 922(g)." *United States v. Stein*, 712 F.3d 1038, 1041 (7th Cir. 2013). Thus, the government need not prove—nor allege in the indictment—that Meza had knowledge of his prohibited status. *See United States v. Wilson*, 159 F.3d 280, 288-89 (7th Cir. 1998) (§ 922(g)(8) - subject to protective order); *see also Stein*, 712 F.3d at 1041 (§ 922(g)(9) - misdemeanor crime of domestic violence); *United States v. Ballentine*, 4 F.3d 504, 506 (7th Cir. 1993) (§ 922(g)(2) - fugitives). Rather, to establish a "knowing" violation of § 922(g)(5), the government merely needs to prove "knowledge by the defendant of the *facts* that constitute the offense." *Wilson*, 159 F.3d at 289 (emphasis added) (citing *Bryan v. United States*, 524 U.S. 184, 193 (1998)).

The *Bryan* rule "has been applied without exception by . . . other circuits when interpreting § 924(a)(2)'s application to subsection (g) firearm possession crimes." *United States v. Mitchell*, 209 F.3d 319, 322 (4th Cir. 2000) (§ 922(g)(9) - misdemeanor crime of domestic violence); *see also United States v. Games-Perez*, 667 F.3d 1136, 1140-42 (10th Cir. 2012) (§ 922(g)(1) - felons); *United States v. Butler*, 637 F.3d 519, 524-25 (5th Cir. 2011) (§ 922(g)(6) - dishonorable dischargees);

*United States v. Mirza*, 454 F. App'x 249, 259-60 (5th Cir. 2011) (unpublished) (§ 922(g)(5) - illegal aliens); *United States v. Hutzell*, 217 F.3d 966, 967-69 (8th Cir. 2000) (§ 922(g)(9) - misdemeanor crime of domestic violence); *United States v. Montero-Camargo*, 177 F.3d 1113, 1120 (9th Cir. 1999) (§ 922(g)(5) - illegal aliens); *United States v. Langley*, 62 F.3d 602, 605-06 (4th Cir. 1995) (§ 922(g)(1) - felons); *United States v. Dancy*, 861 F.2d 77, 80-82 (5th Cir. 1988) (§ 922(g)(1) - felons).

Consequently, although the government must prove at trial that Meza possessed the requisite *mens rea* as to the facts establishing his prohibited status, at this stage it is sufficient for the government to allege that Meza, purportedly an illegal alien, knowingly possessed ammunition that had been transported in interstate commerce. The indictment undoubtedly apprised Meza of the offense with which he is charged. It need not contain a lengthy explanation of the elements nor the details of how the government will prove its case.

Because the indictment is facially sufficient, the court will recommend that the district judge deny Meza's motion to dismiss the indictment for failure to allege an element of the offense.

## B. MOTION TO DISMISS THE INDICTMENT - CONSTITUTIONAL CHALLENGE

Meza also seeks an order dismissing the single-count indictment on constitutional grounds, mounting both a facial and an as-applied constitutional challenge to the statute at issue here, 18 U.S.C. § 922(g)(5).

### 1. Facial Challenge

Meza argues that "the complete ban in § 922(g)(5) on all illegal aliens possessing firearms is overbroad and thus violates the Second Amendment." (Mot. to Dismiss Indictment as Unconstitutional 1.) In support of his argument, Meza maintains that "the people" referenced in the Second Amendment are the same "people" referenced in the First and Fourth Amendments. Thus,

according to Meza, illegal aliens may claim the guarantees of the Second Amendment as long as they have "substantial connections" with the United States. Meza asserts that he has substantial connections with this country because he is a long-time resident of Milwaukee, he attended school in Milwaukee, his two daughters and mother live here, and he has lived here for all of his adult life. Finally, Meza contends that the Supreme Court's language in *Heller*[1] does not alter the analysis regarding to whom the Second Amendment applies.

