UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
_____

No. 14-3271
_____

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

MARIANO A. MEZA-RODRIGUEZ,
Defendant-Appellant.
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
Case No. 13-CR-92

THE HONORABLE RUDOLPH T. RANDA,
UNITED STATES DISTRICT JUDGE, PRESIDING
_____

BRIEF AND SHORT APPENDIX OF PLAINTIFF-APPELLEE
_____

JAMES L. SANTELLE
United States Attorney

GAIL J. HOFFMAN
Assistant United States Attorney
Attorneys for Plaintiff-Appellee

530 United States Courthouse
517 E. Wisconsin Ave
Milwaukee, WI 53202
(414) 297-1700

TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

JURISDICTIONAL STATEMENT ......................................................................................1

STATEMENT OF THE ISSUES ...........................................................................................2

STATEMENT OF THE CASE................................................................................................3

SUMMARY OF THE ARGUMENT .....................................................................................7

ARGUMENT ...........................................................................................................................10

   I.   Under the Second Amendment to the U.S. Constitution, illegal aliens are not included in "the people," and therefore § 922(g)(5) is constitutional. .........10

   II.  The Second Amendment is not violated by prohibiting illegal aliens from possessing firearms under § 922(g)(5)......................................................................19

   III.   The district court correctly applied intermediate scrutiny when analyzing 18 U.S.C. § 922(g)(5), finding that this statute does not violate the Second Amendment because the government can meet the requirements under this standard which have been applied by the Seventh Circuit in other § 922 cases. .....................................................................................................................................23

CONCLUSION.........................................................................................................................30

CERTIFICATE OF SERVICE ..............................................................................................31

SHORT APPENDIX TABLE OF CONTENTS ............................................................32

TABLE OF AUTHORITIES

<u>Cases</u>

*Clark v. Jeter*, 486 U.S. 456 (1988) .............................................................. 25

*Demore v. Kim*, 538 U.S. 510 (2003) ............................................................ 26

*Dickerson v. New Banner Inst.*, 460 U.S. 103, 103 S. Ct. 986, 74 L. Ed. 2d 845 (1983). 27

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............................................. passim

*Fiallo v. Bell*, 430 U.S. 787, 96 S. Ct. 1473 (1977) ................................................... 25, 26

*Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976) ......................................... 26

*Martinez-Aguero v. Gonzalez*, 459 F.3d 618 (5th Cir. 2006) ............................... 13, 14

*Mathews v. Diaz*, 426 U.S. 67 (1976) ...................................................... 25, 26

*Reno v. Flores*, 507 U.S. 292 (1993) ......................................................... 26

*Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953) ............................. 26

*United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012) .................................. 12, 20

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ............................... 24

*United States v. Davis*, 304 F. App'x 473 (9th Cir. 2008) .......................................... 19

*United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011) ......................................... 12, 20

*United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012) ............ 12, 19, 20, 25

*United States v. Jackson*, 555 F.3d 635 (7th Cir. 2009) ............................... 19

*United States v. Lewis*, 2010 WL 3370754, at *3 (N.D. Ga. May 26, 2010) .............. 18

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) .......................................... 19

*United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011) ........... 11, 12, 13, 14, 20

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010) ................................. 24

*United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009) .................................................... 19

*United States v. Sidwell*, 440 F.3d 865 (7th Cir. 2006) ............................... 10

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) .............................. 20, 21, 24, 28

*United States v. Stevens*, 559 U.S. 460 (2010) ...................................................... 19

*United States v. Toner*, 728 F.2d 115 (2d Cir. 1984) ...................................................... 28

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ...................................... 12, 13

ii

*United States v. Williams*, 616 F.3d 685 (7th Cir. 2010) ............................ 20, 21, 24, 28

*United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) ......................... 19, 20, 21, 27, 29

*United States v. Yanez-Vasquez*, 2010 WL 411112, at *2 (D. Kan. Jan 28, 2010) ...... 18

Statutes

18 U.S.C. § 922 ....................................................................................... passim

18 U.S.C. § 924 ............................................................................................ 19

49 U.S.C. § 46505 ........................................................................................ 19

## JURISDICTIONAL STATEMENT

The defendant-appellant's jurisdictional statement is complete and correct.

## STATEMENT OF THE ISSUES

I.       Under the Second Amendment to the U.S. Constitution, citizens are granted an affirmative right to keep and bear arms.  As such, are illegal aliens part of "the people" as  referenced in the Second Amendment to the U.S. Constitution?

II.      When reviewing other challenges to 18 U.S.C. § 922(g), this Circuit has analyzed these claims using a standard of intermediate scrutiny.  Meza argues that the Seventh Circuit should a apply a greater standard of review to § 922(g)(5) which prohibits aliens who are in the United States illegally from possessing firearms or ammunition.  Considering that this restriction relates to a definable government objective, and it specifically applies to Meza, unlike other Section 922(g) provisions, must the section disallowing illegal aliens from possessing firearms be subjected to heightened scrutiny?

STATEMENT OF THE CASE

I.      Factual Background

On August 24, 2013, at approximately midnight, City of Milwaukee police officers responded to a bar at 14xx S. 7th Street, Milwaukee, Wisconsin, regarding a man with a gun complaint. R. 48 at 2.[1]  Law enforcement authorities obtained the bar's surveillance video, and officers observed a man, later identified as Mariano Meza, pointing an object that appeared consistent with a firearm into the bar doorway. *Id.*

Shortly thereafter, at approximately 1:48 a.m., a citizen flagged down the law enforcement officers who had responded to the man with a gun complaint at the bar, to report a fight at another bar nearby. *Id.*  Officers immediately responded to this complaint, observed the fight, and immediately activated their lights. *Id.*  The male, whom, officers recognized as Mariano Meza ("Meza") from the previous bar's surveillance video, looked at the police officers, took off running, and was finally apprehended after a foot chase. *Id.*

---

[1] In this brief, "R." followed by a number refers to an entry on the district court docket in *United States v. Meza*, No. 13-CR-192 (E.D. Wis.); "Def. Br." followed by a number refers to a page of the defendant's appeal brief; "Tr." followed by a number refers to a page of the evidentiary hearing transcript; "PSR" followed by a number refers to a numbered paragraph of the Presentence Report; and, "App." followed by a number refers to a page of the government's short appendix.

The arresting officer patted down Meza for his safety, and found a .22 caliber round of live ammunition in Meza's shorts pocket. R. 48 at 3. The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) later determined that the .22 caliber cartridge was manufactured in Idaho, and, therefore, prior to Meza's possession of it, traveled in interstate commerce in order to reach Wisconsin. *Id.*

After Meza was taken into custody, he was placed in the back of a squad car where he began hitting his head against the glass divider. PSR ¶44. These actions were recorded. *Id.* A sergeant who responded to the scene observed Meza attempting to injure himself, and instructed Meza to stop. *Id.* Meza then confronted the sergeant and asked, "Is your last name Wxxxxx? You Timothy Wxxxxx: You gonna get popped nigger. You killed my homie." *Id.* This was in reference to an officer shooting that Sergeant Wxxxxx was involved in from 2005. Meza continued to threaten the sergeant and stated, "Fuck you nigger…Catch you on the south side fool….Let me catch you without that suit…You bury my homie nigger. I'm gonna bury you motherfucker." Meza continued, "Man, Wxxxxx's fucked. You're fucked Wxxxxx…Bitch ass nigger popped my home…Fuck you and your mom, and grandma, and your granddaddy…Let me out this bitch, I'm gonna fuck this nigger up…Got you hoe ass nigger…My

people know where you live nigger….Just be scared to go to sleep…You ain't

gonna see nothing coming for you…You, your wife and your little girl are gonna

get shot up…You're gonna get your head cut off nigger." *Id.*[2]

Meza was subsequently advised of his Constitutional rights. Meza stated

that he found the bullet along with two others in an alley, and he had the bullet

in his pocket for "like two days." Meza further admitted that he waved the gun

around the bar to scare people, but denied that it was a real firearm, saying that

it was a BB gun. R. 48 at 3.

A Department of Homeland Security special agent checked the relevant

data bases and did not find any record of U.S. citizenship for Mariano Meza. *Id.*

Thereafter, the instant prosecution ensued.

II.     Procedural History

On October 8, 2013, a grand jury sitting in the Eastern District of Wisconsin

returned a one-count indictment charging Meza as an illegal alien in possession

of ammunition under Title 18, United States Code, Section 922(g)(5). R. 1.

Thereafter, Meza was arraigned on this charge, and subsequently, in part, filed

the instant motion. R. 7, 13. After a full briefing occurred, the Magistrate Judge

---

[2] On or about April 22, 2014, Meza pleaded guilty to two misdemeanor offenses arising
from his recorded actions in the squad car, and was sentenced by the state court to a
sentence of sixty days and nine months incarceration, respectively, to be served
consecutively. PSR ¶44.

issued a Recommendation and denied Meza's motions.  R. 27; App. 1-20.  Meza filed objections to this Recommendation, and on April 11, 2014, the district court judge signed an Order adopting the Report and Recommendations of the magistrate judge.  R. 31; App. 21-22.

