# United States District Court
## Eastern District of Wisconsin (Milwaukee)
## CRIMINAL DOCKET FOR CASE #: 2:13–cr–00192–RTR All Defendants

Case title: USA v. Meza

Other court case number: 14–3271 USCA Mariano
Meza–Rodriguez 10/15/14

Date Filed: 10/08/2013

Date Terminated: 10/07/2014

---

Assigned to: Judge Rudolph T
Randa

Appeals court case number:
14–3271

**Defendant (1)**

**Mariano A Meza**
*TERMINATED: 10/07/2014*
*also known as*
Mariano Alelandro
Meza–Rodriguez
*TERMINATED: 10/07/2014*

represented by **Juval Orisha Scott**
Federal Defender Services of Wisconsin Inc
517 E Wisconsin Ave – Rm 182
Milwaukee, WI 53202
414–221–9900
Fax: 414–221–9901
Email: juval.scott@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Joseph A Bugni**
Federal Defender Services of Wisconsin Inc
517 E Wisconsin Ave – Rm 182
Milwaukee, WI 53202
414–221–9900
Fax: 414–221–9901
Email: joseph_bugni@fd.org
*ATTORNEY TO BE NOTICED*
*Designation: Federal Public Defender*

**Julie K Linnen**
Federal Defender Services of Wisconsin Inc
222 W Washington Ave – Ste 300
Madison, WI 53703
608–260–9900
Fax: 608–260–9901
Email: julie_linnen@fd.org
*ATTORNEY TO BE NOTICED*
*Designation: Federal Public Defender*

**Pending Counts**                                  **Disposition**

18:922(g)(5) and 924
(a)(2)UNLAWFUL TRANSPORT
OF FIREARMS, ETC.
(1)

Time–Served sentence; No Supervised Release;
Fine is waived; $100.00 Special Assessment

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                  **Disposition**

None

**Highest Offense Level
(Terminated)**

None

**Complaints**                                         **Disposition**

None

**Plaintiff**

**USA**                    represented by   **Gail J Hoffman**
United States Department of Justice
(ED–WI)
Office of the US Attorney
517 E Wisconsin Ave – Rm 530
Milwaukee, WI 53202
414–297–1731
Fax: 414–297–1738
Email: gail.hoffman@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 10/08/2013 | 1 | 8 | INDICTMENT as to Mariano A Meza (1) count 1. (Attachments: # 1 Information Sheet) (msc) (Entered: 10/09/2013) |
| 10/24/2013 | 2 | | NOTICE OF HEARING as to Mariano A Meza. Arraignment and Plea hrg. set for 11/8/2013 at 9:30 AM before Magistrate Judge Nancy Joseph. (cc: all counsel) (kmf) |
| 10/29/2013 | 3 | 10 | ORDER with APPLICATION for Writ of Habeas Corpus ad Prosequendum signed by Magistrate Judge William E Callahan, Jr on 10/29/2013, for the appearance of Mariano Meza on November 8, 2013 at 9:30 a.m. before Honorable Nancy Joseph in Courtroom 253. (cc: all counsel) (msc) (Entered: 10/30/2013) |
| 10/30/2013 | 4 | | |

| | | | NOTICE OF ATTORNEY APPEARANCE: Joseph A Bugni appearing for Mariano A Meza (Bugni, Joseph) |
|---|---|---|---|
| 10/30/2013 | 5 | | NOTICE OF ATTORNEY APPEARANCE: Julie K Linnen appearing for Mariano A Meza (Linnen, Julie) |
| 11/07/2013 | 6 | | PRIOR RECORD MEMO – BOND STUDY (Sealed) filed by US Pretrial Office as to Mariano A Meza (NOTICE: Counsel for defendant is required to provide a copy of this document to the defendant.) (jm) |
| 11/08/2013 | 7 | 12 | Minute Entry for proceedings held before Magistrate Judge Nancy Joseph: Arraignment and Plea hrg. held on 11/8/13 as to Mariano A Meza (1). Defendant advised of rights, charges, penalties and fines. Not Guilty plea entered by the deft. STD: 1/17/14. Case referred to Magistrate Judge William E Callahan, Jr. for pretrial purposes. BRIEFING: 11/22/13, 12/2/13, 12/6/13. Court orders GJ materials disclosed no later than 1 business day prior to trial. VOIR DIRE: 1/9/14. TRIAL: 1/13/14 at 9:00. Deft. is currently in state custody. Crt. orders the deft. returned to state custody and a detainer lodged. Should he be released from state custody, he is to be brought back to this court for further proceedings. (Tape #9:33:59–9:37:21) (kmf) |
| 11/08/2013 | 8 | 14 | PRETRIAL ORDER as to Mariano A Meza. Motions due: 11/22/13; Responsse due: 12/2/13; Replies due: 12/6/13. Signed by Magistrate Judge William E Callahan, Jr on 11/8/13. (cc: all counsel) (kmf) |
| 11/12/2013 | 9 | | Warrant Returned Executed on 11/8/13 as to Mariano A Meza. (mlm) (Entered: 11/13/2013) |
| 11/12/2013 | 10 | | Detainer Lodged as to Mariano A Meza (mlm) (Entered: 11/13/2013) |
| 11/22/2013 | 11 | 15 | MOTION for Extension of Time to File by Mariano A Meza.(Linnen, Julie) |
| 11/25/2013 | | | TEXT ONLY ORDER signed by Magistrate Judge William E Callahan, Jr on 11/25/1 granting 11 Motion for Extension of Time to File Motions as to Mariano A Meza (1). The deft shall submit any motions by 12/6/2013. Responses, if any, are due by 12/16/2013. Replies, if any, are due by 12/20/2013. The Court makes a Speedy Trial finding that the time between November 22, 2013 and December 6, 2013 is excluded under 18:3161(h)(7)(B)(iv). (cc: all counsel) (bdf) |
| 12/06/2013 | 12 | 18 | MOTION to Dismiss *for Failure to Allege an Element of the Offense* by Mariano A Meza.(Linnen, Julie) |
| 12/06/2013 | 13 | 25 | MOTION to Dismiss *the Indictment* by Mariano A Meza.(Linnen, Julie) |
| 12/06/2013 | 14 | 43 | MOTION to Suppress by Mariano A Meza.(Linnen, Julie) |
| 12/12/2013 | 15 | | NOTICE OF HEARING ON MOTION as to Mariano A Meza 14 MOTION to Suppress. Motion Hearing set for 12/19/2013 09:30 AM in Courtroom 242, 517 E Wisconsin Ave., Milwaukee, WI 53202 before Magistrate Judge William E Callahan Jr. (cc: all counsel)(bdf) Modified on 1/7/2014 (bdf). |
| 12/17/2013 | 16 | 45 | MOTION to Adjourn *Jury Trial* by Mariano A Meza.(Bugni, Joseph) |
| 12/17/2013 | 17 | 47 | LETTER *RE/Request to Reschedule Evidentiary Hearing* (Bugni, Joseph) |
| 12/18/2013 | | | |

| | | | |
|---|---|---|---|
| | | | TEXT ONLY ORDER signed by Judge Rudolph T Randa on 12/18/2013 granting 16 Motion to Adjourn 1/13/2014 Jury Trial as to Mariano A Meza. (cc: all counsel) (Zik, Linda) |
| 12/18/2013 | 18 | | NOTICE OF RESCHEDULED HEARING ON MOTION as to Mariano A Meza 14 MOTION to Suppress Motion Hearing set for 1/7/2014 09:00 AM in Courtroom 242, 517 E Wisconsin Ave., Milwaukee, WI 53202 before Magistrate Judge William E Callahan Jr. (cc: all counsel)(bdf) |
| 01/03/2014 | 19 | 48 | ORDER with APPLICATION for Writ of Habeas Corpus ad Prosequendum signed by Magistrate Judge William E Callahan, Jr on 1/3/2014, for the appearance of Mariano A Meza on January 7, 2014 at 9:00 a.m. before Honorable William E. Callahan in Courtroom 242. (cc: all counsel) (msc) |
| 01/07/2014 | 20 | 50 | Minute Entry for proceedings held before Magistrate Judge William E Callahan, Jr: Evidentiary Hearing as to Mariano A Meza held on 1/7/2014. Testimony taken. Court set follow briefing schedule: briefs due February 3rd regarding motion to suppress – govt will file response to motion to dismiss and briefs due February 10th to motion to suppress – defense will file reply to motion to dismiss (Court Reporter Sheryl) (bdf) (Entered: 01/09/2014) |
| 01/17/2014 | 21 | | TRANSCRIPT of Evidentiary hearing as to Mariano A Meza held on January 7, 2014, before Judge William E. Callahan, Jr.. Court Reporter/Transcriber Sheryl L. Stawski, Contact at 414/881–0922. Transcripts may be purchased using the Transcript Order Form found on our website or viewed at the court public terminal. **NOTICE RE REDACTION OF TRANSCRIPTS:** If necessary, within 7 business days each party shall inform the Court of their intent to redact personal identifiers by filing a Notice of Intent to Redact. Please read the policy located on our website www.wied.uscourts.gov Redaction Statement due 2/10/2014. Redacted Transcript Deadline set for 2/21/2014. Release of Transcript Restriction set for 4/21/2014. (Stawski, Sheryl) |
| 01/23/2014 | 22 | 51 | Writ of Habeas Corpus ad Prosequendum Returned Executed as to Mariano A Meza on 11/8/2013. (djd) |
| 02/03/2014 | 23 | 53 | RESPONSE by USA as to Mariano A Meza re 13 MOTION to Dismiss *the Indictment* , 14 MOTION to Suppress , 12 MOTION to Dismiss *for Failure to Allege an Element of the Offense GOVERNMENT'S CONSOLIDATED RESPONSE* (Hoffman, Gail) |
| 02/03/2014 | 24 | 68 | BRIEF by Mariano A Meza in Support re 14 MOTION to Suppress (Linnen, Julie) |
| 02/10/2014 | 25 | 82 | BRIEF in Opposition by USA as to Mariano A Meza re 14 MOTION to Suppress (Hoffman, Gail) |
| 02/10/2014 | 26 | 85 | REPLY TO RESPONSE to Motion by Mariano A Meza re 13 MOTION to Dismiss *the Indictment* , 14 MOTION to Suppress , 12 MOTION to Dismiss *for Failure to Allege an Element of the Offense* (Linnen, Julie) |
| 02/25/2014 | 27 | 95 | RECOMMENDATIONS as to Mariano A Meza IT IS RECOMMENDED that 13 MOTION to Dismiss *the Indictment* be denied, IT IS FURTHER RECOMMENDED that the 14 MOTION to Suppress be denied, IT IS FURTHER RECOMMENDED that the deft's 12 MOTION to Dismiss *for* |

| | | | |
|---|---|---|---|
| | | | *Failure to Allege an Element of the Offense* be denied. Signed by Magistrate Judge William E Callahan, Jr on 2/25/14. (cc: all counsel) (bdf) |
| 02/26/2014 | | | Case as to Mariano A Meza no longer referred to Magistrate Judge William E Callahan, Jr. File Transmitted to Judge Rudolph T Randa. (bdf) |
| 03/11/2014 | 28 | 115 | OBJECTION TO REPORT AND RECOMMENDATIONS 27 by Mariano A Meza (Linnen, Julie) |
| 03/20/2014 | 29 | 135 | RESPONSE by USA as to Mariano A Meza *LETTER RESPONSE RE: DEFENDANT'S OBJECTION TO MAGISTRATE JUDGE'S RECOMMENDATIONS* (Hoffman, Gail) |
| 04/04/2014 | 30 | | Writ of Habeas Corpus ad Prosequendum Returned Executed as to Mariano A Meza on 3/21/14. (mlm) (Entered: 04/07/2014) |
| 04/11/2014 | 31 | 136 | ORDER ADOPTING REPORT AND RECOMMENDATIONS as to Mariano A. Meza signed by Judge Rudolph T. Randa on 4/11/2014. 12 13 Motions to Dismiss DENIED; 14 Motion to Suppress DENIED. (cc: all counsel) (cb) |
| 05/01/2014 | 32 | | PRIOR RECORD UPDATE MEMO – BOND STUDY (Sealed) filed by US Pretrial Office as to Mariano A Meza (NOTICE: Counsel for defendant is required to provide a copy of this document to the defendant.) (jm) |
| 05/01/2014 | 33 | 138 | Minute Entry for proceedings held before Magistrate Judge Nancy Joseph: Detention Hearing held as to Mariano A Meza. The state has released the deft. and he is here by way of a detainer. The deft. does not contest and stipulates to detention at this time. Crt. statements before ruling. Based on the stipulation to detention, the court orders the deft. detained pending further proceedings. (Tape #2:21:30–2:23:15) (kmf) |
| 05/01/2014 | 34 | 139 | ORDER OF DETENTION Pending Trial as to Mariano A Meza. Signed by Magistrate Judge Nancy Joseph on 5/1/14. (cc: all counsel) (kmf) (Entered: 05/07/2014) |
| 06/06/2014 | 35 | 140 | LETTER from Joseph A. Bugni *re preparing for trial* (Bugni, Joseph) |
| 06/10/2014 | 36 | 141 | ORDER TO CONTINUE – Ends of Justice Signed by Judge Rudolph T Randa on 6/10/2014 as to Mariano A Meza. 2–day Jury Trial set for 7/14/2014 09:00 AM in Courtroom 320, 517 E Wisconsin Ave., Milwaukee, WI 53202 before Judge Rudolph T Randa. Proposed Voir Dire Questions and Proposed Jury Instructions due by 7/10/2014. Court makes a speedy trial finding pursuant to 18 USC Sections 3161(h)(7)(A), (h)(7)(B)(i) and (v). Time excluded from 4/11/2014 until 7/14/2014. (cc: all counsel) (Zik, Linda) |
| 06/30/2014 | 37 | 143 | MOTION to Adjourn *Jury Trial Date* by Mariano A Meza.(Linnen, Julie) |
| 07/01/2014 | | | TEXT ONLY ORDER signed by Judge Rudolph T. Randa on 7/1/2014 GRANTING 37 MOTION to Adjourn *Jury Trial* as to Mariano A Meza. 2–day Jury Trial now set for 8/6/2014 at 9:00 AM in Courtroom 320, 517 E. Wisconsin Ave., Milwaukee, WI Judge Rudolph T. Randa. Proposed Voir Dire Questions and Jury Instructions now due 7/31/2014. (cc: all counsel) (cb) |
| 07/01/2014 | | | Set/Reset Deadlines as to Mariano A Meza: Voir Dire deadline 7/31/2014 (cb) |
| 07/01/2014 | 38 | | NOTICE OF ATTORNEY APPEARANCE: Juval Orisha Scott appearing for Mariano A Meza (Scott, Juval) |

| 07/31/2014 | 39 | 145 | PROPOSED VOIR DIRE by Mariano A Meza. (Linnen, Julie) |
|---|---|---|---|
| 07/31/2014 | 40 | 152 | PROPOSED VOIR DIRE by USA as to Mariano A Meza (Hoffman, Gail) |
| 07/31/2014 | 41 | 159 | TRIAL BRIEF by USA as to Mariano A Meza (Hoffman, Gail) |
| 07/31/2014 | 42 | 163 | PROPOSED JURY INSTRUCTIONS by USA as to Mariano A Meza (Hoffman, Gail) |
| 07/31/2014 | 43 | 189 | MOTION Attorney–Conducted Voir Dire by Mariano A Meza. (Attachments: # 1 Memorandum in Support of Attorney–Conducted Voir Dire)(Linnen, Julie) |
| 07/31/2014 | 44 | 204 | MOTION to Strike *Surplusage from the Indictment* by Mariano A Meza.(Linnen, Julie) |
| 07/31/2014 | 45 | 207 | MOTION in Limine by Mariano A Meza.(Linnen, Julie) |
| 07/31/2014 | 46 | 210 | PROPOSED JURY INSTRUCTIONS by Mariano A Meza. (Linnen, Julie) |
| 08/01/2014 | 47 | | NOTICE OF HEARING as to Mariano A Meza. Change of Plea Hearing set for 8/5/2014 10:30 AM in Courtroom 320, 517 E Wisconsin Ave., Milwaukee, WI 53202 before Judge Rudolph T Randa. (cc: all counsel)(Zik, Linda) |
| 08/04/2014 | 48 | 214 | PLEA AGREEMENT as to Mariano A Meza (mlm) |
| 08/05/2014 | 49 | 227 | Minute Entry for proceedings held before Judge Rudolph T Randa: Change of Plea Hearing as to Mariano A Meza held on 8/5/2014. Guilty Plea entered as to Count 1 of the Indictment. Sentencing set for 10/2/2014 10:30 AM in Courtroom 320, 517 E Wisconsin Ave., Milwaukee, WI 53202 before Judge Rudolph T Randa. Defendant remanded to custody of US Marshal. (Court Reporter Heidi Trapp) (Zik, Linda) |
| 09/16/2014 | 50 | | PRESENTENCE INVESTIGATION REPORT (Sealed) filed by US Probation Office as to Mariano A Meza (NOTICE: Counsel for defendant is required to provide a copy of this document to the defendant. To view this document use your e–filing log–in and password.) (lc) |
| 09/16/2014 | 51 | | SENTENCING RECOMMENDATION (Sealed – for Judge only) filed by US Probation Office as to Mariano A Meza (lc) |
| 10/02/2014 | 52 | 228 | Minute Entry for proceedings held before Judge Rudolph T Randa: Sentencing held on 10/2/2014 for Mariano A Meza–Rodriguez as to Count 1 of the Indictment. Time–Served sentence. No Supervised Release. Fine is waived. $100.00 Special Assessment. SEE Judgment for additional details. Defendant remanded to custody of US Marshal. Defendant is to be deported to Mexico. (Court Reporter Heidi Trapp) (Zik, Linda) (Entered: 10/03/2014) |
| 10/07/2014 | 53 | 231 | JUDGMENT signed by Judge Rudolph T Randa on 10/7/14 as to Mariano A Meza (1), Ct 1, SENT: Time–Served; SUPERVISED RELEASE: None; FINE is waived; SPECIAL ASSESSMENT: $100.00. Conditions of Supervised Release imposed. SEE Judgment for additional details. (cc: all counsel) (mlm) |
| 10/07/2014 | 54 | | STATEMENT OF REASONS (Sealed) as to Mariano A Meza (NOTICE: Attorneys of record for the government and defendant may view this document using their e–filing log–in and password.) Signed by Judge Rudolph T Randa on 10/7/14. (cc: all counsel) (mlm) |

| | | | |
|---|---|---|---|
| 10/08/2014 | <u>55</u> | 236 | EXHIBIT LIST for 1/7/14 hearing filed by All Parties as to Mariano A Meza (cms) |
| 10/08/2014 | <u>56</u> | 237 | EXHIBITS received for USA, Mariano A Meza as to Mariano A Meza exhibit list filed. (Attachments: #<u>1</u> Exhibit List) (cms) |
| 10/15/2014 | <u>57</u> | 239 | NOTICE OF APPEAL by Mariano A Meza (Bugni, Joseph) |
| 10/15/2014 | <u>58</u> | 241 | DOCKETING STATEMENT by Mariano A Meza re <u>57</u> Notice of Appeal (Bugni, Joseph) |
| 10/15/2014 | <u>59</u> | | 7th Circuit Information Sheet re: <u>57</u> Notice of Appeal (dmm) |
| 10/15/2014 | <u>60</u> | | Attorney Cover Letter re: <u>57</u> Notice of Appeal (Attachments: #<u>1</u> Docket Sheet)(dmm) |
| 10/15/2014 | <u>61</u> | | Transmission of Notice of Appeal and Docket Sheet as to Mariano A Meza to US Court of Appeals re <u>57</u> Notice of Appeal. (cc: all counsel) (dmm) |
| 10/16/2014 | <u>62</u> | | USCA Case Number 14–3271 re: <u>57</u> Notice of Appeal filed by Mariano A Meza. (jv) |
| 05/04/2015 | <u>63</u> | | CRIMINAL APPEAL RECORD REQUEST RECEIVED from USCA for Mariano A Meza USCA Number: 14–3271 re <u>57</u> Notice of Appeal. (jv) |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DISTRICT COURT
EASTERN DISTRICT-WI
FILED

2013 OCT -8 P 4: 59

JON A. S̶ILIPP
CLERK

UNITED STATES OF AMERICA,

      Plaintiff,

v.

MARIANO A. MEZA,
a/k/a MARIANO ALELANDRO MEZA-RODRIGUEZ,

      Defendant.

Case No. 13-CR-**192**

[18 U.S.C. §§ 922(g)(5) & 924(a)(2)]

## INDICTMENT

### THE GRAND JURY FURTHER CHARGES THAT:

1.    On or about August 24, 2013, in the State and Eastern District of Wisconsin,

### MARIANO A. MEZA,
### a/k/a MARIANO ALEJANDRO MEZA-RODRIGUEZ,

being an alien illegally and unlawfully in the United States, knowingly possessed ammunition

which, prior to his possession of it, had been transported in interstate commerce, and the

possession of which was therefore in and affecting commerce.

2.    The ammunition is further described as one .22 caliber cartridge containing the

markings "C" on the head-stamp.

All in violation of Title 18, United States Code, Sections 922(g)(5) and 924(a)(2).

A TRUE BILL:

▬▬▬▬▬▬▬▬▬▬

FOREPERSON

Date: 8 Oct 2013

JAMES L. SANTELLE
United States Attorney

U.S. Department of Justice
Executive Office for United States Attorneys
U.S. Attorneys

| Name of Defendant:<br><br>Mariano A. Meza<br><br>a/k/a Mariano Alejandro Meza-Rodriguez | Address: City, State and Zip Code:<br><br>Milwaukee, Wisconsin 53205 |
|---|---|
| Date of Birth:<br>xx-xx-1987 | Occupation: |
| Name of Defendant's Attorney:<br>Unknown | Address of Defendant's Attorney:<br>Unknown |

| Name of U.S. Attorney:<br>Gail J. Hoffman |

| Has warrant been issued?    When?<br>No | By Whom? |
|---|---|

| Has warrant been executed?    When?<br>No | Where? |
|---|---|

| Has defendant appeared<br>before a Magistrate?    When?<br>No | Who? |
|---|---|

| Is the defendant in custody?    Where?<br>No |

| Pretrial Scheduling Conference Necessary? | ☐ YES | ☒ NO |
|---|---|---|

| Issue:<br>WARRANT | SUMMONS | NOTICE | MISDEMEANOR | FELONY |
|---|---|---|---|---|
| X | | | | X |

| Milwaukee Case ☒    Green Bay Case ☐    County: Milwaukee |

| Minor Offense |

| Petty Offense |

| Arraignment & plea before:    Judge:    Magistrate: |

(The above information to be furnished in duplicate (1 copy for file and 1 copy for Marshal with 2 conformed copies of indictment and/or information of defendant))

# THE ABOVE INFORMATION TO BE FURNISHED IF KNOWN

| Charge | Penalty |
|---|---|
| Possession of ammunition by an illegal alien<br>*18 U.S.C. §§ 922(g)(5)(A) & 924(a)(2)* | 10 years imprisonment; $250,000 fine; 3 years supervised release; $100 special assessment |

**Agency/Agent:**    Ken Handy, ATF

**OCDETF:**    No

Case 2:13-cr-00192-RTR    Document 1-1    Filed 10/08/13    Page 1 of 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

U.S. DISTRICT COURT
EASTERN DISTRICT.

UNITED STATES OF AMERICA,

2013 OCT 29 ₽ 2: 05

Plaintiff,

JON W. SANFIL ;;;
CLERK

Case No. 13-CR-192

MARIANO MEZA,

Defendant.

## IN THE MATTER OF THE APPLICATION AND ORDER FOR
## A WRIT OF HABEAS CORPUS FOR PROSECUTION

To:     The Honorable William E. Callahan, Jr.
        United States Magistrate Judge
        Eastern District of Wisconsin

The petition of the United States Attorney for the Eastern District of Wisconsin

respectfully shows to this Court that:

### MARIANO MEZA, xx/xx/1987,

is a defendant in the above-entitled action, whose appearance is necessary for a/an arraignment

and plea.

That petitioner further alleges that the matter will be held before the Honorable Nancy

Joseph, U.S. Courthouse, 517 East Wisconsin Avenue, Room 253, Milwaukee, Wisconsin,

commencing on November 8, 2013 at 9:30 am

The petitioner has been informed and believes that

### MARIANO MEZA,

is now confined at the County Correctional Facility Central, at which institution said person is

committed pursuant to the Order of a Court of the State of Wisconsin.

WHEREFORE, your petitioner prays that this Honorable Court order that a Writ of Habeas Corpus for Prosecution be issued from this Court to the Warden of County Correctional Facility Central, requiring him/her to produce the body of the said

**MARIANO MEZA**,

at the time and place set forth above, and after said proceedings to return the prisoner to said institution under safe and secure conduct.

Dated at Milwaukee, Wisconsin, this 29th day of October 2013.

Respectfully submitted,

JAMES L. SANTELLE
United States Attorney

GAIL J. HOFFMAN
Assistant United States Attorney

Upon the foregoing petition,

IT IS HEREBY ORDERED that a Writ of Habeas Corpus for Prosecution be issued as prayed for in the foregoing petition.

Dated at Milwaukee, Wisconsin, this 29th day of October 2013.

WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**

v.

**MARIANO MEZA**

**ARRAIGNMENT AND PLEA HEARING**

CASE NUMBER **13-CR-192**

---

HONORABLE **Nancy Joseph**, presiding
Deputy Clerk: **Karen**
Hearing Held: **November 8, 2013**

Court Reporter:
Hearing Began: 9:33:59
Hearing Ended: 9:37:21

**Appearances:**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA by: | **Gail Hoffman** | |
| **Mariano Meza**, in person, and by: | **Joseph Bugni/Julie Linnen** | ☐ CJA ☒ FDS ☐ RET |
| , in person, and by: | | ☐ CJA ☐ FDS ☐ RET |
| , in person, and by: | | ☐ CJA ☐ FDS ☐ RET |
| U.S. PROBATION OFFICE by: | **Daniel Dragolovich** | |

INTERPRETER: ☐ None   ☐ Sworn

☒ Original Indictment   ☐ Superseding Indictment   ☐ Information   ☐ Misdemeanor   ☒ Felony

| | | | |
|---|---|---|---|
| Speedy Trial Date: | **1/17/14** | Trial Estimate: | **2 days** |
| Final Pretrial Date: | | Voir Dire: | **1/9/14** |
| Jury Trial Date: | **1/13/14 at 9:00 a.m.** | Motions Due: | **11/22/13** |
| District Judge: | **Rudolph T. Randa** | Responses Due: | **12/2/13** |
| Magistrate Judge: | **William E. Callahan, Jr.** | Replies Due: | **12/6/13** |

---

☒ Defendant advised of rights
☒ Court orders counsel appointed
   ☐ Defendant to reimburse at $ ——— per month

☒ Defendant advised of charges, penalties, and fines

☒ Copy of indictment received by defendant
☐ ☐ Indictment read; or ☐ Defendant waives reading
☒ Not guilty plea entered by:
   ☒ defendant   ☐ the court

☒ Open file policy applies
   Discovery available: **today**
   ☐ Court discussed availability for incarcerated
      defendants
☒ Government to disclose GJ materials one day
   prior to trial
☐ Case designated complex
☐ Scheduling conference set for:

before ☐ AEG ☐ PJG ☐ WEC ☐ NJ

---

Maximum Penalties:   10 Yrs.   $250,000   3 Yrs.   $100

**Bond Status:**

- ☐ Defendant is ordered detained pending trial. SEE Order of Detention Pending Trial
- ☒ Court orders federal detainer
- ☐ Defendant is ordered temporarily detained for a maximum of : ☐ 3 days ☐ 5 days ☐ 10 days
  Detention Hearing set for: _____
- ☐ Defendant detained but court will review upon motion proposing conditions of release
- ☐ Bond continued as previously set
- ☐ Detention continued as previously set
- ☐ Defendant is released on: ☐ O/R bond ☐ Unsecured bond in the amount of: _____
  ☐ Bond secured by: ☐ Cash ☐ Property ☐ Cash/property

**Conditions of Release**:

- ☐ Report to Pretrial Services as directed
- ☐ Execute appearance bond:
  - ☐ Cash only _____
  - ☐ Property only: Value: $ _____ Location: _____
  - ☐ Cash or property: _____
- ☐ Seek/maintain employment
- ☐ Surrender passport to: _____
- ☐ Obtain no passport
- ☐ Travel restricted to: ☐ ED-WI ☐ _____
- ☐ No direct or indirect contact with: _____
  _____
- ☐ Undergo medical/psychiatric treatment: _____
- ☐ No firearms/weapons
- ☐ No excessive use of alcohol ☐ No alcohol
- ☐ No use, or illegal possession, of narcotic drugs/controlled substances, unless prescribed by a physician
  or other licensed medical practitioner
- ☐ Notify any medical provider of drug addiction
- ☐ Furnish PTS with a list of prescribed medications
- ☐ Testing for drugs/alcohol
- ☐ Inpatient drug treatment _____
- ☐ Outpatient drug treatment s directed by PTS
- ☐ Home confinement:
  - ☐ Curfew: ☐ as directed by USPO; or ☐ from: _____
  - ☐ Home detention with EM with restriction to residence at all times except for employment, education,
    religious services, medical, substance abuse or mental health treatment, attorney visits, court appearances,
    court-ordered obligations, or other activities approved in advance by USPO
  - ☐ Home detention with electronic monitoring
  - ☐ Defendant to pay cost of EM as directed by PTS

- ☐
- ☐
- ☐

Deft. currently in state custody. Crt. w/release the deft. And a detainear lodged. If released from state custody,
he will be brought back to this court for further proceedings.

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| | Plaintiff, | **PRETRIAL ORDER** |
| v. | | Case No. **13-CR-192** |
| **MARIANO MEZA**, | | |
| | Defendant. | |

In accordance with the Federal Rules of Criminal Procedure and the Criminal Local Rules for the United States District Court for the Eastern District of Wisconsin, IT IS ORDERED that as part of the pretrial proceedings in this case the parties shall comply with the following motion practice:

1. All motions, together with supporting documents, shall be filed by _____ 11/22/13 _____ ; opposing memorandum shall be filed by _____ 12/2/13 _____ ; and any reply shall be filed by _____ 12/6/13 _____ .

   a. Each motion shall be filed separately, although the moving party may file one memorandum in support of multiple motions.
   b. The length of any legal memorandum shall be in accordance with Civil L.R. 7(f).
   c. Any <u>discovery motion</u> under Fed.R.Crim.P. 16(a) or 16(b) must be accompanied by the statement required by Criminal L.R. 16(b).
   d. No motions to adopt or join in a motion of a co-defendant will be permitted without prior approval of the court for good cause shown.

2. a. If either party files a motion seeking an evidentiary hearing, Criminal L.R. 12(c) applies and the movant is not required to file a supporting memorandum of law with the motion (SEE Criminal L.R. 12(b)(5)).
   b. If a motion seeks an evidentiary hearing, the movant shall provide in the motion:

      (1) a short, plain statement of the principal legal issue or issues at stake and specific grounds for relief in the motion;
      (2) after a conference with the non-moving party, a description of the material disputed facts that movant claims require an evidentiary hearing; and
      (3) an estimate of the in-court time necessary for the hearing.

   c. The non-moving party may file a response opposing an evidentiary hearing within 3 days after filing of a movant's motion seeking an evidentiary hearing. The non-movant's response shall include a short, plain statement of why that party believes that an evidentiary hearing is unnecessary (SEE Criminal L.R. 12(c)).

3. All motions pertaining to bail (e.g. motions for reduction of bail, modifications of conditions of release and reconsideration of detention orders) shall be addressed to the magistrate judge in this district who set bail or issued the order of detention. A copy of the motion shall be either delivered directly, or faxed, to that magistrate judge's chambers.

4. In all cases, counsel are to provide paper copies of all motions and supporting documentation directly to the magistrate judge's chambers. Such copies are to be clearly marked "COPY" on the first page of each document submitted.

Dated at Milwaukee, Wisconsin this <u>8th</u> day of November, 2013.

<div align="right">

s/ William E. Callahan, Jr.
UNITED STATES MAGISTRATE JUDGE

</div>

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

      Plaintiff,

      v.                           Case No. 13-cr-192-rtr

MARIANO A. MEZA,

      Defendant.

## DEFENDANT'S UNOPPOSED MOTION TO EXTEND THE DEADLINE FOR FILING PRETRIAL MOTIONS

Defendant Mariano A. Meza, through counsel, moves this Court for an order extending to December 6, 2013 his deadline for filing pretrial motions. The grounds for this request are as follows:

(1)    Meza is charged with violating 18 U.S.C. § 922(g)(5) and has pleaded not guilty.

(2)    The pretrial order in this case sets November 22, 2013 as the deadline for pretrial motions.

(3)    Counsel reviewed the initial round of discovery provided in a timely fashion by the government and then requested additional discovery, which counsel received and reviewed earlier this week.

(4)     The allegation in this case is that Meza is an alien illegally and unlawfully in the United States who possessed one .22 caliber cartridge.

(5)     Counsel has met with Meza but needs additional time to research any potential challenges to be raised at this stage of the proceedings, consult with co-counsel and Meza, and prepare any submissions.

(6)     Accordingly, Meza respectfully asks that his deadline for filing pretrial motions be extended to December 6, 2013.

(7)     Counsel for the government, Assistant United States Attorney Gail Hoffman, does not object to Meza's request.

Dated this 22nd day of November, 2013.

Respectfully submitted,
MARIANO A. MEZA, Defendant

/s/ Julie K. Linnen
Julie K. Linnen

FEDERAL DEFENDER SERVICES
 OF WISCONSIN, INC.
222 West Washington Avenue, Suite 680
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
julie_linnen@fd.org

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a true and correct copy of the foregoing to be served by the Court's CM/ECF System to Assistant United States Attorney Gail Hoffman, this 22nd day of November, 2013.


*/s/ Julie K. Linnen*
Julie K. Linnen

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

       Plaintiff,

   v.                                Case No. 13CR192

MARIANO A. MEZA,

       Defendant.

---

## DEFENDANT'S FIRST PRETRIAL MOTION: MOTION TO DISMISS THE INDICTMENT FOR FAILURE TO ALLEGE AN ELEMENT OF THE OFFENSE

Mariano Meza, by counsel, moves under the Fifth and Sixth Amendments and Rules 7 and 12(a) of the Federal Rules of Criminal Procedure, for an order dismissing the one-count indictment because it fails to sufficiently allege an element of the offense. A violation of 18 U.S.C. § 922(g) must be committed knowingly. Here, the indictment alleges that Meza acted knowingly but only with regard to one of § 922(g)'s two statutory elements—his possession of the ammunition. There is no mental state associated with the indictment's allegation that he was "an alien ... illegally or unlawfully in the United States." This omission renders the indictment infirm and therefore it must be dismissed.

