No. 14-3271

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

vs.

MARIANO A. MEZA-RODRIGUEZ,

Defendant-Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
THE HONORABLE RUDOLPH T. RANDA, PRESIDING**

**DEFENDANT-APPELLANT'S REPLY BRIEF**

Adam Stevenson, Esq.
Samuel Robins, student
Richard R. Staley, student
Clinical Associate Professor
Director, Oxford Federal and
    Federal Appeals Projects
Frank J. Remington Center
University of Wisconsin Law School
975 Bascom Mall
Madison, WI 53706
(608) 262-9233

Joseph A. Bugni
FEDERAL DEFENDER SERVICES
    OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53703
(608) 260-9900
joseph_bugni@fd.org
Lead Counsel for
    Mariano A. Meza-Rodriguez

# TABLE OF CONTENTS

Page

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -i-

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -iii-

1.0    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.0    Under the First, Second or Fourth Amendments, undocumented
       immigrants are part of "the people.". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2.1    Contrary to the government's assertions, *Heller* did not limit the
       people" to citizens. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

2.2    *Verdugo-Urquidez*'s substantial-connections test applies. . . . . . . . . . . . . . . 7

3.0    The government fails to meet its burden to uphold this statute under
       any form of heightened scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

4.0    Conclusion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Certificate of Compliance

Certificate of Service

# TABLE OF AUTHORITIES

Page

C<small>ASES</small>

*District of Columbia. v. Heller,*
    554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 6, 7

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Fiallo v. Bell,*
    430 U.S. 787 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Friedman v. City of Highland Park, Illinois,*
    __ F.3d __, 2015 WL 1883498 (7th Cir. Apr. 27, 2015). . . . . . . . . . . . . . . 5, 10

*Ibrahim v. Dep't of Homeland Sec.,*
    669 F.3d 983 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8

*Illinois Migrant Council v. Pilliod,*
    540 F.2d 1062 (7th Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*INS v. Lopez-Mendoza,*
    468 U.S. 1032 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Martinez-Aguero v. Gonzalez,*
    459 F.3d 618 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 7

*Massignani v. INS,*
    438 F.2d 1276 (7th Cir. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Tyler v. Hillsdale Cnty. Sheriff's Dep't,*
    775 F.3d 308 (6th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*United States v. Chase,*
    281 F.2d 225 (7th Cir. 1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Cruikshank,*
    92 U.S. 542 (1875). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Portillo-Munoz,*
    643 F.3d 437 (5th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6, 7

*United States v. Quintana,*
    623 F.3d 1237 (8th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Skoien,*
    614 F.3d 638 (7th Cir. 2010) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7, 8

*Washington v. Glucksberg,*
    521 U.S. 702 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## STATUTES AND OTHER AUTHORITY

18 U.S.C. § 922(g)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 922(g)(5)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12, 13

First Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

Second Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

Fourth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

Fifth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Federal Rule of Criminal Procedure 32. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## 1.0    Introduction

At the heart of this case is an issue broader than Meza's possession of a bullet. It's whether undocumented immigrants have a right to defend themselves. The defense argument in favor of that right is straight-forward: the right to defend oneself with a firearm is a pre-existing right, codified in the Second Amendment, and shared among "the People"—the same people who also enjoy the right to free speech and privacy. This Second Amendment right extends to *all* people, including all undocumented immigrants, whether virtuous or not. Thus, while the government would prefer that undocumented persons like Meza not have a single bullet, that preference runs up against the Second Amendment and the natural right to defend oneself.

The government's arguments in opposition to this right are flawed. It contends that undocumented immigrants are not included in the Bill of Rights' reference to "the people." Or, if they are counted among "the people," the government thinks that Meza's status as a misdemeanant would nevertheless strip him of those rights. But the government offers no support, nor can it, for the proposition that undocumented immigrants aren't covered by the First and Fourth Amendment, and by extension the Second Amendment. And nothing in the cases it cites allows the substantial-connections test to rise or fall on whether a person is

(arguably) a bad person. After all, "the Constitution is for the despicable as well as for the admirable." *United States v. Chase*, 281 F.2d 225, 227 (7th Cir. 1960).