The Second Amendment reads simply: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." However, the meaning attached to these words has proven anything but simple. In *Heller*, the Supreme Court clarified that firearm possession is an individual constitutional right. 554 U.S. at 592-95. In reaching this holding, the Court in *Heller* determined that "the people"—as that term is used in the Constitution—"unambiguously refers to all members of the political community, not an unspecified subset." *Id.* at 580. Thus, there is "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.*

The Court in *Heller* made clear that it did not "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Id.* at 626. Moreover, the Court noted that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* However, the Court did not discuss the constitutionality of the various other categories of prohibitions contained in § 922, and in particular, the Court did not address the prohibition at issue here—that is, § 922(g)(5)'s ban on illegal aliens possessing firearms.

Although the Seventh Circuit has yet to consider § 922(g)(5)'s ban in light of the Supreme Court's holding in *Heller*, the court has determined that some categorical bans on firearm possession

---

[1] *District of Columbia v. Heller*, 554 U.S. 570 (2008).

are constitutional. *See United States v. Skoien*, 614 F.3d 638, 640-41 (7th Cir. 2010) (en banc) Consequently, to date, the Seventh Circuit has upheld laws prohibiting firearm possession by persons convicted of misdemeanor crimes of domestic violence under § 922(g)(9), *Skoien*, 614 F.3d 638; felons under § 922(g)(1), *United States v. Williams*, 616 F.3d 685 (7th Cir. 2010); and unlawful users of controlled substances under § 922(g)(3), *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) (per curiam).

Furthermore, the other circuits that have analyzed § 922(g)(5) post-*Heller* all have concluded that the statute is constitutional with respect to the Second Amendment. *See, e.g.*, *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011) (holding that "the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States"); *see also United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) (holding that "illegal aliens do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection"); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1170 (10th Cir. 2012) (holding that § 922(g)(5) withstood the defendant's Second Amendment challenge); *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) (per curiam) (agreeing with the Fifth Circuit's analysis in *Portillo-Munoz* that "the protections of the Second Amendment do not extend to aliens illegally present in this country").

The court finds the analyses of the other circuit courts to be persuasive. In particular, the defendant in *Portillo-Munoz*, like Meza here, relied on the Supreme Court's pre-*Heller* decision in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), to argue that illegal aliens are included within the definition of "the people"—as that term is used in the First, Second, and Fourth

7

Amendments—if they have a substantial connection with the United States.[2]  The Fifth Circuit rejected this argument, holding that the Supreme Court never found that these protections extend to "a native and citizen of another nation who entered and remained in the United States illegally." *Portillo-Munoz*, 643 F.3d at 440.  The *Portillo-Munoz* court further reasoned that "[t]he courts have made clear that the Constitution does not prohibit Congress from making laws that distinguish between citizens and aliens and between lawful and illegal aliens." *Id.* at 442.

Moreover, there is no reason to believe that the Seventh Circuit would treat § 922(g)(5)'s prohibition on the possession of firearms by illegal aliens any differently than it has other categories of prohibitions in § 922(g).  In addressing the categorical ban on the possession of firearms by felons, the Seventh Circuit in *Yancey* acknowledged that "most felons are nonviolent."  621 F.3d at 685. Nevertheless, the court held that such a prohibition is not unconstitutionally overbroad, reasoning that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *Id.* But illegal aliens, by definition, are neither "virtuous" (in the historic, civically virtuous sense) nor "citizens."  Likewise, in exercising "its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Portillo-Munoz*, 643 F.3d at 441 (quoting *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976) (internal quotation marks omitted)).

Accordingly, for all the foregoing reasons, the court finds that the protections of the Second Amendment do not extend to aliens illegally present in the United States such as Meza and, thus, Meza's facial challenge to § 922(g)(5) must fail.

---

[2] In *Verdugo-Urquidez*, the Supreme Court held that its analysis of the Constitution "suggests that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."  494 U.S. at 265.