On August 5, 2014, Meza entered a guilty plea to the charge before the Honorable Rudolph T. Randa, United States District Judge.  R. 45.  In conjunction with his guilty plea, Meza also signed a plea agreement with the government wherein pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure, Meza preserved his right to appeal the instant issue.  R. 48 at 9.

Judge Randa conducted a sentencing hearing on October 2, 2014.  The district court sentenced Meza to time served with no supervised release to follow.  R. 52.  In addition, the fine was waived, and a $100.00 special assessment imposed, with Meza to be deported to Mexico.  *Id.*  Judge Randa entered a written Judgment and Commitment Order on October 7, 2014.  R. 53.  On October 15, 2014, Meza filed a timely Notice of Appeal.  R. 57.

SUMMARY OF THE ARGUMENT

Contrary to the established case law, Meza, an illegal alien, first alleges

that Title 18, United States Code, Section 922(g)(5), which prohibits illegal aliens

from possessing either firearms or ammunition, is unconstitutional because

under the Second Amendment, illegal aliens are part of "the people."  As such,

illegal aliens would therefore be permitted to possess firearms and ammunition.

Meza is wrong.

In a case interpreting the Second Amendment in regard to a United States

citizen, the Supreme Court stated that the Second Amendment conferred the

"right of law-abiding, responsible citizens to use arms in defense of hearth and

home." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).   Indeed, other

circuits have interpreted *Heller*, and found the protections contained in the

Second Amendment do not extend to aliens illegally present in the United States,

and do not guarantee any right to illegal aliens to possess firearms.

In addition, Meza has not conducted himself in a law-abiding manner.

Meza remained in the United States illegally even after being advised by his

brother on several occasions to take care of his citizenship.  Meza verbally

threatened to kill a City of Milwaukee sergeant, the sergeant's wife and small

child in retaliation for an officer shooting in 2005; Meza has failed to follow laws

7

prohibiting possession of illegal substances and the attendant paraphernalia; Meza has failed to follow laws prohibiting driving while intoxicated; Meza has convictions for resisting or obstructing an officer; carrying a concealed weapon and retail theft; and, a restraining order was imposed against him.

Likewise, to support his position that illegal aliens are included in "the people," Meza relies on a decision by the Supreme Court prior to *Heller*, and rejected by another circuit. Incorrectly, Meza posits that illegal aliens are covered under the Second Amendment if they have a substantial connection to the United States. Nevertheless, assuming *arguendo* that Meza's substantial connection test applies, Meza is unable to establish the second prong; that he has accepted some of society's obligations. While Meza has family in Wisconsin, Meza has not conducted himself in a law-abiding manner. In addition to Meza's above criminal behavior, Meza has not held a steady job, is in child support arrears, and has never filed a tax return. Therefore, even under Meza's inapplicable standard Meza fails to establish that he falls under "the people" as referred to in the Second Amendment.

In addition, Meza claims that Section 922(g)(5) violates his Second Amendment rights, and this argument also fails. Although this Circuit has not

considered Section 922(g)(5)'s prohibition, it found constitutional other categorical bans on firearm possession.

To this end, Meza argues that this Court should apply strict scrutiny to analyze his as-applied challenge to the statute. While the standard that must be applied here is unclear, this Circuit has applied intermediate scrutiny to other gun restriction challenges, and should likewise do so here. Section 922(g)(5), like other prohibitions in Section 922(g), seeks to restrict firearms from people who have already engaged in illegal behavior, and are presumptively risky people such as aliens who are present in the United States illegally. As such, the government has satisfied its burden of demonstrating an important governmental objective.

The government has also established that this statute is constitutional as applied to him. Meza possesses a criminal history, and during his various arrests has provided different answers regarding his place of birth, and the social security number he provided did not correspond to him. Thus, the concern that illegal aliens can more easily elude detection through an assumed identity applies to Meza. Accordingly, the statute is therefore constitutional as applied to Meza.

ARGUMENT

I.     Under the Second Amendment to the U.S. Constitution, illegal aliens are not included in "the people," and therefore § 922(g)(5) is constitutional.

Meza challenges the constitutionality of Title 18, United States Code, Section 922(g)(5) which prohibits illegal aliens from possessing either firearms or ammunition. To this end, Meza first alleges that although an illegal alien, he is part of "the people" under the Second Amendment to the United States Constitution, therefore, rendering this prohibition unconstitutional. Meza's argument does not comport with the body of case law, and he is therefore incorrect.

A.     Standard of Review.

A challenge to the constitutionality of a federal statute is reviewed *de novo* by this Court. *United States v. Sidwell*, 440 F.3d 865, 870 (7th Cir. 2006).

B.     Illegal aliens are not part of "the people."

The Second Amendment to the United States Constitution allows for the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. In *Heller*, unlike the case at hand, the individual seeking the right to the privileges conferred by the Second Amendment was a United States citizen, and thereby encompassed by "the people." Thus, the issue

10

of whether an alien has a right to bear arms, and is included in "the people" was not presented to the Supreme Court.

The Court in *Heller* found that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* In this same vein, the Court stated that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community. The Court continued, "[w]e start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all *Americans.*" (Emphasis added).

Indeed, as the Fifth Circuit in *United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011) interpreted *Heller*, the protections contained in the Second Amendment do not extend to aliens illegally present in the United States, and do not guarantee any right to illegal aliens to possess firearms. In *Portillo-Munoz*, the defendant, a Mexican citizen illegally present in the United States, possessed a firearm in order to protect chickens from coyotes at a ranch where he worked. Like Meza, the defendant entered a conditional guilty plea, and, in part, alleged that his conviction as an illegal alien in possession of a firearm violated the Second Amendment.

11

The Fifth Circuit found that "illegal aliens are not 'law-abiding, responsible citizens' or 'members of the political community,' and aliens who enter or remain in this country illegally and without authorization are not Americans as the word is commonly understood." *Portillo-Munoz*, 643 F.3d at 440. The Fifth Circuit also found that the Supreme Court's language in *Heller* did not lend support to the defendant's argument. Likewise, the Fourth and Eighth Circuits have also found that the Second Amendment does not cover illegal aliens, and the Tenth Circuit upheld Section 922(g)(5) because it survived intermediate scrutiny. *See United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012); *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011); and, *United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012).

      C.      Rights conferred under the Fourth Amendment are dissimilar to the Second Amendment.

Like Meza, but to no avail, the defendant in *Portillo-Munoz* relied upon the language in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) for support. In a decision prior to *Heller*, and factually dissimilar to the instant case, the Supreme Court in *Verdugo-Urquidez* held that the Fourth Amendment was inapplicable to a search conducted by American authorities of the Mexican residence of a Mexican citizen who was involuntarily present in the United States at the time of the search. *Verdugo-Urquidez*, 494 U.S. at 265.

12

For support, Meza cites to this passage in *Verdugo-Urquidez* which *Portillo-Munoz* rejected:

> While this textual exegesis is by no means conclusive, it suggests that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

*Id.*

To this end, the *Portillo-Munoz* Court stated: "[the defendant] relies on *Verdugo-Urquidez* and argues that he has sufficient connections with the United States to be included in this definition of 'the people,' but neither this court nor the Supreme Court has held that the Fourth Amendment extends to a native and citizen of another nation who entered and remained in the United States illegally." *Portillo-Munoz*, 643 F.3d at 440. Here, Meza entered the United States when very young, but remained in the United States illegally. In fact, Meza was reminded of this by his brother who told Meza on several occasions that he needed to take steps to become a citizen. R. 48 at 3.

Similar to Meza, the defendant in *Portillo-Munoz* looked to *Martinez-Aguero v. Gonzalez*, 459 F.3d 618 (5th Cir. 2006) to support his position that a non-citizen illegally present in the United States was protected by the Fourth Amendment. Likewise, *Portillo-Munoz* rejected this proposition. The Fifth Circuit noted that

*Martinez-Aguero* did not implicitly or explicitly hold that illegal aliens as a class are covered by the Fourth Amendment. The Court further stated the facts were so dissimilar from *Portillo-Munoz* that the Court's decision in *Martinez-Aguero* was not "especially persuasive." *Portillo-Munoz*, 643 F.3d at 440 n.2. [3]

Nevertheless, assuming *arguendo* the Seventh Circuit finds that Fourth Amendment protections apply to illegal aliens, the Fourth Amendment and Second Amendment convey different rights, and are extended to different circumstances. The Fifth Circuit in *Portillo-Munoz* did not find that the use of "the people" in both the Second and the Fourth Amendments mandates a holding that the two amendments cover exactly the same groups of people.

> The purposes of the Second and the Fourth Amendment are different. The Second Amendment grants an affirmative right to keep and bear arms, while the Fourth Amendment is at its core a protective right against abuses by the government. Attempts to *precisely* analogize the scope of these two amendments is misguided, and we find it reasonable that an affirmative right would be extended to fewer groups than would a protective right.