1.0    An indictment must set forth the elements of the offense and the facts allegedly satisfying those elements.

The Fifth Amendment guarantees every defendant the right to an indictment by grand jury, and the Sixth Amendment guarantees that a defendant be informed of the charges against him. *United States v. Hinkle*, 637 F.2d 1154, 1157 (7th Cir. 1981). For an indictment to comply with these constitutional mandates, it must satisfy three minimum requirements: first, it must adequately state all of the elements of the crime charged; second, it must inform the defendant of the nature of the charge which he must defend; and finally, the indictment must allow the defendant to plead the judgment as a bar to any future prosecution for the same offense. *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000).

As set out in Fed. R. Crim. P. 7(c)(1), an indictment must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." It's generally sufficient if it "tracks" the words of the statute itself, "so long as those words expressly set forth all the elements necessary to constitute the offense intended to be punished." *Smith*, 230 F.3d at 305; *see United States v. Allender*, 62 F.3d 909, 914 (7th Cir. 1995). These requirements protect the defendant from conviction "on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him." *Russell v. United States*, 369 U.S. 749, 770 (1962).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

2.0    The indictment in this case must be dismissed because it fails to sufficiently allege the mens rea element of the offense.

Section 924(a)(2) requires that a violation of § 922(g) be committed "knowingly." The indictment, however, alleges that Meza acted knowingly but only in possessing the ammunition. It ignores the other element of § 922(g) that is applicable here—his status as an illegal or unlawful alien. 18 U.S.C. § 922(g)(5). That is, the indictment says nothing about whether Meza knew that he was illegal alien or that the jury found that there was probable cause to believe that he knew he was an illegal alien. Because the indictment fails to allege that Meza possessed the requisite mens rea as to both elements of § 922(g)(5), it must be dismissed.

Meza faces federal prosecution for possessing one .22 caliber cartridge. 18 U.S.C §§ 922(g)(5), 924(a)(2). These provisions, read together, set forth the elements of the charged offense. Section 922(g)(5) makes it unlawful for "an alien... illegally or unlawfully in the United States" to "possess in or affecting commerce, any firearm or ammunition," and 924(a)(2) provides the mens rea: the offense must be committed "knowingly," 18 U.S.C. § 924(a)(2) (subjecting individuals who knowingly violate § 922(g) to a fine and up to ten years' imprisonment). Nothing in the statute limits the import of the term "knowingly" to the possession of the bullets.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Yet the indictment is worded in such a way that "knowingly" modifies only Meza's possession of the ammunition:

> [Meza], being an alien illegally and unlawfully in the United States, knowingly possessed ammunition which, prior to his possession of it, had been transported in interstate commerce...

DE 1. Possession of ammunition, alone, does not violate § 922(g)(5). For a violation to occur, the defendant must possess the ammunition and—and this is an important *and*—be an alien illegally and unlawfully in the United States. The term knowingly found in § 924(a)(2) would naturally modify both elements. The rule is that unless the text of a statute says differently, the term knowingly "requires proof of knowledge of the facts that constitute the offense." *Bryan v. United States,* 524 U.S. 184, 193 (1998); *see also Staples v. United States*, 511 U.S. 600, 622 n. 3 (1994) (Ginsburg, J., concurring) (noting "[t]he mens rea presumption requires knowledge only of the facts that make the defendant's conduct illegal." (citations omitted)). Nothing in § 924(a) or § 922(g)(5) says otherwise.

To read the word "knowingly" as "leapfrogging" over the first element of 922(g) and applying only to the element of possession "defies linguistic sense—and not a little grammatical gravity." *United States v. Games-Perez,* 677 F.3d 1136 (10th Cir. 2012) (Gorscuh, J., concurring in the judgment) (acknowledging that circuit precedent compelled a decision to the contrary but strongly suggesting that the court would have been better off actually "applying the law Congress wrote"

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

requiring knowledge of both § 922(g)'s elements). After all, Congress set forth three elements in a particular order, "[a]nd it makes no sense to read the word 'knowingly' as so modest that it might blush in the face of the very first element only to regain its composure and reappear at the second." *Id.* It's simply linguistically illogical and nonsensical to require mens rea only to the possession element.

To be clear, the government is not required to prove that Meza had knowledge of the law or the illegality of his actions. *United States v. Wilson,* 437 F.3d 616, 620 (7th Cir. 2006). But it must prove that he knew of the facts that would constitute each element of the offense. *See Flores-Figueroa v. United States,* 556 U.S. 646, 649 (2009) (ordinarily, when a "criminal statute… introduces the elements of a crime with the word 'knowingly,'" courts "apply[] that word to each element.") ; *see also United States v. X-Citement Video, Inc.,* 513 U.S. 63, 79 (1994) (Stevens, J., concurring). In *Flores-Figueroa,* the Court held that in the context of aggravated identify theft, the government must prove not only that a defendant *knowingly* possessed a means of identification but also that the defendant *knew* the identification belonged to another person. *Id.* at 647 (interpreting 18 U.S.C. § 1028A(a)(1)). The Court hypothesized, "[w]ould we apply a statute that makes it unlawful 'knowingly to possess drugs' to a person who steals a passenger's backpack without knowing that the bag has drugs inside?" *Id.* at 650. According to

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

the Court, it "makes little sense" to read the mens rea element out of the portion of the statute that makes possession of a certain object criminal. *Id.*

Not surprisingly, the Seventh Circuit's case law supports this interpretation of the statute. In *United States v. Ballentine,* 4 F.3d 504 (7th Cir. 1993), the Court explained, a "[d]efendant's knowledge of his status as a 'fugitive' was not an element of [§ 922(g)(2)]; he only had to know charges were pending against him that he refused to answer charges, and that he left jurisdiction where charges were pending." *Id.* at 506. Similarly, *United States v. McGiffen,* 267 F.3d 581 (7th Cir. 2001), also supports this interpretation. In *McGiffen,* the Court held that in order to sustain a conviction under § 922(*o*)(1), the government must prove the defendant's knowledge that the weapon he possessed had the characteristics of a machine gun. *Id.* at 590. Notably, it's § 924(a)(2) — the same statute that's at play here — that sets forth the mens rea that was at issue in both of those cases. *See* 18 U.S.C. § 924(a)(2) ("Whoever *knowingly* violates subsection (a)(6), (d), (g), (h), (i), (j), or (o) of section 922 shall be...") (emphasis added).

What's more, if there remains any ambiguity as to the mens rea requirement of § 922(g)(5), that ambiguity should be resolved in Mr. Meza's favor and the indictment dismissed. *See Rewis v. United States,* 401 U.S. 808, 812 (1971) ("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."). The Supreme Court has made that point clear: "Application of the rule

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability." *Liparota v. United States*, 471 U.S. 419, 427 (1985).

3.0    Conclusion

The issue here is straight forward: the indictment does not allege that Meza possessed the requisite mens rea as to both elements of § 922(g)(5)—that he knew he possessed ammunition and that he was an illegal immigrant. Because this required element was omitted, the indictment no longer conforms to minimal constitutional safeguards and must be dismissed.

Dated at Milwaukee, Wisconsin, this 6th day of December, 2013.

Respectfully submitted,

/s/      Julie K. Linnen
Joseph A. Bugni
Julie K. Linnen
FEDERAL DEFENDER SERVICES
      OF WISCONSIN, INC.
517 E. Wisconsin Ave. - Ste 182
Milwaukee, WI 53202
Tel. (414) 221-900
Fax (414) 221-9901
E-mail: joseph_bugni@fd.org
          julie_linnen@fd.org

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    *vs.*                    Case No. 13CR192 (RTR/WEC)

MARIANO MEZA,

        Defendant.

## DEFENDANT'S SECOND PRETRIAL MOTION:
## MOTION TO DISMISS THE INDICTMENT

Mariano Meza, by counsel, moves to dismiss the one-count indictment alleging a violation of 18 U.S.C. § 922(g)(5). In support, he submits the following:

The government alleges that Meza is an alien illegally or unlawfully in the United States and that he possessed ammunition—one .22 caliber cartridge. On October 8, 2013, he was charged in a one-count indictment with violating 18 U.S.C. § 922(g)(5). In response, Meza files this motion to dismiss the indictment making both a facial and an as-applied constitutional challenge to the statute. The facial challenge explains that the complete ban in § 922(g)(5) on all illegal aliens possessing firearms is overbroad and thus violates the Second Amendment. The as-applied challenge contends that the ban in § 922(g)(5) violates Mr. Meza's Second

Amendment rights.[1] Should the court find that the Second Amendment protects the rights of illegal aliens to possess firearms and ammunition, then the defense requests an evidentiary hearing for the government to produce evidence that the ban in § 922(g)(5) survives some form of heightened scrutiny.

1.0 Questions Presented:

In resolving his motion, the court must answer two questions:

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." The First, Second and Fourth Amendments all use the term "the people," and courts have uniformly held that the protections of the First and Fourth Amendments extend to illegal aliens. When the Second Amendment uses the identical term "the people" does it also extend its protections to illegal aliens?

The Second Amendment protects the long-standing and pre-existing right of the people to bear arms. Section 922(g)(5)'s absolute prohibition for illegal aliens infringes on that right. When a statute infringes on a constitutional right, the government must establish that it passes some form of heightened scrutiny. Is the complete ban on illegal aliens possessing a gun closely related to a compelling governmental interest?

2.0 "The People" referenced in the Second Amendment Are the Same "People" Referenced in the First and Fourth Amendments.

The Second Amendment, like the First and Fourth Amendments, protects an individual, pre-existing "right of the people" that "shall not be infringed." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). That is, the right existed at common law before the Bill of Rights: "[The right to bear arms] is not a right granted by the

---

[1] Though no case has addressed whether the Second Amendment applies to ammunition, the right to bear arms means little if they must remain unloaded.

Federal Defender Services
of Wisconsin, Inc.

Constitution. Neither is it in any manner dependent upon that instrument for its existence." *United States v. Cruikshank*, 92 U.S. 542, 553 (1876). Rather, the Constitution acknowledges and protects that right, and it does so for "the people." U.S. Const. amend. II.

"The people" is a term of art used in the Bill of Rights, and many courts have found that "the people" referenced in the First, Second, and Fourth Amendments are the same "people"—that is, the term means the same thing in each amendment. *United States v. Emerson*, 270 F.3d 203, 227–28 (5th Cir. 2001); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990); *Parker v. District of Columbia*, 478 F.3d 370, 381 (D.C. Cir. 2007); *Nordyke v. King*, 364 F.3d 1025, 1028–29 (9th Cir. 2004) (Gould, J., dissenting from denial of rehearing en banc). In *Emerson*, the Fifth Circuit held that "[t]here is no evidence in the text of the Second Amendment, or any other part of the Constitution, that the words 'the people' have a different connotation within the Second Amendment than when employed elsewhere in the Constitution."

Courts draw that understanding from the language, structure, and purpose of the three Amendments. *Id.* Of course, the First, Second, and Fourth Amendments were ratified at the same time. And they all serve the same purpose: to limit government infringement of a right that existed before the ratification of the Constitution. In doing so, each Amendment also recognizes who posses that right—it is "the right of the people."

The First Amendment: "Congress shall make no law . . . abridging . . . *the right of the people* peaceably to assemble, and to petition the government for a redress of grievances."

The Fourth Amendment: "*The right of the people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

The Second Amendment: "*[T]he right of the people* to keep and bear Arms shall not be infringed."

As with any statute or contract, the use of identical phrasing within the Constitution is not a coincidence. *See Parker*, 478 F.3d at 382; *see also Fla. Dept. of Rev. v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 39 (2008) (noting "identical words used in different parts of the same act are intended to have the same meaning" (quotation omitted)). The Supreme Court recognized that fact in *United States v. Verdugo-Urquidez*, stating: "'the people' seems to have been a term of art employed in select parts of the Constitution," referring to those who are "protected by the Fourth Amendment, and by the First and Second Amendments." 494 U.S. 259, 265 (1990). Seizing on this shared usage and purpose, several Circuit Judges writing in dissent from en banc review observed that: "[I]t is hard to imagine that the drafters of the Constitution meant 'the people' in the Second Amendment to take on a meaning different from the meaning ascribed to that term throughout the rest of the Bill of Rights." *King*, 364 F.3d at 1028–29 (Gould, J., dissenting from denial of rehearing en banc). And in *Heller* the Supreme Court reaffirmed this understanding: "the term unambiguously

refers to all members of the political community, not an unspecified subset." 554 U.S. at 580.

2.1. "The People" Are Those With a Substantial Connection to the Country

The seminal case ascribing a precise meaning to the term "the people" arose in the context of a Fourth Amendment claim. *See Verdugo-Urquidez*, 494 U.S. at 265. There the Supreme Court found: "'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Verdugo-Urquidez*, 494 U.S. at 265; *see also Heller*, 554 U.S. at 580 (discussing *Verdugo-Urquidez*). In *Verdugo-Urquidez*, the defendant's home in Mexico was searched shortly after he was arrested and brought to America. 494 U.S. at 262. He claimed that the Fourth Amendment's protections extended to his home in Mexico. The Supreme Court rejected that argument, but before doing so, it gave a detailed analysis of the Fourth Amendment and the term "the people."

No clear holding emerged from *Verdugo-Urquidez* definitively establishing who qualifies as "the people" and who does not. But the five Justices that formed the principal opinion held that "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections

with this country." *Id.* at 271. An alien establishes "substantial connections" when he (1) is voluntarily present in the United States and (2) "accept[s] some societal obligations." *Id.* at 273. There is some debate about whether that definition is too limited, and the concurring opinion supports a more expansive view. *Id.* at 276 (Kennedy, J. concurring); *see also Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 624–25 (5th Cir. 2006) (recognizing and discussing this tension). But at this point the argument is purely academic: the "substantial connections" test governs. Therefore to qualify for the protections of those three amendments an alien must have "substantial connections" to this country. *See Verdugo-Urquidez*, 494 U.S. at 271-73.

### 2.2 The Bill of Rights Extends to Aliens In Many Contexts, Including the Second Amendment.

The idea that the Bill of Rights extends to aliens—here legally or not—is not novel. The Supreme Court has noted that illegal aliens are part of our common fabric: there are "millions of aliens who are unlawfully present in the United States [who] are part of American society." *See Plyler v. Doe*, 457 U.S. 202, 219 (1982). And the First and Fourth Amendments apply just the same to such individuals as they do every citizen. As the Supreme Court noted in 1939: "It has been explicitly and repeatedly affirmed by this Court, without a dissenting voice, that freedom of speech and of assembly for any lawful purpose are rights of personal liberty secured to all persons, *without regard to citizenship*, by the due process clause of the Fourteenth Amendment." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 519 (1939)

Federal Defender Services
of Wisconsin, Inc.

(per curiam, opinion of J. Stone) (emphasis added); *see also Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this country."). Courts have come to the same conclusion with the Fourth Amendment: "Because the Fourth Amendment applies to arrests of illegal aliens, the term 'reason to believe' in § 1357(a)(2) means constitutionally required probable cause." *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010); *see also United States v. Garcia-Garcia*, 633 F.3d 608, 609 (7th Cir. 2011) (applying a Fourth Amendment analysis to an illegal alien without any discussion or dispute as to whether that alien was protected by the Fourth Amendment). Illegal aliens are also protected by the constitution in other contexts, such as under the Fifth and Sixth Amendments. *Verdugo-Urquidez*, 494 U.S. at 271 (collecting cases).

2.3 Meza Has Substantial Connections to the United States

Just as illegal aliens can claim the protection of the First and Fourth Amendments because they are part of the "the people," so too can they claim the guarantees of the Second Amendment. The next question is whether Meza, as a non-citizen, is among "the people." *Verdugo-Urquidez*, 494 U.S. at 262. As explained above, that depends on whether he has substantial connections to the country: whether he is voluntarily present in the United States and has accepted "some societal obligations." *Id.* at 273.

Here, Meza is a long-time resident of Milwaukee. He attended elementary, middle and high school in the Milwaukee Public Schools. He has two daughters here. His mother lives here. And for all of his adult life he has lived here. Family, school, and work, of course, constitute the most stable and substantial connections that any person can have to a country. Thus, he is among "the people" who the Second Amendment guarantees the right to bear arms.

### 2.4 Heller's Somewhat Loose Language About Who Has Historically Held That Right Does Not Change the Test.

At points throughout the opinion, the *Heller* majority used imprecise language to identify who the Second Amendment applies to. At various points it described the right-holders as: the "national community," "all members of the political community," "Americans," "citizens," and "law-abiding citizens." *Heller*, 554 U.S. at 580, 581, 625, 629. Some courts have over-read the importance of this language relying on it to find that under the Second Amendment illegal immigrants are not included in "the people."[2] But in reading *Heller*, it's clear that those terms were not used to determine whether aliens have Second Amendment rights—that was not the

---

[2] The Fifth Circuit—with a divided panel—embraced this reading. *United States v. Portillo-Munoz*, 643 F.3d 437, 2011 WL 2306248 (5th Cir. 2011); *but see id.* at **5–9 (Denis, J. dissenting). In a half-page per curiam opinion, the Eighth Circuit followed the Fifth. *United States v. Flores*, 663 F.3d 1022. Though initially the Fourth Circuit remanded a challenge to § 922(g)(5) for the district court to decide what level of scrutiny to apply, *United States v. Guerrero-Leco*, 446 Fed. Appx. 610 (4th Cir. 2011), it eventually concluded that "illegal aliens do not belong to the class of law-abiding members of the political community to whom the protection of the Second Amendment is given." *United States v. Carpio-Leon*, 701 F.3d 974, 981 (4th Cir. 2012). *United States v. Lewis*, 2010 WL 337 0754, at *3 (N.D. Ga. May 26, 2010); *United States v. Yanez-Vasquez*, 2010 WL 411112, at *2 (D. Kan. Jan. 28, 2010).

question at issue in *Heller*. *See United States v. Huitron-Guizar*, 678 F.3d 1164, 1168 (10th Cir. 2012) (refusing to read an unwritten holding into *Heller*: "the question in *Heller* was the amendment's raison d'être—does it protect an individual or collective right?—and aliens were not part of the calculus."). Rather, those descriptions were used throughout the Court's analysis of whether the Second Amendment provided an individual right or a collective right. *Id.* at 580.

Ultimately the Supreme Court concluded that the Second Amendment secures an individual right—just like the First and Fourth Amendments. And the references to "Americans" and "citizens" are not holdings that control or bear on the question of who are "the people." Indeed, the Supreme Court emphasized that *Heller*'s holding was limited. *Id.* at 635 ("[S]ince this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field.") At no time did the Supreme Court address whether a non-citizen is protected by the Second Amendment. That question has been left open and it should be decided in Mr. Meza's favor; just as the First and Fourth Amendment protect illegal immigrants, so too does the Second Amendment.

3.0 Section 922(g)(5) infringes on Meza's Constitutional Right To Bear Arms.

There is no question that § 922(g)(5) abridges Meza's Second Amendment rights—the statute keeps him from possessing a gun. He can't exercise his right to bear arms if he can't possess one. The remaining issue is whether § 922(g)(5) is a

Federal Defender Services
of Wisconsin, Inc.

constitutionally permissible restraint of that right. Following the Seventh Circuit's interpretation of *Heller* in *Skoien* and *Williams*, the analysis is two-fold. *See United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010). First, is the defendant part of a group that is categorically banned from possessing a firearm? Here, the defendant is—§ 922(g)(5) nullifies the Second Amendment for him and all illegal aliens. Second, can the government show that the categorical ban is constitutional? *Williams*, 616 F.3d at 692 ("But the government does not get a free pass simply because Congress has established a 'categorical ban'; it still must prove that the ban is constitutional, a mandate that flows from *Heller* itself.").

3.1. Heightened Scrutiny Must Be Applied.

The extent of the government's burden is determined by the level of scrutiny this Court applies, whether it be strict scrutiny, intermediate scrutiny, some other heightened form, or rational-basis review. This is not an easy question: at this point, unfortunately, there is no clear answer. *Heller* removes rational-basis review from the equation. *See Heller,* 554 U.S. 570, 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."). So while it's clear that rational-basis review doesn't apply,

Federal Defender Services
of Wisconsin, Inc.

neither *Heller* nor the Supreme Court case that followed, *McDonald v. Chicago*, __ U.S. __, 130 S.Ct. 3020 (2010), identified the proper standard of review for these cases.

Such silence left it for the Circuits to decide. The Seventh Circuit, sitting en banc, side-stepped what it called the "'levels of scrutiny' quagmire." *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc). It alluded to courts using a "strong showing requirement" but it didn't definitively say what that would be. *Id.* at 641–42. And a couple months later, a Seventh Circuit panel again didn't resolve the question of what level of scrutiny to apply to all challenges to gun restrictions. *Williams*, 616 F.3d 685, 692. Instead, it applied an intermediate-scrutiny analysis, but clearly stated that it was not holding that intermediate scrutiny would always be appropriate. *Id.* Nothing has come along since then that would control what level of scrutiny this Court applies. In the most recent case on the issue, the Seventh Circuit cited *Williams* and noted: "[w]e apply that same analytical framework here, and again reserve the question whether a different kind of firearm regulation might require a different approach." *United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010).

3.1.1 Under Any Form of Heightened Form of Scrutiny, § 922(g)(5) Fails.

So, at the very least, this Court must apply a heightened form of scrutiny—something akin to intermediate scrutiny.[3] In *Skoien*, the Court noted that

---

[3] Mr. Marquez-Medina acknowledges that this Court must follow the Seventh Circuit and apply some heightened form of scrutiny, something akin to intermediate scrutiny, but will

"The United States concedes that some form of strong showing ('intermediate scrutiny,' many opinions say) is essential, and that § 922(g)(9) is valid only if substantially related to an important governmental objective." 614 F.3d at 641 (en banc).

The ban under § 922(g)(5) is a different sort of beast from the regulations at issue in *Skoien* and *Williams* and *Yancey*. In *Skoien*, the challenged ban on firearm possession was for those convicted of domestic abuse; in *Williams*, the challenged ban was for convicted felons; and in *Yancey*, the challenged ban was for drug users. In a challenge like this, the analysis starts with the nature of the ban: that is, what is the government's objective in creating that ban. *Williams*, 616 F.3d at 693. In *Skoien* and *Williams* the court upheld the ban because there was something inherently dangerous about the class of persons banned—felons and those convicted of domestic violence. While not every felon who cannot possess a firearm is dangerous, as a general class, society was and is safer by keeping guns out of those persons' hands. *Id; Skoien*, 614 F.3d at 642 ("[F]or no one doubts that the goal of § 922(g)(9), preventing armed mayhem, is an important governmental objective.") In that way, Congress sought to address a very real harm—armed mayhem— by placing a

reserve the right to argue on appeal that it should be strict scrutiny. *But s*ee *United States v. Chester*, 628 F.3d 673, 682–83 (4th Cir. 2010) (holding "we conclude that intermediate scrutiny is more appropriate than strict scrutiny").

Federal Defender Services
of Wisconsin, Inc.

categorical ban on a class of persons that as a general matter have posed a danger to society.

The ban at issue in *Yancey* is similar: Congress had a specific objective—namely, "suppressing armed violence." *Yancey*, 621 F.3d at 684. In upholding that ban, the court focused on the close parallels between prohibitions targeting the mentally ill, felons, and habitual drug users. *See id.* ("Keeping guns away from habitual drug abusers is analogous to disarming felons."); *and id.* at 685 ("Moreover, habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms."). The possession of a firearm by persons from each group poses a real and self-evident threat to society. *Id.* at 686.

But the same cannot be said of the ban at issue in § 922(g)(5). It can't be said that illegal immigrants as a general class are inherently dangerous. Indeed, the empirical data suggests the opposite.

- Even as the undocumented population has doubled to 12 million since 1994, the violent crime rate in the United States has declined 34.2 percent and the property crime rate has fallen 26.4 percent.[4]
- Among men age 18-39 (who comprise the vast majority of the prison population), the 3.5 percent incarceration rate of the native-born in 2000

---

[4] Rombaut & Ewing, The Myth of Immigrant Criminality and the Paradox of Assimilation: Incarceration Rates Among Native and Foreign-born Men 1, 4 (American Immigration Law Foundation 2007), http://www.immigrationpolicy.org/special-reports/myth-immigrant-criminality-and-para dox-assimilation (last visited March 7, 2012)

Federal Defender Services
of Wisconsin, Inc.

was 5 times higher than the 0.7 percent incarceration rate of the foreign-born.[5]

- A study found that first-generation immigrants were 45 percent less likely to commit violence than third-generation Americans, adjusting for individual, family and neighborhood background.[6]

The reality is that illegal immigrants are part of our society. *See Plyler*, 457 U.S. at 219, n.17. They are not a cause of armed mayhem, nor is criminalizing their possession of firearms a step towards preventing armed mayhem. *See Skoein*, 614 F.3d at 642 (noting "preventing armed mayhem, is an important governmental objective"). Without some stated reason that accords with logic, the government cannot sustain its burden and establish that the regulation at issue is substantially related to an important governmental objective. *See Williams*, 616 F.3d at 692 ("To pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective.").

And there is nothing in the legislative history that helps the government meet that burden. A variation of § 922(g)(5) was passed as an amendment, Title VII, to The Omnibus Crime Control and Safe Streets Act of 1967. It was not introduced with empirical data—or even any data—establishing a connection between illegal aliens and dangerousness to society. Rather, it came as a last-minute floor amendment

---

[5] *Id.*

[6] Robert Sampson, *Rethinking Crime and Immigration*, 7 Contexts 28, 29 (Winter 2008).

Federal Defender Services
of Wisconsin, Inc.

proposed by Senator Long. In *United States v. Bass,* 404 U.S. 336, 344 (1971), the

Supreme Court described Title VII as: "hastily passed, with little discussion, no

hearings, and no report."[7] The Senator concluded what little explanation he

provided with the command: "Several Senators: Vote! Vote!" David T. Hardy, *The*

*Firearms Owners' Protection Act: A Historical and Legal Perspective*, 17 Cumb. L. Rev.

585, 600-601 n.79 (1986/1987), citing 114 Cong. Rec. 14, 775. And many did just that,

without any real discussion, giving us the ban at issue here. *Id.* Eventually the ban

found in Title VII was amended in 1986 with the passage of the Firearms Owners'

Protection Act, and all prohibited persons were consolidated into a single

provision—§ 922(g).

---

[7] In a footnote, the Supreme Court summarized how the amendment squeaked its way through:

> On May 17, 1968, Senator Long introduced on the floor his amendment to S. 917, which he designated Title VII. His introductory remarks set forth the purpose of the amendment. 114 Cong.Rec. 13867—13869. About a week later he explained his amendment once again. There was a brief debate; the reaction was favorable but cautious, with 'further thought' and 'study' being suggested by several favorably inclined Senators who observed some problems with the bill as drafted. Unexpectedly, however, there was a call for a vote and Title VII passed without modification. See 114 Cong.Rec. 14772—14775. The amendment received only passing mention in the House discussion of the bill, 114 Cong.Rec. 16286, 16298, and never received committee consideration or study in the House either.

404 U.S. at 344 n.11.

Federal Defender Services
of Wisconsin, Inc.

It can't be said that all of the bans on firearm possession wrapped into § 922(g) have the same validity. Indeed, in *Heller* the Supreme Court noted that some prohibitions are "presumptively lawful," but that list contains the obvious—felons and the mentally ill. 554 U.S. at 627, n.26. The court in *Williams* noted the importance of the qualifying adverb "presumptively":

> In fact, the phrase presumptively lawful regulatory measures suggests the possibility that one or more of these longstanding regulations could be unconstitutional in the face of an as-applied challenge.

*Williams*, 616 F.3d at 692 (quotation omitted). Once we leave the margins and examine other bans contained in § 922(g) courts must take a more critical look and ask what is Congress's objective in prohibiting a particular class of person from possessing a gun. That is, courts must ask "why is Congress infringing that person's Second Amendment right?" If the reason for the specific ban isn't an important governmental objective, then the ban can't be constitutional. And if the ban is not substantially related to an important governmental interest that too will keep it from being constitutional. Here, the government cannot point to an important governmental interest for banning illegal aliens from owning firearms, nor can it establish that "its objective is advanced by means substantially related to that [important governmental interest]." *Williams*, 616 F.3d at 692. Thus, because the underlying statute is unconstitutional, this Court must dismiss the indictment against Mr. Meza.

4.0 Conclusion

The two questions presented in this case should be answered in a straightforward manner. First, the court must find that when the Constitution uses the term "the people" in the Second Amendment, it does so in the same manner and with the same breadth as the First and Fourth Amendments. Reading the Constitution that way means that the guarantees contained in the Second Amendment extend to those who have a substantial connection to the United States—including illegal aliens. Second, the Court must evaluate § 922(g)(5) under heightened scrutiny. In this case, the government cannot point to an important governmental objective in passing that ban, nor can it establish that prohibiting illegal immigrants from possessing firearms furthers an important governmental interest. As a result, the defendant's motion must be granted and § 922(g)(5) struck down as unconstitutional.

Federal Defender Services
of Wisconsin, Inc.

Dated at Milwaukee, Wisconsin, this 6th day of December, 2013.

Respectfully submitted,

/s/     Julie K. Linnen

Joseph A. Bugni
Julie K. Linnen
FEDERAL DEFENDER SERVICES
    OF WISCONSIN, INC.
517 E. Wisconsin Ave. - Ste 182
Milwaukee, WI 53202
Tel. (414) 221-9900
Fax (414) 221-9901
E-mail: joseph_bugni@fd.org
      julie_linnen@fd.org

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

      Plaintiff,

  v.

                            Case No. 13CR192 (RTR/WEC)

MARIANO A. MEZA,

      Defendant.

## DEFENDANT'S THIRD PRETRIAL MOTION: MOTION TO SUPPRESS STATEMENTS

Mariano Meza, by counsel, moves to suppress the statements that he made to an officer with the U.S. Department of Homeland Security on August 27, 2013. Counsel has spoken with AUSA Gail Hoffman who agrees that an evidentiary hearing is necessary.

Mr. Meza was arrested on state charges and held in custody. Days later, he was interviewed by an agent at the jail from the Department of Homeland Security. At that time, he was not Mirandized and he gave inculpatory statements that will be among the principle evidence at trial. The reports received in the discovery do not provide enough facts for this Court to determine whether Meza was in custody and was entitled to *Miranda* warnings. Thus, the defense seeks an evidentiary hearing on the issue, with briefing to follow about whether this interrogation violated his Fifth and Sixth Amendment rights. Again, the parties do not dispute

any facts because the report provides so few, other than Meza was interviewed in the jail.

Therefore, the defense asks that this Court hold an evidentiary hearing, allow the parties to brief the issues surrounding the suppression of Mr. Meza's statements to the immigration officer, and then enter an order suppressing those statements.

Dated at Milwaukee, Wisconsin, this 6th day of December, 2013.

Respectfully submitted,

/s/     Julie K. Linnen
Joseph A. Bugni
Julie K. Linnen
FEDERAL DEFENDER SERVICES
    OF WISCONSIN, INC.
517 E. Wisconsin Ave. - Ste 182
Milwaukee, WI 53202
Tel. (414) 221-900
Fax (414) 221-9901
E-mail:  joseph_bugni@fd.org
       julie_linnen@fd.org

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

        *Plaintiff,*

       *vs*.                              Case No. 13-cr-192 (RTR)

MARIANO A. MEZA,

        *Defendant.*

_____

## MOTION TO ADJOURN THE JURY TRIAL DATE
## AND TOLL THE TIME LIMITS UNDER THE SPEEDY TRIAL ACT

Mariano Meza, by counsel, requests that the Court remove this case from the court's calendar and toll the time limits prescribed by the Speedy Trial Act.

The defendant is charged under 18 U.S.C. § 922(g) with being an illegal alien in possession of a firearm, and he is currently in state custody. Among the motions that were previously filed by the defense was one that required an evidentiary hearing. The day that hearing was scheduled to take place, Thursday, December 19, 2013, Meza is also scheduled to appear in state court for a plea and sentencing on some unresolved state charges. Thus, we are requesting a new date be scheduled.

*Federal Defender Services*
*of Wisconsin, Inc.*

In order to accommodate the parties' holiday plans and give the magistrate judge adequate time to consider and resolve the defense's motions, the defense asks that this case be taken off the court's calendar. I have discussed this matter with AUSA Gail Hoffman, and she does not object to this request.

Thus, this adjournment will provide counsel with reasonable time necessary for the effective preparation of pretrial motions and the ends of justice served by granting this motion outweigh the best interest of the public and defendant in a speedy trial under 18 U.S.C. § 3161(h)(7)(A).

Dated at Milwaukee, Wisconsin this 17th day of December 2013.

Respectfully submitted,

/s/        *Joseph A. Bugni*
Joseph A. Bugni, WI Bar #1062514
FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
517 E. Wisconsin Ave - Rm 182
Milwaukee,   WI   53202
Tel.: (414) 221-9900
E-mail: joseph_bugni@fd.org

*Counsel for Defendant,* Mariano A. Meza

# FEDERAL DEFENDER SERVICES OF WISCONSIN, INC.

LEGAL COUNSEL

Daniel W. Stiller, Federal Defender

Craig W. Albee
Joseph A. Bugni
Anderson M. Gansner
Juval O. Scott

517 E. Wisconsin Avenue
Suite 182
Milwaukee, Wisconsin 53202

Telephone 414-221-9900
Facsimile 414-221-9901

December 17, 2013


Honorable William E. Callahan, Jr.
United States District Court
Eastern District of Wisconsin
517 E. Wisconsin Avenue
Milwaukee, WI 53202

RE:  *United States vs. Mariano A. Meza*
      Case No. 13-cr-192 (RTR) (WEC)

Dear Magistrate Judge Callahan:

An evidentiary hearing is scheduled in this case for December 19, 2013. The defendant is at this time in state custody and thus must be writed over for the hearing. It has come to the parties' attention that Meza also has a state court hearing scheduled for that same time and date. Therefore, the parties request that the hearing be continued and a new hearing scheduled.

Contemporaneous with this motion, the defense has filed a motion with Judge Randa to have this case removed from his trial calendar. That will give the parties time to brief the motions at issue and for this Court to resolve those same motions. I have spoken to AUSA Gail Hoffman and she joins in this request.

Thank you for your attention to this matter.