The government also confuses its burden and misunderstands what this Court may consider in deciding whether to uphold the ban on undocumented immigrants possessing a firearm. The district court never had any briefing or heard evidence from the government about the purpose behind 18 U.S.C. § 922(g)(5)'s ban. To overcome this, the government guesses at Congress's reasons for passing the bill over forty years ago. It then plucks a few statistics from the sentencing commission — about a purported connection between immigrants and crime — and supplies those as a compelling governmental justification. But to the extent that this Court thinks this argument might have some merit, it shouldn't look at the question in the first instance but rather remand the case, so that the district court can hear evidence and make appropriate findings.

### 2.0 Under the First, Second, or Fourth Amendments, undocumented immigrants are part of "the people."

With respect to the First, Second, and Fourth Amendments, the Framers extended constitutional rights to the same group: "the people." Those Amendments all serve the same purpose: to limit government infringement of a personal right that existed before the Constitution's ratification. *District of Columbia. v. Heller*, 554

U.S. 570, 592 (2008). Each Amendment also recognizes who possesses that right: "the people."

For purposes of the First Amendment, there is no dispute that Meza is part of "the people." The Government does not argue otherwise—nor could it. *Massignani v. INS*, 438 F.2d 1276, 1278 (7th Cir. 1971) ("aliens fully enjoy our primary rights of free speech guaranteed by the First Amendment"); *see also Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 997 (9th Cir. 2012) (finding that a woman whose visa was revoked "has the right to assert claims under the First and Fifth Amendments").

The Fourth Amendment has the same scope: undocumented immigrants are part of "the people" and covered by its protections. *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010); *cf. INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984) (regarding the inapplicability of the exclusionary rule to deportation proceedings). But the government argues that the Fourth Amendment would not protect Meza, as an undocumented immigrant. Gov't. Br. 13–14. It's worth noting, however, that the government's short discussion of this subject relies exclusively on *Martinez-Aguero v. Gonzalez*, 459 F.3d 618 (5th Cir. 2006), as discussed in *United States v. Portillo-Munoz*, 643 F.3d 437, 441 n.2 (5th Cir. 2011). But *Portillo-Munoz*'s footnote does not accurately recount *Martinez-Aguero*'s holding. In *Martinez-Aguero*,

the court noted that "[i]n pre-*Verdugo-Urquidez* cases, the Supreme Court had assumed, and *we have explicitly held, that the Fourth Amendment applies to aliens.*" *Martinez-Aguero*, 459 F.3d at 624 (emphasis added); *see also id.* at 625 ("There may be cases in which an alien's connection with the United States is so tenuous that he cannot reasonably expect the protection of its constitutional guarantees; the nature and duration of Martinez-Aguero's contacts with the United States, however, are sufficient to confer Fourth Amendment rights."). It's a stretch to say that undocumented immigrants don't have Fourth Amendment rights, and the reason the government attempts to argue otherwise is in recognition of this simple fact: if Meza has rights under the First and Fourth Amendments, he also has rights under the Second.

### 2.1 Contrary to the government's assertions, *Heller* did not limit "the people" to citizens.

The government uses an overly broad reading of *District of Columbia v. Heller*, 554 U.S. 570 (2008), to limit Second Amendment rights and the scope of "the people" to only law-abiding citizens. Gov't Br. 11. But *Heller* didn't seek to define the full scope of Second Amendment rights. And the government admits as much: "the issue of whether an alien has a right to bear arms … was not presented to the Supreme Court." *Id.* at 10-11. Yet the government treats the various phrases the Supreme Court used in Heller—"American," "law-abiding citizens," and "members

of the political community" — as a binding mandate that the Second Amendment cannot extend beyond law-abiding citizens.