8

*2.  As-applied Challenge*

Meza also argues that the ban in § 922(g)(5) violates his Second Amendment rights.  For one, Meza asserts that some form of heightened scrutiny must be utilized to address his as-applied challenge, although he acknowledges that the exact level of scrutiny is unclear based on Seventh Circuit precedent.  Nevertheless, Meza maintains that the ban in § 922(g)(5) fails under any form of heightened scrutiny because illegal aliens—unlike felons, individuals convicted of domestic abuse, and habitual drug users—are not inherently dangerous.

In analyzing Meza's as-applied constitutional challenge, the court first must determine what level of scrutiny to apply.  The Court in *Heller*, while not adopting a particular standard, clearly ruled out the rational-basis test.  *See Heller*, 554 U.S. at 628, n.27.  The Seventh Circuit, sitting en banc, side-stepped this "'levels of scrutiny' quagmire"; however, in that case, the government conceded that "some form of strong showing ('intermediate scrutiny,' many opinions say) [was] essential, and that [the prohibition was] valid only if substantially related to an important governmental objective." *Skoien*, 614 F.3d at 641.  Several months later, the Seventh Circuit used "the intermediate scrutiny framework" to analyze an as-applied challenge to § 922(g)(1), but the court noted that "the precise test applicable to all challenges to gun restrictions" was still undetermined. *Williams*, 616 F.3d at 692. In *Yancey*, the court applied the same analytical framework utilized in *Skoien* and *Williams* and again "reserve[d] the question whether a different kind of firearm regulation might require a different approach." 621 F.3d at 683.  Accordingly, for the purposes of Meza's challenge to § 922(g)(5) as it applies to him, the court will use the intermediate scrutiny framework.

"To pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." *Williams*, 616 F.3d at 692.  Moreover, in an as-applied

constitutional challenge to a statute, the court examines only the facts of the present case and not "any set of hypothetical facts under which the statute might be unconstitutional." *United States v. Phillips*, 645 F.3d 859, 863 (7th Cir. 2011).

In *Yancey*, the Seventh Circuit stated that "Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people." 621 F.3d at 683. Thus, "[t]he broad objective of § 922(g)—suppressing armed violence—is without a doubt an important one." *Id.* at 684. This finding surely encompasses illegal aliens who "are likely to maintain no permanent address in this country, elude detection through an assumed identity, and – already living outside the law – resort to illegal activities to maintain a livelihood." *Portillo-Munoz*, 643 F.3d at 441 (quoting *United States v. Toner*, 728 F.2d 115, 128-29 (2d Cir. 1984) (internal quotation marks omitted)). As such, § 922(g)(5)—like §§ 922(g)(1), (3), and (9)—seeks to prevent firearm possession by people who, because they have already engaged in illegal behavior, are presumptively risky people. (*See* Govt.'s Resp. 9.) Accordingly, the court finds that the government has satisfied its burden of demonstrating an important governmental objective.

The court next must determine whether § 922(g)(5) is substantially related to this objective in Meza's case. The government attempts to show a substantial relationship between the statute and its objective of preventing illegal aliens' access to guns by pointing to Meza's criminal history. The government's evidence passes constitutional muster.

A review of this history reveals a conviction for resisting or obstructing an officer in 2008 and pending charges—some of which appear related to the case before this court—of two counts of resisting or obstructing an officer and two counts of disorderly conduct. (*See* ECF #6.)[3] Furthermore,

---

[3] Meza's criminal history also includes several arrests for offenses ranging from criminal damage to property to theft to robbery with use of force, although no dispositions are reported. (*See* ECF #6.)

the belief that illegal aliens typically elude detection through an assumed identity applies to Meza as well, as during his arrest Meza provided varied answers regarding his place of birth, and the social security number he provided did not correspond to him. (Tr. 34-35.)

Considering the facts of the present case, including Meza's criminal history and evasive conduct, Meza's claim that § 922(g)(5) unconstitutionally infringes on his right to possess a firearm is without merit and, accordingly, his as-applied challenge must fail. Thus, because § 922(g)(5) is facially constitutional and constitutional as-applied to Meza, the court will recommend that the district judge deny Meza's motion to dismiss the indictment on constitutional grounds.