*Portillo-Munoz*, 643 F.3d at 440-41 (emphasis in original).

---

[3] The defendant in *Martinez-Aguero* was a Mexican national who visited the United States on a monthly basis using a visitor's visa. A border patrol agent subjected the defendant to excessive force. Prior to the encounter, the defendant applied for an updated visa, and had been erroneously told by United States immigration officials that she could use her old card in the interim.

Thus, under this analysis, since constitutional rights differ and can thereby be extended to fewer groups, the government asserts that the term "the people" within the Second Amendment properly excludes illegal aliens.

      D.      Even under Meza's inapplicable standard, Meza is unable to prove that he has substantial connections with this country because he has not accepted "society obligations."

Even analyzing whether Meza falls under "the people" as set forth in the Second Amendment using Meza's inapplicable substantial connections test, Meza fails to fall under the auspices of Second Amendment's "the people." Meza posits that his status should be analyzed under the two pronged substantial connections test which determines: "(1) whether the immigrant is voluntarily present in the United States; and (2) whether the immigrant has accepted "some society obligations.'" Def. Br. at 14. (Citations omitted).

While Meza had been present in the United States voluntarily, his acceptance of "society obligations" is inadequate, and fails to satisfy Meza's second prong. First, Meza has continuously displayed a disregard for law enforcement authority which is a hallmark of accepting "society obligations." In the instant case, after recognizing the sergeant at the scene of his arrest, Meza, using racial slurs, threatened to kill the sergeant, his wife and young child in retaliation for a shooting involving the sergeant, and Meza's "homie." PSR ¶44.

Meza, in his brief, characterizes these threats as "outlandish;" yet to the contrary, these threats are a reflection of Meza's inability to accept law enforcement authority in the United States of America, and live a law-abiding life. In 2008, an officer observed Meza driving at a high rate of speed, and when he attempted to stop Meza, Meza alighted from the moving vehicle, and fled on foot. When reached by an officer, Meza assumed a fighting stance, and attempted to strike the officer with his fist. After being placed in handcuffs, Meza began to thrash his arms and kick his legs violently. Meza was placed in custody, and when asked why he fled, Meza replied that he did not have a driver's license and he hated the police and would fight them and try to get away from them whenever he was stopped. During a search of the vehicle, the officer recovered a tobacco pipe that smelled of burnt marijuana. In addition, Meza was out on bond at the time of this arrest. PSR ¶¶36, 37.

This anti-law enforcement behavior continued while incarcerated in the instant case. On July 29, 2014, Meza committed a disciplinary infraction. Meza became verbally abusive with a supervision officer and stated, "I don't give no fuck, ya'll some pussies." The officers then attempted to handcuff Meza, and he became extremely hostile stating that the officers "needed to get their

'motherfucking hands' off him." On August 22, 2014, Meza committed another disciplinary offense when he refused to return to his cell when ordered. PSR ¶4.

Throughout his time in this country, Meza has also failed to accept other societal obligation of a varied nature. Meza stole items from a vehicle, PSR ¶32; committed retail theft, PSR ¶35; resisted or obstructed an officer PSR ¶¶36, 39, 44; possessed marijuana and drug paraphernalia, PSR ¶¶37, 40; carried a concealed weapon (a large 9" shank style knife), PSR ¶41; and, operated a motor vehicle while intoxicated, PSR ¶¶42, 43.

To be sure, Meza has family in Milwaukee, Wisconsin, and attended high school until "the tenth or eleventh grade;" however, Meza's assertion that he worked to support his daughters, is exaggerated. Def. Br. 15; PSR ¶ 67. Meza has not worked a steady job where he earned a paycheck; has not filed income tax returns; has not complied with his child support order, and is in child support arrears for his nine year old daughter; and, has relied on his girlfriend and mother to help *him* with living expenses. PSR ¶¶62, 68, 71.

Moreover, given the facts giving rise to the officers' arrival at the first bar regarding a man with a gun complaint, it is not within society's interest to wave a gun around at a bar "to scare people." R. 48 at 3. This behavior can and has led to a whole series of cascading events that leave citizens injured or dead.

While Meza claims that he possessed a BB gun, which defies logic considering he possessed a .22 caliber live round, and a foot chase ensued before he was apprehended which allowed time to discard a firearm, a BB gun is equally dangerous. Other patrons at the bar would be unaware that what purported to be a firearm was, in fact, not so, potentially leading to escalating violence that tears at the fabric of the community.

In totality, these events reflect Meza's inability to abide by the obligations of society, such as living a law-abiding life. Furthermore, Meza's actions or inactions reflect a failure to meet almost every cornerstone that living a pro-social life entails. For the above-stated reasons, even under Meza's erroneous standard, Meza has not established that Section 922(g)(5) is unconstitutional.

In sum, despite the children Meza fathered here, the presence of his mother, and school attendance, Def. Br. 15, the fact remains that Meza was illegally in the United States, and as an illegal alien does not fall under "the people" as referenced in the Second Amendment.[4]

---

[4] District courts have also found that the Second Amendment does not apply to illegal aliens. *See United States v. Lewis*, 2010 WL 3370754, at *3 (N.D. Ga. May 26, 2010); *United States v. Yanez-Vasquez*, 2010 WL 411112, at *2 (D. Kan. Jan 28, 2010).

II.    The Second Amendment is not violated by prohibiting illegal aliens from possessing firearms under Section 922(g)(5).

As stated above, the Second Amendment to the United States Constitution allows for the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. While these rights are preserved they are not unlimited. *United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010). The right to bear arms is qualified by what one might call the "who," "what," "where," "when," and "why." *Huitron-Guizar*, 678 F.3d at 1166. For instance, it is unlawful to knowingly receive guns with obliterated serial numbers, *see* 18 U.S.C. § 922(k); *United States v. Marzzarella*, 614 F.3d 85, 100-01 (3d Cir. 2010). A juvenile, with some exceptions, cannot possess a handgun, *see* 18 U.S.C. § 922(x), *United States v. Rene E.*, 583 F.3d 8, 16 (1st Cir. 2009). An airline passenger may not carry aboard a concealed firearm, *see* 49 U.S.C. § 46505 (2006), *United States v. Davis*, 304 F. App'x 473 (9th Cir. 2008). Nor may a drug dealer use or carry a weapon to protect his stash, *see* 18 U.S.C. § 924(c), *United States v. Jackson*, 555 F.3d 635, 636 (7th Cir. 2009). Categorical limits on the possession of firearms or other rights are not a constitutional anomaly. Likewise, the First Amendment has long had categorical limits such as obscenity, defamation, incitement to crime, and others. *See United States v. Stevens*, 559 U.S. 460, 468 (2010).

The instant case addresses who may possess firearms and ammunition. Title 18, United States Code, Section 922(g), part of the amended Gun Control Act of 1968, forbids gun possession by nine classes of individuals: felons, fugitives, addicts or users of controlled substances, the mentally ill, illegal and non-immigrant aliens, the dishonorably discharged, renouncers of their citizenship, those subject to court orders for harassing, stalking, or threatening partners or their children, and those convicted for misdemeanor domestic violence. Many Second Amendment challenges to this statute since *Heller* have failed. *See, e.g., United States v. Williams*, 616 F.3d 685 (7th Cir. 2010) (felons); *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (misdemeanor domestic violence); *Yancey*, 621 F.3d 681 (drug users). Recently, the instant provision prohibiting illegal aliens from possessing firearms was upheld against Second Amendment challenge by the Fifth Circuit (*Portillo-Munoz*, 643 F.3d at 442); Eighth Circuit (*United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011)); Fourth Circuit (*Carpio-Leon*, 701 F.3d 974); and, Tenth Circuit (*Huitron-Guizar*, 678 F.3d 1164).

A.    *Heller* permits law-abiding citizens to bear arms, but, Meza's circumstances do not qualify him as a law-abiding citizen, and, therefore, the prohibition is constitutional.

When Congress passed Title 18, United States Code, Section 922(g)(5), Congress only limited the ban against firearms to aliens who are "illegally or unlawfully in the United States," and has made a defendant's illegal and

unlawful status an element of the offense that the government must prove beyond a reasonable doubt. In essence, like a felon in possession of a firearm, the statute prohibits the possession of firearms by a person who is here illegally, and is therey intended to address illegal conduct.

Meza argues that unlike cases which have upheld other classes of prohibitions, there is nothing inherently dangerous about a person in this country illegally. Def. Br. at 22, 26. *See Skoien*, 614 F.3d 638 (defendant convicted of domestic abuse); *Williams*, 616 F.3d 685 (defendant convicted felon); and *Yancey*, 621 F.3d at 683 (defendant unlawful user of a controlled substance). The same argument has been advanced about non-violent felons who are prohibited from possessing firearms, but the provision has been held to be constitutional. *See Yancey*, 621 F.3d at 685. Other sections that have also been declared constitutional, such as Section 922(g)(3), which prohibits possession of a firearm or ammunition by a user of a controlled substance, which seeks to prevent firearm possession by people who are engaged in illegal behavior, such as Meza who is illegally present in the United States.