Sincerely,


/s/    *Joseph A. Bugni*

JAB/cm

U.S. DISTRICT COURT
EASTERN DIST.
FILED

2014 JAN 3

JON W. SANFILIP
CLERK

UNITED STATES OF AMERICA,

                                    Plaintiff,

        v.                                          Case No. 13-CR-192

MARIANO ALEJANDRO MEZA,

                            Defendant.

## IN THE MATTER OF THE APPLICATION AND ORDER FOR
## A WRIT OF HABEAS CORPUS FOR PROSECUTION

To:     The Honorable William E. Callahan, Jr.
        United States Magistrate Judge
        Eastern District of Wisconsin

        The petition of the United States Attorney for the Eastern District of Wisconsin

respectfully shows to this Court that:

**MARIANO ALEJANDRO MEZA, DOC#: 333783425, DOB: xx/xx/1987,**

is a defendant in the above-entitled action, whose appearance is necessary for a/an suppression

hearing.

        That petitioner further alleges that the matter will be held before the Honorable William

E. Callahan, Jr., U.S. Courthouse, 517 East Wisconsin Avenue, Room 242, Milwaukee,

Wisconsin, commencing on January 7, 2014 at 9:00 a.m.

        The petitioner has been informed and believes that

**MARIANO ALEJANDRO MEZA, DOC#: 333783425, DOB: xx/xx/1987,**

is now confined at the County Correctional Facility - Central, at which institution said person is

committed pursuant to the Order of a Court of the State of Wisconsin.

WHEREFORE, your petitioner prays that this Honorable Court order that a Writ of Habeas Corpus for Prosecution be issued from this Court to the Warden of County Correctional Facility - Central, requiring him/her to produce the body of the said

**MARIANO ALEJANDRO MEZA, DOC#: 333783425, DOB: xx/xx/1987,**

at the time and place set forth above, and after said proceedings to return the prisoner to said institution under safe and secure conduct.

Dated at Milwaukee, Wisconsin, this 3rd day of January, 2014.

Respectfully submitted,

JAMES L. SANTELLE
United States Attorney

GAIL J. HOFFMAN
Assistant United States Attorney

Upon the foregoing petition,

IT IS HEREBY ORDERED that a Writ of Habeas Corpus for Prosecution be issued as prayed for in the foregoing petition.

Dated at Milwaukee, Wisconsin, this 3rd day of January, 2014.

WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

# United States District Court

## EASTERN DISTRICT OF WISCONSIN

## COURT MINUTES

HON. **WILLIAM E. CALLAHAN, JR.**, presiding.

DATE: **January 7, 2014**

CASE NO. **13-CR-192**

UNITED STATES v. **MARIANO MEZA**

PROCEEDING: **EVIDENTIARY HEARING**

Deputy Clerk: Brenda

Court Reporter: Sheryl

Time Called: 9:15

Time Concluded: 10:35

UNITED STATES by: **Gail Hoffman**

      Probation Officer:

      Interpreter:

DEFENDANT: **Mariano Meza**, in person, and by

ATTORNEY: **Joseph Bugni and Julie Linnen**

---

Court gives background of case

Govt calls Agent Cassandra Shearing, sworn, testified

Cross of witness by defense counsel

Govt's redirect of witness

Court question witness

Recross of witness by defense counsel

9:51 Govt calls Agent Russell Dykema, sworn, testified

Cross of witness by defense counsel

10:12 Govt rest. Defense rest.

Court request side bar with counsel

Court set following briefing schedule for motion to suppress and motion to dismiss

    - briefs from both parties to be filed on February 3rd - govt will file response to motion to dismiss

    - briefs from both parties to be filed on February 10th to motion to suppress - defense will file reply to

     motion to dismiss

RTR

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,     2014 JAN 23  A 8: 34

Plaintiff,      ILIFPU
CLERK

v.                                                        Case No. 13-CR-192

MARIANO MEZA,

Defendant.

## WRIT OF HABEAS CORPUS FOR PROSECUTION

To:     **WARDEN OR SUPERINTENDENT, COUNTY CORRECTIONAL FACILITY
CENTRAL OR ANY OTHER PERSON HAVING CUSTODY OF THE DEFENDANT, THE
UNITED STATES MARSHAL FOR THE EASTERN DISTRICT OF WISCONSIN, AND
ANY UNITED STATES MARSHAL OF ANY DISTRICT WHEREIN THE DEFENDANT
MAY BE IN CUSTODY.**

WE COMMAND that you have the body of Mariano Meza, now detained at County
Correctional Facility Central, produced under safe and secure conduct, to the Honorable Nancy
Joseph, United States Courthouse, 517 East Wisconsin Avenue, Milwaukee, Wisconsin, commencing
on November 8, 2013 at 9:30 am. for the purpose of a/an arraignment and plea.

WE FURTHER COMMAND that at the completion of said proceedings, you return the
prisoner to said institution, under safe and secure conduct, and have you then and there this Writ.

WITNESS, The Honorable William E. Callahan, Jr., United States Magistrate Judge for the
Eastern District of Wisconsin, at Milwaukee, in the State and Eastern District of Wisconsin, on this
27 day of October 2013.

JON W. SANFILIPPO
Clerk of Court

BY:

Deputy Clerk

I ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___

ON THIS __8__ DAY OF __Nov__ , __2013__ ___ ___ ___ ___ OF THE

WITHIN NAMED __M. Meza__ AT __MCCF__

AND TRANSPORTED HIM TO __usms__ WHERE HE

WAS COMMITTED INTO THE CUSTODY OF __usms__

ON THE __8__ DAY OF __Nov__ , __2013__.

KEVIN A CARR
UNITED STATES MARSHAL

By: _____
DEPUTY

___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___

ON THIS __8__ DAY OF __Nov__ , __2013__ ___ ___ ___ ___ OF THE

WITHIN NAMED __M Meza__ AT __usms__

AND TRANSPORTED HIM TO __MCCF__ WHERE HE

WAS COMMITTED INTO THE CUSTODY OF __MCCF__

ON THE __9__ DAY OF __Nov__ , __2013__.

KEVIN A CARR
UNITED STATES MARSHAL

By: _____
DEPUTY

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

      v.                            Case No. 13-CR-192

MARIANO MEZA,
a/k/a MARIANO ALELANDRO MEZA-RODRIGUEZ,

        Defendant.

## GOVERNMENT'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS

       The United States of America, by its attorneys, James L. Santelle, United States

Attorney for the Eastern District of Wisconsin, and Gail J. Hoffman, Assistant United States

Attorney, hereby respectfully request that the court deny the defendant's motions set forth

below.

### Introduction

       On October 8, 2013, a grand jury sitting in the Eastern District of Wisconsin returned a

one count indictment charging Meza as an illegal alien in possession of ammunition under

Title 18, United States Code, § 922(g)(5).   R.1. Meza was subsequently arraigned on this

charge, and has since filed the following three motions challenging (1) whether the indictment

fails to allege an element of the offense; (2) whether the prohibition against possession of

firearms and ammunition by illegal aliens violates the Second Amendment; and, (3) whether

the statement obtained from Meza by an immigration officer must be suppressed.   R.12-14.

1

<center>**Analysis**</center>

1. **Meza's motion to dismiss the indictment because it does not allege an essential element fails as the government does not need to prove that Meza knew of his prohibited status.**

The indictment in the instant case alleges that Meza is an alien in possession of ammunition in violation of Title 18, United States Code, Sections 922 (g)(5) and 924(a)(2). Meza alleges that the indictment fails to allege that "Meza knew he was an illegal alien," and it therefore must be dismissed. R. 12 at 3. Meza further alleges that Meza's knowledge of his illegal alien status is an essential element of the crime, and because the indictment did not specifically allege this, the indictment must be dismissed. To the contrary, Meza's knowledge of his alienage is not a necessary element of the offense to be alleged in the indictment, therefore this argument fails. Moreover, appellate courts have ruled on this specific issue and rejected Meza's contention.

First, the Seventh Circuit has set forth a standard for reviewing objections to the sufficiency of the indictment. In *United States v. Glecier*, 923 F.2d 496, 499 (7th Cir. 1991) the court indicated that "in reviewing the sufficiency of an indictment, a court should consider the challenged count as a whole and should refrain from reading it in a hyper-technical manner." *Glecier*, 923 F.2d at 499 (quoting *United States v. Gironda*, 758 F.2d 1202, 1209 (7th Cir. 1985)).

In addition, the indictment need not track the exact language of the statute if the indictment otherwise alleges each of the essential elements of the crime. *United States v. Weatherspoon*, 581 F.2d 595, 600 (7th Cir. 1978). Likewise, when reviewing whether an essential element has been excluded, courts will not demand that any particular word or phrase be used, and that an element may be alleged "in any form" which substantially states

<center>2</center>

it. *Weatherspoon*, 581 F.2d at 600. The specificity requirement of Fed. R. Crim. P.7(c)(1) that

"the indictment or information shall be as plain and concise a definite written statement of the

essential facts constituting the offense charged" is satisfied when the indictment meets the

requirements of the Fifth and Sixth Amendments." *Glecier*, 923 F.2d at 499 n.2. An

indictment is sufficient "if it states the elements of the crime charged, informs the defendant

of the nature of the charge so that she may prepare a defense and enables the defendant to

plead the judgment as a bar against future prosecutions for the same offense." *United States*

*v. Agostino,* 132 F.3d 1183, 1189 (7th Cir. 1997).

In the case at hand, the Indictment reads as follows:

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     On or about August 24, 2013, in the State and Eastern District of Wisconsin,
**MARIANO A. MEZA,**
**a/k/a MARIANO ALEJANDRO MEZA-RODRIGUEZ,**

being an alien illegally and unlawfully in the United States, knowingly possessed
ammunition which, prior to his possession of it, had been transported in interstate
commerce, and the possession of which was therefore in and affecting commerce.

2.     The ammunition is further described as one .22 caliber cartridge containing the
markings "C" on the head-stamp.

All in violation of Title 18, United States Code, Sections 922(g)(5) and 924(a)(2).

Here, simply by comparing the statutory language of the statute to the language of the

indictment, Meza has received sufficient notice of the charge.[1]

Moreover, the Seventh Circuit Pattern Jury Instructions for Title 18 United States Code

Section 922(g)(5) sets forth the following elements to be established at trial:

---

[1] Title 18, United States Code, Section 922(g)(5) reads in pertinent part that   it shall be unlawful for any person
who, being an alien illegally or unlawfully in the United States, to possess any firearm or ammunition which has
been shipped or transported in interstate or foreign commerce.

To sustain a charge of being an alien in possession of ammunition pursuant to 18 United States Code Section 922(g)(5), the government must prove the following propositions:

> First, the defendant knowingly possessed a firearm or ammunition; and
>
> Second, at the time of the charged act, the defendant was a prohibited person; and
>
> Third, the firearm or ammunition had been shipped or transported in interstate or foreign commerce.

*7th Cir. Pattern Crim. Jury Instructions, 2012.*

As clearly stated, the Seventh Circuit Pattern Jury Instructions for this offense do not include the defendant's knowledge of his prohibited status as an element of the offense. Thus, Meza's position finds no support in this circuit's analysis of Section 922(g)(5).

Moreover, in a case right on point, *United Sates v. Montero-Camargo*, 177 F.3d 1113, 1120 (9th Cir. 1999), *opinion withdrawn*, 192 F.3d 946, *reinstated by en banc opinion*, 208 F.3d 1122, 1127 n.8 (2000), the Ninth Circuit rejected the defendant's contention that the district court erred in refusing to instruct the jury that knowledge of his status as an illegal alien was an element of the ammunition possession charge. In so find, the court stated the defendant "need not have known that he was in the United States illegally to 'knowingly violate' 18, U.S.C. § 922(g)(5) as knowledge pertains only to the item possessed not to the status of the possessor." *Id.* at 1120.

Other Circuits have also found that the government need not prove the defendant's knowledge of his status. *United States v. Langley*, 62 F.3d 602, 604-06 (4th Cir. 1995) (en banc) (government need not prove knowledge of felon status nor of interstate commerce nexus);

4

*United States v. Ballentine*, 4 F.3d 504, 506 (7th Cir. 1993) (proof of defendant's knowledge of status as a fugitive unnecessary; government need only show defendant's knowledge that charges were pending); *United States v. Dancy*, 861 F.2d 77, 81-82 (5th Cir. 1988) (collecting cases) (construing legislative history of § 924(a)(1)(B) not to impose requirement of proving defendant's knowledge of status of felon); *United States v. Hutzell*, 217 F.3d 966, 967-68 (8th Cir. 2000) (government not required to prove knowledge of status under § 922(g)(9); *United States v. Butler*, 637 F.3d 519, 532 (5th Cir. 2011); (in § 922(g)(6) prosecution the *mens rea* requirement only applies to the act of firearm possession, not prohibited status).[2]

Indeed the Seventh Circuit recently analyzed the language of Section 922(g) in the context of a challenge to Section 922(g)(9), the subsection prohibiting the possession of firearms or ammunition by those convicted of misdemeanor crimes of domestic violence. In *United States v. Stein*, 712 F.3d 1038, 1040-1041 (7th Cir. 2013) the court stated that "ultimately, as a matter of statutory construction, there is no reason to think Congress intended 'knowingly' to mean different things for different subsections of section 922(g)." *Id.* at 1041. The referenced *Butler*, a 922(g)(6) prosecution where the government did not need to prove the defendant knew of his prohibited status, and noted that it would be illogical to impose a different *mens rea* requirement on different subsections of Section 922(g). Thus, based upon the Seventh Circuit Pattern Jury Instructions in addition to case law, the government need not allege in the indictment nor prove at trial that Meza knew of his alien status. Accordingly, Meza's motion fails.

---

[2] *Butler* also rejects Meza's arguments under *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994) and *United States v. Flores-Figueroa.* 556 U.S. 646 (2009).

**2.    Title 18, United States Code, Section 922(g)(5) neither violates the Second Amendment nor is subject to strict scrutiny.**

In his second motion, Meza alleges that Title 18, United States Code, Section 922(g)(5), the statute which prohibits illegal aliens from possessing ammunition and firearms, violates the Second Amendment to the United States Constitution, and that strict scrutiny should be applied in this review.   Meza is wrong, and this argument has been rejected by other appeal courts that have addressed this issue.

The Second Amendment to the United States Constitution allows for the "right of law-abiding, responsible citizens to use arms in defense of hearth and home."   *District of Columbia v. Heller,* 554 U.S. 570, 635 (2008).   When describing himself as among "the people," Meza presents himself as a stable part of the community with "family, school and work," and sets out his school and family ties.   R. 13 at 8.

Yet, the circumstances of the instant case, and Meza, fall far afield from the circumstances covered by the Second Amendment, and contemplated by *Heller.*   Contrary to this depiction of Meza, according to the Wisconsin Circuit Court Access, a public record, on September 25, 2013, in case number 2013FA006160, a domestic abuse restraining order was granted against Meza, including a firearm restriction, and Meza is "to refrain from committing acts or threats of domestic abuse against the petitioner."   In addition, on September 22, 2008, in case number 2008CM003450, Meza plead guilty to resisting or obstructing an officer.   Currently in case numbers 2013CM000394 and 2013CM003863, respectively, additional charges of resisting/obstructing an officer are pending against Meza from February and August of 2013.   Moreover, during his arrests Meza provided varied

answers when asked about his place of birth, and the social security number Meza provided did not correspond to him. Tr. 35. In short, Meza is present in the United States illegally, and these circumstances do not fall under the protection of *Heller*.

Furthermore, In *Heller*, the United States Supreme Court held that the Second Amendment guarantees an individual the right to possess and carry weapons. *Id*. Unlike the instant case, the individual in *Heller* seeking the right to the privileges conferred by the Second Amendment was a United States citizen. Thus, the issue of whether an alien has a right to bear arms was not presented to the Supreme Court. Regardless, *Heller* does not support Meza's claim that an illegal alien constitutes "the people" as referenced in the Second Amendment.

The Court in *Heller* found that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id*. In this same vein, the Supreme Court stated that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community. The Court continued, "[w]e start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all *Americans*." *Id*. at 580-581. (*Emphasis added*).

Indeed, as the Fifth Circuit in *United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011) interpreted *Heller,* the protections contained in the Second Amendment do not extend to aliens illegally present in the United States, and do not guarantee any right to illegal aliens to possess firearms. In *Portillo-Munoz*, the defendant, a Mexican citizen illegally present in the United States, possessed a firearm in order to protect chickens from coyotes at a ranch where

7

he worked.    The defendant entered a conditional guilty plea and alleged that his conviction

as an illegal alien in possession of a firearm violated the Second Amendment, and the Fifth

Amendment's Due Process Clause.

The Fifth Circuit found that "illegal aliens are not 'law-abiding, responsible citizens' or

'members of the political community,' and aliens who enter or remain in this country illegally

and without authorization are not Americans as that word is commonly understood."    *Id*. at

440.    The Fifth Circuit also found that the Court's language in *Heller* did not lend support to

the defendant's argument.    Likewise, the Fourth, and Eighth Circuits have also found that

the Second Amendment does not cover illegal aliens, and the Tenth Circuit upheld Section

922(g)(5) because it survives intermediate scrutiny.    *See United States v. Carpio-Leon,* 701 F.3d

974 (4th Cir. 2012); *United States v. Flores,* 663 F.3d 1022 (8th Cir. 2011); and, *United States v.*

*Huitron-Guizar,* 678 f.3D 1164 (10th Cir. 2012).

Like Meza, and to no avail, the defendant in *Portillo-Munoz* relied on *United States v.*

*Verdugo-Urquidez*, 494 U.S. 259 (1990).    In a decision prior to *Heller*, the Supreme Court in

*Verdugo-Urquidez* found that some defendants have Fourth Amendment rights in certain

circumstances, but this is not a case where a defendant present in the United States illegally

was held to be part of "the people" under the Constitution.    *Portillo-Munoz*, 643 F.3d at 440.

Therefore, despite Meza's children he fathered here, the presence of his mother, and school

attendance (R.13 at 8), the fact remains that Meza was present illegally in the United States

and as an illegal alien does not fall under "the people" as referenced in the Second Amendment.[3]

In addition, when Congress passed Title 18 United States Code Section 922(g)(5), Congress only limited the ban against firearms to aliens who are "illegally or unlawfully in the United States," and has made this illegal and unlawful status an element of the offense that the government that the government must prove beyond a reasonable doubt. In essence, like a felon in possession of a firearm, the statute prohibits the possession of firearms by persons who are here illegally and is thus intended to address illegal conduct.

Meza also argues that unlike cases which uphold other classes of prohibitions, there is nothing inherently dangerous about a person in this country illegally. *See United States v. Skoien*, 614 F.3d 639 (7th Cir. 2010)(en banc)(defendant convicted of domestic abuse); *United States v. Williams*, 616 F.3d 685 (7th Cir. 2010)(defendant a convicted felon); and, *United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010)(defendant an unlawful user of a controlled substance). To the contrary, the same can be said about non-violent felons who are also prohibited from possessing firearms. *See Yancey*, 631 F.3d at 685. Like Section 922(g)(3), the unlawful user of a controlled substance prohibition, Section 922 (g)(5) does not require a prior conviction or a finding of dangerousness. In addition, like Section 922(g)(3), Section 922(g)(5) seeks to prevent firearm possession by people who are engaged in illegal behavior such as Meza who is illegally present in the United States.

---

[3]As noted by Meza, district courts have also found that the Second Amendment does not apply to illegal aliens. See *United States v. Lewis*, 2010 WL 337 0754, at *3 (N.D. Ga. May 26, 2010); *United States v. Yanez-Vasquez*, 2010 WL 411112, at *2 (D. Kan. Jan 28, 2010).

Meza further argues that strict scrutiny governs the review of all Second Amendment claims. But that test does not apply here. While the Supreme Court declined to articulate a standard of review in *Heller*, its conclusion that specific firearm regulations were "presumptively lawful" under the Second Amendment displays a degree of deference to Congress that is inconsistent with strict scrutiny review. *See Heller*, 554 U.S. at 688 (Breyer, J., dissenting) (noting that "the majority implicitly, and appropriately, rejects [a "strict scrutiny" test] by broadly approving a set of laws . . . whose constitutionality under a strict scrutiny standard would be far from clear.") Moreover, a number of circuit courts, including the Seventh Circuit, have applied intermediate scrutiny when reviewing firearms laws. *See United States v. Chester*, 628 F.3d 73, 682-83 (4th Cir. 2010) (applying intermediate scrutiny to review of §922(g)(9)); *United States v. Reese*, 627 F.3d 792, 801-02 (10th Cir. 2010) (applying intermediate scrutiny to review of the disarmament of those subject to domestic violence restraining orders, under §922(g)(8)); *Williams*, 616 F.3d, 685, 692-94 (7th Cir. 2010) (applying intermediate scrutiny as-applied challenge to felon disarmament under §922(g)(1); and *Skoien*, 614 F.3d 638, 541-42 (7th Cir. 2010) (declining to specifically endorse a level of scrutiny, but upholding 18 U.S.C. §922(g)(9), which prohibits those convicted of "misdemeanor crimes of domestic violence," because "[b]oth logic and data establish a substantial relation between §922(g)(9)" and the "important governmental objective" of "preventing armed mayhem"). Accordingly, to the extent that Section 922(g)(5) is not a presumptively lawful regulatory measure, this court should apply an "intermediate scrutiny" standard of review.

Intermediate scrutiny generally requires some showing that the challenged law is "substantially related to an important government objective." *See, e.g., Clark v. Jeter*, 486 U.S.

456, 461 (1988). But there is reason to believe that an even greater degree of deference should be given to Congress in immigration-related matters. Quite simply, Congress's power over immigration-related matters is not merely "broad," but "over no conceivable subject is the legislative power of Congress more complete." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). As "a fundamental sovereign attribute" (*Id.*), "the responsibility for regulating the relationship between the United States and our alien visitors" – determinations about which aliens should be allowed to enter and remain in the United States and the terms and conditions imposed upon such aliens while they are here – is "committed to the political branches" of government. *Matthews v. Diaz*, 426 U.S. 67, 81 (1976). And, because Congress's "power over aliens is of a political character," its exercise of that power is "subject only to narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n.21 (1976); *see also Shaughnessy v. Mezei*, 345 U.S. 206, 210 (1953) (holding that congressional power over aliens is "largely immune from judicial control").

The Supreme Court has thus recognized Congress's authority to limit the rights of illegal aliens in ways that would not be constitutionally permissible for citizens or permanent residents. In *Fiallo*, the Court explained that "in the exercise of its broad power over immigration and naturalization, 'Congress regularly makes rules that would be acceptable if applied to citizens." *Fiallo*, 430 U.S. at 792 (quoting *Matthews*, 426 U.S. at 80). *See also Demore v. Kim*, 538 U.S. 510, 522 (2003) (noting that, since *Matthews*, "this Court has firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens"). Congress's power includes even "the authority to detain aliens suspected of entering the country illegally pending their deportation hearings

(*Reno v. Flores*, 507 U.S. 292, 305 (1993)), and to do so on a mandatory basis (*Kim*, 538 U.S. at

526-531).   Clearly, as Congress has the authority to detain all aliens suspected of being in this

country illegally, it also has the authority to limit illegal aliens' ability to possess a firearm.

 Moreover, Congress's decision to disarm illegal immigrants is "substantially related to

an important government objective," and would survive intermediate scrutiny even if

Congress did not have particularly broad discretion in regulating immigration.

 Along this line, Meza argues that illegal aliens are "not a cause of armed mayhem, nor

is criminalizing their possession of a firearm a step toward preventing armed mayhem."

R.13. at 14.   Yet a report on sentencing statistics from the United States Sentencing

Commission establishes that 47% of all federal offenses were committed by non-citizens.

U.S. Sentencing Commission Preliminary Quarterly Data Report, at 47 (tbl. 26), available at

http://www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/Quarterly_Senten

cing_Updates/USSC_2010_Quarter_Report_4th.pdf.   Additionally, non-citizens were

responsible for 42.1% of all kidnappings and hostage taking, 30.7% of all drug trafficking,

42.6% of all drug possession, and 50% of all national-defense offenses.   *Id.*

 Thus, Meza's motion for the court to find Title 18, United States Code, Section 922(g)(5)

unconstitutional under the Second Amendment must fail.

**3.** **The officer's questioning of Meza was not an interrogation and therefore need not be suppressed.**

 The United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) ruled

that in order protect the right against self-incrimination, law enforcement authorities must

advise an individual of certain rights prior to a custodial interrogation.   Statements provided

without these warnings may not be used in the government's case-in-chief.    *Id.*

In order to trigger *Miranda*, an individual must be both in "custody" and subject to "interrogation."    *United States v. Yusuff*, 96 F.3d 982, 987 (7th Cir. 1996).    In the instant case, the government does not dispute that Meza was in custody on August 27, 2013, when Customs and Immigration Officer Cassandra Shearing interviewed him.    At issue is the second inquiry, whether that questioning by Officer Shearing amounted to an "interrogation."    The *Miranda* Court defined custodial interrogation as "'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'"    U*nited States v. Westbrook*, 125 F.3d 996, 1002 (7th Cir. 1997)(quoting *Miranda*, 384 U.S. at 444).

Subsequently, the Court elaborated on "interrogation" and stated that it includes any words or actions on the part of law enforcement other than those normally part of arrest and custody, that the police should know are reasonably likely to elicit an incriminating response from the suspect.    *Pennsylvania v. Muniz*, 496 U.S. 291, 300-301 (1990).    The benchmark is "whether a reasonable objective observer would have believed that the law enforcement officer's statements to the defendant were reasonably likely to elicit an incriminating response."    *United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007).    Yet "not all statements obtained after a person is in custody are considered the product of interrogation."    *United States v. Ambrose*, 668 F.3d 943, 955 (7th Cir. 2012)( quoting *United States v. Swanson*, 635 F.3d 995, 1001-02 (7th Cir. 2011)).    The government asserts that questioning of Meza by Officer Shearing did not amount to an "interrogation."

In *United States v. Lopez-Garcia*, 565 F.3d 1306, 1317 (11th Cir. 2009) the Eleventh Circuit ruled that Miranda warnings were not required, finding no functional equivalent of interrogation, when an officer assigned to the jail's Immigration and Customs Enforcement unit asked the defendant in custody for a drug related charge about his immigration status because the officer did not know that the defendant would confess to illegal reentry. The court found that the officer should not have known that the defendant was reasonably likely to make self-incriminating statements during the interview although the officer was aware prior to the interview that the defendant was not born in the United States.

Similarly, in the instant case the purpose of Officer Shearing's interview was to access Meza's status from an administrative perspective related to deportation proceedings – not to illicit incriminating information. Tr. 5-6. Prior to the interview, Officer Shearing had neither read any of the police reports prepared regarding his arrest nor was she aware that Meza was in possession of a bullet. Tr. 22. Officer Shearing was alone in the interview room with Meza, he was not handcuffed, and the interview lasted approximately twenty minutes. Tr. 23-24. When asked if he had any questions, Meza wanted to know the purpose of the interview, and Officer Shearing told him that it was for immigration matters. Tr. 8, 22. Officer Shearing had no information to suggest that Meza had reentered the United States after deportation; only that he may have been in the country illegally. Tr. 26.

Had she learned from Meza that he reentered the United States after deportation, Officer Shearing would have stopped the interview. *Id.* Prior to the interview, Officer Shearing checked "all the systems," and found that Meza had no contact with Immigration. Tr. 27. At no point did Meza request that Officer Shearing refrain from asking him

biographical questions, and approximately one month later Officer Shearing learned that

Meza would be prosecuted in federal court.   Tr. 9.   Accordingly, the instant circumstances

are in keeping with *Lopez-Garcia*, and because Meza was not "interrogated" as contemplated

by *Miranda* and its progeny, Meza's statement given to Officer Shearing was lawfully

obtained, and thus admissible in the government's case-in-chief.

### Conclusion

Therefore, for the forgoing reasons, the government respectfully requests that the

defendant's motions be denied.

Respectfully submitted this 3rd day of February, 2014.

JAMES L. SANTELLE
United States Attorney

By:

s/Gail J. Hoffman
Assistant United States Attorney
Gail J. Hoffman Bar Number: 1007361
Office of the United States Attorney
Eastern District of Wisconsin
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin     53202
Telephone: (414) 297-1700; Fax: (414) 297-1738
E-Mail: gail.hoffman@usdoj.gov

15

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

       Plaintiff,

     v.                                Case No. 13CR192

MARIANO A. MEZA,

       Defendant.

---

## BRIEF IN SUPPORT OF MOTION TO SUPPRESS

The defense previously moved to suppress statements made by Mariano Meza. After the filing of that motion an evidentiary hearing was held and testimony taken. Two law enforcement officers testified: Agent Cassandra Shearing, who interviewed Mr. Meza on August 27, 2013 at the Milwaukee County Jail, and Special Agent Russell Dykema, who requested that Agent Shearing conduct the interview and who later conducted additional investigation based on the information obtained during that interview. In support of its original position that Meza's statement should be suppressed the defense submits this memorandum of law.

## 1.0 Questions Presented

Agent Shearing questioned Mr. Meza without advising him of his *Miranda* rights. Tr. at 6. That's not in dispute. In resolving the defense's motion to suppress, this Court is confronted with two issues:

**Custody:** An individual is in custody if under the circumstances a reasonable person would have felt he was not at liberty to terminate the interview and leave. Here, jail staff escorted Meza from his cell to a seven-by-seven interview room where Shearing was waiting, the door was locked, Shearing never told him that he was free to terminate the interview, and he didn't have the opportunity to ask questions until the interview was over. Under the circumstances was Meza's freedom of movement restrained to the degree associated with a formal arrest?

**Interrogation:** Interrogation refers to express questioning that a law enforcement officer should know is reasonably likely to elicit an incriminating response. As an ICE agent, Shearing enforces statutes criminalizing illegal immigration. She suspected that Meza was in the United States illegally and her questions of him laid the foundation for immigration-related criminal charges. Did Shearing's questions constitute an interrogation?

## 2.0    The Circumstances of the Interview

On August 27, 2013, Special Agent Dykema informed Agent Shearing that Mariano Meza had been arrested and was being held at the Milwaukee County Jail. Tr. at 5. S.A. Dykema requested that she interview Meza at the jail "to determine if [he] was here illegally or not." *Id.* Going into the interview, Shearing suspected, based on a tip from local law enforcement relayed to her by Dykema, that Meza was here illegally. Tr. at 26. The purpose of the interview was to confirm the suspicion.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Shearing interviewed Meza on the third floor of the jail. Tr. at 12. The general public is not allowed access to this area, but an exception is made for members of law enforcement. Tr. 10-12. Of course, as a jail, the Milwaukee County Jail stands as a place that is difficult to get in and, more importantly, out of—most people in jail would prefer not to be there, so the architects design them with plenty of heavy doors and locks. Even law enforcement officers like Shearing must comply with security measures to get inside: she had to present her credentials at least twice, go through several locked doors, and check-in with the on-duty correctional officer, before being escorted to a locked interview room. Tr. at 11-12.

Once Shearing approached the CO's desk and told her she was there to see Meza, the on-duty CO contacted personnel within Meza's pod to summon him and escort him to the interview room. When Meza was removed from his cell, there is no indication that Meza was told who he'd be meeting with or the purpose of the interview. Tr. at 12. When he arrived at the room, Shearing was seated in a chair facing the door. Tr. at 14. Meza sat directly across the table from her, adjacent to the door. The room itself was small and cramped—approximately, seven-by-seven feet, spacious enough for a small table and two or three chairs but not more. Tr. at 13. The agent's sketch of the room at the evidentiary hearing showed a door, table, chairs, and intercom. Tr. at 14-15. There is no evidence that the room, which was inaccessible to the general public and apart from the housing pod, had a window

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

or any other amenities. *Id.* at 11–12, 14–15. This is consistent with its location in the interior of the jail facility *Id.*

Once the door to the interview room closed, it automatically locked behind the exiting CO. Tr. at 16. With the door locked behind him, Meza sat down; Shearing then identified herself as an agent with Immigrations and Customs Enforcement and began questioning Meza. Tr. at 17 (describing interaction, including fact that her badge was visible). There's no evidence that she ever gave Meza the option of refusing or terminating the interview. And the agent didn't give any indication that she characterized Meza's participation as elective. With the exception of the first two questions establishing his name and address, all of Shearing's questions to Meza related to his immigration status and family. As Agent Shearing acknowledged, her questions of Meza laid the foundation for criminal charges. Tr. at 29-30.

It wasn't until the end of the twenty minute interview that Meza was allowed to ask "questions of [her], about the process, or what's going on." Tr. at 22. Shearing recalled that it wasn't until the end that Meza was given the opportunity to ask about the purpose of the interview. In response, Shearing explained that she "was trying to determine if he was here illegally and what status he may or may not have." *Id.* Once she'd finished determining Meza's immigration status, Shearing buzzed a CO to unlock the interview room; she then exited the room and left the

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

jail. Tr. at 19–20. At no time during the interview did Shearing offer Meza food or water, or allow him to place a call to his attorney or family members. Tr. at 19. And there's no indication that she told Meza how long she anticipated the interview would last.

### 3.0 Meza's statements must be suppressed because he was subjected to custodial interrogation without being advised of his *Miranda* rights.

Under these facts, the question is whether Shearing's questioning constituted custodial interrogation triggering *Miranda*'s safeguards. A custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Given the coercive nature of custodial interactions, an individual must be warned before questioning begins that he has "the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to questioning if he so desires." *Id.* at 478–79. If the warnings aren't provided, or if the government fails to demonstrate waiver, the evidence "obtained as a result of the interrogation" cannot be used against a defendant at trial. *Id.*

Here, the interviewing agent admitted that she questioned Meza without providing *Miranda* warnings. Suppression of Meza's unwarned statements turns on

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

whether they were made while he was: (1) in custody; and (2) subject to interrogation. *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984).

### 3.1 Meza was in custody when interviewed by Shearing.

On the issue of custody, Meza was in jail when the interview took place. This is but one feature of an interrogation relevant to the custody determination. *Howes v. Fields*, 132 S. Ct. 1181, 1191 (2012) ("When a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation."). Courts evaluate a person's custody status using the reasonable-person standard: considering the circumstances surrounding the investigation, would a reasonable person would have felt free to put a stop to the interrogation the interrogation and leave? *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004).