Beyond the unsound assumption that the terms "American" and "citizen" even constitute the same group of people as "the people," this Court has rebuked such a broad reading of *Heller*. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc); *Friedman v. City of Highland Park, Illinois*, __ F.3d __, 2015 WL 1883498 at *3 (7th Cir. Apr. 27, 2015) ("*Heller* does not purport to define the full scope of the Second Amendment. The Court has not told us what other entitlements the Second Amendment creates or what kinds of gun regulations legislatures may enact."). This Court cautioned "not to treat *Heller* as containing broader holdings than the [Supreme] Court set out to establish: that the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense." *Skoien*, 614 F.3d at 640. And it noted that the Supreme Court's "general expressions must be read in light of the subject under consideration." *Id.* (internal citation omitted); *see also Friedman*, __ F.3d __, 2015 WL 1883498, at *3 ("Cautionary language about what has been left open should not be read as if it were part of the Constitution or answered all possible questions.").

Yet the government homes in on *Heller*'s word choices as if the opinion were a statute and it equates "the people" with "citizen." In doing so, the government

builds its entire case on the Fifth Circuit and its reasoning: "*Portillo-Munoz* did not find that the use of 'the people' in both the Second and Fourth Amendments mandates a holding that the two amendments cover exactly the same group of people." Gov't Br. 14. Without further elaboration, the government justifies this break from the norms of statutory and constitutional construction on the basis of *Portillo-Munoz*'s statement that "[t]he Second Amendment grants an affirmative right to keep and bear arms, while the Fourth Amendment is at its core a protective right." *Id.* (quoting *Portillo-Munoz*, 643 F.3d at 440-41). Yet the government doesn't attempt to reconcile this passage with *Heller*, which stated: "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, *codified a pre-existing right.*" *Heller*, 554 U.S. at 592 (emphasis in original); *see also United States v. Cruikshank*, 92 U.S. 542, 553 (1875) (reasoning that the right to bear arms "is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence.").

The government does not provide any reasoning for its contention that *Heller*'s logic and the foundational principles of statutory construction should bow to the Fifth Circuit's creative reading of the Second Amendment. The government merely asserts*, ipse dixit*, that the Fifth Circuit has held otherwise—end of discussion. But missing from the government's brief is any explanation of why this

Court should find the *Portillo-Munoz* majority's reasoning persuasive—and not the dissent's.

## 2.2  *Verdugo-Urquidez*'s substantial-connections test applies.

Reading *Heller* to limit "the people" to citizens is a substantial departure from both the text of the Bill of Rights and past jurisprudence. It also flies in the face of the Supreme Court's reasoning in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), which found that under the Fourth Amendment undocumented immigrants could be counted among "the people." There, the Supreme Court applied a substantial-connections test to determine if an undocumented immigrant was part of the people. The government argues that Meza fails the substantial-connections test. But the government's brief doesn't cite any cases to support its proposition that the twenty plus years that Meza has spent in this country—going to school, raising children, and working—fail to establish a substantial connection. Indeed, it couldn't: other cases have found a substantial connection based on far less. *See Martinez-Aguero*, 459 F.3d at 624–25 (noting "her regular and lawful entry of the United States pursuant to a valid border-crossing card and her acquiescence in the U.S. system of immigration constitute her voluntary acceptance of societal obligations, rising to the level of 'substantial connections'"); *Ibrahim*, 669 F.3d at 997 (several years here as a Ph.D. student were enough).

Rather, the government argues that Meza doesn't have a substantial connection to this country because he's not a good person—he's the sort that would threaten a police officer's family and wave a BB gun around in a bar. Govt. Br. 15–18. It may well be that Meza will never get a civic award. But in *Verdugo-Urquidez* the Supreme Court did not lay down a good-person test. It focused on whether there are substantial connections between the undocumented immigrant and this country. And in over twenty years here Meza has established more than enough connections to call them "substantial." Indeed, it's hard to imagine the government opposing an illegal search of Meza's home on the basis that he doesn't have Fourth Amendment rights; or it arguing that he could be arrested for speaking in a public forum because he doesn't have First Amendment rights. But it effectively makes these arguments when it contends that Meza lacks any Second Amendment rights because he doesn't have a substantial connection here.