## C. MOTION TO SUPPRESS STATEMENTS

Finally, Meza seeks an order suppressing the statements that he made to a law enforcement officer on August 27, 2013. The court held an evidentiary hearing with respect to Meza's motion to suppress on January 7, 2014. Accordingly, the court will begin by reviewing the circumstances surrounding Meza's interview, as testified to during that hearing.

### 1. Facts

At the evidentiary hearing, the court heard testimony from two law enforcement officers, Cassandra Shearing ("Officer Shearing" or "Shearing"), an officer with the Immigration and Customs Enforcement ("Immigration"), and Russell Dykema ("Agent Dykema" or "Dykema"), a special agent with the United States Department of Homeland Security. As part of her role, Officer Shearing is charged with enforcing the customs and immigration laws of the United States. (Tr. 10.)

According to Agent Dykema, on or about August 25, 2013, he received information from a City of Milwaukee police officer that Meza had been arrested the previous night and that he was believed to be in the country illegally. (Tr. 32-33.) Meza was being held in state custody at the Milwaukee County Jail. (Tr. 33.) Agent Dykema contacted Officer Shearing, the deportation officer

who handles the Milwaukee County Jail, and told her that he received a tip that Meza might be present in the United States illegally. (Tr. 5, 33.) Consequently, Dykema requested that Shearing "interview [Meza] administratively to see if he was legally or illegally present in the United States and to take action appropriate at that time depending on what her interview determined." (Tr. 5.)

Officer Shearing conducted the interview at the Milwaukee County Jail on August 27, 2013. (Tr. 5-7.) The interview took place in a small square room, approximately 7x7 feet, on the third floor of the jail. (Tr. 13.) The door remained closed and locked during the interview, and only Officer Shearing and Meza were present. (Tr. 15-16, 23.) Officer Shearing wore normal street clothes; however, she had her badge and empty gun holster on her belt. (Tr. 7, 16-17.)

At the beginning of the interview, Shearing identified herself as an officer with Immigration and informed Meza that she had a few questions for him. (Tr. 7.) At that time, Meza did not ask any questions relating to the purpose of the interview or otherwise. Thereafter, Officer Shearing asked Meza "his full and correct name . . . ; date of birth; . . . if he had a social security number; where he was born; if he went to high school here; and whether he completed his high school; if he was working; what his current address was; if he had children; and if he was married." (Tr. 7.) Shearing and Meza then talked about his father and mother, and she also asked about his health and whether he had any gang affiliation. (Tr. 8.) Shearing did not ask Meza any questions regarding the reason for his incarceration.

At the end of the interview, Meza asked about the purpose of the interview and what was going to happen to him. Officer Shearing repeated that the interview was for immigration purposes and that she did not know what would happen to him at that point as she needed to conduct additional

research.  (Tr. 8, 22.)  The interview lasted approximately 20 minutes, and it was not recorded.  (Tr. 8-9.)  Meza was never advised of his *Miranda*[4] rights.  (Tr. 6.)

Following the interview, Officer Shearing ran Meza's name and the date of birth he gave her through a series of system checks.  (Tr. 21.)  That same day, Shearing called Agent Dykema and told him that she conducted the interview, and at that point she believed that Meza was in the United States illegally, and she was placing a detainer on him.

Officer Shearing did not review any police reports prior to conducting the interview, and she did not know the nature of Meza's arrest.  (Tr. 22.)  On September 20, 2013, Agent Dykema informed Shearing that Meza would be prosecuted in federal court.  (Tr. 9.)

Although Officer Shearing testified that the purpose of the interview was to determine if Meza was in the United States illegally, she also stated that she was "not just there to go against him."  (Tr. 18.)  For instance, she testified that the interview also was used to determine if Meza was eligible for any applications or status grants.  Notwithstanding this "two-fold process," Shearing stated that she knew entry without inspection and illegal re-entry were both crimes and that she can refer cases for criminal prosecution if she believes there is enough substance.  (Tr. 18, 29.)  Shearing did testify, however, that her office has a policy of not referring entry without inspection cases for prosecution, although her testimony was unclear as to whether that policy was written or whether she had ever seen it.  (Tr. 24, 28-29.)