Meza presents himself as a stable part of the community and sets out his school and family ties. Def. Br. at 15. Yet, the circumstances of the instant case, and Meza, fall far afield from the circumstances covered by the Second Amendment and contemplated by *Heller*. According to the Wisconsin Circuit

21

Court Access, a public record, on September 25, 2013, in case number 2013FA006160, a domestic abuse restraining order was granted against Meza, including a firearm restriction, and that Meza was "to refrain from committing acts or threats of domestic abuse against the petitioner." In addition, in the past Meza has resisted or obstructed an officer; possessed an illegal substance (Marijuana) and paraphernalia; carried a concealed weapon (9" shank style knife); and, operated a motor vehicle while intoxicated. PSR ¶¶36, 37, 40, 41, 42.

Finally, on October 13, 2014, Meza pled guilty to disorderly conduct and resisting or obstructing an officer. In this case, Meza threatened to kill a City of Milwaukee sergeant, his wife, and small child in retaliation for a police shooting. PSR ¶44. During his multiple arrests, Meza also provided varied answers when asked about his place of birth, and the social security number Meza provided did not correspond to him. Tr. 35.

In short, Meza was present in the United States illegally and had acted unlawfully while in the country; therefore, these circumstances do not fall under the protection of *Heller*. Thus, since Second Amendment protections only apply to law-abiding citizens, and since Meza is neither law-abiding nor a citizen, the Second Amendment does not protect his conduct, and his conviction should be upheld under Section 922(g)(5).

III.   The lower court correctly applied intermediate scrutiny when analyzing 18 U.S.C. § 922(g)(5), finding that this statute does not violate the Second Amendment because the government can meet the requirements under this standard which have been applied by the Seventh Circuit in other § 922 cases.

As the magistrate judge noted, the Seventh Circuit and the Supreme Court have not determined which level of scrutiny applies to Second Amendment constitutional challenges.  R. 37 at 9; App. 9. Yet contrary to Meza's claim, based on the language of the Court in *Heller*, the Court did not intend for challenges to statutes to be analyzed under a level of strict scrutiny.

A.   Strict scrutiny does not apply to Second Amendment cases.

Meza argues that strict scrutiny governs the review of all Second Amendment claims, but strict scrutiny simply does not apply here. While the Supreme Court declined to articulate a standard of review in *Heller,* its conclusion that specific firearm regulations were "presumptively lawful" under the Second Amendment displays a degree of deference to Congress that is inconsistent with strict scrutiny review. *See Heller*, 554 U.S. at 688 (Breyer, J., dissenting) (noting that "the majority implicitly, and appropriately, rejects [a "strict scrutiny" test] by broadly approving a set of laws . . . whose constitutionality under a strict scrutiny standard would be far from clear."). Moreover, *Heller* involved the Second Amendment rights of a United States citizen, and the citizen was not afforded strict scrutiny. In addition, other cases

involving citizens challenging 18 U.S.C. § 922(g) in this Circuit have also not been afforded strict scrutiny. *Williams*, 616 F.3d at 692-94; and *Skoien*, 614 F.3d at 641-42. To apply strict scrutiny to 18 U.S.C. § 922(g)(5), involving the rights of an illegal alien, would require Congress to meet a higher level of scrutiny when regulating actions of illegal aliens rather than of its own citizens, and this defies logic.

> B.   Challenges to the constitutionality of 18 U.S.C. § 922(g) have been reviewed under intermediate scrutiny by the Seventh Circuit and other appellate courts.

The Seventh Circuit, among other circuits, has applied intermediate scrutiny when reviewing firearm laws. *Williams*, 616 F.3d at 692-94 (applying intermediate scrutiny as-applied challenge to felon disbarment under § 922(g)(1)); and *Skoien*, 614 F.3d at 641-42 (declining to specifically endorse a level of scrutiny, but upholding 18 U.S.C. § 922(g)(9), which prohibits those convicted of "misdemeanor crimes of domestic violence," because "[b]oth logic and data establish a substantial relation between § 922(g)(9)" and the "important governmental objective" or "preventing armed mayhem"); *see United States v. Chester*, 628 F.3d 673, 682-83 (4th Cir. 2010) (applying intermediate scrutiny to review of § 922(g)(9)); *United States v. Reese*, 627 F.3d 792, 801-02 (10th Cir. 2010) (applying intermediate scrutiny to review of the disarmament of those subject to domestic violence restraining orders, under § 922(g)(8)). Accordingly, to the

24

extent that 18 U.S.C. § 922(g)(5) is not a presumptively lawful regulatory

measure, this Court should apply an intermediate scrutiny standard of review.

> 1. The government is able to establish an important
> governmental objective.

Intermediate scrutiny generally requires some showing that the challenged

law is "substantially related to an important governmental objective." *See, e.g.*,

*Clark v. Jeter*, 486 U.S. 456, 461 (1988). Here there is reason to believe that an even

greater degree of deference should be given to Congress in immigration-related

matters. Courts must defer to Congress as it lawfully exercises its constitutional

power to distinguish between citizens and non-citizens, or between lawful and

unlawful aliens, and to ensure safety and order. *Huitron-Guizar*, 678 F.3d at 1170.

Quite simply, Congress' power over immigration-related matters is not

merely "broad," but "over no conceivable subject is the legislative power of

Congress more complete." *Fiallo v. Bell*, 430 U.S. 787, 792, 96 S. Ct. 1473, 1478

(1977). As "a fundamental sovereign attribute," *Fiallo*, 430 U.S. at 792, 96 S. Ct.

1473, "the responsibility for regulating the relationship between the United

States and our alien visitors" – determinations about which aliens should be

allowed to enter and remain in the United States and the terms and conditions

imposed upon such aliens while they are here – is "committed to the political

branches" of government. *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). In addition,

because Congress' "power over aliens is of a political character," its exercise of that power is "subject only to narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n.21 (1976); *see also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953) (holding that congressional power over aliens is "largely immune from judicial control").

The Supreme Court has thus recognized Congress' authority to limit the rights of illegal aliens in ways that would not be constitutionally permissible for citizens or permanent residents. In *Fiallo*, the Court explained that "in the exercise of its broad power over immigration and naturalization, 'Congress regularly makes rules that would be unacceptable if applied to citizens.'" *Fiallo*, 430 U.S. at 792, 96 S. Ct. 1473 (quoting *Mathews v. Diaz*, 426 U.S. 67, 80 (1976)). *See also Demore v. Kim*, 538 U.S. 510, 522 (2003) (noting that, since Matthews, "this Court has firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens"). Congress' power includes even "the authority to detain aliens suspected of entering the country illegally pending their deportation hearings" (*Reno v. Flores*, 507 U.S. 292, 305 (1993)), and to do so on a mandatory basis (*Demore*, 538 U.S. at 526-31). Clearly, as Congress has the authority to detain all aliens suspected of being in this country illegally, it also has the authority to limit an illegal alien's ability to possess a firearm.

Congress enacted the prohibitions in § 922(g) to keep guns out of the hands of presumptively risky people. *See Dickerson v. New Banner Inst.*, 460 U.S. 103, 112 n.6, 103 S. Ct. 986, 74 L. Ed. 2d 845 (1983); *see also* S. Rep. No. 90-1501, at 22 (1968) ("The ready availability, that is, the ease with which any person can anonymously acquire firearms (including criminals, . . . and others whose possession of firearms is similarly contrary to the public interest) is a matter of serious national concern."). *See Yancey*, 621 F.3d at 683-84. Because the ability of a person to anonymously acquire firearms is "a matter of serious national concern," Congress' decision to disarm illegal immigrants is substantially related to an important government objective and survives intermediate scrutiny even if Congress did not have particularly broad discretion in regulating immigration.

Along this line, Meza argues that illegal aliens are not inherently violent. Def. Br. at 26. Yet a report on sentencing statistics from the United States Sentencing Commission establishes that 41.6% of all federal offenses were committed by non-citizens. U.S. Sentencing Commission Preliminary Quarterly Data Report, at 47 (tbl. 26) (available at

http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2014-4th-Quarterly-Report.pdf). In addition, non-citizens were responsible for

41.7% of all kidnappings and hostage taking, 25.6% of all drug trafficking, 79.9 % of all drug possession, and 48.1% of all national-defense offenses. *Id.*

To this end, the Second Circuit also set forth an explanation for why it would be easier for an illegal alien to anonymously possess a firearm. The Court stated that because illegal aliens "are likely to maintain no permanent address in this country, elude detection through an assumed identity, and—already living outside the law—resort to illegal activities to maintain a livelihood." *United States v. Toner*, 728 F.2d 115, 128–29 (2d Cir. 1984). Thus, the need to keep firearms out of the hands of those who evade law-enforcement and have broken the law, such as an illegal alien, is an important governmental objective.