Simply put, custody "is a state of mind." *United States v. Slaight*, 620 F.3d 816, 819 (7th Cir. 2010). It is an objective inquiry into how a reasonable person would have understood the situation. *Id.* Neither the intentions, opinions, or perceptions of the interviewing officer, nor the subjective perception of the individual being questioned are considered. *Id.* at 820; *see also Beckwith v. United States*, 425 U.S. 341, 346-347 (1976). Nor does the reason behind the custody control. *United States v. Stewart*, 536 F.3d 714, 720 (7th Cir. 2008).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

When making the determination of whether a person is in "custody" the Seventh Circuit provided the following list of factors for Courts to consider:

- whether the encounter occurred in a public place;

- whether the suspect consented to speak with the officers;

- whether the officers informed the individual that he was not under arrest and was free to leave;

- whether the individual was moved to another area;

- whether there was a threatening presence of several officers and a display of weapons or physical force; and

- whether the officers' tone of voice was such that their requests were likely to be obeyed.

*United States v. Snodgrass*, 635 F.3d 324, 327 (7th Cir. 2011); *see also United States v. Ambrose*, 668 F.3d 943, 956 (7th Cir. 2012). In addition, to the factors from *Snodgrass*, the Seventh Circuit has noted that voluntarily agreeing to meet with law enforcement weighs against a custody determination, while the opposite's true if the interaction isn't voluntary. *Id.*

The Seventh Circuit has also noted that courts must determine if there are any other circumstances present that allow a court to gauge how a reasonable person would perceive the atmosphere, the questioning, and his ability to leave. *See United States v. Pelletier*, 700 F.3d 1109, 1115 (7th Cir. 2012). Here, one such factor is the dimensions and layout of the interview environment. The Seventh Circuit in *Ambrose* detailed how the spaciousness of the room and public visibility of the

7

interview influence the analysis. There, the interview was on an "active floor with many people," the conference table seated 20, and the doors to the room were at least partially open for the duration of the interview. 668 F.3d at 957. Those characteristics contributed to a finding that Ambrose was not in custody. By contrast, in *United States v. Slaight*, the Court observed that the "minute" size of the interrogation room made the atmosphere more coercive. 620 F.3d 816, 819 (7th Cir. 2010). There, the Court held that the officer's show of force while executing a warrant, "the claustrophobic setting of a windowless room the size of a bathroom," along with the defendant's knowledge that officers had evidence against him, would cause "[a]nyone in his situation" to think himself in custody. *Id.* at 821. And this was true even though officers gave Slaight the option of refusing the interview at the station and repeatedly told him that he was free to leave. *Id.* at 819.

That's not to say that an interviewer's method or approach is a less important consideration. The content and timing of questions or comments are equally relevant to the custody determination, and the same is true of the interviewer's demeanor and tone. *United States v. Littledale,* 652 F.3d 698, 701 (7th Cir. 2011) (identifying tone of voice as a relevant consideration); *see also Stansbury v. California,* 511 U.S. 318, 325–27 (1994) (information conveyed "by word or deed" to the suspect can be relevant to the custody issue). Indeed, in *Fields* the Supreme Court held that a prison inmate was not in custody because, importantly, he was told at the

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

beginning and again during the interview that he was free to go back to his cell, the interview took place in a average-sized conference room with the door open at times, and he was offered food and water. *Fields*, 132 S. Ct. at 1194.

At the evidentiary hearing, Shearing painted a more complete picture of the circumstances surrounding the interview: it took place in a small, cramped room in the bowels of the jail, the room was locked from the outside for the duration, and Shearing never told Meza that he was free to refuse or to terminate the interview and return to his cell. Once she'd finished determining Meza's immigration status, she buzzed a CO to unlock the interview room and then exited the room. Tr. at 19–20. At no time during the interview did Shearing offer Meza food or water, or allow him to place a call to his attorney or family members. *Id.* And there's no indication she told Meza how long she anticipated the interview would last. When confronted with these circumstances—locked in a "claustrophobic" room for the foreseeable future,  in an unfamiliar and uncomfortable environment, with a law enforcement officer who wants answers to questions having the potential to incriminate yourself and your family—anyone would think of him or herself as "in custody." *See Yarborough*, 541 U.S. at 662. ("[C]ustody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances.")

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Finally, as to the objective determination, this Court should find that "the relevant environment present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *See Fields,* 132 S. Ct. at 1190. This was not a "temporary and relatively nonthreatening" encounter. *See Maryland v. Shatzer*, 559 U.S. 98 (2010) (finding that a traffic stop did not have the same inherently coercive character as a station house interrogation). Meza was subjected to a surprise interview in a locked room within the already coercive, uncomfortable jail atmosphere. During the interview he was asked questions with criminal implications for himself and his family members, without being informed how long the interview would last. *Miranda* safeguards are in place to protect the privilege against self-incrimination in a coercive environment like this.

### 3.2 Agent Shearing interrogated Mr. Meza.

The second inquiry is whether Meza was subjected to interrogation. Interrogation triggering *Miranda* includes express questioning and "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). The analysis incorporates the perspectives of both the interrogator and the subject of the interrogation. *Smiley v. Thurmer*, 542 F.3d 574, 582 (7th Cir. 2008); *see also United States v. Ventura,* 947 F.Supp. 25 (D.P.R. 1996) (explaining the interrogation standard:

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

"[I]f an officer should know that a question is reasonably likely to elicit an incriminating response, and a reasonable person would perceive the question as an interrogative one, there is an interrogation.")(internal citations removed).

The goal is to "spare the accused from having to reveal, directly or indirectly, his knowledge of facts relating him to the offense or from having to share his thoughts and beliefs with the Government." *Doe v. United States,* 487 U.S. 201, 213 (1988). This is no different in a situation like Meza's, where the questions relate to immigration status and the answers could carry criminal consequences. In these circumstances, courts have said that *Miranda* warnings are required where an ICE agent is inquiring as to citizenship and status in the United States. *See e.g., United States v. Mata-Abundiz,* 717 F.2d 1277, 1278 (9th Cir. 1983) ("[i]f civil investigations by the [Immigration and Naturalization Service] were excluded from the *Miranda* rule, [immigration] agents could evade that rule by labeling all investigations civil."); *United States v. Gallardo,* 58 F. Supp. 2d 1018, 1021-22 (S.D. Iowa 1999) (barring the government from introducing in its case-in-chief evidence of defendant's answers to the citizenship and alien status questions); *United States v. Aragon-Ruiz,* 551 F. Supp. 2d 904 (D. Minn. 2008) (determining that statements were admissible because defendant heard and waived his *Miranda* rights twice). Shearing wasn't seeking basic benign, biographical information from Meza, she wanted to know if he was in the U.S. illegally.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

To be sure, the questions she posed to Meza related to criminal conduct. As an agent with the Immigration and Customs Enforcement, she is charged with enforcing U.S. immigration statutes, including those with criminal consequences. As she candidly acknowledged at the evidentiary hearing, the questions she posed to Meza addressed all the elements of at least two criminal offenses: illegal entry in violation of 18 U.S.C. § 1325 and illegal re-entry in violation of 18 U.S.C. § 1326. Tr. at 29–30. Whether she could ultimately establish a violation of either depended, of course, on the answers Meza provided. There's no doubt, though, that she has significant experience enforcing these and other immigration laws, and that she is aware of what constitutes criminal conduct. (Tr. at 25) (explaining that there have been times during similarly un-*Mirandized* interviews that the subject confesses to illegal re-entry, at which point the agency proceeds "down the criminal path.") According to Shearing, there is "no fool-proof way" to ensure that an un-*Mirandized* interview like Meza's doesn't result in an illegal re-entry confession. Tr. at 27.

And going into the interview, Shearing should have known that any questions related to Meza's immigration status would be reasonably likely to elicit an incriminating response. She knew that he was suspected of being here illegally. *Id.* Yet the following questions were among those she asked of Meza: "I asked him if he *had* a social security number; where he was born... whether his father was still alive or not; his mother; and her biographical information..."; "their citizenship";

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

"how did you get [to the U.S.]"  Tr. at 7–8; 17–18; 29. This knowledge cannot be reconciled with Shearing's characterization of the interview as mere administrative procedure.

Rather, Shearing's questions laid the foundation for immigration-related criminal offenses, including illegal entry under § 1325. It does not matter whether the Milwaukee office of the Department of Homeland Security has policy against prosecuting one of these offenses. At the evidentiary hearing, Shearing referred vaguely to a policy but couldn't say with certainty that the policy was written, and she admitted that a prosecution could proceed notwithstanding the existence of a policy. Tr.24–26, 28. Even if a written policy exists and is followed to a tee, its existence does not stop illegal entry from being a criminal offense. After all, the fact that a criminal offense is obscure or prosecuted infrequently does not render it invalid. *See Yick Wo v. Hopkins,* 118 U.S. 356 (1886). This was an interrogation and Meza was in custody at the time. Because *Miranda* warnings were required but never provided, Meza's statements must be suppressed.

**4.0  Conclusion.**

Without providing *Miranda* warnings, Shearing asked Meza targeted questions about his citizenship knowing they'd likely cause him to admit a violation of § 1325, if not a more serious criminal offense. And she asked him these questions in a tiny locked room within the Milwaukee County Jail—an unfamiliar and undoubtedly

13

unnerving environment to begin with. She didn't tell him he was free to leave. She didn't offer to let him call his attorney. She didn't ask him if he was willing to answer questions. She didn't even tell him he could pause the interview to use the restroom. This type of coercive interrogation is the reason *Miranda*'s safeguards exist. All of Meza's statements stemming from the unwarned custodial interrogation must be suppressed. *Miranda*, 384 U.S. at 444 ("[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates" the use of the Miranda safeguards.); *see also Brown v. Illinois*, 422 U.S. 590, 604 (1975) (the burden of showing admissibility rests on the prosecution).

Dated this 3rd day of January, 2014.

Respectfully submitted,
MARIANO A. MEZA, Defendant

*/s/ Julie K. Linnen*
Julie K. Linnen

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.
222 West Washington Avenue, Suite 680
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
julie_linnen@fd.org



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of Wisconsin*

*Federal Courthouse*         *(414)297-1700*
*517 E. Wisconsin Ave, Rm 530*     *Fax (414) 297-1738*
*Milwaukee WI 53202*       *www.justice.gov/usao/wie*

February 10, 2014

The Honorable Judge William E. Callahan, Jr.
United States Magistrate Judge
Room 250, 517 East Wisconsin Avenue
Milwaukee, WI 53202

     RE:    *United States v. Meza*, Case No. 13-CR-192

Dear Judge Callahan:

     This letter brief serves as the government's reply to the defendant's brief submitted in support of its motion to suppress Meza's statement to Officer Shearing. In sum, the government asserts that the instant case is distinguishable from the authorities cited by Meza and he was not "interrogated" as contemplated by *Miranda*.

     First, Meza cites to *United States v. Mata-Abundiz*, 717 F.2d 1277, 1278 (9th Cir. 1983) in support of its contention that "*Miranda* warnings are required where an ICE agent is inquiring as to citizenship and status in the United States." R.24 at 11. Contrary to the instant case, the defendant in *Mata-Abundiz* was in custody on alien in possession of firearm charges. The immigration agent's questions of the incarcerated defendant about citizenship required *Miranda* warnings because the INS investigator knew that "evidence of alienage, coupled with the evidence of firearms possession, could lead to federal prosecution…He had reason to know that any admission of alienage by [the defendant] would be highly incriminating." *Mata-Abundiz*, 717 F.2d at 1279. In other words, the questions asked by the immigration agent related directly to an element of the crime that the INS agent suspected. *Id.* at 1280. The court continued:

     This does not mean that admissions obtained in civil investigation of in-custody suspects can never be used in criminal prosecutions, unless the investigator first gives warnings. The question here, as in other contexts, turns on whether there was 'interrogation' within the meaning of *Miranda*. If an INS investigator has no reason to suspect that the question asked is likely to elicit an incriminating response, there is no interrogation, and

therefore, no *Miranda* violation.  Not all civil questioning constitutes interrogation…the investigator cannot control the constitutional question by placing a 'civil' label on the investigation.

*Id*.at 1279-1280.

Unlike *Mata-Abundiz*, Meza was neither in custody on charges related to his immigration status nor was he asked about the reason for his incarceration.  Officer Shearing was solely questioning Meza about his immigration status.  Tr. 5.  To set the stage, when questioning Meza, Officer Shearing was not wearing a uniform; identified herself as an immigration officer; and, first asked whether Meza had any questions of her to which Meza replied no.  Tr. 7.

Officer Shearing interviewed Meza no longer than twenty minutes, obtained biographical information from him; and, never questioned him about the basis for his incarceration.  Tr. 8.  Moreover, prior to the interview of Meza,Officer Shearing had neither read any of the police reports prepared regarding Meza's arrest nor was she aware that a bullet had been found during the investigation.  Tr. 22.  Therefore, Officer Shearing had no reason to suspect that her questions regarding alienage would elicit an incriminating response.

The instant case is similar to *United States v. Lugo*, 289 F.Supp.2d 790 (S.D. Texas 2003) where the defendant was incarcerated for unrelated state offenses and questioning by agents of the Border Patrol Criminal Alien Program (hereinafter "BORCAP") in jail did not rise to the level of "interrogation" within the meaning of *Miranda*.  Specifically, the court stated that when an alien is in custody for an unrelated state law offense the questioning by BORCAP of all inmates which concerned "only basic biographical information regarding inmates' names, date of birth, citizenship and alien status," did not constitute 'interrogation,' where BORCAP agents were merely fact finders who had no discretion upon whether any particular inmate would be prosecuted or subjected to administrative proceedings.

In so finding, the court in *Lugo* took note of another Ninth Circuit case, *United States v. Salgado*, 292 F.3d 1169 (9th Cir. 2002).  In *Salgado,* the defendant was in custody on a state charge unrelated to his immigration status when he was questioned by an immigration officer about his alienage.  The INS officer did not *Mirandize* the defendant, and based upon his answers the officer placed a detainer on him.  This allowed the defendant to be transferred to INS custody once the defendant completed his state sentence.

Salgado was deported, and he eventually returned to the United States where he was prosecuted for immigration violations.  Salgado sought to suppress the statement

made to the INS officer which caused him to be deported in the first place. *Lugo,* 289 F.Supp.2d 798. Citing *Salgado,* the district court in *Lugo* stated:

> *If* Salgado had been interviewed in connection with a prosecution for violating the immigration laws, or *if* Salgado had been in custody on charges relating to his immigration status, *then* questions about birthplace and citizenship might have been reasonably likely to elicit an incriminating response in which case he should have been *Mirandized* before-hand. We so held in *Mata-Abundiz.* But that is not this case. *Id.*

Nor is it this one. While incarcerated on unrelated state charges, Meza was asked the same biographical questions referenced above, and after the interview, Officer Shearing placed a detainer on Meza. Tr. 21.

While Meza argues that he could be charged with a violation of Title 8, United States Code, Section 1325, entry without inspection, it is the Immigration Office's policy not to prosecute that offense. Over the 1,000 immigration interviews that Officer Shearing has conducted zero have resulted in a criminal prosecution. Tr. 24-25. Had Officer Shearing received information or believed that Meza had re-entered the country after deportation, then she would have *Mirandized* him. Tr. 26-27.

Therefore, given the above and its previous filing, the government respectfully requests that this Court deny Meza's motion to suppress his statement to Officer Shearing.

Respectfully submitted this 10th day of February, 2014.

<div style="margin-left:auto">

JAMES L. SANTELLE
United States Attorney

By:

s/GAIL J. HOFFMAN
Assistant United States Attorney
Gail J. Hoffman Bar Number: 1007361
Attorney for Plaintiff
Office of the United States Attorney
Eastern District of Wisconsin
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin 53202
Telephone: (414) 297-1761; Fax: (414) 297-1738
E-Mail: gail.hoffman@usdoj.gov

</div>

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

       Plaintiff,

  v.                                 Case No. 13CR192

MARIANO A. MEZA,

       Defendant.

**CONSOLIDATED REPLY BRIEF IN SUPPORT OF MOTIONS TO DISMISS
AND MOTION TO SUPPRESS**

     Mariano Meza, through counsel, submits this consolidated reply brief in

support of his motion to dismiss the indictment for failure to allege an element of

the offense (Dkt. 12), his motion to dismiss the indictment on Second Amendment

grounds (Dkt. 13), and his motion to suppress evidence (Dkts. 14, 24).

**I.    The indictment must be dismissed because it fails to allege the elements of
§ 922(g)(5) and the facts satisfying those elements.**

     In opposition to Meza's motion to dismiss, the government argues that it is

not required to prove Meza's knowledge of his prohibited status. In other words, the

government does not need to establish that Meza knew he qualified as an "alien

unlawfully or illegally in the United States." And the government does not need to

prove that he had knowledge that it is a crime to possess ammunition with that

status. Meza agrees. After all, ignorance of the law is no defense. *Cheek v. United States,* 498 U.S. 192, 199 (1991).

Meza's argument is that the government must allege, and ultimately prove at trial, that he had knowledge of the facts constituting a violation of § 922(g)(5). This includes the facts giving rise to his unlawful or illegal status. Meza is not proposing this Court adopt a new interpretation of the *mens rea* requirement. It is the government's burden to prove that Meza knew of the facfts that constitute the offense. The Seventh Circuit has said that this understanding extends to all subsections of 18 U.S.C. § 922 that require a "knowing" violation, including those in § 922(g). *United States v. Stein*, 712 F.3d 1038, 1041 (7th Cir. 2013); *United States v. Carlton Wilson*, 159 F.3d 280, 289 (7th Cir. 1998). The government cites the Pattern Jury Instructions in support of its position, (Dkt. 23 at 4), but jury instructions do not replace the statutory text or supersede the caselaw interpreting it.

In *United States v. Carleton Wilson,* the Seventh Circuit addressed knowledge in the context of a § 922(g)(8) prosecution. 159 F.3d at 289. In that case, Wilson argued that he had no notice of § 922(g)(8)'s prohibition and was therefore unable to form the requisite *mens rea* to violate the statute. In rejecting Wilson's argument, the Court reiterated the common understanding that knowledge in this context applies to the facts constituting the offense. *Id.* The Court took care to note that the defendant did not argue that he lacked "knowledge of the actions constituting the offense (i.e., that

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

he was possessing a gun in his car and was subject to an order of protection)." *Id.* By contrast, "Wilson's lack of knowledge of the existence of the statute" was "immaterial." *Id.*

*United States v. Stein,* cited by the government, relies on the same understanding of the requisite *mens rea.* 712 F.3d 1038 (7th Cir. 2013). In *Stein,* the Court affirmed the district court's ruling that evidence concerning Stein's "knowledge of his legal status" — that he was prohibited from possessing a firearm — was irrelevant. *Id.* at 1039. Stein wanted to argue that he was ignorant of his prohibited status because he had been told that his prior battery conviction would not impact his ability to possess a firearm. *Id.* at 1039-1040. Importantly, the evidence in the case established Stein knew of his prior conviction. *Id.* The Court insisted that the distinction is essential: the term "knowingly" requires proof of knowledge of the facts, not knowledge of his prohibited status. *Id.* at 1041.

Admittedly, this is a low burden and is easily established in most cases by proof of adjudicative procedures. In *Stein,* the defendant knew that he'd been convicted of battery against his live-in girlfriend, in *United States v. Ballentine,* 4 F.3d 504, 506 (7th Cir. 1993), the defendant knew that he had charges pending against him and that he had left the jurisdiction, and in *Carlton Wilson,* the defendant knew he was subject to a protective order. These cases confirm that the Seventh Circuit

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

interprets 18 U.S.C. § 924(a)(2)'s knowledge requirement as extending not only to the fact of possession, but to the facts establishing the prohibition.

Though its not the law, Judge Posner's dissent in *Carleton Wilson* reveals the force of the panel's opinion.159 F.3d at 295 (Posner, J., dissenting). The dissent takes issue with the panel's limited interpretation of the *mens rea* element, arguing that the government must prove the defendant knew his legal status in addition to the facts giving rise to it. The problem, from the dissent's point of view, is not that the panel opinion disposes with any *mens rea* element; rather, the problem is the narrow reading of the element. Put differently, the panel opinion insists upon the imposition of a *mens rea* element; the dissent agrees but concludes the imposition should extend more broadly.

Again, Meza is not arguing that the government must allege and prove he knew that his immigration status prohibited him from possessing a firearm or ammunition. But it must allege and prove knowledge of the facts of the offense, including the facts underlying his immigration status. The indictment in this case fails to allege that Meza possessed the requisite *mens rea* as to the facts establishing his prohibited status. Because this required element was omitted, the indictment must be dismissed.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**II.    Meza has a Second Amendment right to bear arms and § 922(g)(5) unconstitutionally infringes upon that right.**

Meza raises both a facial and an as-applied constitutional challenge to § 922(g)(5). The government argues, in response, that Meza is not entitled to Second Amendment protection because he has engaged in criminal behavior and he is present in the United States illegally. It further argues that § 922(g)(5) should be treated as a presumptively lawful regulatory measure. If not, according to the government, intermediate scrutiny should be applied, but with additional deference to Congress because the statute is related to immigration. Dkt. 23 at 11. Finally, it is the government's position that § 922(g)(5) survives intermediate scrutiny even without this additional deference. *Id.* at 12. Because Meza addressed most of these arguments in his motion, his reply will be brief.

First, it is Meza's position that illegal immigrants are among "the people" protected under the Second Amendment and that he qualifies for Second Amendment protection because he has substantial connections to the county. Dkt. 13 at 6-8. It should be irrelevant that Meza has a prior misdemeanor conviction and currently-pending misdemeanor charges. *See* Dkt. 24 at 6 (arguing that Meza's circumstances are different than those contemplated by *Heller*). These circumstances do not change the fact that he and his family have built a life in Milwaukee.

Consistent with *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc) and *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010), this Court must

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

apply a heightened form of scrutiny. The government acknowledges that under an intermediate scrutiny standard, it bears the burden of establishing that § 922(g)(5) is substantially related to an important governmental objective. Dkt. 23 at 10; *see also Skoien,* 614 F.3d at 641. But then it argues that its burden should be reduced, with greater deference to Congress, because § 922(g)(5) relates to immigration. Dkt. 23 at 11. The cases cited by the government do not extend this deference in the context of a constitutional challenge to a criminal statute, though. Dkt. 23 at 11. It remains Meza's position that § 922(g)(5) should be analyzed in the same manner as other § 922(g) subsections. Dkt. 13 at 9-12.

Finally, the government has neither identified an important governmental objective behind § 922(g)(5), nor established that the statute furthers that goal. The government argues that § 922(g)(5) would survive intermediate scrutiny, but the only evidence it offers in support relates to the percentage of federal offenses committed by non-citizens, and the types of offenses. Dkt. 23 at 14. Again, it is the government's burden to establish that the statute is substantially related to an important governmental objective. It is not Meza's burden to disprove an objective or a connection. Because the government cannot meet its burden, this Court should find § 922(g)(5) unconstitutional.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**III. Meza's motion to suppress should be granted because he was subject to interrogation without *Miranda* warnings.**

The parties agree that Meza was "in custody" for *Miranda* purposes at the time of the interview. Dkt. 23 at 13. This narrows the issue before the Court to the following: Did Agent Shearing's questions constitute interrogation?

The government argues that Shearing's questions were purely administrative but this ignores several important facts. First, and most importantly, Shearing initiated the interview based on a tip that Meza was present in the United States illegally. Tr. at 27. She testified that she went to the jail specifically to interview Meza at the request of Special Agent Dykema. Second, she knew that her questions to Meza addressed the elements of at least two criminal offenses. Tr. at 30. Third, Shearing indicated that she has the ability to refer cases to the United States Attorney's Office for prosecution. Tr. at 25, 29.

The case relied on by the government, *United States v. Lopez-Garcia,* 565 F.3d 1306 (11th Cir. 2009), shows the relevance of the facts set forth above. There were two interviews at issue in *Lopez-Garcia*. Lopez-Garcia was not read his *Miranda* rights until the second interview. The first interview was conducted as matter of standard procedure in the booking area of the jail after Lopez-Garcia's name appeared "on a list of individuals booked at the jail who had been born outside the United States." *Id.* at 1311. An ICE agent "regularly received" this list and determined who to interview after performing initial immigration status checks.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

This agent's "purpose was not to initiate criminal charges against those present in the United States illegally," and in fact, he "lacked the authority to decide whether to bring criminal charges against any of the individuals whom he interviewed."*Id.* The agent knew prior to the interview was that Lopez-Garcia was born outside the United States, but had no reason to suspect that he was in the country illegally. *Id.* at 1311-1312. As the agent explained to Lopez-Garcia, the interview "was to determine whether [he] had immigration papers." *Id.* at 1311.Then the agent told him about deportation procedures and explained "that he could expedite his removal by signing a waiver of appearance." *Id.*

Further investigation after the first interview revealed that Garcia-Lopez had been previously removed and that no record of legal entry had been found. *Id.* Suspecting that Lopez-Garcia was in the country illegally and seeking to confirm that suspicion, the agent read him his *Miranda* warnings before beginning the second interview. *Id.* at 1312.

From its inception, Shearing's interview of Meza had the characteristics of an interrogation. It was initiated based on a tip from law enforcement that Meza was in the country "illegally." Tr. at 33. This was a specific tip as opposed to biographical data set forth on a routinely-prepared printout. During the interview and at the evidentiary hearing, Shearing framed the interview as an investigation into whether he was here "illegally." Tr. at 5, 22. As was the case with the second

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

interview in *Garcia-Lopez,* Shearing set out to confirm the suspicion that Meza was here illegally. Her questions were specifically targeted to establish when, where, and how he had entered the United States, and if he had ever been deported. Tr. at 29. There is no indication that Shearing ever walked Meza through the deportation procedures, or explained the administrative process. Finally, as previously stated, Shearing has the ability to refer cases for prosecution. *Id.* In this case though, Shearing relayed the information to Dykema who ultimately determined "that he was somebody that should be a candidate for federal prosecution." Tr. at 34.

These circumstances, especially when considered alongside those in *Garcia-Lopez,* are consistent with an interrogation. These were questions that "the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 300-301 (1980). All of Meza's statements stemming from the unwarned custodial interrogation must be suppressed.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

## CONCLUSION

For the reasons stated in this brief and in his prior submissions, Meza's

motions to dismiss and his motion to suppress should be granted.


Dated this 10th day of February, 2014.

Respectfully submitted,
MARIANO A. MEZA, Defendant

/s/ Julie K. Linnen
Julie K. Linnen

FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
222 West Washington Avenue, Suite 680
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
julie_linnen@fd.org

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                  Case No. 13-CR-192

MARIANO A. MEZA,

        Defendant.

## RECOMMENDATION ON DEFENDANT'S MOTIONS TO DISMISS THE INDICTMENT AND MOTION TO SUPPRESS STATEMENTS

## I. BACKGROUND

On October 8, 2013, a federal grand jury sitting in this district returned a single-count indictment against Mariano A. Meza ("Meza"), charging Meza as an illegal alien in possession of ammunition, in violation of 18 U.S.C. § 922(g)(5). Meza was arraigned on November 8, 2013, and he pled not guilty to the above-mentioned charge. The matter is assigned to United States District Judge Rudolph T. Randa for trial and to this court for processing pretrial motions.

On November 25, 2013, this court granted Meza's motion seeking additional time to file pretrial motions. Thereafter, on December 6, 2013, Meza filed three motions: (1) to dismiss the indictment for failure to allege an element of the offense; (2) to dismiss the indictment on constitutional grounds; and (3) to suppress statements. Meza requested an evidentiary hearing with respect to his motion to suppress. On December 18, 2013, Judge Randa granted Meza's motion to adjourn the trial date; a new date has not yet been scheduled. The evidentiary hearing was initially set for December 19, 2013. However, the hearing was rescheduled at the request of Meza, who was set to appear in state court that same day on other charges.

The evidentiary hearing was held on January 7, 2014. At the conclusion of the hearing, the court set a briefing schedule for all three motions. On February 3, 2013, the government filed its consolidated response to all three motions. That same day, Meza filed a post-hearing brief in support of his motion to suppress. On February 10, 2013, the government filed a letter brief in opposition to Meza's motion to suppress. That same day, Meza filed his consolidated reply. Accordingly, the defendant's motions are now fully briefed and ready for resolution. For the reasons that follow, it will be recommended that the district judge deny all three of Meza's motions.

## II. DISCUSSION

Currently pending before this court are three motions: (1) to dismiss the indictment for failure to allege an element of the offense; (2) to dismiss the indictment on constitutional grounds; and (3) to suppress statements. The court will address Meza's motions *ad seriatim*.

## A. MOTION TO DISMISS THE INDICTMENT - ELEMENTS OF THE OFFENSE

Meza seeks an order dismissing the indictment under the Fifth and Sixth Amendments and Rules 7 and 12(a) of the Federal Rules of Criminal Procedure because the indictment fails to sufficiently allege an element of the offense. Specifically, Meza argues that the indictment fails to allege that he possessed the requisite *mens rea* as to the facts establishing his prohibited status. Rather, according to Meza, the indictment merely alleges that he knowingly possessed ammunition.

An "indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). As such, to be legally sufficient, an indictment must satisfy three distinct requirements:

> First, the indictment must state all of the elements of the crime charged; second, it must adequately apprise the defendant of the nature of the charges so that he may prepare a defense; and third, it must allow the defendant to plead the judgment as a bar to any future prosecutions for the same offense.

*United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000). In assessing the sufficiency of an indictment, courts are to review the document in its entirety, giving it a "practical," rather than a "hypertechnical," reading. *Id.*

"In setting forth the offense, it is generally acceptable for the indictment to 'track' the words of the statute itself, so long as those words expressly set forth all the elements necessary to constitute the offense intended to be punished." *Id.* (citing *United States v. Hinkle*, 637 F.2d 1154, 1157 (7th Cir. 1981)). "However, an indictment that tracks the statutory language can nonetheless be considered deficient if it does not provide enough factual particulars to 'sufficiently apprise the defendant of what he must be prepared to meet.'" *Id.* (quoting *Russell v. United States*, 369 U.S. 749, 763 (1962)).

Still, "[f]acial sufficiency is not a high hurdle. Indictments need not exhaustively describe the facts surrounding a crime's commission nor provide lengthy explanations of the elements of the offense." *United States v. Bates*, 96 F.3d 964, 970 (7th Cir. 1996). Rather, "[t]he defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved." *United States v. Kendall*, 665 F.2d 126, 135 (7th Cir. 1981)).

The indictment here alleges that, "[o]n or about August 24, 2013," Meza, "being an alien illegally and unlawfully in the United States, knowingly possessed ammunition which, prior to his possession of it, had been transported in interstate commerce." (Indictment 1.) The indictment further states that the ammunition consisted of "one .22 caliber cartridge containing the markings 'C' on the head-stamp." (*Id.*) Thereafter, the indictment indicates that Meza's conduct was in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2).

Title 18 U.S.C. § 922(g)(5) provides that "[i]t shall be unlawful for any person . . . who, being an alien[,] . . . is illegally or unlawfully in the United States." The mental state and penalty associated with a violation of this statute is found in 18 U.S.C. § 924(a)(2), which states that "[w]hoever

*knowingly* violates subsection . . . (g) . . . of section 922 [18 USCS § 922] shall be fined as provided in this title, imprisoned not more than 10 years, or both."  (second alteration in original) (emphasis added).

Having reviewed the indictment, the court finds that it meets the threshold requirements of legal sufficiency.  For one, the indictment generally "tracks" the language found in § 922(g)(5). Moreover,  the indictment contains the elements of the offense charged, fairly informs the defendant of the nature of the charges against which he must defend, and enables him to plead the judgment as a bar to any future prosecution for the same offense.  Nothing more is required.

With respect to the mental state associated with violations of § 922(g), the Seventh Circuit has held that "there is no reason to think Congress intended 'knowingly' to mean different things for different subsections of § 922(g)." *United States v. Stein*, 712 F.3d 1038, 1041 (7th Cir. 2013).  Thus, the government need not prove—nor allege in the indictment—that Meza had knowledge of his prohibited status. *See United States v. Wilson*, 159 F.3d 280, 288-89 (7th Cir. 1998) (§ 922(g)(8) - subject to protective order); *see also Stein*, 712 F.3d at 1041 (§ 922(g)(9) - misdemeanor crime of domestic violence); *United States v. Ballentine*, 4 F.3d 504, 506 (7th Cir. 1993) (§ 922(g)(2) - fugitives).  Rather, to establish a "knowing" violation of § 922(g)(5), the government merely needs to prove "knowledge by the defendant of the *facts* that constitute the offense." *Wilson*, 159 F.3d at 289 (emphasis added) (citing *Bryan v. United States*, 524 U.S. 184, 193 (1998)).

The *Bryan* rule "has been applied without exception by . . . other circuits when interpreting § 924(a)(2)'s application to subsection (g) firearm possession crimes." *United States v. Mitchell*, 209 F.3d 319, 322 (4th Cir. 2000) (§ 922(g)(9) - misdemeanor crime of domestic violence); *see also United States v. Games-Perez*, 667 F.3d 1136, 1140-42 (10th Cir. 2012) (§ 922(g)(1) - felons); *United States v. Butler*, 637 F.3d 519, 524-25 (5th Cir. 2011) (§ 922(g)(6) - dishonorable dischargees);

4

*United States v. Mirza*, 454 F. App'x 249, 259-60 (5th Cir. 2011) (unpublished) (§ 922(g)(5) - illegal aliens); *United States v. Hutzell*, 217 F.3d 966, 967-69 (8th Cir. 2000) (§ 922(g)(9) - misdemeanor crime of domestic violence); *United States v. Montero-Camargo*, 177 F.3d 1113, 1120 (9th Cir. 1999) (§ 922(g)(5) - illegal aliens); *United States v. Langley*, 62 F.3d 602, 605-06 (4th Cir. 1995) (§ 922(g)(1) - felons); *United States v. Dancy*, 861 F.2d 77, 80-82 (5th Cir. 1988) (§ 922(g)(1) - felons).

Consequently, although the government must prove at trial that Meza possessed the requisite *mens rea* as to the facts establishing his prohibited status, at this stage it is sufficient for the government to allege that Meza, purportedly an illegal alien, knowingly possessed ammunition that had been transported in interstate commerce. The indictment undoubtedly apprised Meza of the offense with which he is charged. It need not contain a lengthy explanation of the elements nor the details of how the government will prove its case.

Because the indictment is facially sufficient, the court will recommend that the district judge deny Meza's motion to dismiss the indictment for failure to allege an element of the offense.

## B. MOTION TO DISMISS THE INDICTMENT - CONSTITUTIONAL CHALLENGE

Meza also seeks an order dismissing the single-count indictment on constitutional grounds, mounting both a facial and an as-applied constitutional challenge to the statute at issue here, 18 U.S.C. § 922(g)(5).