While the Supreme Court in *Verdugo-Urquidez* held that sufficient, voluntary connections between an immigrant and the United States can give rise to constitutional protections, the Court didn't create a bright-line rule. If this Court finds that two decades in this country spent attending school, having children, and working, are not enough, then this case should be remanded with instructions, so

that a clearer picture of Meza's connections to this country can be established. Simply relying on the lack of facts developed in the PSR would be inappropriate. The PSR is, after all, focused on the mandates of Federal Rule of Criminal Procedure 32 and not on the question at hand: has a defendant established substantial connections to this country, such that he is protected by the First, Second or Fourth Amendments.

In sum, if this Court doesn't apply the historical, plain-text meaning of "the people" discussed above, Meza asks this Court to define the threshold level of connections and adoption of societal obligations that a defendant must establish in order to rely on the protections of the First, Second, and Fourth Amendments. And if this Court finds that the more-than-twenty years Meza has spent here fails to establish such a connection, then it should remand this case for a hearing so that Meza can develop a record of the nature and extent of his connection to this country and thereby show that he meets the threshold as defined by this Court.

### 3.0 The government fails to meet its burden to uphold this statute under any form of heightened scrutiny.

Undocumented immigrants have a fundamental right to protect themselves and their homes with firearms. Thus, a categorical ban on firearm possession by any undocumented immigrant with substantial connections to this country—even someone the government thinks is insufferable—implicates a fundamental Second Amendment right. The next question is whether such a ban can survive review under the Second Amendment. It cannot.

It is not clear what level of heightened scrutiny applies to this sort of ban. *See, e.g., Skoien*, 614 F.3d at 641–42 (en banc); *Friedman*, __ F.3d __, 2015 WL 1883498 *3 (discussing without deciding the level of scrutiny); *id.* at 8 (Manion, J., dissenting) (discussing strict scrutiny). Much suggests that when evaluating the ban in § 922(g)(5)(A), this Court should use strict scrutiny—there is a presumption in favor of strict scrutiny when the government infringes on a fundamental right. *See Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (strict scrutiny applies to laws restricting a "fundamental" liberty); *Ezell v. City of Chicago*, 651 F.3d 684, 706–07 (7th Cir. 2011) (noting "we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context"). And the Sixth Circuit's panel decision in *Tyler* found the First Amendment analysis applies to the Second Amendment, requiring the court to apply strict scrutiny when assessing the

constitutionality of a categorical ban on a person's Second Amendment right. *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 775 F.3d 308, 326 (6th Cir. 2014). Although that opinion was vacated and rehearing en banc was granted on April 21, 2015, the reasoning is still instructive and persuasive.

Regardless of the form of heightened scrutiny, the government cannot demonstrate a sufficient tie to a valid government interest. The government has given three possible objectives for Congress passing the ban on firearms in § 922(g)(5)(A):

- regulation of immigration;

- prevention of violence; or

- preventing undocumented immigrants' access to guns.

But there is no way to assess the government's proposed objectives because the government fails to illustrate how the ban actually or sufficiently relates to the objectives. And for that matter, the government doesn't even establish that any of its proposed objectives were relied on by Congress in passing § 922(g)(5)(A)—over forty years ago. That is, the government doesn't cite anything from the congressional record or any findings by the Congress. It just speculates about objectives, as post-hoc rationalizations. But even assuming that any of the government's proposed objectives was an actual ground for Congress's passage of

§ 922(g)(5)(A), the government has not met its burden of showing that § 922(g)(5)(A) is either the least restrictive means to meet that objective or even substantially related to those ends.

There is no denying that Congress has very broad power in regulating immigration. *See Fiallo v. Bell*, 430 U.S. 787, 792 (1977). Despite this undeniable power over immigration, that power cannot justify a law unrelated to immigration, which simply regulates immigrants' Second Amendment rights. *See Illinois Migrant Council v. Pilliod*, 540 F.2d 1062, 1068 n.5 (7th Cir. 1976) ("Congress' power to exclude aliens cannot be interpreted so broadly as to limit the Fourth Amendment rights of those present in the United States."). Section 922(g)(5)(A) simply imposes criminal liability on a class of persons for possessing a firearm or bullet—it does nothing to affect the admission, expulsion, or naturalization of undocumented immigrants.