Shearing explained that the process used to investigate illegal re-entry cases is different and, therefore, she advises suspects of their *Miranda* rights at the beginning of that type of interview.  (Tr. 25-28.)  Of the interviews she has conducted regarding entry without inspection, none were referred

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

by her for prosecution. (Tr. 25.) If, however, during the course of an interview she discovers that there was an illegal re-entry, the interview would stop and she would proceed "down the criminal path[,] which is different than the administrative [path]." (Tr. 26.) Nevertheless, Officer Shearing acknowledged that there is "no foolproof way" to ensure that an un-*Mirandized* interview does not result in an illegal re-entry confession, although prior to interviewing Meza, Officer Shearing did determine that he had no previous contacts with Immigration and no active applications in its systems. (Tr. 27.)

    *2. Analysis*

According to the well-established rules of *Miranda*, 384 U.S. at 444-45, law enforcement authorities must advise an individual of certain rights prior to a custodial interrogation. Statements obtained without these warnings, or without a waiver of these rights, cannot be used against a defendant in the government's case-in-chief. *Id.* at 479.

Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. Thus, to trigger the *Miranda* warnings, an individual must be both in "custody" and subject to "interrogation." *United States v. Yusuff*, 96 F.3d 982, 987 (7th Cir. 1996). Courts evaluate a person's custody status using the reasonable person standard. That is, considering the circumstances surrounding the investigation, would a reasonable person have felt free to put a stop to the interrogation and leave? *See Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004). Interrogation includes express questioning and "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 309, n.5 (1980).

This interrogation analysis incorporates the perspectives of both the interviewer and the individual subject to the interview. *See Smiley v. Thurmer*, 542 F.3d 574, 582 (7th Cir. 2008).

Here, Officer Shearing admitted that she questioned Meza without providing *Miranda* warnings. Moreover, the parties do not dispute that Meza was in "custody" at the time of the interview. Accordingly, the only issue that remains is whether the questioning by Shearing amounted to an "interrogation."

While the government asserts that Officer Shearing's questioning was purely administrative in nature, Meza argues that the questions she posed were reasonably likely to elicit an incriminating response as they directly related to criminal conduct. As an immigration officer, Shearing is charged with enforcing United States immigration statutes, including those with criminal consequences. As such, she has the ability to refer cases to the United States Attorney's Office for prosecution. Consequently, Meza contends that Officer Shearing should have known that any questions relating to his immigration status would be reasonably likely to elicit an incriminating response because her questions addressed all of the elements of at least two criminal offenses—improper entry in violation of 18 U.S.C. § 1325 and illegal re-entry in violation of 18 U.S.C. § 1326. In addition, Meza points out that Shearing initiated the interview based on a tip that he was present in the United States illegally; Agent Dykema specifically requested that Shearing interview Meza in order to confirm this suspicion.

In arguing that Officer Shearing's questioning amounted to an interrogation, Meza relies in part on a case from the Ninth Circuit, *United States v. Mata-Abundiz*, 717 F.2d 1277 (9th Cir. 1983). The defendant in *Mata-Abundiz* was arrested on state charges of carrying a concealed weapon and possession of a firearm by an alien. 717 F.2d at 1278. Ten days later, the defendant was interviewed at the county jail by an experienced criminal investigator from the Immigration and Naturalization

App. 204

Service ("INS"). Although the agent was aware of the state firearms charges, he characterized the interview as a routine, civil investigation; thus, no *Miranda* warnings were provided. During the interview, the defendant admitted that he was a citizen of Mexico. Accordingly, the agent looked further into the defendant's immigration status, and he returned three hours later with a warrant for the defendant's arrest. During a second, *Mirandized* interview, the agent questioned the defendant about the state firearms charges. Several days later, the defendant was charged with federal charges of possession of a firearm by an illegal alien. At trial, the defendant's first (i.e., unwarned) statement regarding his alien status was admitted over his objection. The defendant was convicted and sentenced.