The Seventh Circuit, applying the scrutiny considerations in *Skoien*, found that the government's stated objective in keeping firearms out of the hands of felons was enough to pass intermediate scrutiny. *Williams*, 616 F.3d at 692-93. In *Williams*, the government satisfied its burden by noting a study showing that felons convicted of a specific crime were more likely to commit future crimes, which led the government to believe that felons are most likely to misuse firearms. *Williams*, 616 F.3d at 693. The Court stated that this objective is an important one and that § 922(g)(1) is substantially related to this objective in Williams's case. *Id.* "The government attempts to show a substantial relationship between its objective of preventing felons access to guns and

§ 922(g)(1) by pointing to Williams's own violent past. The government's evidence passes constitutional muster." *Id.*

        2.      Section 922(g)(5) is constitutional as applied to Meza.

Similarly, the government has met its burden in this case by establishing that Section 922(g)(5) is substantially related to this objective in Meza's case. The government has shown a substantial relationship between the statute and its objective of preventing illegal aliens access to guns through Meza's criminal history, as set forth above. Furthermore, Meza has provided varied answers regarding his place of birth, and the social security number he provided did not correspond to him. Tr. 34-35. Presenting such erroneous information to law enforcement officials highlights Meza's ability to elude detection through an assumed identity. Thus, Section 922(g)(5) is facially constitutional, and constitutional as-applied to Meza.[5]

---

[5] Unlike those who have been convicted of a felony, an illegal alien like Meza could regain his right to possess a firearm by taking steps to be legally in the country. *See Yancey*, 621 F.3d at 686.

# CONCLUSION

For the reasons stated above, this Court should affirm the constitutionality of Title 18, United State Code, Section 922(g)(5), and affirm the decision of the district court.

Dated at Milwaukee, Wisconsin, this 28th  day of April, 2015.

Respectfully submitted,

JAMES L. SANTELLE
United States Attorney

By:

s/Gail J. Hoffman
GAIL J. HOFFMAN
Assistant United States Attorney

530 United States Courthouse
517 E. Wisconsin Ave
Milwaukee, WI 53202
(414) 297-1700

CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2015, I electronically filed the foregoing with the Clerk for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF System. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


s/ Gail J. Hoffman
GAIL J. HOFFMAN
Assistant United States Attorney


530 United States Courthouse
517 E. Wisconsin Ave, Room 530
Milwaukee, WI 53202
(414) 297-1700

# SHORT APPENDIX TABLE OF CONTENTS

Page

Recommendation on Defendant's Motion to Suppress .................................... App. 1

Decision and Order ............................................................................................ App. 21

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                            Case No. 13-CR-192

MARIANO A. MEZA,

        Defendant.

---

## RECOMMENDATION ON DEFENDANT'S MOTIONS TO DISMISS THE INDICTMENT AND MOTION TO SUPPRESS STATEMENTS

---

### I. BACKGROUND

On October 8, 2013, a federal grand jury sitting in this district returned a single-count indictment against Mariano A. Meza ("Meza"), charging Meza as an illegal alien in possession of ammunition, in violation of 18 U.S.C. § 922(g)(5). Meza was arraigned on November 8, 2013, and he pled not guilty to the above-mentioned charge. The matter is assigned to United States District Judge Rudolph T. Randa for trial and to this court for processing pretrial motions.

On November 25, 2013, this court granted Meza's motion seeking additional time to file pretrial motions. Thereafter, on December 6, 2013, Meza filed three motions: (1) to dismiss the indictment for failure to allege an element of the offense; (2) to dismiss the indictment on constitutional grounds; and (3) to suppress statements. Meza requested an evidentiary hearing with respect to his motion to suppress. On December 18, 2013, Judge Randa granted Meza's motion to adjourn the trial date; a new date has not yet been scheduled. The evidentiary hearing was initially set for December 19, 2013. However, the hearing was rescheduled at the request of Meza, who was set to appear in state court that same day on other charges.

The evidentiary hearing was held on January 7, 2014. At the conclusion of the hearing, the court set a briefing schedule for all three motions. On February 3, 2013, the government filed its consolidated response to all three motions. That same day, Meza filed a post-hearing brief in support of his motion to suppress. On February 10, 2013, the government filed a letter brief in opposition to Meza's motion to suppress. That same day, Meza filed his consolidated reply. Accordingly, the defendant's motions are now fully briefed and ready for resolution. For the reasons that follow, it will be recommended that the district judge deny all three of Meza's motions.

## II. DISCUSSION

Currently pending before this court are three motions: (1) to dismiss the indictment for failure to allege an element of the offense; (2) to dismiss the indictment on constitutional grounds; and (3) to suppress statements. The court will address Meza's motions *ad seriatim*.

## A. MOTION TO DISMISS THE INDICTMENT - ELEMENTS OF THE OFFENSE

Meza seeks an order dismissing the indictment under the Fifth and Sixth Amendments and Rules 7 and 12(a) of the Federal Rules of Criminal Procedure because the indictment fails to sufficiently allege an element of the offense. Specifically, Meza argues that the indictment fails to allege that he possessed the requisite *mens rea* as to the facts establishing his prohibited status. Rather, according to Meza, the indictment merely alleges that he knowingly possessed ammunition.

An "indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). As such, to be legally sufficient, an indictment must satisfy three distinct requirements:

> First, the indictment must state all of the elements of the crime charged; second, it must adequately apprise the defendant of the nature of the charges so that he may prepare a defense; and third, it must allow the defendant to plead the judgment as a bar to any future prosecutions for the same offense.

2

*United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000). In assessing the sufficiency of an indictment, courts are to review the document in its entirety, giving it a "practical," rather than a "hypertechnical," reading. *Id.*

"In setting forth the offense, it is generally acceptable for the indictment to 'track' the words of the statute itself, so long as those words expressly set forth all the elements necessary to constitute the offense intended to be punished." *Id.* (citing *United States v. Hinkle*, 637 F.2d 1154, 1157 (7th Cir. 1981)). "However, an indictment that tracks the statutory language can nonetheless be considered deficient if it does not provide enough factual particulars to 'sufficiently apprise the defendant of what he must be prepared to meet.'" *Id.* (quoting *Russell v. United States*, 369 U.S. 749, 763 (1962)).

Still, "[f]acial sufficiency is not a high hurdle. Indictments need not exhaustively describe the facts surrounding a crime's commission nor provide lengthy explanations of the elements of the offense." *United States v. Bates*, 96 F.3d 964, 970 (7th Cir. 1996). Rather, "[t]he defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved." *United States v. Kendall*, 665 F.2d 126, 135 (7th Cir. 1981)).

The indictment here alleges that, "[o]n or about August 24, 2013," Meza, "being an alien illegally and unlawfully in the United States, knowingly possessed ammunition which, prior to his possession of it, had been transported in interstate commerce." (Indictment 1.) The indictment further states that the ammunition consisted of "one .22 caliber cartridge containing the markings 'C' on the head-stamp." (*Id.*) Thereafter, the indictment indicates that Meza's conduct was in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2).

Title 18 U.S.C. § 922(g)(5) provides that "[i]t shall be unlawful for any person . . . who, being an alien[,] . . . is illegally or unlawfully in the United States." The mental state and penalty associated with a violation of this statute is found in 18 U.S.C. § 924(a)(2), which states that "[w]hoever

Case 2:13-cr-00192-RTR   Filed 02/25/14   Page 3 of 20   Document 27

App. 3

*knowingly* violates subsection . . . (g) . . . of section 922 [18 USCS § 922] shall be fined as provided in this title, imprisoned not more than 10 years, or both." (second alteration in original) (emphasis added).

Having reviewed the indictment, the court finds that it meets the threshold requirements of legal sufficiency. For one, the indictment generally "tracks" the language found in § 922(g)(5). Moreover, the indictment contains the elements of the offense charged, fairly informs the defendant of the nature of the charges against which he must defend, and enables him to plead the judgment as a bar to any future prosecution for the same offense. Nothing more is required.

With respect to the mental state associated with violations of § 922(g), the Seventh Circuit has held that "there is no reason to think Congress intended 'knowingly' to mean different things for different subsections of § 922(g)." *United States v. Stein*, 712 F.3d 1038, 1041 (7th Cir. 2013). Thus, the government need not prove—nor allege in the indictment—that Meza had knowledge of his prohibited status. *See United States v. Wilson*, 159 F.3d 280, 288-89 (7th Cir. 1998) (§ 922(g)(8) - subject to protective order); *see also Stein*, 712 F.3d at 1041 (§ 922(g)(9) - misdemeanor crime of domestic violence); *United States v. Ballentine*, 4 F.3d 504, 506 (7th Cir. 1993) (§ 922(g)(2) - fugitives). Rather, to establish a "knowing" violation of § 922(g)(5), the government merely needs to prove "knowledge by the defendant of the *facts* that constitute the offense." *Wilson*, 159 F.3d at 289 (emphasis added) (citing *Bryan v. United States*, 524 U.S. 184, 193 (1998)).