### 1. Facial Challenge

Meza argues that "the complete ban in § 922(g)(5) on all illegal aliens possessing firearms is overbroad and thus violates the Second Amendment." (Mot. to Dismiss Indictment as Unconstitutional 1.) In support of his argument, Meza maintains that "the people" referenced in the Second Amendment are the same "people" referenced in the First and Fourth Amendments. Thus,

according to Meza, illegal aliens may claim the guarantees of the Second Amendment as long as they have "substantial connections" with the United States. Meza asserts that he has substantial connections with this country because he is a long-time resident of Milwaukee, he attended school in Milwaukee, his two daughters and mother live here, and he has lived here for all of his adult life. Finally, Meza contends that the Supreme Court's language in *Heller*[1] does not alter the analysis regarding to whom the Second Amendment applies.

The Second Amendment reads simply: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." However, the meaning attached to these words has proven anything but simple. In *Heller*, the Supreme Court clarified that firearm possession is an individual constitutional right. 554 U.S. at 592-95. In reaching this holding, the Court in *Heller* determined that "the people"—as that term is used in the Constitution—"unambiguously refers to all members of the political community, not an unspecified subset." *Id.* at 580. Thus, there is "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.*

The Court in *Heller* made clear that it did not "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Id.* at 626. Moreover, the Court noted that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* However, the Court did not discuss the constitutionality of the various other categories of prohibitions contained in § 922, and in particular, the Court did not address the prohibition at issue here—that is, § 922(g)(5)'s ban on illegal aliens possessing firearms.

Although the Seventh Circuit has yet to consider § 922(g)(5)'s ban in light of the Supreme Court's holding in *Heller*, the court has determined that some categorical bans on firearm possession

---

[1] *District of Columbia v. Heller*, 554 U.S. 570 (2008).

6

are constitutional. *See United States v. Skoien*, 614 F.3d 638, 640-41 (7th Cir. 2010) (en banc)

Consequently, to date, the Seventh Circuit has upheld laws prohibiting firearm possession by persons

convicted of misdemeanor crimes of domestic violence under § 922(g)(9), *Skoien*, 614 F.3d 638;

felons under § 922(g)(1), *United States v. Williams*, 616 F.3d 685 (7th Cir. 2010); and unlawful users

of controlled substances under § 922(g)(3), *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) (per

curiam).

Furthermore, the other circuits that have analyzed § 922(g)(5) post-*Heller* all have concluded

that the statute is constitutional with respect to the Second Amendment. *See, e.g.*, *United States v.*

*Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011) (holding that "the phrase 'the people' in the

Second Amendment of the Constitution does not include aliens illegally in the United States"); *see*

*also United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) (holding that "illegal aliens do

not belong to the class of law-abiding members of the political community to whom the Second

Amendment gives protection"); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1170 (10th Cir.

2012) (holding that § 922(g)(5) withstood the defendant's Second Amendment challenge); *United*

*States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) (per curiam) (agreeing with the Fifth Circuit's

analysis in *Portillo-Munoz* that "the protections of the Second Amendment do not extend to aliens

illegally present in this country").

The court finds the analyses of the other circuit courts to be persuasive. In particular, the

defendant in *Portillo-Munoz*, like Meza here, relied on the Supreme Court's pre-*Heller* decision in

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), to argue that illegal aliens are included

within the definition of "the people"—as that term is used in the First, Second, and Fourth

7

Amendments—if they have a substantial connection with the United States.[2]  The Fifth Circuit rejected this argument, holding that the Supreme Court never found that these protections extend to "a native and citizen of another nation who entered and remained in the United States illegally." *Portillo-Munoz*, 643 F.3d at 440.  The *Portillo-Munoz* court further reasoned that "[t]he courts have made clear that the Constitution does not prohibit Congress from making laws that distinguish between citizens and aliens and between lawful and illegal aliens."  *Id.* at 442.

Moreover, there is no reason to believe that the Seventh Circuit would treat § 922(g)(5)'s prohibition on the possession of firearms by illegal aliens any differently than it has other categories of prohibitions in § 922(g).  In addressing the categorical ban on the possession of firearms by felons, the Seventh Circuit in *Yancey* acknowledged that "most felons are nonviolent."  621 F.3d at 685.  Nevertheless, the court held that such a prohibition is not unconstitutionally overbroad, reasoning that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'"  *Id.*  But illegal aliens, by definition, are neither "virtuous" (in the historic, civically virtuous sense) nor "citizens."  Likewise, in exercising "its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens."  *Portillo-Munoz*, 643 F.3d at 441 (quoting *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976) (internal quotation marks omitted)).

Accordingly, for all the foregoing reasons, the court finds that the protections of the Second Amendment do not extend to aliens illegally present in the United States such as Meza and, thus, Meza's facial challenge to § 922(g)(5) must fail.

---

[2] In *Verdugo-Urquidez*, the Supreme Court held that its analysis of the Constitution "suggests that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."  494 U.S. at 265.

*2. As-applied Challenge*

Meza also argues that the ban in § 922(g)(5) violates his Second Amendment rights. For one, Meza asserts that some form of heightened scrutiny must be utilized to address his as-applied challenge, although he acknowledges that the exact level of scrutiny is unclear based on Seventh Circuit precedent. Nevertheless, Meza maintains that the ban in § 922(g)(5) fails under any form of heightened scrutiny because illegal aliens—unlike felons, individuals convicted of domestic abuse, and habitual drug users—are not inherently dangerous.

In analyzing Meza's as-applied constitutional challenge, the court first must determine what level of scrutiny to apply. The Court in *Heller*, while not adopting a particular standard, clearly ruled out the rational-basis test. *See Heller*, 554 U.S. at 628, n.27. The Seventh Circuit, sitting en banc, side-stepped this "'levels of scrutiny' quagmire"; however, in that case, the government conceded that "some form of strong showing ('intermediate scrutiny,' many opinions say) [was] essential, and that [the prohibition was] valid only if substantially related to an important governmental objective." *Skoien*, 614 F.3d at 641. Several months later, the Seventh Circuit used "the intermediate scrutiny framework" to analyze an as-applied challenge to § 922(g)(1), but the court noted that "the precise test applicable to all challenges to gun restrictions" was still undetermined. *Williams*, 616 F.3d at 692. In *Yancey*, the court applied the same analytical framework utilized in *Skoien* and *Williams* and again "reserve[d] the question whether a different kind of firearm regulation might require a different approach." 621 F.3d at 683. Accordingly, for the purposes of Meza's challenge to § 922(g)(5) as it applies to him, the court will use the intermediate scrutiny framework.

"To pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." *Williams*, 616 F.3d at 692. Moreover, in an as-applied

constitutional challenge to a statute, the court examines only the facts of the present case and not "any set of hypothetical facts under which the statute might be unconstitutional." *United States v. Phillips*, 645 F.3d 859, 863 (7th Cir. 2011).

In *Yancey*, the Seventh Circuit stated that "Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people." 621 F.3d at 683. Thus, "[t]he broad objective of § 922(g)—suppressing armed violence—is without a doubt an important one." *Id.* at 684. This finding surely encompasses illegal aliens who "are likely to maintain no permanent address in this country, elude detection through an assumed identity, and – already living outside the law – resort to illegal activities to maintain a livelihood." *Portillo-Munoz*, 643 F.3d at 441 (quoting *United States v. Toner*, 728 F.2d 115, 128-29 (2d Cir. 1984) (internal quotation marks omitted)). As such, § 922(g)(5)—like §§ 922(g)(1), (3), and (9)—seeks to prevent firearm possession by people who, because they have already engaged in illegal behavior, are presumptively risky people. (*See* Govt.'s Resp. 9.) Accordingly, the court finds that the government has satisfied its burden of demonstrating an important governmental objective.

The court next must determine whether § 922(g)(5) is substantially related to this objective in Meza's case. The government attempts to show a substantial relationship between the statute and its objective of preventing illegal aliens' access to guns by pointing to Meza's criminal history. The government's evidence passes constitutional muster.

A review of this history reveals a conviction for resisting or obstructing an officer in 2008 and pending charges—some of which appear related to the case before this court—of two counts of resisting or obstructing an officer and two counts of disorderly conduct. (*See* ECF #6.)[3] Furthermore,

---

[3] Meza's criminal history also includes several arrests for offenses ranging from criminal damage to property to theft to robbery with use of force, although no dispositions are reported. (*See* ECF #6.)

10

the belief that illegal aliens typically elude detection through an assumed identity applies to Meza as well, as during his arrest Meza provided varied answers regarding his place of birth, and the social security number he provided did not correspond to him. (Tr. 34-35.)

Considering the facts of the present case, including Meza's criminal history and evasive conduct, Meza's claim that § 922(g)(5) unconstitutionally infringes on his right to possess a firearm is without merit and, accordingly, his as-applied challenge must fail. Thus, because § 922(g)(5) is facially constitutional and constitutional as-applied to Meza, the court will recommend that the district judge deny Meza's motion to dismiss the indictment on constitutional grounds.

## C. MOTION TO SUPPRESS STATEMENTS

Finally, Meza seeks an order suppressing the statements that he made to a law enforcement officer on August 27, 2013. The court held an evidentiary hearing with respect to Meza's motion to suppress on January 7, 2014. Accordingly, the court will begin by reviewing the circumstances surrounding Meza's interview, as testified to during that hearing.

### 1. Facts

At the evidentiary hearing, the court heard testimony from two law enforcement officers, Cassandra Shearing ("Officer Shearing" or "Shearing"), an officer with the Immigration and Customs Enforcement ("Immigration"), and Russell Dykema ("Agent Dykema" or "Dykema"), a special agent with the United States Department of Homeland Security. As part of her role, Officer Shearing is charged with enforcing the customs and immigration laws of the United States. (Tr. 10.)

According to Agent Dykema, on or about August 25, 2013, he received information from a City of Milwaukee police officer that Meza had been arrested the previous night and that he was believed to be in the country illegally. (Tr. 32-33.) Meza was being held in state custody at the Milwaukee County Jail. (Tr. 33.) Agent Dykema contacted Officer Shearing, the deportation officer

who handles the Milwaukee County Jail, and told her that he received a tip that Meza might be present in the United States illegally. (Tr. 5, 33.) Consequently, Dykema requested that Shearing "interview [Meza] administratively to see if he was legally or illegally present in the United States and to take action appropriate at that time depending on what her interview determined." (Tr. 5.)

Officer Shearing conducted the interview at the Milwaukee County Jail on August 27, 2013. (Tr. 5-7.) The interview took place in a small square room, approximately 7x7 feet, on the third floor of the jail. (Tr. 13.) The door remained closed and locked during the interview, and only Officer Shearing and Meza were present. (Tr. 15-16, 23.) Officer Shearing wore normal street clothes; however, she had her badge and empty gun holster on her belt. (Tr. 7, 16-17.)

At the beginning of the interview, Shearing identified herself as an officer with Immigration and informed Meza that she had a few questions for him. (Tr. 7.) At that time, Meza did not ask any questions relating to the purpose of the interview or otherwise. Thereafter, Officer Shearing asked Meza "his full and correct name . . . ; date of birth; . . . if he had a social security number; where he was born; if he went to high school here; and whether he completed his high school; if he was working; what his current address was; if he had children; and if he was married." (Tr. 7.) Shearing and Meza then talked about his father and mother, and she also asked about his health and whether he had any gang affiliation. (Tr. 8.) Shearing did not ask Meza any questions regarding the reason for his incarceration.

At the end of the interview, Meza asked about the purpose of the interview and what was going to happen to him. Officer Shearing repeated that the interview was for immigration purposes and that she did not know what would happen to him at that point as she needed to conduct additional

research. (Tr. 8, 22.) The interview lasted approximately 20 minutes, and it was not recorded. (Tr. 8-9.) Meza was never advised of his *Miranda*[4] rights. (Tr. 6.)

Following the interview, Officer Shearing ran Meza's name and the date of birth he gave her through a series of system checks. (Tr. 21.) That same day, Shearing called Agent Dykema and told him that she conducted the interview, and at that point she believed that Meza was in the United States illegally, and she was placing a detainer on him.

Officer Shearing did not review any police reports prior to conducting the interview, and she did not know the nature of Meza's arrest. (Tr. 22.) On September 20, 2013, Agent Dykema informed Shearing that Meza would be prosecuted in federal court. (Tr. 9.)

Although Officer Shearing testified that the purpose of the interview was to determine if Meza was in the United States illegally, she also stated that she was "not just there to go against him." (Tr. 18.) For instance, she testified that the interview also was used to determine if Meza was eligible for any applications or status grants. Notwithstanding this "two-fold process," Shearing stated that she knew entry without inspection and illegal re-entry were both crimes and that she can refer cases for criminal prosecution if she believes there is enough substance. (Tr. 18, 29.) Shearing did testify, however, that her office has a policy of not referring entry without inspection cases for prosecution, although her testimony was unclear as to whether that policy was written or whether she had ever seen it. (Tr. 24, 28-29.)

Shearing explained that the process used to investigate illegal re-entry cases is different and, therefore, she advises suspects of their *Miranda* rights at the beginning of that type of interview. (Tr. 25-28.) Of the interviews she has conducted regarding entry without inspection, none were referred

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

by her for prosecution. (Tr. 25.) If, however, during the course of an interview she discovers that there was an illegal re-entry, the interview would stop and she would proceed "down the criminal path[,] which is different than the administrative [path]." (Tr. 26.) Nevertheless, Officer Shearing acknowledged that there is "no foolproof way" to ensure that an un-*Mirandized* interview does not result in an illegal re-entry confession, although prior to interviewing Meza, Officer Shearing did determine that he had no previous contacts with Immigration and no active applications in its systems. (Tr. 27.)

2. *Analysis*

According to the well-established rules of *Miranda*, 384 U.S. at 444-45, law enforcement authorities must advise an individual of certain rights prior to a custodial interrogation. Statements obtained without these warnings, or without a waiver of these rights, cannot be used against a defendant in the government's case-in-chief. *Id.* at 479.

Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. Thus, to trigger the *Miranda* warnings, an individual must be both in "custody" and subject to "interrogation." *United States v. Yusuff*, 96 F.3d 982, 987 (7th Cir. 1996). Courts evaluate a person's custody status using the reasonable person standard. That is, considering the circumstances surrounding the investigation, would a reasonable person have felt free to put a stop to the interrogation and leave? *See Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004). Interrogation includes express questioning and "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 309, n.5 (1980).

This interrogation analysis incorporates the perspectives of both the interviewer and the individual subject to the interview. *See Smiley v. Thurmer*, 542 F.3d 574, 582 (7th Cir. 2008).

Here, Officer Shearing admitted that she questioned Meza without providing *Miranda* warnings. Moreover, the parties do not dispute that Meza was in "custody" at the time of the interview. Accordingly, the only issue that remains is whether the questioning by Shearing amounted to an "interrogation."

While the government asserts that Officer Shearing's questioning was purely administrative in nature, Meza argues that the questions she posed were reasonably likely to elicit an incriminating response as they directly related to criminal conduct. As an immigration officer, Shearing is charged with enforcing United States immigration statutes, including those with criminal consequences. As such, she has the ability to refer cases to the United States Attorney's Office for prosecution. Consequently, Meza contends that Officer Shearing should have known that any questions relating to his immigration status would be reasonably likely to elicit an incriminating response because her questions addressed all of the elements of at least two criminal offenses—improper entry in violation of 18 U.S.C. § 1325 and illegal re-entry in violation of 18 U.S.C. § 1326. In addition, Meza points out that Shearing initiated the interview based on a tip that he was present in the United States illegally; Agent Dykema specifically requested that Shearing interview Meza in order to confirm this suspicion.

In arguing that Officer Shearing's questioning amounted to an interrogation, Meza relies in part on a case from the Ninth Circuit, *United States v. Mata-Abundiz*, 717 F.2d 1277 (9th Cir. 1983). The defendant in *Mata-Abundiz* was arrested on state charges of carrying a concealed weapon and possession of a firearm by an alien. 717 F.2d at 1278. Ten days later, the defendant was interviewed at the county jail by an experienced criminal investigator from the Immigration and Naturalization

15

Service ("INS"). Although the agent was aware of the state firearms charges, he characterized the interview as a routine, civil investigation; thus, no *Miranda* warnings were provided. During the interview, the defendant admitted that he was a citizen of Mexico. Accordingly, the agent looked further into the defendant's immigration status, and he returned three hours later with a warrant for the defendant's arrest. During a second, *Mirandized* interview, the agent questioned the defendant about the state firearms charges. Several days later, the defendant was charged with federal charges of possession of a firearm by an illegal alien. At trial, the defendant's first (i.e., unwarned) statement regarding his alien status was admitted over his objection. The defendant was convicted and sentenced.

On appeal, the Ninth Circuit reversed the defendant's conviction, holding that "in-custody questioning by INS investigators must be preceded by *Miranda* warnings, if the questioning is reasonably likely to elicit an incriminating response." *Id.* at 1280. Consequently, the court determined that the agent's question regarding the defendant's citizenship "was very likely to produce an incriminating response"; thus, the agent "had a duty to warn [the defendant] before questioning him about his citizenship." *Id.* In reaching this decision, the court reasoned that the agent "had reason to know that any admission of alienage by [the defendant] would be highly incriminating" because the agent was an experienced INS criminal investigator and he knew that the defendant was in custody on state firearms charges. *Id.* at 1279. Thus, "[t]he 'background questions' asked related directly to an element of a crime that [the agent] had reason to suspect." *Id.* at 1280.

Furthermore, the court stated that the agent's "actions immediately after the unwarned statement strengthen[ed] the inference that [the agent] already contemplated criminal prosecution at the time of the first interview," as the agent returned merely three hours later with an arrest warrant and thereafter launched a "full-fledged" criminal investigation. *Id.* at 1279. Overall, the court held

that an agent "cannot control the constitutional question by placing a 'civil' label on the investigation." *Id.* at 1280. However, the court also noted that "[t]his does not mean that admissions obtained in civil investigations of in-custody suspects can never be used in criminal prosecutions, unless the investigator first gives warnings." *Id.* at 1279. Rather, "[i]f an INS investigator has no reason to suspect that the question asked is likely to elicit an incriminating response, there is no interrogation and, therefore, no *Miranda* violation." *Id.*

The court finds that Meza's reliance on *Mata-Abundiz* is misplaced because the facts of that case are easily distinguishable from the facts present here. For one, at the time of the interview, Meza was in state custody on charges having nothing to do with his immigration status. In any case, and perhaps most importantly, Officer Shearing testified that she did not know the nature of Meza's arrest prior to conducting the interview. (Tr. 22.) She did not read any of the police reports that were prepared regarding his arrest, and she did not ask any questions relating to the reason for his incarceration; thus, she did not know that Meza was found to be in possession of ammunition. (Tr. 8, 22.) Accordingly, Shearing had no reason to believe that Meza's answers would be incriminating. *See United States v. Salgado*, 292 F.3d 1169, 1172 (9th Cir. 2002) (distinguishing *Mata-Abundiz* and holding that "*[i]f* [the defendant] had been interviewed in connection with a 'prosecution for violating the immigration laws,' or *if* [the defendant] had been in custody on charges relating to his immigration status, *then* questions about his birthplace and citizenship might have been reasonably likely to elicit an incriminating response in which case he should have been *Mirandized* before-hand. . . . But that is not this case."); *see also United States v. Lugo*, 289 F. Supp. 2d 790, 798 (S.D. Tex. 2003) (distinguishing *Mata-Abundiz* because the defendant there was being held on immigration-related offenses); *United States v. Lopez-Garcia*, 565 F.3d 1306, 1316-17 (11th Cir. 2009) (finding no interrogation where a law enforcement officer questioned a defendant in custody for a drug-related

offense about his immigration status, even though the officer was aware prior to the interview that the defendant was not born in the United States).

To be sure, the cases cited by the government—*Salgado*, *Lugo*, and *Lopez-Garcia*—are not directly on point as the case presently before this court involves certain factual details that are not present in all of those cases. More precisely, going into the interview, Officer Shearing knew that Meza was suspected of being in the United States illegally. (Tr. 5.) In fact, Agent Dykema specifically requested that Shearing interview Meza in order to confirm, or refute, this suspicion. (Tr. 5, 33.) Likewise, Shearing knew that entry without inspection and illegal re-entry were both crimes, and at least a few of her questions related to the elements of those offenses. (Tr. 18, 29-30.) Moreover, Shearing is able to refer matters for criminal prosecution. (Tr. 18, 29.) Indeed, the information she obtained during her interview of Meza did lead to a prosecution (i.e, the present case).

Although it may be a close call, the court still believes that Officer Shearing had no reason to know that her questions would elicit an incriminating response, notwithstanding these additional facts. In contrast to the situation in *Mata-Abundiz*, Shearing's actions following the interview actually strengthen the inference that she *never* contemplated criminal prosecution. After the interview, Shearing ran Meza's name and the date of birth he gave her through all of her system checks. (Tr. 21.) Believing that Meza was present in the country illegally, she ordered that a detainer be placed on him. She provided this information to Agent Dykema, and it was not until nearly a month later that Shearing learned Meza would be prosecuted in federal court. (Tr. 9, 21.) Notably, although Officer Shearing believed that Meza was present in the United States illegally, she did not refer that crime for prosecution. Indeed, Shearing testified that her office has a policy of not referring entry without inspection cases for prosecution, and she has never done so. (Tr. 24-25.) Similarly, prior to the interview, Shearing determined that Meza had no previous contacts with Immigration and no

18

active applications in its systems. (Tr. 27.)

Furthermore, Officer Shearing had no reason to believe that Meza's answers would result in a criminal prosecution. As stated above, she did not know the nature of Meza's arrest, and she did not ask any questions relating to his incarceration. (Tr. 8, 22.) It was not until after Agent Dykema informed Shearing that the case had been accepted for prosecution that Shearing prepared a memorandum of investigation based on her notes from the interview with Meza. (Tr. 22-23.) Thus, overall, the facts and circumstances demonstrate that Officer Shearing had no reason to believe that her questions were likely to elicit an incriminating response.

Because the court finds that the August 27, 2013 interview did not amount to an "interrogation," no *Miranda* warning were required. Accordingly, the court will recommend that the district judge deny Meza's motion to suppress statements.

**NOW THEREFORE IT IS RECOMMENDED** that the defendant's "Motion to Dismiss the Indictment for Failure to Allege an Element of the Offense" (ECF #12) be **DENIED**;

**IT IS FURTHER RECOMMENDED** that the defendant's "Motion to Dismiss the Indictment" (ECF #13) be **DENIED**;

**IT IS FURTHER RECOMMENDED** that the defendant's "Motion to Suppress Statements" (ECF #14) be **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C), and Federal Rule of Criminal Procedure 59(b)(2) (as amended effective December 1, 2009), whereby written objections to any recommendation herein or part thereof may be filed within fourteen days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district

court shall result in a waiver of a party's right to appeal.

Dated this <u>25th</u> day of February 2014, at Milwaukee, Wisconsin.

**BY THE COURT:**

<u>s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

      Plaintiff,

v.

                          Case No. 13CR192 (RTR/WEC)

MARIANO A. MEZA,

      Defendant.

## DEFENDANT'S OBJECTION TO
## THE MAGISTRATE JUDGE'S RECOMMENDATIONS

Mariano Meza, by counsel, objects to the Magistrate Judge's recommendation on his motion to dismiss for failure to allege an element of the offense (dkt. 12), his motion to dismiss on Second Amendment grounds (dkt. 13), and his motion to suppress statements (dkt. 14). He requests an order dismissing the indictment. If the indictment is not dismissed, he then requests an order be entered suppressing all statements obtained during an un-*Mirandized* interview by law enforcement.

**1.0    The indictment must be dismissed because it fails to allege that Meza possessed the requisite mens rea.**

The issue here is straight forward: the indictment must be dismissed because it fails to allege that Meza *knowingly* possessed ammunition as an "alien... illegally or unlawfully in the United States," in violation of 18 U.S.C. § 922(g)(5) and 18 U.S.C. § 924(a)(2). It is § 924(a)(2) that provides the mental state and penalty associated

with a violation of § 922(g)(5). It states that "[w]hoever *knowingly* violates subsection ... (g)... of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both." (emphasis added). There are two non-jurisdictional elements to § 922(g)(5): (1) status as an alien illegally or unlawfully in the United States, and (2) possession of a firearm or ammunition. The indictment does not allege that Meza possessed the requisite mens rea as to both elements of § 922(g)(5) — that he knew (1) he possessed ammunition *and* (2) that he was an illegal immigrant. Because this required element was omitted, the indictment fails to conform to minimal constitutional safeguards and must be dismissed.

To charge and to prove a violation of § 922(g)(5) and § 924(a)(2), the government must present evidence that Meza knew the facts establishing his prohibited status. The indictment in this case fails to allege the requisite knowledge. Given its wording, the indictment gives no indication that the grand jury was asked to find and in fact found probable cause as to this element of the offense. *See United States v. Calandra,* 414 U.S. 338, 343 (1974) (the grand jury's role is to determine whether there is probable cause to believe a crime has been committed and to protect citizens against unfounded criminal prosecutions). The indictment charges that Meza:

> being an alien illegally and unlawfully in the United States, knowingly possessed ammunition which, prior to his possession of it, had been transported in interstate commerce, and the possession of which was therefore in an affecting commerce.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Dkt. 1. As it is worded, the indictment does not allege that Meza knew the facts establishing his prohibited status. The allegation related to Meza's prohibited status precedes the use of the word "knowingly." "Knowingly" in the indictment modifies only Meza's possession of the bullet. This placement of the adverb cannot be read as implying the scienter for the previously alleged element.

The resulting indictment must allege all the elements of the charged crime. *Jones v. United States,* 526 U.S. 227, 232 (1999); *Almendarez-Torres v. United States,* 523 U.S. 224, 228 (1998). That is, an indictment must "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *United States v. Carll*, 105 U.S. 611, 612 (1881). So it follows that Rule 7(c)(1) of the Federal Rules of Criminal Procedure demands "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).

And, of course, every element of the crime must be presented to the jury and proven beyond a reasonable doubt. *See Jones*, 526 U.S. at 232. But this requirement "is in addition to the indictment's including every element, not instead of it." *United States v. Edwards*, 111 F. Supp. 2d 1057, 1061 (E.D. Wis. 2000) (*citing Jones*, 526 U.S. at 232). Generally it is sufficient for the indictment to parrot the words of the statute itself. *See United States v. Torres*, 191 F.3d 799, 805 (7th Cir. 1999). But as the court observed in *Edwards,* this "does not on its own satisfy the requirement that the

indictment must charge every element of the crime" unless "those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Edwards,* 111 F. Supp. 2d at 1063.

Here, the indictment alleges that Meza acted knowingly but only in possessing the ammunition. It ignores the other element of § 922(g) that is applicable here—his status as an illegal or unlawful alien. 18 U.S.C. § 922(g)(5). Even though the indictment contains the word "knowingly" as a technical matter, it is not worded in a way that alleges that Meza possessed the requisite mens rea as to both elements of § 922(g)(5).

To be clear, Meza is not arguing that the government is required to allege and prove that he knew his immigration status prohibited him from possessing a gun. And he is not arguing that the government must set forth in detail the facts he knew that would establish his prohibited status. But the indictment must allege that he knew those facts, along with knowing he possessed ammunition. The Magistrate Judge agrees that the government is required to prove at trial Meza's knowledge as to the facts supporting both of these elements of § 922(g)(5). *See* dkt. 27 at 5. The government was required to establish probable cause of the same to obtain the indictment: "the prosecutor must persuade the grand jury that the accused's acts and state of mind fulfilled all the elements of the offense." *United States v.*

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

*Resendiz-Ponce*, 549 U.S. 102, 115 (2007) (Scalia, J., dissenting). In this case, the indictment fails to allege that Meza's acts and state of mind fulfilled the elements of the offense. At best, there is uncertainty and ambiguity surrounding the mens rea element. What matters is this: there is no indication from the indictment that the grand jury was asked to find that Meza's acts and state of mind fulfilled all the elements of the offense.

Thus, Meza moves under the Fifth and Sixth Amendments and Rules 7 and 12(a) of the Federal Rules of Criminal Procedure, for an order dismissing the one-count indictment because it fails to sufficiently allege an element of the offense.

## 2.0 The indictment must be dismissed because 18 U.S.C. § 922(g)(5) is unconstitutional.

Meza makes both a facial and an as-applied constitutional challenge to 18 U.S.C. § 922(g)(5). The facial challenge explains that the complete ban in § 922(g)(5) on all illegal aliens possessing firearms is overbroad and thus violates the Second Amendment. The as-applied challenge contends that the ban in § 922(g)(5) violates Meza's Second Amendment rights.

### 2.1 Illegal aliens are not categorically excluded from "the people" protected by the Second Amendment.

Words have meaning. And when the same words are used in the same document, they are given the same meaning—unless that is expressly stated otherwise. *See Parker v. District of Columbia*, 478 F.3d 370, 382 (D.C. Cir. 2007); *see also*

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

*Fla. Dept. of Rev. v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 39 (2008) (noting "identical words used in different parts of the same act are intended to have the same meaning" (quotation omitted)). Here, the analysis and argument are controlled by words the Constitutional Convention chose when drafting the Bill of Rights. The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). The First, Second and Fourth Amendments all use the term "the people"—a term of art—and many courts have found that it means the same thing in each amendment. *United States v. Emerson*, 270 F.3d 203, 227–28 (5th Cir. 2001); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990); *Parker*, 478 F.3d at 381; *Nordyke v. King*, 364 F.3d 1025, 1028–29 (9th Cir. 2004) (Gould, J., dissenting from denial of rehearing en banc). Courts have reached this conclusion by comparing the language, structure, and purpose of the three amendments. Of course, the First, Second, and Fourth Amendments were ratified at the same time. And they all serve the same purpose: to limit government infringement of a right that existed before the ratification of the Constitution. In doing so, each amendment also recognizes who posses that right—it is "the right of the people."

The Supreme Court recognized that fact in *United States v. Verdugo-Urquidez*, stating: "'the people' seems to have been a term of art employed in select parts of the Constitution," referring to those who are "protected by the Fourth Amendment, and

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

by the First and Second Amendments." 494 U.S. 259, 265 (1990). And so it is not surprising that courts have uniformly held that the protections of the First and Fourth Amendments extend to individuals with a substantial connection to the United States. And under this test, illegal aliens can be considered among "the people." The seminal case ascribing a precise meaning to the term "the people" arose in the context of a Fourth Amendment claim. *See Verdugo-Urquidez*, 494 U.S. at 265. There the Supreme Court found:"'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Verdugo-Urquidez*, 494 U.S. at 265; *see also Heller*, 554 U.S. at 580 (discussing *Verdugo-Urquidez*). In *Verdugo-Urquidez*, the defendant's home in Mexico was searched shortly after he was arrested and brought to America. 494 U.S. at 262. He claimed that the Fourth Amendment's protections extended to his home in Mexico. The Supreme Court rejected that argument, but before doing so, it gave a detailed analysis of the Fourth Amendment and the term "the people."

Meza, as a non-citizen, is among "the people" under the analysis set forth in *Verdugo-Urquidez*, 494 U.S. at 262. He is voluntarily present in the United States and has accepted "some societal obligations." *See id.* at 273. More specifically, he is a

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

long-time resident of Milwaukee. He attended elementary, middle and high school in the Milwaukee Public Schools. He has two children here. *See* dkt. 21, exh. 1. His mother lives here. *Id.* And for all of his adult life he has lived here. Thus, Meza is among "the people" whom the Second Amendment guarantees the right to bear arms.

The Magistrate Judge's fatal mistake rested in his belief that *Heller* should be read to exclude Meza from Second Amendment protection simply because of his immigration status. Some courts, including the Fifth Circuit in *United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011), have relied on *Heller* to find that under the Second Amendment illegal immigrants are not included in "the people."[1] But this was not the issue in *Heller* and it's improper to read an "unwritten holding" into the opinion. *See United States v. Huitron-Guizar*, 678 F.3d 1164, 1168 (10th Cir. 2012) (refusing to read an unwritten holding into *Heller*: "the question in *Heller* was the amendment's raison d'être—does it protect an individual or collective right?—and aliens were not part of the calculus."); *Fletcher v. Haas*, 851 F. Supp. 2d 287, 297 (D.

---

[1] The Fifth Circuit panel in *Portillo-Munoz* was divided on the issue. *Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011); *but see id.* at 442-43 (Denis, J. dissenting). In a half-page per curiam opinion, the Eighth Circuit followed the Fifth. *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011). Though initially the Fourth Circuit remanded a challenge to § 922(g)(5) for the district court to decide what level of scrutiny to apply, *United States v. Guerrero-Leco*, 446 Fed. Appx. 610 (4th Cir. 2011), it eventually concluded that "illegal aliens do not belong to the class of law-abiding members of the political community to whom the protection of the Second Amendment is given." *United States v. Carpio-Leon*, 701 F.3d 974, 981 (4th Cir. 2012). *United States v. Lewis*, 2010 WL 337 0754, at *3 (N.D. Ga. May 26, 2010); *United States v. Yanez-Vasquez*, 2010 WL 411112, at *2 (D. Kan. Jan. 28, 2010).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Mass. 2012) ("[T]he issue in Heller was not the scope of the term 'the people,' but whether the Second Amendment protected a collective or an individual right.") Indeed, the Supreme Court emphasized that *Heller*'s holding was limited and that "one should not expect [the opinion] to clarify the entire field."*Id.* at 635.

Ultimately, the Supreme Court determined in *Heller* that the Second Amendment secures an individual right—like the First and Fourth Amendments. At no time did the Supreme Court address whether a non-citizen is protected by the Second Amendment. That question has been left open and should be decided in Meza's favor; just as the First and Fourth Amendment protect illegal immigrants with substantial connections to the United States, so too does the Second Amendment. Once this is established, the question becomes whether § 922(g)(5) unconstitutionally infringes on Meza's right to bear arms.