Just as § 922(g)(5)(A) does not affect immigration, it can't be shown to prevent violence among a class of people who particularly need preventative measures. Even if the "prevention of violence" purpose applies here, there is no clear data with regard to the violent criminality of immigrants. The government's statistics from the United States Sentencing Commission are irrelevant here. Gov't Br. at 27. These statistics indicate the percentage of federal criminal offenders who

are non-citizens, which the government then uses to justify an impermissible restraint on *all* undocumented immigrants.  But while the percentage of all undocumented immigrants who are violent criminal offenders might be an appropriate metric from which to gauge the inherent riskiness of such persons, the converse—the percentage of offenders who are immigrants—is irrelevant. In other words, the government is assessing proportional criminality from the wrong population.  Additionally, the percentage of federal defendants who are undocumented immigrants could be artificially inflated by the fact that they are, by their status and the federal prosecution of illegal immigration cases, more likely to come to the attention of federal authorities.

In sum, the government cannot show that a complete prohibition on the Second Amendment rights of undocumented immigrants is related to an important governmental objective. If the proffered objective is to prevent violence, then a categorical ban on the possession of firearms by all undocumented immigrants is overly broad—applied to a group the government cannot show is more violent than the country at large. If the objective is to regulate immigration, then Congress exceeded its authority because § 922(g)(5)(A) does not relate to immigration itself, and instead only infringes the undocumented immigrants' Second Amendment rights. A law aimed at flatly denying all undocumented immigrants Second

Amendment rights simply cannot survive constitutional muster under any form of heightened scrutiny. To the extent that this court thinks the government's arguments about Congress's objectives might have any merit, this Court should remand the case so that the district court can examine the legislative record and so that the government may produce evidence, if it can find any, establishing a connection between undocumented immigrants, guns, and violent crimes.

### 4.0 Conclusion

Again, this case is bigger than the single bullet in Meza's pocket. It's about fundamental rights—those protected by the Bill of Rights. The defense's reading of the Second Amendment accords with the basics of statutory construction—identical words used in different parts of the same act are given the same meaning. As part of "the people," Meza has First and Fourth Amendment rights, and he also has Second Amendment rights. To the extent that Meza's enjoyment of these rights is dependent on substantial connections with this country, his twenty years here more than suffice. Thus, the government may deprive Meza of his Second Amendment rights only upon establishing a compelling governmental objective—and, here, it hasn't even established an "important" objective. Therefore, this Court should reverse and remand with instructions to dismiss the case or, in the alternative,

remand with instructions to engage in evidentiary proceedings to establish relevant findings of fact.

Dated at Madison, Wisconsin this 19th day of May, 2015.

Respectfully submitted,

/s/ Joseph A. Bugni
Joseph A. Bugni, Esq.
Federal Defender Services of WI, Inc.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53703
608-260-9900
608-260-9901
joseph_bugni@fd.org

Adam Stevenson, Esq.
Samuel Robins, student
Richard R. Staley, student
Clinical Associate Professor
Director, Oxford Federal
    and Federal Appeals Projects
Frank J. Remington Center
University of Wisconsin Law School
975 Bascom Mall
Madison, WI 53706
(608) 262-9233

# CERTIFICATE OF COMPLIANCE

Pursuant to FED. R. APP. P. 32(a)(7), counsel for Defendant-Appellant certifies that this brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) and (C).  This brief contains 3,100 words.


Dated: May 19, 2015                    /s/ Joseph A. Bugni
                                       Joseph A. Bugni
                                       Counsel for Defendant-Appellant
                                       Mariano A. Meza-Rodriguez

# CERTIFICATE OF SERVICE

The undersigned counsel for the Defendant-Appellant Mariano A. Meza-Rodriguez, hereby certifies that on May 19, 2015, two copies of the Defendant-Appellant's brief, as well as a digital version of the brief via the Court's CM/ECF system, were delivered by first class mail, postage pre-paid, to AUSA Gail Hoffman, counsel for the government in this action.

Dated: May 19, 2015      _/s/ Joseph A. Bugni_
                                    Joseph A. Bugni
                                    Counsel for Defendant-Appellant
                                    Mariano A. Meza-Rodriguez