On appeal, the Ninth Circuit reversed the defendant's conviction, holding that "in-custody questioning by INS investigators must be preceded by *Miranda* warnings, if the questioning is reasonably likely to elicit an incriminating response." *Id.* at 1280. Consequently, the court determined that the agent's question regarding the defendant's citizenship "was very likely to produce an incriminating response"; thus, the agent "had a duty to warn [the defendant] before questioning him about his citizenship." *Id.* In reaching this decision, the court reasoned that the agent "had reason to know that any admission of alienage by [the defendant] would be highly incriminating" because the agent was an experienced INS criminal investigator and he knew that the defendant was in custody on state firearms charges. *Id.* at 1279. Thus, "[t]he 'background questions' asked related directly to an element of a crime that [the agent] had reason to suspect." *Id.* at 1280.

Furthermore, the court stated that the agent's "actions immediately after the unwarned statement strengthen[ed] the inference that [the agent] already contemplated criminal prosecution at the time of the first interview," as the agent returned merely three hours later with an arrest warrant and thereafter launched a "full-fledged" criminal investigation. *Id.* at 1279. Overall, the court held

that an agent "cannot control the constitutional question by placing a 'civil' label on the investigation." *Id.* at 1280. However, the court also noted that "[t]his does not mean that admissions obtained in civil investigations of in-custody suspects can never be used in criminal prosecutions, unless the investigator first gives warnings." *Id.* at 1279. Rather, "[i]f an INS investigator has no reason to suspect that the question asked is likely to elicit an incriminating response, there is no interrogation and, therefore, no *Miranda* violation." *Id.*

The court finds that Meza's reliance on *Mata-Abundiz* is misplaced because the facts of that case are easily distinguishable from the facts present here. For one, at the time of the interview, Meza was in state custody on charges having nothing to do with his immigration status. In any case, and perhaps most importantly, Officer Shearing testified that she did not know the nature of Meza's arrest prior to conducting the interview. (Tr. 22.) She did not read any of the police reports that were prepared regarding his arrest, and she did not ask any questions relating to the reason for his incarceration; thus, she did not know that Meza was found to be in possession of ammunition. (Tr. 8, 22.) Accordingly, Shearing had no reason to believe that Meza's answers would be incriminating. *See United States v. Salgado*, 292 F.3d 1169, 1172 (9th Cir. 2002) (distinguishing *Mata-Abundiz* and holding that "*[i]f* [the defendant] had been interviewed in connection with a 'prosecution for violating the immigration laws,' or *if* [the defendant] had been in custody on charges relating to his immigration status, *then* questions about his birthplace and citizenship might have been reasonably likely to elicit an incriminating response in which case he should have been *Mirandized* before-hand. . . . But that is not this case."); *see also United States v. Lugo*, 289 F. Supp. 2d 790, 798 (S.D. Tex. 2003) (distinguishing *Mata-Abundiz* because the defendant there was being held on immigration-related offenses); *United States v. Lopez-Garcia*, 565 F.3d 1306, 1316-17 (11th Cir. 2009) (finding no interrogation where a law enforcement officer questioned a defendant in custody for a drug-related

offense about his immigration status, even though the officer was aware prior to the interview that the defendant was not born in the United States).

To be sure, the cases cited by the government—*Salgado*, *Lugo*, and *Lopez-Garcia*—are not directly on point as the case presently before this court involves certain factual details that are not present in all of those cases. More precisely, going into the interview, Officer Shearing knew that Meza was suspected of being in the United States illegally. (Tr. 5.) In fact, Agent Dykema specifically requested that Shearing interview Meza in order to confirm, or refute, this suspicion. (Tr. 5, 33.) Likewise, Shearing knew that entry without inspection and illegal re-entry were both crimes, and at least a few of her questions related to the elements of those offenses. (Tr. 18, 29-30.) Moreover, Shearing is able to refer matters for criminal prosecution. (Tr. 18, 29.) Indeed, the information she obtained during her interview of Meza did lead to a prosecution (i.e, the present case).