The *Bryan* rule "has been applied without exception by . . . other circuits when interpreting § 924(a)(2)'s application to subsection (g) firearm possession crimes." *United States v. Mitchell*, 209 F.3d 319, 322 (4th Cir. 2000) (§ 922(g)(9) - misdemeanor crime of domestic violence); *see also United States v. Games-Perez*, 667 F.3d 1136, 1140-42 (10th Cir. 2012) (§ 922(g)(1) - felons); *United States v. Butler*, 637 F.3d 519, 524-25 (5th Cir. 2011) (§ 922(g)(6) - dishonorable dischargees);

*United States v. Mirza*, 454 F. App'x 249, 259-60 (5th Cir. 2011) (unpublished) (§ 922(g)(5) - illegal aliens); *United States v. Hutzell*, 217 F.3d 966, 967-69 (8th Cir. 2000) (§ 922(g)(9) - misdemeanor crime of domestic violence); *United States v. Montero-Camargo*, 177 F.3d 1113, 1120 (9th Cir. 1999) (§ 922(g)(5) - illegal aliens); *United States v. Langley*, 62 F.3d 602, 605-06 (4th Cir. 1995) (§ 922(g)(1) - felons); *United States v. Dancy*, 861 F.2d 77, 80-82 (5th Cir. 1988) (§ 922(g)(1) - felons).

Consequently, although the government must prove at trial that Meza possessed the requisite *mens rea* as to the facts establishing his prohibited status, at this stage it is sufficient for the government to allege that Meza, purportedly an illegal alien, knowingly possessed ammunition that had been transported in interstate commerce. The indictment undoubtedly apprised Meza of the offense with which he is charged. It need not contain a lengthy explanation of the elements nor the details of how the government will prove its case.

Because the indictment is facially sufficient, the court will recommend that the district judge deny Meza's motion to dismiss the indictment for failure to allege an element of the offense.

## B. MOTION TO DISMISS THE INDICTMENT - CONSTITUTIONAL CHALLENGE

Meza also seeks an order dismissing the single-count indictment on constitutional grounds, mounting both a facial and an as-applied constitutional challenge to the statute at issue here, 18 U.S.C. § 922(g)(5).

### 1. Facial Challenge

Meza argues that "the complete ban in § 922(g)(5) on all illegal aliens possessing firearms is overbroad and thus violates the Second Amendment." (Mot. to Dismiss Indictment as Unconstitutional 1.) In support of his argument, Meza maintains that "the people" referenced in the Second Amendment are the same "people" referenced in the First and Fourth Amendments. Thus,

5

according to Meza, illegal aliens may claim the guarantees of the Second Amendment as long as they have "substantial connections" with the United States. Meza asserts that he has substantial connections with this country because he is a long-time resident of Milwaukee, he attended school in Milwaukee, his two daughters and mother live here, and he has lived here for all of his adult life. Finally, Meza contends that the Supreme Court's language in *Heller*[1] does not alter the analysis regarding to whom the Second Amendment applies.

The Second Amendment reads simply: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." However, the meaning attached to these words has proven anything but simple. In *Heller*, the Supreme Court clarified that firearm possession is an individual constitutional right. 554 U.S. at 592-95. In reaching this holding, the Court in *Heller* determined that "the people"—as that term is used in the Constitution—"unambiguously refers to all members of the political community, not an unspecified subset." *Id.* at 580. Thus, there is "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.*

The Court in *Heller* made clear that it did not "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Id.* at 626. Moreover, the Court noted that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* However, the Court did not discuss the constitutionality of the various other categories of prohibitions contained in § 922, and in particular, the Court did not address the prohibition at issue here—that is, § 922(g)(5)'s ban on illegal aliens possessing firearms.

Although the Seventh Circuit has yet to consider § 922(g)(5)'s ban in light of the Supreme Court's holding in *Heller*, the court has determined that some categorical bans on firearm possession

---

[1] *District of Columbia v. Heller*, 554 U.S. 570 (2008).

are constitutional. *See United States v. Skoien*, 614 F.3d 638, 640-41 (7th Cir. 2010) (en banc) Consequently, to date, the Seventh Circuit has upheld laws prohibiting firearm possession by persons convicted of misdemeanor crimes of domestic violence under § 922(g)(9), *Skoien*, 614 F.3d 638; felons under § 922(g)(1), *United States v. Williams*, 616 F.3d 685 (7th Cir. 2010); and unlawful users of controlled substances under § 922(g)(3), *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) (per curiam).

Furthermore, the other circuits that have analyzed § 922(g)(5) post-*Heller* all have concluded that the statute is constitutional with respect to the Second Amendment. *See, e.g., United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011) (holding that "the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States"); *see also United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) (holding that "illegal aliens do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection"); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1170 (10th Cir. 2012) (holding that § 922(g)(5) withstood the defendant's Second Amendment challenge); *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) (per curiam) (agreeing with the Fifth Circuit's analysis in *Portillo-Munoz* that "the protections of the Second Amendment do not extend to aliens illegally present in this country").

The court finds the analyses of the other circuit courts to be persuasive. In particular, the defendant in *Portillo-Munoz*, like Meza here, relied on the Supreme Court's pre-*Heller* decision in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), to argue that illegal aliens are included within the definition of "the people"—as that term is used in the First, Second, and Fourth

Amendments—if they have a substantial connection with the United States.[2] The Fifth Circuit rejected this argument, holding that the Supreme Court never found that these protections extend to "a native and citizen of another nation who entered and remained in the United States illegally." *Portillo-Munoz*, 643 F.3d at 440. The *Portillo-Munoz* court further reasoned that "[t]he courts have made clear that the Constitution does not prohibit Congress from making laws that distinguish between citizens and aliens and between lawful and illegal aliens." *Id.* at 442.

Moreover, there is no reason to believe that the Seventh Circuit would treat § 922(g)(5)'s prohibition on the possession of firearms by illegal aliens any differently than it has other categories of prohibitions in § 922(g). In addressing the categorical ban on the possession of firearms by felons, the Seventh Circuit in *Yancey* acknowledged that "most felons are nonviolent." 621 F.3d at 685. Nevertheless, the court held that such a prohibition is not unconstitutionally overbroad, reasoning that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *Id.* But illegal aliens, by definition, are neither "virtuous" (in the historic, civically virtuous sense) nor "citizens." Likewise, in exercising "its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Portillo-Munoz*, 643 F.3d at 441 (quoting *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976) (internal quotation marks omitted)).

Accordingly, for all the foregoing reasons, the court finds that the protections of the Second Amendment do not extend to aliens illegally present in the United States such as Meza and, thus, Meza's facial challenge to § 922(g)(5) must fail.

---

[2] In *Verdugo-Urquidez*, the Supreme Court held that its analysis of the Constitution "suggests that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 494 U.S. at 265.

## 2. As-applied Challenge

Meza also argues that the ban in § 922(g)(5) violates his Second Amendment rights. For one, Meza asserts that some form of heightened scrutiny must be utilized to address his as-applied challenge, although he acknowledges that the exact level of scrutiny is unclear based on Seventh Circuit precedent. Nevertheless, Meza maintains that the ban in § 922(g)(5) fails under any form of heightened scrutiny because illegal aliens—unlike felons, individuals convicted of domestic abuse, and habitual drug users—are not inherently dangerous.

In analyzing Meza's as-applied constitutional challenge, the court first must determine what level of scrutiny to apply. The Court in *Heller*, while not adopting a particular standard, clearly ruled out the rational-basis test. *See Heller*, 554 U.S. at 628, n.27. The Seventh Circuit, sitting en banc, side-stepped this "'levels of scrutiny' quagmire"; however, in that case, the government conceded that "some form of strong showing ('intermediate scrutiny,' many opinions say) [was] essential, and that [the prohibition was] valid only if substantially related to an important governmental objective." *Skoien*, 614 F.3d at 641. Several months later, the Seventh Circuit used "the intermediate scrutiny framework" to analyze an as-applied challenge to § 922(g)(1), but the court noted that "the precise test applicable to all challenges to gun restrictions" was still undetermined. *Williams*, 616 F.3d at 692. In *Yancey*, the court applied the same analytical framework utilized in *Skoien* and *Williams* and again "reserve[d] the question whether a different kind of firearm regulation might require a different approach." 621 F.3d at 683. Accordingly, for the purposes of Meza's challenge to § 922(g)(5) as it applies to him, the court will use the intermediate scrutiny framework.

"To pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." *Williams*, 616 F.3d at 692. Moreover, in an as-applied

9

constitutional challenge to a statute, the court examines only the facts of the present case and not "any set of hypothetical facts under which the statute might be unconstitutional." *United States v. Phillips*, 645 F.3d 859, 863 (7th Cir. 2011).