### 2.2    Section 922(g)(5) is facially unconstitutional.

The Seventh Circuit has yet to consider whether § 922(g)(5)'s ban passes constitutional muster in light of the Supreme Court's holding in *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). As an initial matter, there is no question that § 922(g)(5) abridges Meza's Second Amendment rights—the statute keeps him from possessing a gun or ammunition. He cannot exercise his right to bear arms if he can't possess a gun or the bullets to use one—after all, a gun is of little use if it can't be used.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

The remaining issue is whether § 922(g)(5) is a constitutionally permissible restraint of that right. The analysis is two-fold. *See United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010). First, is the defendant part of a group that is categorically banned from possessing a firearm? Here, the defendant is: § 922(g)(5) nullifies the Second Amendment for him and all illegal aliens. Second, can the government show that the categorical ban is constitutional? *Williams*, 616 F.3d at 692. As the Seventh Circuit explained in *Williams,* "the government does not get a free pass simply because Congress has established a 'categorical ban'; it still must prove that the ban is constitutional, a mandate that flows from *Heller* itself." *Id.*

The government has failed to meet its burden here — under whatever form that burden takes. At the very least, the government must meet some form of heightened scrutiny. *See Skoien*, 614 F.3d at 641 (en banc) (the Court noted that "[t]he United States concedes that some form of strong showing ('intermediate scrutiny,' many opinions say) is essential, and that § 922(g)(9) is valid only if substantially related to an important governmental objective."). The ban under § 922(g)(5) is different from the categorical prohibitions examined in *Skoien* and *Williams* and *Yancey*.  In *Skoien,* the challenged ban on firearm possession was for those convicted of domestic abuse; in *Williams,* the challenged ban was for convicted felons; and in *Yancey,* the challenged ban was for drug users. In a challenge like this, the analysis

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

starts with the nature of the ban: that is, what is the government's objective in creating that ban. *Williams*, 616 F.3d at 693. In *Skoien* and *Williams* the court upheld the ban because there was something inherently dangerous about the class of persons banned—felons and those convicted of domestic violence. While not every felon who cannot possess a firearm is dangerous, as a general class, society was and is safer by keeping guns out of those persons' hands. *Id; Skoien*, 614 F.3d at 642.

The ban at issue in *Yancey* is similar: Congress had a specific objective—namely, "suppressing armed violence." *United States v. Yancey*, 621 F.3d 681, 684 (7th Cir. 2010). In upholding that ban, the court focused on the close parallels between prohibitions targeting the mentally ill, felons, and habitual drug users. *See id.* ("Keeping guns away from habitual drug abusers is analogous to disarming felons."); *and id.* at 685 ("Moreover, habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms."). The possession of a firearm by persons from each group poses a real and self-evident threat to society. *Id.* at 686.

But the same cannot be said of the ban at issue in § 922(g)(5). It can't be said that illegal immigrants as a general class are inherently dangerous. The government has not presented evidence establishing otherwise. Here, the Magistrate Judge tried to bridge that gap by speculating that illegal immigrants are not, as a class, virtuous people to whom the Second Amendment protections encompass. Dkt. 27 at 8. First,

virtue or the lack thereof has never been the test for whether someone is afforded Constitutional protections. If it were, evidence from a drug case or a robbery or really any crime would not be suppressed. A commission of a crime naturally militates against society recognizing someone as virtuous. That's not to mention the protections afforded in the First Amendment. Shakespeare and pornography, the ballet and strip clubs, a Neighborhood Watch meeting and a protest at a combat veteran's funeral, a Sunday church service and a gathering of Satanists, all enjoy the same protection under the First Amendment. *See e.g., Snyder v. Phelps,* 562 U.S. ___, 131 S.Ct. 1207 (2011). A value judgment about virtue, or a lack of it, cannot be the basis for stripping Constitutional protections.

Because the government cannot point to an important governmental objective underlying § 922(g)(5)'s ban, nor can it establish that prohibiting illegal immigrants from possessing firearms furthers an important governmental interest, the defendant's motion must be granted and § 922(g)(5) struck down as unconstitutional.

### 2.3    Section 922(g)(5) is unconstitutional as applied to Mr. Meza.

Under the standard applied by the Magistrate Judge — intermediate scrutiny — § 922(g)(5) must be found unconstitutional as applied to Meza. Under that standard, it is the government's burden to demonstrate that the statute's objective "is an important one" and that it "is advanced" by "substantially related" means.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

*United States v. Williams,* 616 F.3d 685, 692 (7th Cir. 2010). Whether a statute meets this standard in any given case must be determined based on "the facts of the present case." Dkt. 27 at 10, citing *United States v. Phillips,* 645 F.3d 859, 863 (7th Cir. 2011).

The Seventh Circuit has said that the purpose of § 922(g) is "to keep guns out of the hands of presumptively risky people and that "[its] broad objective — suppressing armed violence — is without a doubt an important one." *Yancey,* 621 F.3d at 863. *Yancey* involved a challenge to § 922(g)(3) (drug user in possession of a firearm), and the Court relied on evidence to support the link between drug use and risky, violent behavior involving guns. The government cannot discharge its burden here by simply asserting that individuals "illegally and unlawfully in the United States," and Meza in particular, qualify as "presumptively risky."

The Magistrate Judge relies on the Fifth Circuit's reasoning in *Portillo-Munoz,* 643 F.3d at 441, to lump illegal aliens into the category of "presumptively risky people." Dkt. 27 at 10. Illegal aliens, according to the court, "are likely to maintain no permanent address in this country, elude detection through an assumed identity, and — already living outside the law — resort to illegal activities to maintain a livelihood." *Portillo-Munoz,* 643 F.3d at 441 (quoting *United States v. Toner,* 728 F.2d 115, 128-29 (2d Cir. 1984)). But what remains unclear is the link between these broad generalizations and armed violence. It seems just as likely that individuals without

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

legal status would try to avoid run-ins with law enforcement—especially violent or brazen behavior—to minimize the risk of detection and deportation. What's more, entering the United States without inspection—illegal entry—is a non-violent misdemeanor. But under the Magistrate Judge's interpretation Meza, along with many others, became "presumptively risky" by allegedly committing the non-violent misdemeanor offense of illegal re-entry and then remaining here. It is the government's burden to demonstrate that there's an important governmental interest at work here, but all it has offered, and all the Magistrate Judge relied on, are broad generalizations.

Even if these broad generalizations are enough to demonstrate an important governmental objective, the statute is not substantially related to advancing that objective here. This case involves the following facts: Meza is a longtime resident of Milwaukee where he is now raising his two children. *See* Dkt. 21, exh. 1. He attended school here and has extended family in the area. Before his arrest, his permanent residence was on Burnham Street in Milwaukee which he reported to law enforcement. *See id.* He had never been deported before and to this day does not have an A-File with ICE. On August 24, 2013, he was arrested with one .22 caliber cartridge in his back pocket. *See* dkt. 1 (charging Meza with possessing one cartridge). He has never been convicted of a felony and has never been caught using drugs, though a CCAP search does reveal one prior conviction: five years before this

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

incident, he was convicted of misdemeanor resisting or obstructing an officer. *See also* dkt. 6. He does have misdemeanor charges currently pending, but he is presumed innocent of those, as is true of prior charges that were dismissed by the State and prior arrests that never resulted in charges. He did not have a gun when he was arrested and has never been convicted of committing armed violence.

Given these facts, banning Meza from possessing one bullet does not advance in a substantially-related manner the goal of preventing armed violence, if this is in fact an important governmental interest. Because the government has not and cannot meet its burden to prove otherwise, § 922(g)(5) is unconstitutional as applied to Meza and the indictment should be dismissed.

**3.0    Meza's statements must be suppressed because those statements were made during a custodial interrogation without the protection of *Miranda.***

Agent Shearing with Immigration and Customs Enforcement interviewed Meza at the Milwaukee County Jail two days after he was arrested on state charges. There is no question that Meza was in custody at the time. Dkt. 27 at 15. During that interview, Shearing questioned Meza about his alienage, his parents' immigration status, his place of birth, and his entry into the United States. Shearing went into the interview suspecting that Meza was in the United States illegally. Tr. at 8; dkt. 27 at 12.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

This interview did not take place as a matter of course: Shearing was directed by Agent Dykema specifically to interview Meza based on a tip from local law enforcement. Dkt. 27 at 11; Tr. at 32-33. Shearing admitted at the evidentiary hearing that her questions of Meza could establish the elements of both illegal entry (18 U.S.C. § 1325) and illegal re-entry (18 U.S.C. § 1326), and that she can refer cases for prosecution. Tr. at 18-19, 29–30; dkt. 72 at 13. Whether she could ultimately establish a violation of either depended, of course, on the answers Meza provided. There's no doubt, though, that she has significant experience enforcing these and other immigration laws, and that she is aware of what constitutes criminal conduct. *See* Tr. at 25 (explaining that there have been times during similarly un-*Mirandized* interviews that the subject confesses to illegal re-entry, at which point the agency proceeds "down the criminal path"). According to Shearing, there is "no fool-proof way" to ensure that an un-*Mirandized* interview like Meza's doesn't result in an illegal re-entry confession. Tr. at 27; dkt. 27 at 13-14. One preventative measure, of course, would be that the agent give *Miranda* warnings before every such interview.

Even though that would be the best course of action, there is no blanket demand. Rather, the question is whether, under these facts, Shearing's questioning constituted custodial interrogation triggering *Miranda*'s safeguards. A custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). In *Rhode Island v. Innis*, 446 U.S. 291 (1980), the Court clarified that questioning for *Miranda* purposes includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301.

The focus in determining whether words or actions are "reasonably likely to elicit an incriminating response" is primarily upon the perceptions of the suspect, rather than the intent of the police. *Id.* at 301(footnotes omitted); *see also Illinois v. Perkins*, 496 U.S. 292, 296 (1990). The Magistrate Judge focused instead on the agent's perception of the situation, (*see* dkt. 27 at 18-29), when it is Meza's point of view that matters under *Miranda* and *Innis.*

The goal of *Miranda,* after all, is to "spare the accused from having to reveal, directly or indirectly, his knowledge of facts relating him to the offense or from having to share his thoughts and beliefs with the Government." *Doe v. United States,* 487 U.S. 201, 213 (988). Shearing wasn't seeking basic benign, biographical information from Meza — this type of information had already been obtained when Meza was booked into jail two days earlier. Rather, she wanted to know if he was in the U.S. illegally. Her questioning laid the foundation for immigration-related criminal offenses, including illegal entry under § 1325 and illegal re-entry under § 1326. *United States v. Gallardo*, 58 F. Supp. 2d 1018, 1021-22 (S.D. Iowa 1999)

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

(barring the government from introducing in its case-in-chief evidence of defendant's answers to the citizenship and alien status questions); *United States v. Aragon-Ruiz,* 551 F. Supp. 2d 904 (D. Minn. 2008) (determining that statements were admissible because defendant heard and waived his *Miranda* rights twice). Again, these were targeted questions of Meza relating to his immigration status. And Shearing asked him these questions in a tiny locked room within the Milwaukee County Jail—an unfamiliar and undoubtedly unnerving environment to begin with. She didn't tell him he was free to leave. She didn't offer to let him call his attorney. She didn't ask him if he was willing to answer questions. She didn't give him an opportunity to ask questions of her until she was finished with her questioning. She didn't even tell him he could pause the interview to use the restroom. This type of coercive interrogation is the reason *Miranda*'s safeguards exist.

Finally, it does not matter whether the Milwaukee office of the Department of Homeland Security has policy against prosecuting § 1325 offenses. At the evidentiary hearing, Shearing referred vaguely to a policy but couldn't say with certainty that the policy was written, and she admitted that a prosecution could proceed notwithstanding the existence of a policy. Tr. 24–26, 28. There is no such policy in evidence in this case. And even if a written policy exists and is followed to a tee, its existence does not stop illegal entry from being a criminal offense. After all, the fact that a criminal offense is obscure or prosecuted infrequently does not render

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

it invalid. *See Yick Wo v. Hopkins,* 118 U.S. 356 (1886). And it also does not matter whether Shearing would have paused the interview to recite *Miranda* warnings had Meza admitted to illegally re-entering the United States — an offense that is frequently prosecuted. *Miranda* warnings serve no purpose when given after the fact; they're intended as a prophylactic, not a cure or a remedy. *See Missouri v. Seibert,* 542 U.S. 600, 604 (2004) (observing that "[a] midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with Miranda's constitutional requirement," rendering "a statement repeated after a warning in such circumstances [] inadmissible.")

This was an interrogation and Meza was in custody at the time. Because *Miranda* warnings were required but never provided, Meza's statements must be suppressed. *Miranda*, 384 U.S. at 444 ("[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates" the use of *Miranda*'s safeguards.); *see also Brown v. Illinois*, 422 U.S. 590, 604 (1975) (the burden of showing admissibility rests on the prosecution).

### 4.0    Conclusion.

The indictment in this case fails to allege that Meza possessed the requisite mens rea as to both elements of § 922(g)(5). Because this required element was omitted, the indictment fails to conform to minimal constitutional safeguards and

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

must be dismissed. In addition, the indictment must be dismissed because § 922(g)(5) is unconstitutional, both facially and as applied to Meza. Finally, all of Meza's statements stemming from the unwarned custodial interrogation must be suppressed.

Dated this 11th day of March, 2014.

Respectfully submitted,
MARIANO A. MEZA, Defendant

/s/ Julie K. Linnen
Julie K. Linnen

FEDERAL DEFENDER SERVICES
 OF WISCONSIN, INC.
222 West Washington Avenue, Suite 680
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
julie_linnen@fd.org



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of Wisconsin*

*Federal Courthouse*          *(414)297-1700*
*517 E. Wisconsin Ave, Rm 530*    *Fax (414) 297-1738*
*Milwaukee WI 53202*      *www.justice.gov/usao/wie*

March 20, 2014

Honorable Rudolph T. Randa
United States District Judge
Eastern District of Wisconsin
517 East Wisconsin Avenue
Milwaukee, Wisconsin 53202

      RE:    *United States v. Meza*
              Case No. 13-CR-192

Dear Judge Randa:

     The above-referenced defendant has filed objections to the Magistrate Judge's Recommendations. To this end, the government rests upon its previous submissions in this case, and respectfully requests that the Magistrate Judge's Recommendation be upheld.

                   Sincerely,

                   JAMES L. SANTELLE
                   United States Attorney
         By:

                   s/Gail J. Hoffman
                   Assistant United States Attorney
                   Gail J. Hoffman Bar Number: 1007361
                   Attorney for Plaintiff
                   Office of the United States Attorney
                   Eastern District of Wisconsin
                   517 East Wisconsin Avenue, Room 530
                   Milwaukee, Wisconsin  53202
                   Telephone: (414) 297-1761; Fax: (414) 297-1738
                   E-Mail: gail.hoffman@usdoj.gov

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

      -vs-                              **Case No. 13-CR-192**

MARIANO A. MEZA,

        Defendant.

---

# DECISION AND ORDER

---

Defendant, Mariano Meza, ("Meza") brings three motions: a motion to dismiss the indictment for failure to allege an element of the offense, a motion to dismiss the indictment on constitutional grounds, and a motion to suppress evidence.

Magistrate Judge William Callahan has recommended to this Court that Meza's motions be denied in their entirety.

The Court has read the submissions that support the positions of Meza and the Government and analyzed the reasoning and conclusions offered by the Magistrate Judge for his recommendation and concludes as follows.

The Court adopts the Magistrate Judges' recommendations in toto. The Court also adopts the rationale underpinning Magistrate Judge Callahan's decision.

Therefore, Meza's motions are denied.

**IT IS HEREBY ORDERED THAT:**

The Court adopts Magistrate Judge Callahan's recommendations (ECF No. 27); and

Meza's motions to dismiss (ECF Nos. 12, 13) and his motion to suppress (ECF No. 14) are **DENIED**.

Dated at Milwaukee, Wisconsin, this 11th day of April, 2014.

<div align="right">

**BY THE COURT:**

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**

</div>

# United States District Court

## EASTERN DISTRICT OF WISCONSIN

## COURT MINUTES

HON. **Nancy Joseph**, presiding.           Deputy Clerk: Karen

DATE: **May 1, 2014**           Court Reporter:

CASE NO. **13-CR-192**           Time Called: 2:21:30

UNITED STATES v. **Mariano Meza**           Time Concluded: 2:23:15

PROCEEDING: **Detention Hearing**


UNITED STATES by: **Gail Hoffman by Penelope Coblentz**

       Probation Officer: **Melissa Quistorf**

       Interpreter:


DEFENDANT: **Mariano Meza**, in person, and by

ATTORNEY:  **Joseph Bugni (USFD)**

Crt. gives background of matter.  The state has released the deft. and he is here by way of a detainer.

The deft. does not contest and stipulates to detention at this time.

Crt. statements before ruling. Based on the stipulation to detention, the court orders the deft. detained pending further proceedings.

# United States District Court

## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA

v.

**MARIANO MEZA**

*Defendant*

**ORDER OF DETENTION PENDING TRIAL**

Case Number: 13-CR-192

     In accordance with the Bail Reform Act, 18 U.S.C. § 3142(f), a detention hearing has been held. I conclude that the following facts require the detention of the defendant pending trial in this case.

### Part I - Findings of Fact

☐  (1)  The defendant is charged with an offense described in 18 U.S.C. § 3142(f)(1) and has been convicted of a ☐ federal offense ☐ state or ☐ local offense that would have been a federal offense if a circumstance giving rise to federal jurisdiction had existed that is

      ☐  a crime of violence as defined in 18 U.S.C. § 3156(a)(4).

      ☐  an offense for which the maximum sentence is life imprisonment or death.

      ☐  an offense for which a maximum term of imprisonment of ten years or more is prescribed in.[1]

      ☐  a felony that was committed after the defendant had been convicted of two or more prior federal offenses described in 18 U.S.C.§ 3142(f)(1)(A)-(C), or comparable state or local offenses.

☐  (2)  The offense described in finding (1) was committed while the defendant was on release pending trial for a federal, state or local offense.

☐  (3)  A period of not more than five years has elapsed since the ☐ date of conviction ☐ release of the defendant from imprisonment for the offense described in finding (1).

☐  (4)  Findings Nos. (1), (2) and (3) establish a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of (an) other person(s) and the community. I further find that the defendant has not rebutted this presumption.

### Alternative Findings (A)

☐  (1)  There is probable cause to believe that the defendant has committed an offense
      ☐  for which a maximum term of imprisonment of ten years or more is prescribed in.
      ☐  under 18 U.S.C.§ 924(c).

☐  (2)  The defendant has not rebutted the presumption established by finding 1 that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community.

### Alternative Findings (B)

☐  (1)  There is a serious risk that the defendant will not appear.

☐  (2)  There is a serious risk that the defendant will endanger the safety of another person or the community.

### Part II - Written Statement of Reasons for Detention

     I find that the information submitted at the hearing establishes by that the defendant has been released from state custody and was brought to this court by way of a detainer. The defendant does not contest detention at this time. Therefore, the defendant is detained pending further proceedings.

### Part III - Directions Regarding Detention

     The defendant is committed to the custody of the Attorney General or his designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The defendant shall be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility shall deliver the defendant to the United States marshal for the purpose of an appearance in connection with a court proceeding.

Dated:   May 1, 2014

*Signature of Judicial Officer*

Nancy Joseph, United States Magistrate Judge
*Name and Title of Judicial Officer*

---

[1]Insert as applicable: (a) Controlled Substances Act (21 U.S.C.§ 801 *et seq.*); (b) Controlled Substances Import and Export Act (21 U.S.C.§ 951 *et seq.*); or (c) Section 1 of Act of Sept. 15, 1980 (21 U.S.C.§955a).

# FEDERAL DEFENDER SERVICES OF WISCONSIN, INC.

LEGAL COUNSEL

Daniel W. Stiller
Craig W. Albee
Joseph A. Bugni
Anderson M. Gansner
Juval O. Scott

517 East Wisconsin Avenue
Suite 182
Milwaukee, Wisconsin 53202

Telephone 414-221-9900
Facsimile 414-221-9901

June 6, 2014

Hon. Rudolph T. Randa
United States District Court
Eastern District of Wisconsin
517 East Wisconsin Avenue
Milwaukee, Wisconsin 53202

RE:     *United States v. Mariano A. Meza*
        Case No. 13CR192(RTR)

To the Honorable Rudolph T. Randa,

The Court continued the trial in this case after the defense's pretrial motions were denied and the parties informed your Chambers that a settlement might be reached. Mr. Meza's immigration status was the driving concern. After consulting with an immigration attorney, the defense cannot accept the terms of the proposed plea. Thus, the parties are preparing for trial.

Since the defense requested more time to consult an immigration attorney and figure out the immigration consequences of the proposed plea, the defense will waive any claim under the speedy trial act between the time the defense's pretrial motions were denied, April 11, 2014 and the next scheduled court appearance in this case.

Thank you for your attention to this matter.

Sincerely,

s/Joseph A. Bugni
Joseph A. Bugni

JAB/lc

N:\Cases-Open\M-N\Meza, Mariano A. - 14-037\Correspondence\0606.2014.Hon RTR re prepping for trial.wpd

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    -vs-                          Case No. 13-Cr-192

MARIANO A. MEZA,

        Defendant.

## ORDER

        Mariano A. Meza's ("Meza") motions to dismiss the indictment for failure to allege an element of the offense, to dismiss the indictment on constitutional grounds, and to suppress statements were denied by this Court on April 11, 2014. Since that time, Meza's attorney has been diligently pursuing a plea agreement with the government. The defendant considered the proposal but after consultation with an immigration attorney he rejected it due to his immigration status. The defendant wishes to proceed to trial and waives any claim under the speedy trial act from April 11, 2014, until the next scheduled court appearance in this case.

        Therefore, the Court is scheduling a two-day jury trial in this matter to commence **Monday, July 14, 2014 at 9:00 a.m.** in Courtroom 320. Proposed Voir Dire Questions and Proposed Jury Instructions are due **Thursday, July 10, 2014.**

Based upon the above, the Court finds that the ends of justice are served by granting a continuance which outweighs the best interest of the public and the defendant in a speedy trial. *See* 18 U.S.C. §§ 3161(h)(7)(A) and (h)(7)(B)(i) and (iv). The time from April 11, 2014 until July 14, 2014 is deemed excludable.

Dated at Milwaukee, Wisconsin, this __**10th**__ day of June, 2014.

**BY THE COURT:**

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**

- 2 -

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        *Plaintiff,*

        *vs.*                         Case No. 13-cr-192 (RTR)

MARIANO A. MEZA,

        *Defendant.*

---

## MOTION TO ADJOURN THE JURY TRIAL DATE

Mariano Meza, by counsel, requests that the Court adjourn the jury trial currently set for July 14, 2014 and that it be reset for August 6, 2014, with proposed voir dire and jury instructions due on July 31, 2014.

Meza is requesting this three-week adjournment to enable counsel to adequately prepare for trial. Attorney Juval Scott will be substituted for Attorney Bugni as co-counsel for trial, and Attorney Scott is currently scheduled to be out of state for training the week of July 14, 2014. In addition, an adjournment will give counsel sufficient time to conduct further investigation. Meza will not be requesting any additional adjournments.

In an order entered on June 10, 2014, this Court made a speedy trial finding pursuant to 18 U.S.C. §§ 3161(h)(7)(A), (h)(7)(B)(I) and (v), (dkt. 36), and the speedy trial date is September 9, 2014. In anticipation of this request, counsel consulted

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

with this Court's clerk who confirmed that it is possible for this Court to accommodate Meza's two-day trial on August 6, 2014, with proposed voir dire and jury instructions due the week before.

Dated at Madison, Wisconsin this 30th day of June, 2014.

Respectfully submitted,

/s/        *Julie K. Linnen*
Julie K. Linnen, WI Bar #1085029
FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53703
Tel.: (608) 260-9900
E-mail: julie_linnen@fd.org

*Counsel for Defendant,* Mariano A. Meza

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        *Plaintiff,*

    *vs.*                                      Case No. 13-CR-192 (RTR)

MARIANO MEZA,

        *Defendant.*

---

## PROPOSED VOIR DIRE QUESTIONS

Pursuant to Fed. R. Crim. P. 24(a), counsel for Mariano Meza submits the following questions for voir dire. The voir dire process is essential to ensuring a defendant receives a fair and impartial trial. And as part of that process, a defendant is entitled to inquire into the background and attitude of jurors to the extent necessary to intelligently exercise his peremptory challenges. *United States v. Dellinger*, 472 F.2d 340, 368 (7th Cir. 1972). Separate questioning of each prospective juror will facilitate counsel's intelligent use of peremptory challenges pursuant to Rule 24(b) and ensure that voir dire meets constitutional standards.

*Federal Defender Services*
*of Wisconsin, Inc.*

Meza submits the following questions to be asked of the prospective jurors during the voir dire examination in this case, supplementing the questions that will be asked as part of the juror questionnaire:

## I.      BACKGROUND

A.     *Residence*

1.      Where do you currently live?

2.      How long have you lived there?

3.      Do you own or rent?

4.      Do you live with friends or family?

5.      How long have you lived in Wisconsin?

6.      Where have you lived in the last 10 years?

B.     *Education/Employment*

1.      What is the highest level of education you have completed?

2.      Have you ever received training or education, or been employed, either on a paid or volunteer basis in:

Corrections/Jail/Prison
Court System
Immigration
Law

If yes, please explain what that training/education/employment was.

*Federal Defender Services
of Wisconsin, Inc.*

3.        Have you or a relative or close friend ever been employed by the government (federal, state or local)? If yes, what agency and in what capacity? What were your duties? How long were you employed there?

4.        Do you have any special education, knowledge or experience with respect to counseling or treating alleged crime victims? If yes, please explain.

5.        What is your current job or occupation? If you are retired, what was your last job or occupation? If you are currently unemployed, what is your customary work?

6.        In your employment, have you been a supervisor of others? What was that experience like?

7.        Have you ever owned your own business? Please describe your business. Please describe your experience owning your own business.

8.        Were you ever in the military? Please describe the nature of your service.

C.    *Family*

1.        What is your marital status? (Single, Married, Separated, Divorced, Widowed, Unmarried but living with significant other)

2.        If married, how long have you been married?

3.        If divorced or widowed, how long were you previously married?

4.        If living with significant other, how long have you lived with this person?

5. What is your spouse's or significant other's job or occupation? If he/she is retired or unemployed, what was his or her occupation?

6. What is his/her highest level of education?

7. If previously married, what was your former spouse's occupation?

8. Do you have children, stepchildren, or foster children? If yes, how old are they? Do any of them live at home? What do they do for a living?

9. As a child, were you able to approach a parent or older adult relative/caregiver to discuss uncomfortable or sensitive topics? Why or why not?

10. As a child/young adult, do you recall your parent(s)/relative/caregiver shielding you from uncomfortable or sensitive topics or were such topics discussed freely within your home?

D. *Knowledge of Anyone in This Case or Media Exposure*

1. Do you know any other member of the jury panel or any other person in the court room today?

2. Do you know (insert list of witnesses)?

3. Since filling out the jury questionnaire, have you discussed this case with anyone?

## II. VIEWS ON IMMIGRATION

1. Do you agree or disagree with current immigration policy?

2. What experiences, if any, have shaped your view on immigration or immigrants living in the United States?

*Federal Defender Services*
*of Wisconsin, Inc.*

4

2.      Do you think our government effectively enforces border security?

4.      Do you have any reaction when you hear individuals speaking Spanish in the grocery store, at a restaurant, or in other public places? If yes, please explain.

5.      Do you have a prior experience with immigration that would make it difficult for you judge this case impartially?

## III.    CRIMINAL JUSTICE EXPERIENCE

1.      Have you ever taken any courses or received training in law, law enforcement, or criminology?  If yes, what courses?

2.      Have you or anyone close to you ever worked for, volunteered with, or considered working for any law enforcement agency in any capacity?  If yes, please describe that experience.

3.      Have you, a family member, or close friend had a positive or negative experience with the police, law enforcement, or a prosecutor's office? If yes, please explain that experience.

4.      Do you have any negative feelings about the criminal justice system? If yes, why?

5.      Do you have any negative feelings about criminal defense attorneys? If yes, why?

6.      Do you have any negative feelings about the United States Attorney's Office or prosecutors in general?  If yes, why?

7.      Do you have any particularly positive feelings about the criminal justice system, police, or prosecutors?  If yes, describe the experience that brought about those feelings.

8.      Have you ever been accused of something you did not do?  If so, how did you respond?

*Federal Defender Services*
5                      *of Wisconsin, Inc.*

9.     Have you ever been a witness to a crime, filed a report with a police officer or other law enforcement agency, or had contact with a prosecutor's office?  If yes, please explain.

10.    Have you or anyone close to you ever been the victim of a crime, whether it was reported to law enforcement authorities or not?  If yes, please explain that experience.

11.    Have you or anyone close to you been a suspect in, arrested for, or charged with a criminal offense (other than a minor traffic violation)?  If yes, please explain that experience.

12.    Have you or anyone in your immediate family ever been involved in a lawsuit, including a divorce?  If yes, please explain.

13.    Have you ever served on a jury before?  If yes, was it a civil or criminal case?  How long ago was it?  Where was it?  Did you reach a verdict?  Were you the foreperson?

## IV.  INTERESTS

1.     Do you belong to any associations in which you are active?  If so, what are they?

2.     Have you ever held public office?  If yes, what office and when?

3.     Do you have any bumper stickers on your car?  If yes, describe them.

4.     Have you ever posted on any blogs or posted comments on news stories or other blog postings on the internet?  If yes, what blogs or news stories?

5.     Do you regularly follow the news?  What sources do you turn to for news?

6.     Is there any other information about your background, experience or opinions that the court has not inquired about that may impact your ability to be a fair and impartial juror?

*Federal Defender Services*
6          *of Wisconsin, Inc.*

Dated at Milwaukee, Wisconsin this 31st day of July, 2014.

Respectfully submitted,

/s/    Julie K. Linnen
Julie K. Linnen, WI Bar #1085029
Federal Defender Services
  Of Wisconsin, Inc.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53705
Tel: (608) 260-9900
E-mail: julie_linnen@fd.org

COUNSEL FOR Mariano Meza

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff

    v.

                                         Case No. 13-CR-192

MARIANO A. MEZA,

        Defendant.

## PROPOSED VOIR DIRE

      The United States, by its attorneys, James L. Santelle, United States Attorney for the Eastern District of Wisconsin, and Gail J. Hoffman, Assistant United States Attorney, respectfully requests that the court include the following questions in its examination of prospective jurors pursuant to Fed. R. Crim. P. 24(a). The court is also requested to ask further questions whenever a particular response suggests that further inquiry is appropriate.

   1. Please state your name, city of residence, marital status, educational background, occupation, and occupation of your spouse. If retired or unemployed, please state the nature of your last employment.

   2. Have any of you had any prior connection to or knowledge of: (a) the defendant, Mariano A. Meza; (b) his attorneys, Juval Scott and Julie Linnen; or (c) Assistant United

1

States Attorney Gail J. Hoffman?

3.  The potential government witnesses are:

    Edgardo Bauzo-Santiago
    Police Officer
    Milwaukee Police Department

    Roman Martinez
    Police Officer
    Milwaukee Police Department

    Erik Rodriguez
    Police Officer
    Milwaukee Police Department

    Rudolph Verhoeven
    Police Officer
    Milwaukee Police Department

    Kenyatte Wooden
    Detective
    Milwaukee Police Department

    Jimmy Young
    Forensic Investigator
    Milwaukee Police Department

    Kenneth Handy
    Special Agent
    Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)

    Cassandra Shearing
    Deportation Officer
    Department of Homeland Security
    Immigration and Customs Enforcement

    Russell Dykema
    Special Agent
    Department of Homeland Security
    Homeland Security Investigations

2

Nate Catura
Casey Roseliep
Special Agents
Social Security Administration
Office of the Inspector General

Juan De Dios Meza-Rodriguez

Shannon Meza

Rosa Graciela Rodriguez

Carla Espino-Gallegos

Juan Espino-Ramirez

Do you know any of the individuals on the witness list provided to you? If any of you have had any prior contact with them, what was it? Will it affect the way in which you view the evidence in this case? If so, how?

4. Have you previously served as a juror? If so, please state whether the case was a criminal or civil matter, whether the jury reached a verdict, and whether you were the foreperson.

5. Have you, any of your close friends, or your relatives ever been employed by any federal, state, or local law enforcement or governmental agency? Have any of you ever served in the military?

6. Have any of you ever attended law school, received legal training, or worked in a law office?

7. Have you, any member of your family, or any close friend ever been charged with

3

a felony or misdemeanor other than a minor traffic violation? If yes, do you feel the outcome was fair? Would this affect your ability to be an impartial juror in this case?

8. Have you, any member of your family, or any close friend ever been involved in an investigation by federal or state authorities or otherwise been involved in a criminal case either as a witness, a party, victim, or in some other capacity? Would this experience affect your ability to be an impartial juror in this case?

9. Have you ever been involved in a lawsuit other than a divorce?

10. Have you, any member of your family, or any close friend ever had any other direct interest in the outcome of a criminal case that would cause you to be unfair either to the United States or to the defendant?

11. Does any juror have any feelings regarding the United States, the United States Department of Justice, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), the United States Department of Homeland Security, the Milwaukee Police Department, or any other law enforcement agency that might affect your ability to sit as a juror in this case and listen impartially to the evidence and render a verdict according to that evidence?

12. Have you or any of your acquaintances ever had any experiences with entities of Department of Homeland Security, such as Citizenship & Immigration Services, Immigration & Customs Enforcement, Customs & Border Protection officers at the ports of entry, the U.S. Border Patrol, or the former Immigration and Naturalization Service that would influence your ability to sit as a fair and impartial juror in this

4

matter?

13.     The defendant in this case is charged as an alien in possession of ammunition.  Do any of you feel that laws prohibiting noncitizens from possessing either firearms or ammunition are unfair?   Because of your personal feelings about such laws, would any of you refuse, or even hesitate, to convict a defendant in a case like this even if the evidence proved his guilt beyond a reasonable doubt?

14.     Have you or anyone you know ever owned a firearm?   If so, what type? For what purpose?

15.     Do any of you have any personal feelings about the immigrations laws that might affect your ability to sit as a juror and weigh the evidence fairly and impartially?

16.     Is there anything that you have read in newspapers, magazines, or viewed on television regarding immigration issues that would influence your ability to sit as a fair and impartial juror in this case?

17.     Does anyone have any feelings or opinions about our system of justice or the jury system which might affect your ability to sit as a juror and weigh the evidence fairly and impartially?

18.     Do any of you hold any belief, bias, or stereotype, based upon race, which might affect your ability to render a fair and impartial verdict?

19.     Do you have any moral, religious, or philosophical beliefs which make you reluctant to serve on a jury or which would make it difficult for you to judge another person in a criminal case?

20.    Is there any one of you who cannot set aside what you have seen on television or in movies regarding criminal investigations and courtroom evidence, and make a decision in this case solely on the evidence presented at this trial and the instructions given to you by the court?

21.    The jury is the judge of the facts while the judge decides the law.   At the close of the case, the judge will instruct you on the law that you must apply to the facts of this case.   It is your obligation to follow the judge's instructions about the law, whether or not you agree with the law. Is there anyone who would be unwilling to follow the judge's instructions?   If you had opinions on what the law should be and your opinions were different from the judge's instructions on what the law is, does anyone feel they might refuse, or even hesitate, to follow the judge's instructions?