Although it may be a close call, the court still believes that Officer Shearing had no reason to know that her questions would elicit an incriminating response, notwithstanding these additional facts. In contrast to the situation in *Mata-Abundiz*, Shearing's actions following the interview actually strengthen the inference that she *never* contemplated criminal prosecution. After the interview, Shearing ran Meza's name and the date of birth he gave her through all of her system checks. (Tr. 21.) Believing that Meza was present in the country illegally, she ordered that a detainer be placed on him. She provided this information to Agent Dykema, and it was not until nearly a month later that Shearing learned Meza would be prosecuted in federal court. (Tr. 9, 21.) Notably, although Officer Shearing believed that Meza was present in the United States illegally, she did not refer that crime for prosecution. Indeed, Shearing testified that her office has a policy of not referring entry without inspection cases for prosecution, and she has never done so. (Tr. 24-25.) Similarly, prior to the interview, Shearing determined that Meza had no previous contacts with Immigration and no

18

active applications in its systems. (Tr. 27.)

Furthermore, Officer Shearing had no reason to believe that Meza's answers would result in a criminal prosecution. As stated above, she did not know the nature of Meza's arrest, and she did not ask any questions relating to his incarceration. (Tr. 8, 22.) It was not until after Agent Dykema informed Shearing that the case had been accepted for prosecution that Shearing prepared a memorandum of investigation based on her notes from the interview with Meza. (Tr. 22-23.) Thus, overall, the facts and circumstances demonstrate that Officer Shearing had no reason to believe that her questions were likely to elicit an incriminating response.

Because the court finds that the August 27, 2013 interview did not amount to an "interrogation," no *Miranda* warning were required. Accordingly, the court will recommend that the district judge deny Meza's motion to suppress statements.

**NOW THEREFORE IT IS RECOMMENDED** that the defendant's "Motion to Dismiss the Indictment for Failure to Allege an Element of the Offense" (ECF #12) be **DENIED**;

**IT IS FURTHER RECOMMENDED** that the defendant's "Motion to Dismiss the Indictment" (ECF #13) be **DENIED**;

**IT IS FURTHER RECOMMENDED** that the defendant's "Motion to Suppress Statements" (ECF #14) be **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C), and Federal Rule of Criminal Procedure 59(b)(2) (as amended effective December 1, 2009), whereby written objections to any recommendation herein or part thereof may be filed within fourteen days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district

court shall result in a waiver of a party's right to appeal.

Dated this <u>25th</u> day of February 2014, at Milwaukee, Wisconsin.

**BY THE COURT:**

<u>s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

      -vs-                                 **Case No. 13-CR-192**

MARIANO A. MEZA,

        Defendant.

---

# DECISION AND ORDER

---

Defendant, Mariano Meza, ("Meza") brings three motions: a motion to dismiss the indictment for failure to allege an element of the offense, a motion to dismiss the indictment on constitutional grounds, and a motion to suppress evidence.

Magistrate Judge William Callahan has recommended to this Court that Meza's motions be denied in their entirety.

The Court has read the submissions that support the positions of Meza and the Government and analyzed the reasoning and conclusions offered by the Magistrate Judge for his recommendation and concludes as follows.

The Court adopts the Magistrate Judges' recommendations in toto. The Court also adopts the rationale underpinning Magistrate Judge Callahan's decision.

Therefore, Meza's motions are denied.

**IT IS HEREBY ORDERED THAT:**

The Court adopts Magistrate Judge Callahan's recommendations (ECF No. 27); and

Meza's motions to dismiss (ECF Nos. 12, 13) and his motion to suppress (ECF No. 14) are **DENIED**.

Dated at Milwaukee, Wisconsin, this 11th day of April, 2014.

BY THE COURT:

HON. RUDOLPH T. RANDA
U.S. District Judge

- 2 -