In *Yancey*, the Seventh Circuit stated that "Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people." 621 F.3d at 683. Thus, "[t]he broad objective of § 922(g)—suppressing armed violence—is without a doubt an important one." *Id.* at 684. This finding surely encompasses illegal aliens who "are likely to maintain no permanent address in this country, elude detection through an assumed identity, and – already living outside the law – resort to illegal activities to maintain a livelihood." *Portillo-Munoz*, 643 F.3d at 441 (quoting *United States v. Toner*, 728 F.2d 115, 128-29 (2d Cir. 1984) (internal quotation marks omitted)). As such, § 922(g)(5)—like §§ 922(g)(1), (3), and (9)—seeks to prevent firearm possession by people who, because they have already engaged in illegal behavior, are presumptively risky people. (*See* Gov't.'s Resp. 9.) Accordingly, the court finds that the government has satisfied its burden of demonstrating an important governmental objective.

The court next must determine whether § 922(g)(5) is substantially related to this objective in Meza's case. The government attempts to show a substantial relationship between the statute and its objective of preventing illegal aliens' access to guns by pointing to Meza's criminal history. The government's evidence passes constitutional muster.

A review of this history reveals a conviction for resisting or obstructing an officer in 2008 and pending charges—some of which appear related to the case before this court—of two counts of resisting or obstructing an officer and two counts of disorderly conduct. (*See* ECF #6.)[3] Furthermore,

---

[3] Meza's criminal history also includes several arrests for offenses ranging from criminal damage to property to theft to robbery with use of force, although no dispositions are reported. (*See* ECF #6.)

the belief that illegal aliens typically elude detection through an assumed identity applies to Meza as well, as during his arrest Meza provided varied answers regarding his place of birth, and the social security number he provided did not correspond to him. (Tr. 34-35.)

Considering the facts of the present case, including Meza's criminal history and evasive conduct, Meza's claim that § 922(g)(5) unconstitutionally infringes on his right to possess a firearm is without merit and, accordingly, his as-applied challenge must fail. Thus, because § 922(g)(5) is facially constitutional and constitutional as-applied to Meza, the court will recommend that the district judge deny Meza's motion to dismiss the indictment on constitutional grounds.

## C. MOTION TO SUPPRESS STATEMENTS

Finally, Meza seeks an order suppressing the statements that he made to a law enforcement officer on August 27, 2013. The court held an evidentiary hearing with respect to Meza's motion to suppress on January 7, 2014. Accordingly, the court will begin by reviewing the circumstances surrounding Meza's interview, as testified to during that hearing.

### 1. Facts

At the evidentiary hearing, the court heard testimony from two law enforcement officers, Cassandra Shearing ("Officer Shearing" or "Shearing"), an officer with the Immigration and Customs Enforcement ("Immigration"), and Russell Dykema ("Agent Dykema" or "Dykema"), a special agent with the United States Department of Homeland Security. As part of her role, Officer Shearing is charged with enforcing the customs and immigration laws of the United States. (Tr. 10.)

According to Agent Dykema, on or about August 25, 2013, he received information from a City of Milwaukee police officer that Meza had been arrested the previous night and that he was believed to be in the country illegally. (Tr. 32-33.) Meza was being held in state custody at the Milwaukee County Jail. (Tr. 33.) Agent Dykema contacted Officer Shearing, the deportation officer

who handles the Milwaukee County Jail, and told her that he received a tip that Meza might be present in the United States illegally. (Tr. 5, 33.) Consequently, Dykema requested that Shearing "interview [Meza] administratively to see if he was legally or illegally present in the United States and to take action appropriate at that time depending on what her interview determined." (Tr. 5.)

Officer Shearing conducted the interview at the Milwaukee County Jail on August 27, 2013. (Tr. 5-7.) The interview took place in a small square room, approximately 7x7 feet, on the third floor of the jail. (Tr. 13.) The door remained closed and locked during the interview, and only Officer Shearing and Meza were present. (Tr. 15-16, 23.) Officer Shearing wore normal street clothes; however, she had her badge and empty gun holster on her belt. (Tr. 7, 16-17.)

At the beginning of the interview, Shearing identified herself as an officer with Immigration and informed Meza that she had a few questions for him. (Tr. 7.) At that time, Meza did not ask any questions relating to the purpose of the interview or otherwise. Thereafter, Officer Shearing asked Meza "his full and correct name . . . ; date of birth; . . . if he had a social security number; where he was born; if he went to high school here; and whether he completed his high school; if he was working; what his current address was; if he had children; and if he was married." (Tr. 7.) Shearing and Meza then talked about his father and mother, and she also asked about his health and whether he had any gang affiliation. (Tr. 8.) Shearing did not ask Meza any questions regarding the reason for his incarceration.

At the end of the interview, Meza asked about the purpose of the interview and what was going to happen to him. Officer Shearing repeated that the interview was for immigration purposes and that she did not know what would happen to him at that point as she needed to conduct additional

research. (Tr. 8, 22.) The interview lasted approximately 20 minutes, and it was not recorded. (Tr. 8-9.) Meza was never advised of his *Miranda*[4] rights. (Tr. 6.)

Following the interview, Officer Shearing ran Meza's name and the date of birth he gave her through a series of system checks. (Tr. 21.) That same day, Shearing called Agent Dykema and told him that she conducted the interview, and at that point she believed that Meza was in the United States illegally, and she was placing a detainer on him.

Officer Shearing did not review any police reports prior to conducting the interview, and she did not know the nature of Meza's arrest. (Tr. 22.) On September 20, 2013, Agent Dykema informed Shearing that Meza would be prosecuted in federal court. (Tr. 9.)

Although Officer Shearing testified that the purpose of the interview was to determine if Meza was in the United States illegally, she also stated that she was "not just there to go against him." (Tr. 18.) For instance, she testified that the interview also was used to determine if Meza was eligible for any applications or status grants. Notwithstanding this "two-fold process," Shearing stated that she knew entry without inspection and illegal re-entry were both crimes and that she can refer cases for criminal prosecution if she believes there is enough substance. (Tr. 18, 29.) Shearing did testify, however, that her office has a policy of not referring entry without inspection cases for prosecution, although her testimony was unclear as to whether that policy was written or whether she had ever seen it. (Tr. 24, 28-29.)

Shearing explained that the process used to investigate illegal re-entry cases is different and, therefore, she advises suspects of their *Miranda* rights at the beginning of that type of interview. (Tr. 25-28.) Of the interviews she has conducted regarding entry without inspection, none were referred

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

by her for prosecution. (Tr. 25.) If, however, during the course of an interview she discovers that there was an illegal re-entry, the interview would stop and she would proceed "down the criminal path[,] which is different than the administrative [path]." (Tr. 26.) Nevertheless, Officer Shearing acknowledged that there is "no foolproof way" to ensure that an un-*Mirandized* interview does not result in an illegal re-entry confession, although prior to interviewing Meza, Officer Shearing did determine that he had no previous contacts with Immigration and no active applications in its systems. (Tr. 27.)

      *2. Analysis*

      According to the well-established rules of *Miranda*, 384 U.S. at 444-45, law enforcement authorities must advise an individual of certain rights prior to a custodial interrogation. Statements obtained without these warnings, or without a waiver of these rights, cannot be used against a defendant in the government's case-in-chief. *Id.* at 479.

      Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. Thus, to trigger the *Miranda* warnings, an individual must be both in "custody" and subject to "interrogation." *United States v. Yusuff*, 96 F.3d 982, 987 (7th Cir. 1996). Courts evaluate a person's custody status using the reasonable person standard. That is, considering the circumstances surrounding the investigation, would a reasonable person have felt free to put a stop to the interrogation and leave? *See Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004). Interrogation includes express questioning and "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 309, n.5 (1980).

14

App. 14

This interrogation analysis incorporates the perspectives of both the interviewer and the individual subject to the interview. *See Smiley v. Thurmer*, 542 F.3d 574, 582 (7th Cir. 2008).

Here, Officer Shearing admitted that she questioned Meza without providing *Miranda* warnings. Moreover, the parties do not dispute that Meza was in "custody" at the time of the interview. Accordingly, the only issue that remains is whether the questioning by Shearing amounted to an "interrogation."

While the government asserts that Officer Shearing's questioning was purely administrative in nature, Meza argues that the questions she posed were reasonably likely to elicit an incriminating response as they directly related to criminal conduct. As an immigration officer, Shearing is charged with enforcing United States immigration statutes, including those with criminal consequences. As such, she has the ability to refer cases to the United States Attorney's Office for prosecution. Consequently, Meza contends that Officer Shearing should have known that any questions relating to his immigration status would be reasonably likely to elicit an incriminating response because her questions addressed all of the elements of at least two criminal offenses—improper entry in violation of 18 U.S.C. § 1325 and illegal re-entry in violation of 18 U.S.C. § 1326. In addition, Meza points out that Shearing initiated the interview based on a tip that he was present in the United States illegally; Agent Dykema specifically requested that Shearing interview Meza in order to confirm this suspicion.