22.    Is there any one of you who cannot set aside whatever personal opinions you might have about the defendant, the government, or the type of case before you, and arrive at a decision based solely on the evidence presented at trial and the instructions given to you by the court?

23.    Is there anything else that I have not covered which you believe will affect your ability to give a fair trial to either the prosecution or the defendant in this case?

Respectfully submitted at Milwaukee, Wisconsin, this 31st day of July 2014.

JAMES L. SANTELLE
United States Attorney

By:

    <u>s/GAIL J. HOFFMAN</u>
    Assistant United States Attorney
    Gail J. Hoffman Bar Number: 1007361
    Attorney for Plaintiff
    Office of the United States Attorney
    Eastern District of Wisconsin
    517 East Wisconsin Avenue, Room 530
    Milwaukee, WI 53202
    Telephone: (414) 297-1700
    Fax: (414) 297-1738
    E-Mail: <u>gail.hoffman@usdoj.gov</u>

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                         Case No. 13-CR-192

MARIANO MEZA,
a/k/a MARIANO ALEJANDRO MEZA-RODRIGUEZ,

        Defendant.

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF
## ELEMENT OF OFFENSE JURY INSTRUCTION

The United States of America, by its attorneys, James L. Santelle, United States

Attorney for the Eastern District of Wisconsin, and Gail J. Hoffman, Assistant United States

Attorney, hereby respectfully submit the following memorandum in support of the

government's proposed element of the offense jury instruction for the charged offense.

On October 8, 2013, a grand jury sitting in the Eastern District of Wisconsin returned a

one count indictment charging Meza as an illegal alien in possession of ammunition under

Title 18, United States Code, Section 922(g)(5). For this offense, the Seventh Circuit Pattern

Jury Instructions for Title 18, United States Code, Section 922(g) sets forth the following

elements to be established at trial:

    To sustain a charge of being an illegal alien in possession of ammunition

    pursuant to 18 United States Code Section 922(g)(5), the government must prove

    the following propositions:

1

> First, the defendant knowingly possessed a firearm or ammunition; and

> Second, at the time of the charged act, the defendant was a prohibited person; and

> Third, the firearm or ammunition had been shipped or transported in interstate or foreign commerce.

*7th Cir. Pattern Crim. Jury Instructions, 2012.*

As stated above, the Seventh Circuit Pattern Jury Instructions for this offense do not include the defendant's knowledge of his prohibited status as an element of the offense.

To this end, in a case right on point, *United Sates v. Montero-Camargo,* 177 F.3d 1113, 1120 (9th Cir. 1999), *opinion withdrawn*, 192 F.3d 946, *reinstated by en banc opinion*, 208 F.3d 1122, 1127 n.8 (2000), the Ninth Circuit rejected the defendant's contention that the district court erred in refusing to instruct the jury that the defendant's knowledge of his status as an illegal alien was an element of the ammunition possession charge. In so finding, the court stated the defendant "need not have known that he was in the United States illegally to 'knowingly violate' 18, U.S.C. § 922(g)(5) as knowledge pertains only to the item possessed not to the status of the possessor." *Id.* at 1120.

Other Circuits have also found that the government need not prove a defendant's knowledge of his prohibited status. *United States v. Langley*, 62 F.3d 602, 604-06 (4th Cir. 1995) (en banc) (government need not prove knowledge of felon status nor of interstate commerce nexus); *United States v. Ballentine*, 4 F.3d 504, 506 (7th Cir. 1993) (proof of defendant's knowledge of status as a fugitive unnecessary; government need only show defendant's knowledge that charges were pending); *United States v. Dancy*, 861 F.2d 77, 81-82

2

(5th Cir. 1988) (collecting cases) (construing legislative history of § 924(a)(1)(B) not to impose requirement of proving defendant's knowledge of status of felon); *United States v. Hutzell*, 217 F.3d 966, 967-68 (8th Cir. 2000) (government not required to prove knowledge of status under § 922(g)(9); *United States v. Butler,* 637 F.3d 519, 532 (5th Cir. 2011); (in § 922(g)(6) prosecution the *mens rea* requirement only applies to the act of firearm possession, not prohibited status).

Indeed the Seventh Circuit recently analyzed the language of Section 922(g) in the context of a challenge to Section 922(g)(9), the subsection prohibiting the possession of firearms or ammunition by those convicted of misdemeanor crimes of domestic violence. In *United States v. Stein*, 712 F.3d 1038, 1040-1041 (7th Cir. 2013) the Court stated that "ultimately, as a matter of statutory construction, there is no reason to think Congress intended 'knowingly' to mean different things for different subsections of section 922(g)." *Id.* at 1041. The Seventh Circuit referenced *Butler,* a 922(g)(6) prosecution where the government did not need to prove the defendant knew of his prohibited status, and noted that it would be illogical to impose a different *mens rea* requirement on different subsections of Section 922(g). Thus, based upon the Seventh Circuit Pattern Jury Instructions in addition to case law from this Circuit and elsewhere, the government need not prove at trial that Meza knew of his alien status.

Respectfully submitted this 31st day of July, 2014.

JAMES L. SANTELLE
United States Attorney

By:

s/Gail J. Hoffman
Assistant United States Attorney
Gail J. Hoffman Bar Number: 1007361

Office of the United States Attorney
Eastern District of Wisconsin
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin    53202
Telephone: (414) 297-1700; Fax: (414) 297-1738
E-Mail: gail.hoffman@usdoj.gov

4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

        Plaintiff

    v.                                   Case No. 13-CR-192

MARIANO A. MEZA,
a/k/a MARIANO ALEJANDRO MEZA-RODRIGUEZ,

        Defendant.

_____

## PROPOSED JURY INSTRUCTIONS

_____

      The United States, by its attorneys, James L. Santelle, United States Attorney for the Eastern District of Wisconsin, and Gail J. Hoffman, Assistant United States Attorney, respectfully submit that the following proposed jury instructions. The United States reserves the right to modify or resubmit these instructions at any time prior to jury deliberations.

      Respectfully submitted at Milwaukee, Wisconsin, this ____ day of July, 2014.

                          By:    s/GAIL J. HOFFMAN
                                     Assistant United States Attorney
                                     Gail J. Hoffman Bar Number: 1007361
                                     Attorney for Plaintiff
                                     Office of the United States Attorney
                                     Eastern District of Wisconsin
                                     517 East Wisconsin Avenue, Room 530
                                     Milwaukee, WI 53202
                                     Telephone: (414) 297-1700
                                     Fax: (414) 297-1738
                                     E-Mail: gail.hoffman@usdoj.gov

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

**1.01 FUNCTIONS OF THE COURT AND THE JURY**

Members of the jury, I will now instruct you on the law that you must follow in deciding this case.   Each of you has a copy of these instructions to use in the jury room.   You must follow all of my instructions about the law, even if you disagree with them.   This includes the instructions I gave you before the trial, any instructions I gave you during the trial, and the instructions I am giving you now.

As jurors, you have two duties.   Your first duty is to decide the facts from the evidence that you saw and heard here in court.   This is your job, not my job or anyone else's job.

Your second duty is to take the law as I give it to you, apply it to the facts, and decide if the government has proved the defendant guilty beyond a reasonable doubt.

You must perform these duties fairly and impartially.   Do not let sympathy, prejudice, fear, or public opinion influence you.   In addition, do not let any person's race, color, religion, national ancestry, or gender influence you.

You must not take anything I said or did during the trial as indicating that I have an opinion about the evidence or about what I think your verdict should be.

**Seventh Circuit Federal Criminal Jury Instructions § 1.01.**

Given  _____

Refused  _____

Modified  _____

2

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

### 1.02 THE CHARGE

The charge against the defendant is in a document called an indictment.   You will have a copy of the indictment during your deliberations.

The indictment in this case charges that the defendant with possession of ammunition by an alien illegally and unlawfully in the United States.   The defendant has pled not guilty to the charge.

The indictment is simply the formal way of telling the defendant what crime he is accused of committing.   It is not evidence that the defendant is guilty.   It does not even raise a suspicion of guilt.

**Seventh Circuit Federal Criminal Jury Instructions § 1.02.**

Given _____

Refused _____

Modified _____

3

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

**1.03 PRESUMPTION OF INNOCENCE/BURDEN OF PROOF**

The defendant is presumed innocent of the charge. This presumption continues throughout the case, including during your deliberations. It is not overcome unless, from all the evidence in the case, you are convinced beyond a reasonable doubt that the defendant is guilty as charged.

The government has the burden of proving the defendant's guilt beyond a reasonable doubt. This burden of proof stays with the government throughout the case.

The defendant is never required to prove his innocence. He is not required to produce any evidence at all.

**Seventh Circuit Federal Criminal Jury Instructions § 1.03.**

Given _____

Refused _____

Modified _____

4

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

## 2.01 THE EVIDENCE

You must make your decision based only on the evidence that you saw and heard here in court.   Do not consider anything you may have seen or heard outside of court, including anything from the newspaper, television, radio, the Internet, or any other source.

The evidence includes only what the witnesses said when they were testifying under oath, the exhibits that I allowed into evidence, and the stipulations that the lawyers agreed to.   A stipulation is an agreement that certain facts are true.

Nothing else is evidence.   The lawyers' statements and arguments are not evidence.   If what a lawyer said is different from the evidence as you remember it, the evidence is what counts. The lawyers' questions and objections likewise are not evidence.

A lawyer has a duty to object if he thinks a question is improper.   If I sustained objections to questions the lawyers asked, you must not speculate on what the answers might have been. If, during the trial, I struck testimony or exhibits from the record, or told you to disregard something, you must not consider it.

**Seventh Circuit Federal Criminal Jury Instructions § 2.01.**

Given _____

Refused  _____

Modified _____

5

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

## 2.02 CONSIDERING THE EVIDENCE

Give the evidence whatever weight you decide it deserves.   Use your common sense in weighing the evidence, and consider the evidence in light of your own everyday experience.

People sometimes look at one fact and conclude from it that another fact exists.   This is called an inference.   You are allowed to make reasonable inferences, so long as they are based on the evidence.

**Seventh Circuit Federal Criminal Jury Instructions § 2.02.**

Given  _____

Refused   _____

Modified  _____

6

COURT'S INSTRUCTION NO. __________

GOVERNMENT'S PROPOSED INSTRUCTION NO. __________

**2.03 DIRECT AND CIRCUMSTANTIAL EVIDENCE**

You may have heard the terms "direct evidence" and "circumstantial evidence." Direct evidence is evidence that directly proves a fact. Circumstantial evidence is evidence that indirectly proves a fact.

You are to consider both direct and circumstantial evidence. The law does not say that one is better than the other. It is up to you to decide how much weight to give to any evidence, whether direct or circumstantial.

**Seventh Circuit Federal Criminal Jury Instructions § 2.03.**

Given ________________________

Refused ______________________

Modified ______________________

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

**2.04    NUMBER OF WITNESSES**

Do not make any decisions simply by counting the number of witnesses who testified about a certain point.

What is important is how truthful and accurate the witnesses were and how much weight you think their testimony deserves.

**Seventh Circuit Federal Criminal Jury Instructions § 2.04.**

Given _____

Refused _____

Modified _____

8

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

**2.05    DEFENDANT'S FAILURE TO TESTIFY OR PRESENT EVIDENCE**

A defendant has an absolute right not to testify or present evidence.    You may not consider in any way the fact that the defendant did not testify or present evidence.    You should not even discuss it in your deliberations.

**Seventh Circuit Federal Criminal Jury Instructions § 2.05.**

Given _____

Refused    _____

Modified _____

9

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

### 3.01    CREDIBILITY OF WITNESSES

Part of your job as jurors is to decide how believable each witness was, and how much weight to give each witness' testimony.   You may accept all of what a witness says, or part of it, or none of it.

Some factors you may consider include:

-        the intelligence of the witness;

-        the witness' ability and opportunity to see, hear, or know the things the witness testified about;

-        the witness' memory;

-        the witness' demeanor;

-        whether the witness had any bias, prejudice, or other reason to lie or slant the testimony;

-        the truthfulness and accuracy of the witness' testimony in light of the other evidence presented; and

-        inconsistent statements or conduct by the witness.

**Seventh Circuit Federal Criminal Jury Instructions § 3.01.**

Given _____

Refused _____

Modified _____

10

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

### 3.02    ATTORNEY INTERVIEWING WITNESS

It is proper for an attorney to interview any witness in preparation for trial.

**Seventh Circuit Federal Criminal Jury Instructions § 3.02.**

Given _____

Refused _____

Modified _____

11

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

**3.09    STATEMENT BY DEFENDANT**

You have heard testimony that the defendant made statements to City of Milwaukee Detective Kenyatte Wooden, and Department of Homeland Security Immigration and Enforcement Agent Cassandra Shearing.   You must decide whether the defendant actually made each statement and, if so, how much weight to give to each of the statements.   In making these decisions, you should consider all of the evidence, including the defendant's personal characteristics and circumstances under which the statements may have been made.

**Seventh Circuit Federal Criminal Jury Instructions § 3.09.**

Given _____

Refused  _____

Modified _____

12

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

### 3.14   RECORDED CONVERSATIONS/TRANSCRIPTS

You have heard a recorded conversation.   This is proper evidence that you should consider together with and in the same way you consider the other evidence.

You were also given a partial transcript of the interview to help you follow the recording as you listened to it.   The recording is the evidence of what was said and who said it.   The transcript is not evidence.   If you noticed any differences between what you heard in the interview and what you read in the transcript, your understanding of the recording is what matters.   In other words, you must rely on what you heard, not what you read.   And if you could not hear or understand certain parts of a recording, you must ignore the transcript as far as those parts are concerned.

I am providing you with the recording and a device with instructions on its use.   It is up to you to decide whether to listen to the recording during your deliberations.   You may, if you wish, rely on your recollections of what you heard during the trial.

If, during your deliberations, you wish to have another opportunity to view the transcript as you listen to a recording, send a written message to the court security officer, and I will provide you with the transcript.

**Seventh Circuit Federal Criminal Jury Instructions § 3.14.**

Given _____

Refused _____

Modified _____

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

**4.01 ELEMENTS OF 18 U.S.C. § 922(g)(5)**

**POSSESSION OF AMMUNITION BY AN ALIEN ILLEGALLY AND UNLAWFULLY IN THE UNITED STATES**

The indictment charges the defendant with possession of ammunition by an alien illegally and unlawfully in the United States.   In order for you to find the defendant guilty of this charge, the government must prove each of the three following elements beyond a reasonable doubt:

1.     The defendant knowingly possessed ammunition; and

2.     At the time of the charged act, the defendant was an illegal alien in the United States; and

3.     The ammunition had been shipped or transported in interstate commerce.

If you find from your consideration of all the evidence that the government has proved each of these elements beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that the government has failed to prove any one of these elements beyond a reasonable doubt, then you should find the defendant not guilty.

**Seventh Circuit Federal Criminal Jury Instructions § 4.01 and 18 U.S.C § 922(g)(5).**

Given _____

Refused  _____

Modified  _____

14

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

**4.01 ELEMENTS OF THE OFFENSE DEFINITIONS**

**<u>Definition of "Ammunition"</u>**

"Ammunition" means ammunition or cartridge cases, primers, or propellant powder designed for use in any firearm.

**Seventh Circuit Federal Criminal Jury Instructions 18 U.S.C. § 921(a)(17)(A).**

Given _____

Refused _____

Modified _____

Case 2:13-cr-00192-RTR   Document 42   Filed 07/31/14   Page 15 of 26

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

**4.01 ELEMENTS OF THE OFFENSE DEFINITIONS**

**<u>Definition of "Alien"</u>**

An "alien" is a person who is not a citizen or national of the United States.

**8 U.S.C. § 1101(a)(3).**

Given _____

Refused _____

Modified _____

16

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

**4.01 ELEMENTS OF THE OFFENSE DEFINITIONS**

**<u>Definition of "National"</u>**

A "national" is a "person who, though not a citizen of the United States, owes permanent allegiance to the United States."   A non-citizen "national" is limited to someone born in a United States territory, and "owing a permanent allegiance to the United States" requires either birth in the United States or one of its territories, or a completed naturalization.

**8 U.S.C. § 1101(a)(22).   See also *United States v. Laguna*, 333 F.Supp.2d 748, 750-751 (N.D. IL 2004); *Salim v. Ashcroft,* 350 F.3d 307, 309-310 (3rd Cir. 2003); *Perdomo-Padilla v. Ashcroft,* 333 F.3d 964, 967-968 (9th Cir. 2003).**

Given _____

Refused _____

Modified _____

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

**4.01 ELEMENTS OF THE OFFENSE DEFINITIONS**

**<u>Definitions of "In or Affecting Commerce" and</u>**
**<u>"In Interstate or Foreign Commerce"</u>**

"In or affecting commerce" and "interstate or foreign commerce" include commerce between any place in a State and any place outside of that State. The terms do not include commerce between places within the same State but through any place outside of that State.

This requirement is satisfied if the ammunition traveled in interstate or foreign commerce prior to the defendant's possession of it. Ammunition has traveled in interstate or foreign commerce if it has traveled between one state and any other state or country, or across a state or national boundary line. The government need not prove how the ammunition traveled in interstate commerce; that the ammunition's travel was related to the defendant's possession of it; or, that the defendant knew the ammunition had traveled in interstate commerce.

**Seventh Circuit Federal Criminal Jury Instructions 18 U.S.C. § 922(g).**

Given _____

Refused _____

Modified _____

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

**4.05     DATE OF CRIME CHARGED**

The indictment charges that the crime happened "on or about" August 24, 2013.   The government must prove that the crime happened reasonably close to the date.   The government is not required to prove that the crime happened on the exact date.

**Seventh Circuit Federal Criminal Jury Instructions § 4.05.**

Given _____

Refused   _____

Modified _____

19

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

### 4.08   PUNISHMENT

In deciding your verdict, you should not consider the possible punishment for the defendant who is on trial.  If you decide that the government has proved the defendant guilty beyond a reasonable doubt, then it will be my job to decide on the appropriate punishment.

**Seventh Circuit Federal Criminal Jury Instructions § 4.08.**

Given _____

Refused _____

Modified _____

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

**4.10 KNOWINGLY – DEFINITION**

A person acts knowingly if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident. In deciding whether the defendant acted knowingly, you may consider all of the evidence, including what the defendant did or said.

**Seventh Circuit Federal Criminal Jury Instructions § 4.10.**

Given _____

Refused _____

Modified _____

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

**4.13 POSSESSION – DEFINITION**

A person possesses an object if he has the ability and intention to exercise direction or control over the object, either directly or through others.

**Seventh Circuit Federal Criminal Jury Instructions § 4.13.**

Given _____

Refused _____

Modified _____

22

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

**7.01 JURY DELIBERATIONS**

Once you are all in the jury room, the first thing you should do is choose a foreperson. The foreperson should see to it that your discussions are carried on in an organized way and that everyone has a fair chance to be heard.   You may discuss the case only when all jurors are present.

Once you start deliberating, do not communicate about the case or your deliberations with anyone except other members of your jury.   You may not communicate with others about the case or your deliberations by any means.   This includes oral or written communication, as well as any electronic method of communication, such as telephone, cell phone, smart phone, iPhone, Blackberry, computer, text messaging, instant messaging, the Internet, chat rooms, blogs, websites, or services like Facebook, MySpace, LinkedIn, YouTube, Twitter, or any other method of communication.

If you need to communicate with me while you are deliberating, send a note through the court security officer.   The note should be signed by the foreperson, or by one or more members of the jury.   To have a complete record of this trial, it is important that you do not communicate with me except by a written note.   I may have to talk to the lawyers about your message, so it may take me some time to get back to you.   You may continue your deliberations while you wait for my answer.

23

If you send me a message, do not include the breakdown of any votes you may have conducted.   In other words, do not tell me that you are split 6–6, or 8–4, or whatever your vote happens to be.

**Seventh Circuit Federal Criminal Jury Instructions § 7.01.**

Given _____

Refused   _____

Modified _____

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

## 7.02    VERDICT FORM

A verdict form has been prepared for you.   You will take this form with you to the jury room.

[Read the verdict form.]

When you have reached unanimous agreement, your foreperson will fill in, date, and sign the verdict form.

Advise the court security officer once you have reached a verdict.   When you come back to the courtroom, the clerk will read the verdict aloud.

**Seventh Circuit Federal Criminal Jury Instructions § 7.02.**

Given _____

Refused _____

Modified _____

25

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. _____

**7.03 UNANIMITY/DISAGREEMENT AMONG JURORS**

The verdict must represent the considered judgment of each juror.   Your verdict, whether it is guilty or not guilty, must be unanimous.

You should make every reasonable effort to reach a verdict.  In doing so, you should consult with each other, express your own views, and listen to your fellow jurors' opinions. Discuss your differences with an open mind.   Do not hesitate to re-examine your own view and change your opinion if you come to believe it is wrong.   But you should not surrender your honest beliefs about the weight or effect of evidence just because of the opinions of your fellow jurors or just so that there can be a unanimous verdict.

The twelve of you should give fair and equal consideration to all the evidence.  You should deliberate with the goal of reaching an agreement that is consistent with the individual judgment of each juror.

You are impartial judges of the facts.  Your sole interest is to determine whether the government has proved its case beyond a reasonable doubt.


**Seventh Circuit Federal Criminal Jury Instructions § 7.03.**

Given _____

Refused  _____

Modified _____

26

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

         *Plaintiff,*

    *vs.*                                 Case No. 13-CR-192 (RTR)

MARIANO MEZA,

         *Defendant.*

---

## MOTION FOR PARTIAL ATTORNEY-CONDUCTED VOIR DIRE

Mariano Meza, by undersigned counsel, respectfully moves this Court pursuant to Rule 24(a) of the Federal Rules of Criminal Procedure, for thirty minutes per side of attorney-conducted voir dire in addition to the Court's voir dire.

This motion is based upon the attached memorandum of law filed in support of this motion, all files and records in this case, and any further argument that may be presented at the hearing on this motion.

Dated at Milwaukee, Wisconsin this 31st day of July, 2014.

Respectfully submitted,


/s/    Julie K. Linnen
Julie K. Linnen, WI Bar #1085029
Federal Defender Services
  Of Wisconsin, Inc.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53705
Tel: (608) 260-9900
E-mail: julie_linnen@fd.org

COUNSEL FOR Mariano Meza

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        *Plaintiff*,

    *vs*.                                 Case No. 13-CR-192 (RTR)

MARIANO MEZA,

        *Defendant*.

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PARTIAL ATTORNEY-CONDUCTED VOIR DIRE

Mariano Meza is charged with possessing one bullet as an individual "illegally or unlawfully in the United States," in violation of 18 U.S.C. § 922(g)(5).

Mr. Meza requests that the Court permit each side in the case thirty minutes of attorney-conducted voir dire, not to substitute to Court-conducted voir dire, but to supplement it. Supplemental attorney-conducted voir dire will add an important dimension to the voir dire process. Specifically, it will more effectively advance the goal of obtaining an impartial jury through (1) the intelligent exercise of peremptory challenges by counsel and (2) full and informed consideration by the Court of any challenges for cause which may be made.

**ARGUMENT**

A defendant has a constitutional right to an impartial jury. That right is protected through voir dire, *see Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981), and through a defendant's ability to make challenged, particularly peremptory challenges. Indeed, peremptory challenges are so crucial that a "system that prevents or embarrasses the full, unrestricted exercise of that right of challenge must be condemned." *Pointer v. United States*, 151 U.S. 396, 408 (1894).

Rule 24(a) of the Federal Rules of Criminal Procedure grants the district court broad discretion over voir dire. Included within that discretion is the right to control who conducts voir dire. The rule provides three options: (1) permitting counsel to conduct the entire voir dire examination; (2) permitting counsel to conduct some voir dire examination to supplement the court's; or (3) permitting no voir dire examination by counsel and conducting the entire voir dire examination itself. *See* Fed. R. Crim. P. 24(a).

However, the district court's discretion under Rule 24(a) is not without limit. It is "subject to the essential demands of fairness." *Aldridge v. United States*, 283 U.S. 308, 310 (1931). And supplemental attorney-conducted voir dire further advances the interests of fairness.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

## A. ATTORNEY-CONDUCTED VOIR DIRE WILL PERMIT THE MOST INTELLIGENT EXERCISE OF PEREMPTORY CHALLENGES.

### 1. *The Importance Of Voir Dire To Peremptory Challenges.*

The dual purpose of voir dire is to provide enough information to exercise challenges for cause and enough information to exercise peremptory challenges. *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991). Challenges for cause are narrow in scope; they "permit rejection of jurors on narrowly specified, provable and legally cognizable bas[e]s of partiality." *Swain v. Alabama*, 380 U.S. 202, 220 (1965). Peremptory challenges, on the other hand, can be exercised "without a reason stated, without inquiry, and without being subject to the court's control." *Id.* at 220. *But see Batson v. Kentucky*, 476 U.S. 79 (1986) and its progeny, discussed *infra* pp. 10-12.

Because of the narrow scope of challenges for cause, the peremptory challenge is often the most useful and important tool for a litigant in picking an impartial jury. As noted by the Supreme Court in *Swain*, "voir dire in American trials tends to be extensive and probing, operating as a predicate for the exercise of peremptories . . . . The persistence of peremptories and their extensive use demonstrate the long and widely held belief that peremptory challenge is a necessary part of trial by jury." *Swain*, 380 U.S. at 218-219.

In order for a peremptory challenge to serve its purposes, it must be intelligently exercised. This requires that the parties obtain sufficient information from the potential jurors upon which to base their challenges. *Art Press, Ltd. v.*

FEDERAL DEFENDER SERVICES OF WISCONSIN, INC.

*Western Printing Machinery Co.*, 791 F.2d 616, 618 (7th Cir. 1986). As one court has noted, "[p]eremptory challenges are worthless if trial counsel is not afforded an opportunity to gain the necessary information upon which to base such strikes." *United States v. Ledee*, 549 F.2d 990, 993 (5th Cir. 1977); *see also United States v. Corey*, 625 F.2d 704, 707 (5th Cir. 1980) ("[t]his court has previously stressed that voir dire examination not conducted by counsel has little meaning").

2.      The Contribution Of The Attorneys' In-Depth Knowledge Of
        The Case.

One reason why a short period of attorney-conducted voir dire after the court's general voir dire will contribute to more complete information about the potential jurors is the attorneys' in-depth knowledge of the case. Important follow-up questions are more likely to occur to an advocate than a judge for several reasons, including the fact that a judge "does not have the advocate's awareness that soon he will be making peremptory challenges based on inferences from what prospective jurors have said" and the fact that "the judge does not know the case of either party in detail, so that he cannot realize when responses have opened areas for further inquiry." Barbara Allen Babcock, *Voir Dire: Preserving "Its Wonderful Power"*, 27 Stan. L. Rev. 545, 549 (1975). The Fifth Circuit has recognized:

> While Federal Rule of Criminal Procedure 24(a) gives wide discretion to the trial court, voir dire may have little meaning if it is not conducted at least in part by counsel. The "federal" practice of almost exclusive voir dire examination by the court does not take into account the fact that it is the parties, rather than the court, who have a full grasp of the

> nuances and the strength and weaknesses of the case. . . . Experience indicates that in the majority of situations questioning by counsel would be more likely to fulfill this need [for information upon which to base the intelligent exercise of peremptory challenges] than an exclusive examination in general terms by the trial court.

*United States v. Ible,* 630 F.2d 389, 395 (5th Cir. 1980). *Accord United States v. Corey*, 625 F.2d at 707; *United States v. Ledee*, 549 F.2d at 993.

Voir dire conducted solely by the court thus reduces the effectiveness of peremptory challenges. In contrast to the court in most matters, attorneys have been working for months on the case. They are most likely to know the areas of questioning that must be explored further in order to uncover the prejudices that are most pertinent to the issues at trial. In addition, they act with an awareness that they will have to base peremptory challenges on the juror's answers.

3.   *The Contribution Of The Attorneys' Different Relationship To Potential Jurors.*

A second reason why attorney-conducted voir dire – in addition to court voir dire – will elicit more complete information from potential jurors arises out of the attorneys' relationship to the jurors. Psychological studies suggest at least two differences between attorney-juror relationships and judge-juror relationships that enable attorneys to obtain more or different information from some potential jurors. *See* Davids Suggs and Bruce D. Sales, *Juror Self-Disclosure in the Voir Dire: A Social Science Analysis*, 56 Ind. L.J. 245, 253-58 (1981).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

The first difference is the comparative status of judges and attorneys. Psychological studies suggest two things about the relationship between self-disclosure and the status of an interviewer: people (1) tend to disclose more to a person who is perceived to have higher "status" than they are, but (2) tend to disclose less if the difference in status is too great. *See* Suggs and Sales, *supra* at 253. In other words, a juror is likely to disclose the most information to a person who has somewhat greater status but not such greater status that the juror finds it impossible to identify with the other person. *Id*. at 253-54.

This suggests that supplemental attorney-conducted voir dire can add an important dimension to the voir dire process. Potential jurors come from widely varying social backgrounds, ranging from unemployed high school dropouts to established and well-educated professionals. They also vary widely in age, from elderly retirees to young adults who are still living with their parents. For some of these jurors, they may feel closer in "status" to the judge, and thus they will be most responsive to questions that come from the Court. But for others, particularly where the gulf in status between them and the Court is wider, attorneys may be more effective. Thus by having both attorneys and the court conduct voir dire, self-disclosure is most likely to be maximized.

A second difference in the juror-attorney relationship and the juror-judge relationship is also significant. As one set of commentators has noted, "the judge

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

has an extremely difficult role to fulfill, both intellectually and emotionally. He must be the arbiter of fine points of law, coordinate the activities of all parties to facilitate a just result and remain above interparty rivalries, all of which require that he remain aloof and emotionally detached." Suggs and Sales, *supra* p. 5, at 254. In contrast, attorneys are not so constrained. *See id.*

This is important to the question of jurors' self-disclosure. Psychological studies show that people are less willing to talk and reveal themselves to those who must remain at least somewhat detached. Suggs and Sales, *supra* p. 5, at 254-55. Permitting the attorneys to conduct some follow-up voir dire in addition to the court's voir dire will counter this problem in the voir dire process.

In sum, attorney-conducted voir dire in addition to the court's voir dire takes advantage of both the attorneys' greater knowledge of the underlying facts of the case and the differences between the attorney-juror relationship and the judge-juror relationship. Permitting attorney-conducted voir dire in addition to court voir dire will bring the best of both worlds to the process and maximize the information obtained.

4.      *The Ability Of The Court To Control And Limit Voir Dire Abuse.*

There is a concern expressed by some commentators that attorneys may abuse the voir dire process, either by seeking to improperly ingratiate themselves with jurors or argue their theory of the case or by showing no concern for efficiency. *See*

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Suggs and Sales, *supra* p. 5, at 250-51. But allowing attorney-conducted voir dire as a supplement to the court's voir dire will enable the Court to prevent such abuses.

First, if the Court begins by conducting its own voir dire, it can reasonably limit the voir dire it allows the attorneys to conduct. For example, after conducting the initial voir dire, the court can legitimately expect the attorneys not to repeat its questions or simply go on and on in an effort to charm the jurors. The Court can instead insist that the attorneys limit themselves to exploring new areas or asking follow-up questions o matters that are clearly relevant to the case.

In addition, this Court can place a specific time limit on attorney-conducted voir dire when it conducts the initial questioning. For example, this motion proposes a thirty-minute limit on attorney-conducted voir dire. Such a time is appropriately brief given that initial voir dire will have been conducted by the Court. Moreover, an attorney who is given this limited period is unlikely to waste time trying to smooth-talk the jury, and instead will be focused on a few limited, specific areas.

**B.      ATTORNEY-CONDUCTED VOIR DIRE WILL AID THE PARTIES IN COMPLYING WITH THE REQUIREMENTS OF *BATSON V. KENTUCKY.***

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court held that the Equal Protection Clause prohibits challenging potential jurors "solely on account of their race or on the assumption that black jurors as a group will be unable to impartially to consider the State's case against a black defendant." *Id*. at 83; *See also*

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

*United States v. Carter*, 111 F.3d 509, 512 (7th Cir. 1997). Thus, peremptory challenges cannot be made in a way that discriminates against a cognizable racial group or other protected class. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) (expanding *Batson*'s protections to gender); *United States v. Harris*, 197 F.3d 870, 873 (7th Cir. 1999).[1]

Complete and effective voir dire is a basic premise underlying the rationale of *Batson* and its progeny in two respects. First, a complete and effective voir dire eliminates any need to rely on generalizations and stereotypes about people. As the Supreme Court recognized in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994):

> If conducted properly, voir dire can inform litigants about potential jurors, making reliance upon stereotypical and pejorative notions about a particular gender or race both unnecessary and unwise. Voir dire provides a means of discovering actual or implied bias and a firmer basis upon which the parties may exercise their peremptory challenges intelligently.

*J.E.B.*, 511 U.S. 127, 143-44. Simply put, there is no reason for counsel to rely on stereotypes and generalizations about people if he is permitted to ask specific questions about them. *See id. at* 144, n.17 ( explaining that "the voir dire process aids litigants in their ability to articulate race-neutral explanations for their peremptory challenges").

---

[1]After *Batson*, a string of Supreme Court cases have extended its reach to parties other than the government. Criminal defendants and civil litigants are thus also barred from discriminating in the exercise of peremptory challenges. *See Georgia v. McCollum*, 505 U.S. 42 (1992); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Whether a litigant is trying to prove a prima facie case of discrimination or trying to rebut one, an in-depth and extensive voir dire is essential. An attorney who must defend his peremptories should have sufficient information to provide a neutral explanation that will survive a *Batson* challenge. The court in *Burks v. Borg*, 27 F.3d 1424 (9th Cir. 1994), stated that "the stronger the objective evidence of discrimination, the more we will require by way of verifiable facts" to rebut the challenge. *Id.* at 1429-30. If an attorney is required to explain and point to "verifiable facts," he should be allowed to seek out those facts.

The *Batson* framework thus strongly supports allowing some attorney-conducted voir dire. If an attorney is going to be required to justify the inferences he draws and/or the impressions he gets from a juror's answers, he ought to be allowed to ask appropriate follow-up questions or ask questions in a way which will maximize the information he feels he needs to avoid relying on generalizations and stereotypes. An attorney conducting voir dire is able to do this more effectively than the Court because the attorney knows what factors he is concerned about and knows the underlying circumstances of the case and what characteristics in jurors are relevant to those circumstances.