In arguing that Officer Shearing's questioning amounted to an interrogation, Meza relies in part on a case from the Ninth Circuit, *United States v. Mata-Abundiz*, 717 F.2d 1277 (9th Cir. 1983). The defendant in *Mata-Abundiz* was arrested on state charges of carrying a concealed weapon and possession of a firearm by an alien. 717 F.2d at 1278. Ten days later, the defendant was interviewed at the county jail by an experienced criminal investigator from the Immigration and Naturalization

15

Service ("INS"). Although the agent was aware of the state firearms charges, he characterized the interview as a routine, civil investigation; thus, no *Miranda* warnings were provided. During the interview, the defendant admitted that he was a citizen of Mexico. Accordingly, the agent looked further into the defendant's immigration status, and he returned three hours later with a warrant for the defendant's arrest. During a second, *Mirandized* interview, the agent questioned the defendant about the state firearms charges. Several days later, the defendant was charged with federal charges of possession of a firearm by an illegal alien. At trial, the defendant's first (i.e., unwarned) statement regarding his alien status was admitted over his objection. The defendant was convicted and sentenced.

On appeal, the Ninth Circuit reversed the defendant's conviction, holding that "in-custody questioning by INS investigators must be preceded by *Miranda* warnings, if the questioning is reasonably likely to elicit an incriminating response." *Id.* at 1280. Consequently, the court determined that the agent's question regarding the defendant's citizenship "was very likely to produce an incriminating response"; thus, the agent "had a duty to warn [the defendant] before questioning him about his citizenship." *Id.* In reaching this decision, the court reasoned that the agent "had reason to know that any admission of alienage by [the defendant] would be highly incriminating" because the agent was an experienced INS criminal investigator and he knew that the defendant was in custody on state firearms charges. *Id.* at 1279. Thus, "[t]he 'background questions' asked related directly to an element of a crime that [the agent] had reason to suspect." *Id.* at 1280.

Furthermore, the court stated that the agent's "actions immediately after the unwarned statement strengthen[ed] the inference that [the agent] already contemplated criminal prosecution at the time of the first interview," as the agent returned merely three hours later with an arrest warrant and thereafter launched a "full-fledged" criminal investigation. *Id.* at 1279. Overall, the court held

that an agent "cannot control the constitutional question by placing a 'civil' label on the investigation." *Id.* at 1280. However, the court also noted that "[t]his does not mean that admissions obtained in civil investigations of in-custody suspects can never be used in criminal prosecutions, unless the investigator first gives warnings." *Id.* at 1279. Rather, "[i]f an INS investigator has no reason to suspect that the question asked is likely to elicit an incriminating response, there is no interrogation and, therefore, no *Miranda* violation." *Id.*

The court finds that Meza's reliance on *Mata-Abundiz* is misplaced because the facts of that case are easily distinguishable from the facts present here. For one, at the time of the interview, Meza was in state custody on charges having nothing to do with his immigration status. In any case, and perhaps most importantly, Officer Shearing testified that she did not know the nature of Meza's arrest prior to conducting the interview. (Tr. 22.) She did not read any of the police reports that were prepared regarding his arrest, and she did not ask any questions relating to the reason for his incarceration; thus, she did not know that Meza was found to be in possession of ammunition. (Tr. 8, 22.) Accordingly, Shearing had no reason to believe that Meza's answers would be incriminating. *See United States v. Salgado*, 292 F.3d 1169, 1172 (9th Cir. 2002) (distinguishing *Mata-Abundiz* and holding that "*[i]f* [the defendant] had been interviewed in connection with a 'prosecution for violating the immigration laws,' or *if* [the defendant] had been in custody on charges relating to his immigration status, *then* questions about his birthplace and citizenship might have been reasonably likely to elicit an incriminating response in which case he should have been *Mirandized* before-hand. . . . But that is not this case."); *see also United States v. Lugo*, 289 F. Supp. 2d 790, 798 (S.D. Tex. 2003) (distinguishing *Mata-Abundiz* because the defendant there was being held on immigration-related offenses); *United States v. Lopez-Garcia*, 565 F.3d 1306, 1316-17 (11th Cir. 2009) (finding no interrogation where a law enforcement officer questioned a defendant in custody for a drug-related

17

offense about his immigration status, even though the officer was aware prior to the interview that the defendant was not born in the United States).

To be sure, the cases cited by the government—*Salgado*, *Lugo*, and *Lopez-Garcia*—are not directly on point as the case presently before this court involves certain factual details that are not present in all of those cases. More precisely, going into the interview, Officer Shearing knew that Meza was suspected of being in the United States illegally. (Tr. 5.) In fact, Agent Dykema specifically requested that Shearing interview Meza in order to confirm, or refute, this suspicion. (Tr. 5, 33.) Likewise, Shearing knew that entry without inspection and illegal re-entry were both crimes, and at least a few of her questions related to the elements of those offenses. (Tr. 18, 29-30.) Moreover, Shearing is able to refer matters for criminal prosecution. (Tr. 18, 29.) Indeed, the information she obtained during her interview of Meza did lead to a prosecution (i.e, the present case).

Although it may be a close call, the court still believes that Officer Shearing had no reason to know that her questions would elicit an incriminating response, notwithstanding these additional facts. In contrast to the situation in *Mata-Abundiz*, Shearing's actions following the interview actually strengthen the inference that she *never* contemplated criminal prosecution. After the interview, Shearing ran Meza's name and the date of birth he gave her through all of her system checks. (Tr. 21.) Believing that Meza was present in the country illegally, she ordered that a detainer be placed on him. She provided this information to Agent Dykema, and it was not until nearly a month later that Shearing learned Meza would be prosecuted in federal court. (Tr. 9, 21.) Notably, although Officer Shearing believed that Meza was present in the United States illegally, she did not refer that crime for prosecution. Indeed, Shearing testified that her office has a policy of not referring entry without inspection cases for prosecution, and she has never done so. (Tr. 24-25.) Similarly, prior to the interview, Shearing determined that Meza had no previous contacts with Immigration and no

Case 2:13-cr-00192-RTR   Filed 02/25/14   Page 18 of 20   Document 27

App. 18

active applications in its systems. (Tr. 27.)

Furthermore, Officer Shearing had no reason to believe that Meza's answers would result in a criminal prosecution. As stated above, she did not know the nature of Meza's arrest, and she did not ask any questions relating to his incarceration. (Tr. 8, 22.) It was not until after Agent Dykema informed Shearing that the case had been accepted for prosecution that Shearing prepared a memorandum of investigation based on her notes from the interview with Meza. (Tr. 22-23.) Thus, overall, the facts and circumstances demonstrate that Officer Shearing had no reason to believe that her questions were likely to elicit an incriminating response.

Because the court finds that the August 27, 2013 interview did not amount to an "interrogation," no *Miranda* warning were required. Accordingly, the court will recommend that the district judge deny Meza's motion to suppress statements.

**NOW THEREFORE IT IS RECOMMENDED** that the defendant's "Motion to Dismiss the Indictment for Failure to Allege an Element of the Offense" (ECF #12) be **DENIED**;

**IT IS FURTHER RECOMMENDED** that the defendant's "Motion to Dismiss the Indictment" (ECF #13) be **DENIED**;

**IT IS FURTHER RECOMMENDED** that the defendant's "Motion to Suppress Statements" (ECF #14) be **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C), and Federal Rule of Criminal Procedure 59(b)(2) (as amended effective December 1, 2009), whereby written objections to any recommendation herein or part thereof may be filed within fourteen days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district

court shall result in a waiver of a party's right to appeal.

Dated this 25th day of February 2014, at Milwaukee, Wisconsin.

BY THE COURT:

s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

      Plaintiff,

    -vs-                            Case No. 13-CR-192

MARIANO A. MEZA,

      Defendant.

# DECISION AND ORDER

Defendant, Mariano Meza, ("Meza") brings three motions: a motion to dismiss the indictment for failure to allege an element of the offense, a motion to dismiss the indictment on constitutional grounds, and a motion to suppress evidence.

Magistrate Judge William Callahan has recommended to this Court that Meza's motions be denied in their entirety.

The Court has read the submissions that support the positions of Meza and the Government and analyzed the reasoning and conclusions offered by the Magistrate Judge for his recommendation and concludes as follows.

The Court adopts the Magistrate Judges' recommendations in toto. The Court also adopts the rationale underpinning Magistrate Judge Callahan's decision.

Therefore, Meza's motions are denied.

**IT IS HEREBY ORDERED THAT:**

The Court adopts Magistrate Judge Callahan's recommendations (ECF No. 27); and

Meza's motions to dismiss (ECF Nos. 12, 13) and his motion to suppress (ECF No. 14) are **DENIED**.

Dated at Milwaukee, Wisconsin, this 11th day of April, 2014.

BY THE COURT:

HON. RUDOLPH T. RANDA
**U.S. District Judge**

- 2 -