## C. ATTORNEY-CONDUCTED VOIR DIRE WILL HELP AVOID REVERSIBLE ERROR ON APPEAL.

The denial or impairment of the right to exercise peremptory challenges can result in reversal without a showing of prejudice. *Lewis v. United States*, 146 U.S. 370,

376 (1892). A court that insists on conducting all voir dire itself may create grounds for reversal. As the Ninth Circuit noted in *United States v. Baldwin*, 607 F.2d 1295 (9th Cir. 1979):

> The trial judge [may] insist on conducting a voir dire examination, but if he does so, he must exercise a sound judicial discretion in the acceptance or rejection of supplemental questions proposed by counsel. Discretion is not properly exercised if the questions are not reasonably sufficient to test the jury for bias or partiality.
> *Id.* at 1297.

The court went on to reverse the defendant's conviction for failure of the trial court to conduct a voir dire that created "reasonable assurances that prejudice would be discovered if present." *Id.* at 1298.

Other convictions have been reversed for insufficient voir dire as well. *See, e.g., United States v. Contreras-Castro*, 825 F.2d 185, 187 (9th Cir. 1987) (failure to ask whether jurors would give greater credence to law enforcement officer testimony); *United States v. Washington*, 819 F.2d 221 (9th Cir. 1987) (failure to ask whether jurors knew any of government's witnesses); *United States v. Ible*, 630 F.2d at 394-95 (failure to ask about jurors' moral or religious beliefs about alcohol); *United States v. Shavers*, 615 F.2d 266, 268 (5th Cir. 1980) (failure to ask jurors in assault case whether they had ever been victim of crime involving knife or gun); *United States v. Allsup*, 566 F.2d 68, 70 (9th Cir. 1977) (failure to ask jurors about views on insanity defense); *United States v. Segal*, 534 F.2d 578, 581 (3d Cir. 1976) (failure to ask jurors whether they had been employed by agency prosecuting case); *United States v. Dellinger*, 472

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

F.2d 340, 368-69 (7th Cir. 1972) (failure to ask jurors about attitudes toward Vietnam War, "youth culture", and relationship with law enforcement officers in case arising out of protest demonstration); *United States v. Poole*, 450 F.2d 1082, 1083-83 (3d Cir. 1971) (failure to ask jurors in bank robbery case whether they or any family member had been victim of robbery or other crime).

There will be no possibility of such a reversal if the Court permits counsel thirty minutes of voir dire each. After all, a defendant would hardly be in the position to complain about a failure of the court to ask a particular voir dire question when he himself failed to ask the question. Permitting counsel to conduct thirty minutes of voir dire transfers the burden of asking appropriate questions from the Court to counsel. Any risk of error due to insufficient voir dire will thereby be eliminated. *See, e.g., United States v. Rigsby*, 45 F.3d 120, 125 (6th Cir. 1995) (rejecting claim of error based on failure of court to ask particular voir dire question where defense attorneys were allowed to conduct additional voir dire after initial voir dire by court), *cert. denied*, 514 U.S. 1134 (1995).

## CONCLUSION

For the foregoing reasons, it is respectfully requested that this Court allow counsel to conduct limited voir dire in the above-entitled case.

Dated at Milwaukee, Wisconsin, this 31st day of July, 2014.

Respectfully submitted,

/s/    *Julie K. Linnen*
Julie K. Linnen - Bar No. 1085029
FEDERAL DEFENDER SERVICES OF WI, INC.
517 East Wisconsin Avenue, Room 182
Milwaukee, Wisconsin  53202
Telephone: 414-221-9900
Fax: 414-221-9901
E-mail: julie_linnen@fd.org
Counsel for Mariano Meza

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        *Plaintiff*,

    *vs.*                                   Case No. 13-CR-192 (RTR)

MARIANO MEZA,

        *Defendant.*

**MOTION TO STRIKE SURPLUSAGE FROM THE INDICTMENT**

Mariano Meza, by undersigned counsel, respectfully moves that the Court strike from the indictment in this case language that is surplusage and prejudicial. Specifically, the defendant requests that the Court strike the phrase, "a/k/a Mariano Alelandro Meza-Rodriquez," or, in the alternative, "Mariano A. Meza," in the caption of the indictment and from any other place in the indictment or pleadings filed in this case.

In support of this motion, Meza states as follows:

1.      The caption and the single-count indictment returned and filed in this case lists the defendant as Mariano A. Meza, a/k/a Mariano Alelandro Meza-Rodriquez. The defendant contends that the use of the phrase "a/k/a Mariano Alelandro Meza-Rodriquez" in the context of this case is inherently prejudicial and at a minimum, surplusage.

2.    It does not appear from the language of the indictment that the additional "a/k/a" phrase is necessary to identify this defendant.

3.    Discovery provided by the government so far does not indicate that Meza has attempted to use one name in place of the other in an effort to conceal his identity.

4.    "A/K/A" is law enforcement shorthand for "also known as" and is frequently used to refer to individuals who have tried to hide or disguise their identity through the use of an alias or false name. There is no indication here that Meza used either name to hide his real identity.

5.    Persons of Mexican descent are given hyphenated last names as a sign of respect to both their paternal and maternal heritage. For simplicity, only one of the last names, the one stemming from the paternal lineage, is often used. Potential jurors may be unfamiliar with this concept.

6.    According to Federal Rule of Criminal Procedure 7(c)(1), "the indictment or information shall be a plain, concise and definite written statement of the  essential facts constituting the offense charged." Subsection (d) allows  permits the Court to strike surplusage from the indictment or information upon the defendant's motion. Fed. R. Crim.

P. 7(c),(d).

7.    Here, the use of the alias is prejudicial because it portrays Meza as one who used different names to hide his true identity. It serves no purpose and has the potential to mislead jurors, and thus it should be stricken under Fed. R. Crim. P. 7.

Dated at Milwaukee, Wisconsin this 31st day of July, 2014.

Respectfully submitted,


/s/    Julie K. Linnen
Julie K. Linnen, WI Bar #1085029
Federal Defender Services
   Of Wisconsin, Inc.
22 E. Mifflin St., Ste. 1000
Madison, WI 53705
Tel: (608) 260-9900
E-mail: julie_linnen@fd.org

COUNSEL FOR Mariano Meza

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        *Plaintiff*,

    *vs.*                                   Case No. 13-CR-192 (RTR)

MARIANO MEZA,

        *Defendant*.

## MOTION IN LIMINE

Mariano Meza, by undersigned counsel, respectfully moves this Court pursuant to Fed. R. Evid. 402, 403, 404, and 802 and his rights to due process, a fair trial, and confrontation as guaranteed by the Fifth and Sixth Amendments to the United States Constitution, for the entry of an order prohibiting the government from presenting the following evidence at trial:

    1.    Any evidence or testimony relating to the reason for Meza's arrest by Milwaukee Police officers on August 24-25, 2013. This would include testimony of the complaining witnesses, Carla Espino-Gallegos and Juan Espino-Ramirez, and any accusations of Meza possessing a gun or engaging in confrontational or threatening behavior at a bar earlier in the evening, before his arrest and the subsequent discovery of the bullet in his pocket. The information provided by the government

confirms that no gun was ever recovered. In addition, there are conflicting descriptions of the gun at issue in the discovery. This evidence will only serve to confuse the issue and will be unduly prejudicial.

2. Any evidence relating to an alleged gang affiliation. There are conflicting reports of Meza's alleged gang affiliation and any evidence on this issue would be highly inflammatory and unduly prejudicial.

3. The nature of Meza's prior arrests or any supporting documentation of those arrests. Again, this information is irrelevant and unduly prejudicial, is impermissible and unnoticed other-acts evidence, and would only serve as a basis for jurors to draw a propensity inference.

4. Meza's booking records from the Milwaukee County Jail or any other facility. The government cannot establish the authenticity of these documents. In addition, they are irrelevant and unduly prejudicial.

5. The citizenship status of Meza's family members. This is irrelevant, highly prejudicial, and will only serve to confuse jurors.

6. Applications for citizenship completed by Meza's family members, including Juan De Dios Meza-Rodriquez, Shannon Meza, and Rosa Graciela Rodriquez. Again, such information is irrelevant, confusing, and unduly prejudicial.

7.   Any statements or threats allegedly made by Meza to Milwaukee Police Sgt. Timothy Wilger. Evidence of threats made to a police officer is highly inflammatory, irrelevant to the current prosecution, and unduly prejudicial.

8.   Any videos or recordings of Meza's post-arrest behavior in Squad # 2420 and Squad # 2390 (Police Wagon # 468). Meza attempted to injure himself in the police squad car and then allegedly made reference to Sgt. Wilger's role in an officer-involved shooting, threatening him in the process. Again, this evidence is unduly prejudicial, irrelevant, and would only divert jurors' attention from the real issue at hand— whether Meza is an illegal alien in possession of ammunition.

Dated at Milwaukee, Wisconsin this 31st day of July, 2014.

Respectfully submitted,

/s/   **Julie K. Linnen**
Julie K. Linnen, WI Bar #1085029
Federal Defender Services
  Of Wisconsin, Inc.
22 E. Mifflin St., Ste. 1000
Madison, WI 53705
Tel: (608) 260-9900
E-mail: julie_linnen@fd.org

COUNSEL FOR Mariano Meza

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        *Plaintiff,*

    *vs.*                                  Case No. 13-CR-192 (RTR)

MARIANO MEZA,

        *Defendant.*

## MEZA'S PROPOSED JURY INSTRUCTIONS

Mariano Meza, by undersigned counsel, hereby submits the following proposed instructions to the jury in the above-captioned case.

Meza seeks leave to modify or supplement these instructions, including the submission of instructions bearing on the theory of the defense.

I.    *Seventh Circuit Pattern Instructions*

Meza requests the following current Seventh Circuit Pattern Jury Instructions, to the extent they are applicable:

- **1.01: The Functions of the Court and the Jury**

- **1.02: The Charge**

- **1.03: Presumption of Innocence – Burden of Proof**

- **2.01: The Evidence**

- **2.02: Considering The Evidence**

- **2.03: Direct and Circumstantial Evidence**

- **2.04 Number of Witnesses**

- **3.04: Prior Inconsistent Statements – Defendant (if applicable)**

- **3.09: Statement by Defendant**

- **4.05: Date of Crime Charged**

- **4.06: "Knowingly" – Definition**

- **7.01: Jury Deliberations**

II.   *Modified Pattern Instructions*

In addition to the Pattern instructions listed above, Meza requests the following instructions, modified slightly from the Seventh Circuit instructions:

- **3.02: Attorney Interviewing Witnesses**

If this instruction is appropriate, Meza asks that it be supplemented to include the following:

"However, the fact that an attorney may have interviewed a witness in preparation for trial is a factor that may be considered by you in determining how much, if any, weight to give a witness's testimony. You may also consider whether the witness refused an interview with an attorney for either party."

- **2.05 Defendant's Failure to Testify or Present Evidence**

Meza asks that this instruction be given, but re-captioned to read: "Defendant's Right Not to Testify or Present Evidence."

III.   *Defendant's Proposed Instruction*

Finally, Meza requests the following instructions:

- **Count One: Alien Illegally or Unlawfully in the United States in Possession of Ammunition**

To sustain the charge of possession of ammunition as an alien illegally and unlawfully in the United States, the government must prove the following propositions beyond a reasonable doubt:

First, that the defendant knowingly possessed ammunition; and

Second, at the time of the charged act, the defendant knew that he was illegally and unlawfully in the United States; and

Third, that the ammunition the defendant possessed had been shipped or transported in interstate or foreign commerce.

If you find from your consideration of all the evidence that the government has proved each of these elements beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that the government has failed to prove any one of these elements beyond a reasonable doubt, then you must find the defendant not guilty.

**Seventh Circuit Pattern Instruction with Modification to Second Element**; *see* dkt. 27 at 4 ("the government must prove at trial that Meza possessed the requisite *mens rea* as to the facts establishing his prohibited status."); *Bryan v. United States,* 524 U.S. 184, 193 (1998) (term "knowingly" in 18 U.S.C. § 924(a)(2) "requires proof of knowledge of the facts that constitute the offense"); *see also Staples v. United States*, 511 U.S. 600, 622 n. 3 (1994) (Ginsburg, J., concurring) (noting "[t]he *mens rea* presumption requires knowledge only of the facts that make the defendant's conduct illegal." (citations omitted)); *see also* dkts. 12, 28 (Defendant's Motion to

Dismiss for Failure to Allege an Element of the Offense and Defendant's Objection to the Magistrate Judge's Recommendations).

Dated at Milwaukee, Wisconsin this 31st day of July, 2012.

Respectfully submitted,


/s/   **Julie K. Linnen**
Julie K. Linnen, WI Bar #1085029
Federal Defender Services
  Of Wisconsin, Inc.
22 E. Mifflin St., Ste. 1000
Madison, WI 53705
Tel: (608) 260-9900
E-mail: julie_linnen@fd.org

COUNSEL FOR Mariano Meza



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED

2014 AUG -4  P 2: 59

JON A. SANFILIPPO
CLERK

UNITED STATES OF AMERICA,

                Plaintiff,

      v.                                      Case No. 13-CR-192

MARIANO A. MEZA,

                Defendant.

## **PLEA AGREEMENT**

1.      The United States of America, by its attorneys, James L. Santelle, United States Attorney for the Eastern District of Wisconsin, and Gail J. Hoffman, Assistant United States Attorney, and the defendant, Mariano A. Meza, individually and by attorney Julie K. Linnen, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### **CHARGE**

2.      The defendant has been charged in a one-count indictment, which alleges a violation of Title 18, United States Code, Sections 922(g)(5) and 924(a)(2).

3.      The defendant has read and fully understands the charge contained in the indictment. He fully understands the nature and elements of the crime with which he has been charged, and the charge and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.      The defendant voluntarily agrees to plead guilty to the following count set forth in full as follows:

**THE GRAND JURY CHARGES THAT:**

1.    On or about August 24, 2013, in the State and Eastern District of Wisconsin,

**MARIANO A. MEZA,**
**a/k/a MARIANO A. MEZA-RODRIGUEZ,**

being an alien illegally and unlawfully in the United States, knowingly possessed ammunition which, prior to his possession of it, had been transported in interstate commerce, and the possession of which was therefore in and affecting commerce.

2.    The ammunition is further described as one .22 caliber cartridge containing the markings "C" on the head-stamp.

All in violation of Title 18, United States Code, Sections 922(g)(5) and 924(a)(2).

5.    The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense described in paragraph 4. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the following facts beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt:

*On August 24, 2013, at approximately 11:55 p.m., Milwaukee police officers were called to a bar at 1444 S. 7th Street, Milwaukee, Wisconsin, regarding a man with a gun complaint. The bar's surveillance video obtained by law enforcement officers depicted a man, later identified by witnesses as Mariano Meza, pointing an object that appeared consistent with a firearm into the bar doorway.*

*Shortly thereafter, on August 25, 2013, at approximately 1:48 a.m., a citizen flagged down the police officers who had responded to the man with a gun complaint at 1444 S. 7th Street to report a fight at a nearby bar. Officers immediately responded to this complaint, observed the fight, and immediately activated their lights. The male, whom officers recognized as Mariano Meza from the previous bar's surveillance video, looked at the police officers, took off running, and was finally apprehended after a foot chase in the 1500 block of S. 6th Street, Milwaukee, Wisconsin by a City of Milwaukee Police Officer.*

2

The officer patted down Meza for his safety and found a .22 caliber round of live ammunition in Meza's shorts pocket.

After being advised of his constitutional rights, Meza, in part, stated the following about the bullet found in his pocket: that he found the bullet along with two others, in an alley; and that he had the bullet in his pocket for "like two days." Meza admitted that he waved the gun around the bar to scare people, but denied that it was a real firearm, saying that it was a BB gun.

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) determined that the .22 caliber cartridge containing the markings "C" on the head-stamp was manufactured by CCI in Idaho. Therefore prior to August 24, 2013, the .22 caliber cartridge containing the markings "C" on the head-stamp travelled in interstate commerce in order to reach Wisconsin. In addition, ATF determined that the above-referenced .22 caliber cartridge containing the markings "C" on the head-stamp satisfies the definition of ammunition as defined in Title 18, U.S.C. Section 921(a)(17)(A).

A Department of Homeland Security special agent checked the relevant data bases and did not find any record of U.S. citizenship for Mariano Meza. The agent obtained Mariano Meza's certified birth certificate from Mexico. Mariano Meza's mother identified the birth certificate as that of her son, Mariano Meza who was born in Mexico. In part, Meza's mother further related that neither she nor Mariano Meza's deceased father ever obtained U.S. citizenship for Mariano Meza.

In addition, Mariano Meza's older brother stated that his brother was illegally in the United States, and on several occasions mentioned to Mariano Meza that Mariano Meza needed to take steps to become a U.S. citizen.

3

*Mariano Meza acknowledges that the government can prove he is an illegal alien, and knew that he was not a U.S. citizen. Therefore, Meza is an illegal alien present in the United States.*

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

## PENALTIES

6. The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries a maximum term of ten years' imprisonment and a $250,000 fine. This count also carries a mandatory special assessment of $100 and up to three years of supervised release.

## ELEMENTS

7. The parties understand and agree that in order to sustain the charge of possession of ammunition by an illegal alien, the government must prove each of the following propositions beyond a reasonable doubt:

> First, the defendant was illegally in the United States;
> Second, the defendant knowingly possessed ammunition; and
> Third, the ammunition possessed traveled in interstate commerce prior to defendant's possession.

## SENTENCING PROVISIONS

8. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

4

9. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

10. The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense set forth in paragraph 4. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

11. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

**Sentencing Guidelines Calculations**

12. The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

5

## Relevant Conduct

13.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

## Base Offense Level

14.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count One is 14 under Sentencing Guidelines Manual § 2K2.1(a)(6).

## Acceptance of Responsibility

15.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility.

## Sentencing Recommendations

16.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

17.     Both parties reserve the right to make any recommendation regarding any and all factors pertinent to the determination of the sentencing guideline range; the fine to be imposed; the length of supervised release and the terms and conditions of the release; the defendant's custodial status pending the sentencing; and any other matters not specifically addressed by this agreement.

18.     The parties agree to recommend a sentence of time served to the sentencing court.

6

## Court's Determinations at Sentencing

19. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

20. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

21. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant agrees not to request any delay or stay in payment of any and all financial obligations.

22. The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form.

## Special Assessment

23. The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

# DEFENDANT'S WAIVER OF RIGHTS

24.     In entering this agreement, the defendant acknowledges and understands that in so doing he surrenders any claims he may have raised in any pretrial motion, except for the issues addressed in paragraph 28, as well as certain rights which include the following:

a.      If the defendant persisted in a plea of not guilty to the charge against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

b.      If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c.      If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d.      At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e.      At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

25.     The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights.

8

The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

26.     The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

27.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. Specifically, the defendant knowingly and voluntarily waives all claims to his motion to suppress the statement that he made to Cassandra J. Shearing, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement Officer (R.14). The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

28.     The defendant acknowledges and understands that pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure, he retains the right to raise on appeal the issue of (1) dismissal of the indictment for failure to allege an element of the offense (R.12); and (2) dismissal of the indictment on constitutional grounds (R.13).

### Further Civil or Administrative Action

29.     The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any

9

other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## MISCELLANEOUS MATTERS

30.     The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which defendant is pleading guilty.  Because defendant is pleading guilty to possession of ammunition by an illegal alien, removal is presumptively mandatory.  Removal and other immigration consequences are the subject of a separate proceeding, and the defendant understands that no one, including the defendant's attorney or the sentencing court, can predict to a certainty the effect of the defendant's conviction on the defendant's immigration status.  The defendant nevertheless affirms that the defendant wants to plead guilty regardless of any immigration consequences, including the potential for automatic removal from the United States.

## GENERAL MATTERS

31.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

32.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

33.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

34.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

35.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

11

## VOLUNTARINESS OF DEFENDANT'S PLEA

36.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty.  The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

# ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 8/4/2014

MARIANO A. MEZA
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 8/4/2014

JULIE K. LINNEN
Attorney for Defendant

For the United States of America:

Date: 8/4/14

JAMES L. SANTELLE
United States Attorney

Date: 8/4/14

GAIL J. HOFFMAN
Assistant United States Attorney

13

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

## COURT MINUTES

HON. **Rudolph T. Randa**, presiding.　　　Deputy Clerk:　　**Linda M. Zik**

DATE:　**August 5, 2014  10:30 a.m.**　　　Court Reporter:　**Heidi Trapp**

CASE NO.　**13-Cr-192**　　　　　　　Time Called:　　__10:51 am.__

UNITED STATES v.　**Mariano A. Meza**　　Time Concluded:　__11:08 am.__

PROCEEDING:　　　**CHANGE OF PLEA**

UNITED STATES by:　　**Gail J. Hoffman**

PROBATION OFFICER:　　**Eileen E. Vodak**

INTERPRETER:

DEFENDANT:　**Mariano A. Meza,**　in person, and by

ATTORNEY:　**Julie K. Linnen / Juval O. Scott**

___

\_\_　　Information filed today　　　　　\_\_　Waiver of Indictment signed and filed today
\_\_　　Plea Agreement filed today

Plea:　__**Guilty**__　　to Count　__1__　　of the Indictment


__X__　Adjudged Guilty　　　　　__X__ Presentence Report ordered

Sentencing date:　__**October 2, 2014 at 10:30 a.m.**__

*Sentencing Memorandums and motions must be filed at least one-week prior to the sentencing date.*

__X__　Defendant remanded to custody of U.S. Marshal
\_\_　　Bond continued as previously set

Defendant sworn.  Court questions defendant.  Government's offer of proof is in the Plea Agreement. Rule 32 waived in the Plea Agreement.  Defendant waives the preparation of a PSR pursuant to  Federal Rule of Criminal Procedure § 32(c)(1)(A)(ii).  There is a joint recommendation of time-served and the defendant will be deported.  Government objects unless the probation officer sees otherwise.  Court will accept an abbreviated PSR.

Penalties:
Imprisonment: 10 years max; Fine: $250,000.00 max.; Special Assessment: $100.00;
Supervised Release: 3 years max.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

## SENTENCING MINUTES

HON. **Rudolph T. Randa**, presiding.

Deputy Clerk: **Linda M. Zik**

DATE: **October 2, 2014 10:30 a.m.**

Court Reporter: **Heidi Trapp**

CASE NO. **13-Cr-192**

Time Called: ___10:40 a.m.___

UNITED STATES of AMERICA v. **Mariano Alejandro Meza-Rodriguez**

Time Concluded: ___10:53 a.m.___

UNITED STATES by: **Gail J. Hoffman**

PROBATION OFFICER: **Lisa M. Cyrak**

INTERPRETER:

DEFENDANT: **Mariano Alejandro Meza-Rodriguez**, in person, and by

ATTORNEY: **Julie K. Linnen / Juval O. Scott**

---

<u>Custody Bureau of Prisons</u> ___Time-Served___ on Count ___1 of the Indictment___
Credit for time served.

Defendant is subject to deportation to Mexico.

<u>Supervised Release</u> ___NONE___

Sentencing Minutes Continued

Defendant: **Mariano Alejandro Meza-Rodriguez**
Case No.: **13-Cr-192**

Fine: **$**

  X  Fine and costs waived

                              ___ Participate in BOP Inmate Financial
                                    Responsibility Program

Restitution:
Payee:

Forfeiture:

  X    Defendant remanded to custody of U.S. Marshal

  ___    Execution of sentence stayed until _____

  ____    Voluntary surrender to institution

  X    Defendant advised of right to appeal by court

  ____    Court orders copy of transcript to accompany presentence report

Special Assessment:

        $100.00

Other:

Court has the PSR.

No objections by the parties to the factual statements in the PSR.

Defendant: **Mariano Alejandro Meza-Rodriguez**
Case No.: **13-Cr-192**

Government notes the PSR places the defendant at OL = 12, CHC = III, 15-21 months. Government recommends time-served which is essentially 13 months. He has been in custody since 8/24/2013, about 13 months; with time served this is a low-end recommendation. He will remain in custody and deported to Mexico. There is no public interest to continue incarcerating the defendant here. This provides just punishment.

Defense counsel states the average time awaiting deportation is 1½ to 5½ months. So time-served is a bottom of the guideline range sentence. Including the waiting for deportation, this places him at the top of the guideline range. Deportation is a severe sentence for the defendant. He hopes his girlfriend and 2 children will join him in Mexico. He does not intend to come back. The offense is one bullet. Grant the joint request for a time-served sentence.

Defendant's right of allocution.

Court addresses § 3553(a):
OL = 12, CHC = III, 15-21 mos.
(1) Nature of offense: possession of a bullet; the defendant says he found it in an alley but in context there was a man with a gun complaint and the defendant is on video with what looks like a gun; this puts a more serious cast on it;
(2) History of defendant: prior record starts at age 15; connection with Mexican Posse; lives on the South Side; negative on peers and personality due to his associations; no substance abuse problem; Paragraph 68 of PSR summarizes the defendant's employment – he earned cash;
(3) Court takes into consideration the practicalities of the case regarding deportation and adopts the parties recommendation; no supervised release.

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>**MARIANO ALEJANDRO MEZA-RODRIGUEZ** | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number:      **13-Cr-192**<br>USM Number:      **12952-089**<br><br>**Julie K. Linnen / Juval O. Scott**<br>Defendant's Attorney<br>**Gail J. Hoffman**<br>Assistant United States Attorney |

THE DEFENDANT:

☒ pleaded guilty to count(s)   __One (1) of the Indictment__

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☐ was found guilty on count(s) _____
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| **18 U.S.C. §§ 922(g)(5) and 924(a)(2)** | **Possession of Ammunition by an Illegal Alien** | **August 24, 2013** | **1** |

The defendant is sentenced as provided in Pages 2 through __5__ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and the United States attorney of material changes in economic circumstances.

__October 2, 2014__
Date of Imposition of Judgment

__Rudolph X Randa__
Signature of Judicial Officer

__Hon. Rudolph T. Randa, U. S. District Judge__
Name & Title of Judicial Officer

__October 7, 2014__
Date

AO 245B  (Rev. 09/11) Judgment in a Criminal Case:
Sheet 2 - Imprisonment

Defendant:      **Mariano Alejandro Meza-Rodriguez**
Case Number: **13-Cr-192**

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of : **Time-Served.**

**Defendant shall be given credit for time served as determined/calculated by the United States Bureau of Prisons.**

**The defendant is subject to deportation to Mexico**

☐  The court makes the following recommendations to the Bureau of Prisons:

☒  **The defendant is remanded to the custody of the United States Marshal.**

☐  The defendant shall surrender to the United States Marshal for this district.

    ☐  at _____ ☐ a.m.   ☐ p.m.  on _____

    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons,

    ☐  before 12:00 p.m. on _____.

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____  to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By   _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/11) Judgment in a Criminal Case:
Sheet 3 - Supervised Release

Defendant: **Mariano Alejandro Meza-Rodriguez**
Case Number: **13-Cr-192**

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of : **NONE.**

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and two drug tests thereafter within one year.

☐ The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☐ The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

☐ The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐ The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐ The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or a restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without permission of the court or probation officer;
2) the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependents and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notification and to confirm the defendant's compliance with such notification requirement.

AO 245B (Rev 09/11) Judgment in a Criminal Case:
        Sheet 5 - Criminal Monetary Penalties

Defendant:          **Mariano Alejandro Meza-Rodriguez**
Case Number:        **13-Cr-192**

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|         | **Assessment** | **Fine** | **Restitution** |
|---------|----------------|----------|-----------------|
| **Totals:** | **$100.00** | **waived** | **none** |

☐ The determination of restitution is deferred until _____ An *Amended Judgment in a Criminal Case* (AO 245C) will
   be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise
in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must
be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|-------------------|------------------|-------------------------|----------------------------|
| **Totals:** | $ _____ | $ _____ | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the
   fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject
   to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

   ☐ the interest requirement is waived for the       ☐ fine       ☐ restitution.

   ☐ the interest requirement for the       ☐ fine       ☐ restitution is modified as follows:

\*Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on
or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev 09/11) Judgment in a Criminal Case:
    Sheet 6 - Schedule of Payments

Defendant:      **Mariano Alejandro Meza-Rodriguez**
Case Number:    **13-Cr-192**

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

**A**  ☐   Lump sum payment of $ _____ due immediately, balance due

       ☐  not later than _____ , or

       ☐  in accordance ☐ C, ☐ D,  ☐ E or ☐ F below; or

**B**  ☒   Payment to begin immediately (may be combined with ☐ C,  ☐ D, or  ☐ **F**  below); or

**C**  ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
       _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**  ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
       _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprison-
       ment to a term of supervision; or

**E**  ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
       imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐   Special instructions regarding the payment of criminal monetary penalties:

       Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties
is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate
Financial Responsibility Program are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several
    Defendant and Co-Defendant Names, Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and
    corresponding payee, if appropriate:

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine
interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

# EXHIBIT LIST

| | | | | | |
|---|---|---|---|---|---|
| USA | | | vs. Mariano Meza | DISTRICT COURT Eastern | |
| PLAINTIFF'S ATTORNEY Gail Hoffman | | | DEFENDANT'S ATTORNEY Joseph Bugni | DOCKET NUMBER 13-CR-192 TRIAL DATE(S) 1-7-14 | |
| PRESIDING JUDGE William E Callahan | | | COURT REPORTER Sheryl | COURTROOM DEPUTY Brenda | |

| Exhibit No. | Date Offered | Date Admitted | Witness | DESCRIPTION OF EXHIBITS | Offers, Objections, Rulings. |
|---|---|---|---|---|---|
| 1 | 1/7/14 | 1/7/14 | Stearns | Interview notes of Agent | O-NO-R |
| 1001 | 1/7/14 | 1/7/14 | Stearns | Chart | O-NO-R |
| 2 | 1/7/14 | 1/7/14 | Aykens | notes of interview of dept Sister in law | O-NO-R |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

# United States District Court

## EASTERN DISTRICT OF WISCONSIN

USA,

        Plaintiff(s),

    v.                                     CASE NO.  13CR192

Mariano Meza,

        Defendant(s).

## EXHIBITS RECEIVED BY CLERK OF COURT'S OFFICE

The undersigned hereby acknowledges receipt of exhibits entered as evidence in the above captioned case on behalf of:

        ☒    Plaintiff

        ☒    Defendant

An itemization of the exhibits submitted by the party(ies) indicated above, is attached to this document.

                                          JON W. SANFILIPPO
                                          Clerk of Court

Date:  10/8/14                            By:  s/C. Bongel
                                                    Deputy Clerk

# EXHIBIT LIST

| | | | | | |
|---|---|---|---|---|---|
| U S A | | | VS. Mariano Meza | DISTRICT COURT Eastern | |
| PLAINTIFF'S ATTORNEY Gail Hoffman | | | DEFENDANT'S ATTORNEY Joseph Bugni | DOCKET NUMBER 13-CR-192 | |
| | | | | TRIAL DATE(S) 1-7-14 | |
| PRESIDING JUDGE William E Callahan | | | COURT REPORTER Sheryl | COURTROOM DEPUTY Brenda | |

| Exhibit No. | Date Offered | Date Admitted | Witness | DESCRIPTION OF EXHIBITS | Offers, Objections, Rulings. |
|---|---|---|---|---|---|
| 1 | 1/7/14 | 1/7/14 | Stearns | Interview notes of agent | O-NO-R |
| 1001 | 1/7/14 | 1/7/14 | Stearns | Chart | O-NO-R |
| 2 | 1/7/14 | 1/7/14 | Aykens | notes of interview depts sister in law | O-NO-R |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

     *Plaintiff,*

    v.                       Case No.  13-cr-192-rtr

MARIANO A. MEZA,

     *Defendant.*

### NOTICE OF APPEAL

Mariano A. Meza, by counsel, now gives notice pursuant to FED. R. APP. P. 3(c) and 4(b), that he appeals the judgment of conviction imposed on October 2, 2014, by the United States District Court for the Eastern District of Wisconsin, the Honorable Rudolph T. Randa presiding, and entered on October 7, 2014. Mr. Meza takes this appeal to the United States Court of Appeals for the Seventh Circuit.

With this notice of appeal, Mr. Meza also files the docketing statement required by CIRCUIT RULE 3 (7th Cir.) combined with a CIRCUIT RULE 26.1 disclosure statement. Mr. Meza proceeds *in forma pauperis* on appeal, as counsel in the United States District Court was appointed under the Criminal Justice Act of 1964, and Mr. Meza's financial circumstances have not changed meaningfully. FED. R. APP. P. 24(a)(3).

Dated at Madison, Wisconsin, October 15, 2014.

Respectfully submitted,
MARIANO A. MEZA, *Defendant*

/s/ Joseph A. Bugni
Joseph A. Bugni

FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
joseph_bugni@fd.org

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

       *Plaintiff,*

      v.                                    Case No.  13-cr-192-rtr

MARIANO A. MEZA,

       *Defendant.*

## DEFENDANT'S DOCKETING STATEMENT
## AND DISCLOSURE STATEMENT

Mariano A. Meza, by counsel, now files this docketing statement pursuant to CIRCUIT RULE 3(c)(1) (7th Cir.). He files his notice of appeal simultaneously. Mr. Meza also includes here his CIRCUIT RULE 26.1 (7th Cir.) disclosure statement.

1.      The United States District Court for the Eastern District of Wisconsin had jurisdiction over this federal criminal case under 18 U.S.C. § 3231. A grand jury in the Eastern District of Wisconsin charged Meza in a one-count indictment with violating 18 U.S.C. §§ 922(g)(5) and 924(a)(2).

2.      The defendant-appellant is a natural person, and no party is a corporation.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

3.       This is a direct appeal from a judgment of conviction. The United States Court of Appeals for the Seventh Circuit has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

4.       The judgment that Mr. Meza appeals was imposed on October 2, 2014 and entered on October 7, 2014.

5.       The notice of appeal is filed with this docketing statement on October 15, 2014.

6.       There was no prior litigation in the district court arising out of the same transaction or designated by the district court as satisfying the criteria of 28 U.S.C. § 1915(g).

7.       Pursuant to CIRCUIT RULE 26.1 (7th Cir.), counsel notes that only the law firm of Federal Defender Services of Wisconsin, Inc., through Julie K. Linnen, Juval O. Scott, and Joseph A. Bugni appeared for the defendant-appellant in the United States District Court for the Eastern District of Wisconsin, and only Federal Defender Services of Wisconsin, Inc., through Joseph A. Bugni, is expected to appear for defendant-appellant in the United States Court of Appeals for the Seventh Circuit.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Dated at Madison, Wisconsin, October 15, 2014.

Respectfully submitted,
Mariano A. Meza, *Defendant*

*/s/ Joseph A. Bugni*
Joseph A. Bugni

FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
joseph_bugni@fd.org

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.