In the

# United States Court of Appeals

## For the Seventh Circuit



CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

———————————

No. 14-3271

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARIANO A. MEZA-RODRIGUEZ,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 13-CR-192 — **Rudolph T. Randa**, *Judge.*

———————————

ARGUED JUNE 5, 2015 — DECIDED AUGUST 20, 2015

———————————

Before WOOD, *Chief Judge*, and FLAUM and EASTERBROOK, *Circuit Judges*.

WOOD, *Chief Judge*. When Mariano Meza-Rodriguez, a citizen of Mexico, was arrested in August 2013, he was carrying a .22 caliber cartridge. But it was what he did not have—documentation showing that he is lawfully in the United States—that concerns us now. His immigration status made his possession of the cartridge a crime under 18 U.S.C. § 922(g)(5), which prohibits foreigners who are not entitled

to be in the United States (whom we will call "unauthorized aliens") from possessing firearms. Meza-Rodriguez moved to dismiss the indictment that followed, arguing that § 922(g)(5) impermissibly infringed on his rights under the Second Amendment to the Constitution. The district court denied his motion on the broad ground that the Second Amendment does not protect unauthorized aliens. That rationale swept too far, and we do not endorse it. The court's judgment, however, was correct for a different reason: the Second Amendment does not preclude certain restrictions on the right to bear arms, including the one imposed by § 922(g)(5).

## I

Meza-Rodriguez was brought to this country by his family when he was four or five years old. Without ever regularizing his status, he has remained here since that time. His current troubles began just before midnight on August 24, 2013, when City of Milwaukee police officers responded to a report that an armed man was at a local bar. The officers obtained a surveillance video showing a man pointing an object that resembled a firearm. Witnesses later identified that man as Meza-Rodriguez. A few hours later, the same officers responded to a different report of a fight at a neighboring bar. The officers broke up the fight and recognized Meza-Rodriguez as the man from the surveillance video. After a foot chase, they apprehended him and patted him down. This brief search turned up a .22 caliber cartridge in his shorts pocket.

The government later filed an indictment alleging that Meza-Rodriguez had violated 18 U.S.C. § 922(g)(5). That statute states, in pertinent part, that:

[i]t shall be unlawful for any person …

(5) who, being an alien–

(A) is illegally or unlawfully in the United States;

or

(B) except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa …

to … possess in or affecting commerce, any firearm or ammunition … .

Meza-Rodriguez moved to dismiss the indictment on the ground that § 922(g)(5) imposes an unconstitutional restraint on his Second Amendment right to bear arms. The magistrate judge recommended that the district court deny the motion, relying in part on the conclusion that the Second Amendment does not protect unauthorized aliens. The district court concurred and denied Meza-Rodriguez's motion. Meza-Rodriguez then pleaded guilty pursuant to an agreement with the government and preserved this issue for appeal. See FED. R. CRIM. P. 11(a)(2). The district court sentenced Meza-Rodriguez to time served with no supervised release, and he was later removed to Mexico. Meza-Rodriguez filed a timely notice of appeal from his conviction.

## II

Before addressing the merits, we must ensure that Meza-Rodriguez's removal to Mexico has not rendered his appeal moot. We may not entertain this appeal unless it represents a live case or controversy. See U.S. CONST. art. III, § 2. To satis-

fy this requirement, Meza-Rodriguez "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)). A person cannot continue to litigate "unless he can show a reasonable probability of obtaining a tangible benefit from winning." *Diaz v. Duckworth*, 143 F.3d 345, 347 (7th Cir. 1998). A convicted person who already has served his sentence must point to "some concrete and continuing injury," *i.e.*, "some 'collateral consequence' of the conviction." *Spencer*, 523 U.S. at 7.

With the benefit of supplemental briefing from the parties, for which we thank them, we are satisfied that Meza-Rodriguez meets this standard. The immigration laws declare that any person who has been removed from the United States and who has committed an aggravated felony is permanently inadmissible. See 8 U.S.C. § 1182(a)(9)(A)(ii). As matters presently stand, Meza-Rodriguez meets both requirements for this permanent bar: he has been removed, and his violation of 18 U.S.C. § 922(g)(5) is an aggravated felony. See 8 U.S.C. § 1101(a)(43)(E)(ii).

Indeed, it is possible, though not certain, that a § 922(g)(5) violation might also qualify as a crime involving moral turpitude (CIMT). The latter term is not defined by statute, see *Marin-Rodriguez v. Holder*, 710 F.3d 734, 737 (7th Cir. 2013), but the Board of Immigration Appeals and the courts have offered definitions. The Board has said that moral turpitude is "conduct that is inherently base, vile, or depraved, contrary to the accepted rules of morality and the duties owed other persons … ." See *Knapik v. Ashcroft*, 384

F.3d 84, 89 (3d Cir. 2004) (describing the definition used by the Board in its case and deferring to it). This court has suggested that such crimes are both "deliberately committed and 'serious,' either in terms of the magnitude of the loss that it causes or the indignation that it arouses in the law-abiding public." *Padilla v. Gonzales*, 397 F.3d 1016, 1019 (7th Cir. 2005); see also *Mei v. Ashcroft*, 393 F.3d 737 (7th Cir. 2004) (discussing difficulty of creating a clear definition of the term). Persons who have been convicted of a CIMT are also inadmissible. See 8 U.S.C. § 1182(a)(2)(A)(i)(I).

Thus, if Meza-Rodriguez loses this appeal, he cannot return to the United States. If he wins, he does not face a permanent bar to admission. The possibility of returning to this country is a "tangible benefit" to Meza-Rodriguez; likewise, his current inability to reenter is a "concrete and continuing injury." The appeal is therefore not moot.

The decision in *Diaz* might appear at first glance to be in some tension with that conclusion, but a closer look shows that it is not. *Diaz* also involved an unauthorized alien who had completed his sentence and had been removed from the country before we heard his appeal. See *Diaz*, 143 F.3d at 346. But that is the extent of the similarity between that case and ours. Diaz did not contest the validity of his conviction. Instead, he argued—in a habeas corpus proceeding, rather than in a direct appeal—that he had been denied due process when the prison revoked some of his good-time credit, causing him to serve a longer sentence. See *id.* Our mootness finding did not depend on Diaz's deportation; we concluded that there was no relief we could order because he already had completed his sentence. The only consequence of the extended prison time about which he was complaining was the

possibility that he might be subject to enhanced punishment for a future criminal violation. This possibility, we found, was too speculative to avoid mootness, particularly given the fact that Diaz already had been removed and thus was unlikely to commit future crimes within the country. See *id.* at 346–47.

The consequences of Meza-Rodriguez's conviction are not theoretical; his right ever to reenter the United States hangs in the balance. *Diaz* recognized that "statutory disabilities such as loss of the right to vote or the right to own a gun" are sufficient to save an appeal from mootness. *Id.* at 346. Meza-Rodriguez faces a comparable statutory disability. *Diaz* thus actually supports our conclusion that this appeal presents a live controversy. See also *United States v. Ashraf*, 628 F.3d 813, 822 (6th Cir. 2011) (defendant's removal did not render appeal of his conviction moot because reversal "might affect the Attorney General's discretionary decision to allow him back in the country"); *United States v. Quezada-Enriquez*, 567 F.3d 1228, 1232 (10th Cir. 2009) (same, because reversal of the conviction "could provide Quezada–Enriquez with relief from the collateral consequences of conviction"); *United States v. Jurado-Lara*, 287 F. App'x 704, 707 (10th Cir. 2008) (same with respect to appeal of a sentence, because a reduction in the sentence could affect the applicability of the aggravated felon bar); *United States v. Hamdi*, 432 F.3d 115, 118–21 (2d Cir. 2005) (same for appeal of a sentence, because of the "substantial impact" a reduction in that sentence would have on defendant's ability to obtain discretionary relief to be admitted into the country); *Perez v. Greiner*, 296 F.3d 123, 126 (2d Cir. 2002) (noting in dicta that a permanent bar on reentry was enough to prevent a habeas petition from becoming moot). We therefore find that this appeal is not

moot, and we move on to address Meza-Rodriguez's substantive arguments.

### III

Meza-Rodriguez argues that 18 U.S.C. § 922(g)(5) impermissibly infringes on his rights under the Second Amendment to the Constitution. We review the constitutionality of federal statutes *de novo*. See *United States v. Sidwell*, 440 F.3d 865, 870 (7th Cir. 2006).

### A

We first tackle the question whether the Second Amendment protects unauthorized non-U.S. citizens within our borders. The Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has confirmed that this language confers an "individual right to possess and carry weapons." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). But neither *Heller* nor any other Supreme Court decision has addressed the issue whether unauthorized noncitizens (or noncitizens at all) are among "the people" on whom the Amendment bestows this individual right. A few other courts of appeals have reached this issue, however, and have concluded, based on language in *Heller*, that the Amendment does *not* protect the unauthorized. See *United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012); *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) (per curiam); *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011); see also *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169–70 (10th Cir. 2012) (declining to reach the issue because § 922(g)(5) passes intermediate scrutiny in any case).

This issue was not, however, before the Court in *Heller*. While some of *Heller*'s language does link Second Amendment rights with the notions of "law-abiding citizens" and "members of the political community," see *Heller*, 554 U.S. at 580, 625, those passages did not reflect an attempt to define the term "people." We are reluctant to place more weight on these passing references than the Court itself did. See *Huitron-Guizar*, 678 F.3d at 1168 (declining to infer such a rule both "because the question in *Heller* was the amendment's *raison d'être*—does it protect an individual or collective right?—and aliens were not part of the calculus" and because nothing indicates that the *Heller* Court used the word 'citizen' deliberately to settle the question); see also *Friedman v. City of Highland Park*, 784 F.3d 406, 410 (7th Cir. 2015) ("*Heller* does not purport to define the full scope of the Second Amendment.").

Other language in *Heller* supports the opposite result: that all people, including non-U.S. citizens, whether or not they are authorized to be in the country, enjoy at least some rights under the Second Amendment. (Although it is hard to find good data about the percentage of noncitizens in the United States before 1820, see BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, HISTORICAL STATISTICS OF THE UNITED STATES 1789-1945: A SUPPLEMENT TO THE STATISTICAL ABSTRACT OF THE UNITED STATES (1949), *available at* http://www2.census.gov/prod2/statcomp/documents/ HistoricalStatisticsoftheUnitedStates1789-1945.pdf, immigration in the late 18th century was a common phenomenon. And such provisions as Article I, section 2, paragraph 2, which limits membership in the House of Representatives to persons who have been "seven Years a Citizen," and Article II, section 1, paragraph 4, which requires the President to be

"a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution," show that the drafters of the Constitution used the word "citizen" when they wanted to do so.)

*Heller* noted the similarities between the Second Amendment and the First and Fourth Amendments, implying that the phrase "the people" (which occurs in all three) has the same meaning in all three provisions. See *Heller*, 554 U.S. at 592 ("[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right."); *id.* at 580 (noting that "the people" is "a term of art employed in select parts of the Constitution," including the First, Second, Fourth, Ninth, and Tenth Amendments) (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). An interpretation of the Second Amendment as consistent with the other amendments passed as part of the Bill of Rights has the advantage of treating identical phrasing in the same way and respecting the fact that the first ten amendments were adopted as a package. (We recognize that other uses of "the people" in the Constitution, including in section 2 of Article I and the Seventeenth Amendment, likely do not reflect this meaning. But the word appears in a different context in those provisions, which deal expressly with elections, not affirmative individual rights.)

The conclusion that the term "the people" in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights is just the first step in our analysis. We still must decide what it means. The Supreme Court has spoken on this issue, albeit obliquely. In *Verdugo-Urquidez*, the Court determined that the Fourth Amendment did not

protect a noncitizen brought involuntarily to the United States against a warrantless search of his *foreign* residence. See *Verdugo-Urquidez*, 494 U.S. at 274–75. In rejecting Verdugo-Urquidez's position, the Court stated that "'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* at 265. Of interest here, the Court also said that "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." *Id.* at 271. It then contrasted Verdugo-Urquidez with the unauthorized immigrants with whom it had dealt in *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032 (1984). Unlike Verdugo-Urquidez, the latter "were in the United States voluntarily and presumably had accepted some societal obligations." *Verdugo-Urquidez*, 494 U.S. at 273.

At a minimum, *Verdugo-Urquidez* governs the applicability of the Fourth Amendment to noncitizens. For Fourth Amendment rights to attach, the alien must show "substantial connections" with the United States. See, *e.g.*, *United States v. Vilches-Navarrete*, 523 F.3d 1, 13 (1st Cir. 2008) (noncitizen who was in the country involuntarily and lacked significant previous voluntary connection with the United States could not rely on the Fourth Amendment); *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 625 (5th Cir. 2006) (whether a noncitizen can invoke the Fourth Amendment depends on whether she has substantial connections with the United States, *i.e.*, whether she is in the country of her own accord and has accepted some societal obligations).

Given our earlier conclusion that the Second and Fourth Amendments should be read consistently, we find it reasonable to look to *Verdugo-Urquidez* to determine whether Meza-Rodriguez is entitled to invoke the protections of the Second Amendment. See *Verdugo-Urquidez*, 494 U.S. at 265. Doing so, we see first that Meza-Rodriguez was in the United States voluntarily; there is no debate on this point. He still has extensive ties with this country, having resided here from the time he arrived over 20 years ago at the age of four or five until his removal. He attended public schools in Milwaukee, developed close relationships with family members and other acquaintances, and worked (though sporadically) at various locations. This is much more than the connections our sister circuits have found to be adequate. See, *e.g.*, *Martinez-Aguero*, 459 F.3d at 625 (noncitizen's "regular and lawful entry of the United States pursuant to a valid border-crossing card and her acquiescence in the U.S. system of immigration" was sufficient, even though she had not spent long periods of time in the country); *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 996–97 (9th Cir. 2012) (applying test from *Verdugo-Urquidez* and finding that noncitizen pursuing Ph.D. in the United States for four years had established significant voluntary connection with the United States such that she could invoke the First and Fifth Amendments).

The government counters with two arguments. First, it contends that unauthorized noncitizens categorically have not accepted the basic obligations of membership in U.S. society and thus cannot be considered as part of "the people." Second, it argues that Meza-Rodriguez's unsavory traits, including his multiple brushes with the law, failure to file tax returns, and lack of a steady job, demonstrate that he has not sufficiently accepted the obligations of living in American

society. We take the latter point first. We do not dispute that
Meza-Rodriguez has fallen down on the job of performing as
a responsible member of the community. But that is not the
point. Many people, citizens and noncitizens alike, raising
Fourth Amendment claims are likely to have a criminal rec-
ord, but we see no hint in *Verdugo-Urquidez* that this is a rel-
evant consideration. Such a test would require a case-by-case
examination of the criminal history of every noncitizen (in-
cluding a lawful permanent resident) who seeks to rely on
her constitutional rights under the First, Second, or Fourth
Amendment. Not only would this test be difficult to imple-
ment; it would also create the potential for a noncitizen to
lose constitutional rights she previously possessed simply
because she began to behave in a criminal or immoral way.
The Second Amendment is not limited to such on-again, off-
again protection. Instead, the only question is whether the
alien has developed substantial connections as a resident in
this country; Meza-Rodriguez has.

The government's argument might have some force if
*Verdugo-Urquidez* represented the Supreme Court's only rel-
evant holding, but it does not. In *Plyler v. Doe,* 457 U.S. 202
(1982), which *Verdugo-Urquidez* left undisturbed, the Court
addressed the status of unauthorized aliens as "persons" for
constitutional purposes:

> Appellants argue at the outset that undocu-
> mented aliens, because of their immigration
> status, are not "persons within the jurisdiction"
> of the State of Texas, and that they therefore
> have no right to the equal protection of Texas
> law. We reject this argument. Whatever his sta-
> tus under the immigration laws, an alien is

surely a "person" in any ordinary sense of that
term. Aliens, even aliens whose presence in
this country is unlawful, have long been rec-
ognized as "persons" guaranteed due process
of law by the Fifth and Fourteenth Amend-
ments. *Shaughnessy v. Mezei*, 345 U.S. 206, 212
(1953); *Wong Wing v. United States*, 163 U.S. 228,
238 (1896); *Yick Wo v. Hopkins*, 118 U.S. 356, 369
(1886). Indeed, we have clearly held that the
Fifth Amendment protects aliens whose pres-
ence in this country is unlawful from invidious
discrimination by the Federal Government.

457 U.S. at 210. *Verdugo-Urquidez* summarized *Plyler*'s hold-
ing (along with a number of others in which the Court had
recognized that aliens enjoy certain constitutional rights) as
follows: "These cases … establish only that aliens receive
constitutional protections when they have come within the
territory of the United States and developed substantial con-
nections with this country." 494 U.S. at 271.

Meza-Rodriguez satisfies both those criteria. He has lived
continuously in the United States for nearly all his life. Dur-
ing that time, his behavior left much to be desired, but as we
have said, that does not mean that he lacks substantial con-
nections with this country. *Plyler* shows that even unauthor-
ized aliens enjoy certain constitutional rights, and so unau-
thorized status (reflected in the lack of documentation) can-
not support a *per se* exclusion from "the people" protected
by the Bill of Rights. In the post-*Heller* world, where it is now
clear that the Second Amendment right to bear arms is no
second-class entitlement, we see no principled way to carve
out the Second Amendment and say that the unauthorized

(or maybe all noncitizens) are excluded. No language in the
Amendment supports such a conclusion, nor, as we have
said, does a broader consideration of the Bill of Rights.[1]

### B

Meza-Rodriguez's ability to invoke the Second Amend-
ment does not resolve this case, however, because the right
to bear arms is not unlimited. See *Heller*, 554 U.S. at 595.
Congress may circumscribe this right in some instances
without running afoul of the Constitution, and so we must
now decide whether 18 U.S.C. § 922(g)(5) is such a permissi-
ble restriction.

The Supreme Court has steered away from prescribing a
particular level of scrutiny that courts should apply to cate-
gorical bans on the possession of firearms by specified
groups of people, though it has said that rational-basis re-
view would be too lenient. See *Ezell v. City of Chicago*, 651
F.3d 684, 706 (7th Cir. 2011) (citing *Heller*, 554 U.S. at 628
n.27). In addressing § 922(g), we have concluded that "some
form of strong showing," akin to intermediate scrutiny, is
the right approach. See *United States v. Skoien*, 614 F.3d 638,
641–42 (7th Cir. 2010) (en banc) (avoiding the "'levels of
scrutiny' quagmire" but noting that § 922(g)(9) serves an
important governmental objective and that this provision
has a substantial relation with this objective); *United States v.
Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (applying interme-
diate scrutiny to § 922(g)(1)); *United States v. Yancey*, 621 F.3d

---

[1] Because this holding creates a split between our circuit and the
Fourth, Fifth, and Eighth Circuits, *ante* at 7, this opinion has been circu-
lated to all active judges pursuant to Circuit Rule 40(e). No judge voted
to hear the case *en banc*.

681, 683 (7th Cir. 2010) (requiring "a strong showing that the challenged subsection of § 922(g) [i]s substantially related to an important governmental objective"). Other circuits have applied at least intermediate scrutiny. See *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (applying intermediate scrutiny to § 922(g)(9)); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010) (same for § 922(g)(8)). But see *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 775 F.3d 308, 322–30 (6th Cir. 2014), *vacated and reh'g en banc granted*, No. 13-1876 (6th Cir. Apr. 21, 2015) (applying strict scrutiny to § 922(g)(4)).

Congress's objective in passing § 922(g) was "to keep guns out of the hands of presumptively risky people" and to "suppress[] armed violence." *Yancey*, 621 F.3d at 683–84 (citing S. REP. NO. 90-1501, at 22 (1968)); see also *Huitron-Guizar*, 678 F.3d at 1169–70 (§ 922(g)'s purposes are to assist law enforcement in combating crime and to keep weapons away from those deemed dangerous or irresponsible). One such group includes aliens "who … [are] illegally or unlawfully in the United States." 18 U.S.C. § 922(g)(5)(A). The government argues that the ban on the possession of firearms by this group of people is substantially related to the statute's general objectives because such persons are able purposefully to evade detection by law enforcement. We agree with this position: unauthorized noncitizens often live "largely outside the formal system of registration, employment, and identification, [and] are harder to trace and more likely to assume a false identity." *Huitron-Guizar*, 678 F.3d at 1170. Persons with a strong incentive to use false identification papers will be more difficult to keep tabs on than the general population. (Section 922(g)(5)(B)'s prohibition on firearms possession by most aliens who are lawfully present but who hold only nonimmigrant visas reflects a similar concern. Holders of

nonimmigrant visas sometimes have no address associated with them, making them equally difficult to track.)

The government also argues that § 922(g)(5) reflects the likelihood that unauthorized immigrants are more likely to commit future gun-related crimes than persons in the general population. It offers no data to support that assertion, however, and we have our doubts about its accuracy. The government extrapolates from the fact that persons who are here illegally have "show[n] a willingness to defy our law" to the conclusion that they are likely to abuse guns. This may go too far: the link to firearms is unclear, and unlawful presence in the country is not, without more, a crime. See *Arizona v. United States*, 132 S. Ct. 2492, 2505 (2012) ("As a general rule, it is not a crime for a removable alien to remain present in the United States."). While it is a misdemeanor to enter the country improperly, see 8 U.S.C. § 1325(a), many unauthorized immigrants—such as Meza-Rodriguez himself—were too young to form the requisite intent to violate this statute when they were originally brought to the United States. Even if this future-oriented rationale lacks support, however, the government has an strong interest in preventing people who already have disrespected the law (including, in addition to aliens unlawfully in the country, felons, § 922(g)(1), fugitives, § 922(g)(2), and those convicted of misdemeanor crimes of domestic violence, § 922(g)(9)) from possessing guns.

Congress's interest in prohibiting persons who are difficult to track and who have an interest in eluding law enforcement is strong enough to support the conclusion that 18 U.S.C. § 922(g)(5) does not impermissibly restrict Meza-

No. 14-3271                                                    17

Rodriguez's Second Amendment right to bear arms. We thus
Affirm the district court's denial of his motion to dismiss.

FLAUM, *Circuit Judge*, concurring in the judgment.

I concur in the judgment. Unlike the majority, I have doubts that the Second Amendment grants undocumented immigrants the right to bear arms, as my read of *District of Columbia v. Heller*, 554 U.S. 570 (2008), does not suggest such an expansive interpretation. But because we need not make that determination in reaching our result in this matter, I would follow the Tenth Circuit's prudential approach and reserve resolution of this challenging constitutional question for a case that compels addressing it. *See United States v. Huitron-Guizar*, 678 F.3d 1164, 1169–70 (10th Cir. 2012).

In choosing to confront the issue, the majority roots its constitutional analysis in the common use of the phrase "the people" by the First, Second, and Fourth Amendments, and the Supreme Court's suggestion in *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990), that all persons, regardless of citizenship, who are part of our "national community" or who manifest a "sufficient connection with this country" are entitled to the rights that those amendments bestow. That view is not without appeal. Indeed, *Heller* describes the Second Amendment's guarantee as an "ancient right," codified in the constitution "to prevent the elimination of the militia," but also "valued … for self-defense and hunting." 554 U.S. at 599. Hence, it might be argued that all adult persons in this country share the same basic need to defend themselves. Further, *Heller* tells us that "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service." *Id.* at 627. Today, that includes certain undocumented immigrants. *See* Andrew Tilghman, *Military to Allow Undocumented Immigrants to Serve*, USA TODAY (Sept. 25, 2014, 5:22 PM),

http://www.usatoday.com/story/news/nation/2014/09/25/policy-to-allow-undocumented-immigrants-in-military/16225135/.

Conversely, who is part of our "national community" and whether (and how) an undocumented immigrant can establish a "sufficient connection" under *Verdugo-Urquidez* remains unsettled. And *Heller* provides considerable reason to doubt that an undocumented immigrant can enjoy Second Amendment rights at all. The Court's analysis professes to "start … with a strong presumption that the Second Amendment right is exercised individually and belongs to all *Americans*." *Id.* at 581 (emphasis added). It also characterizes "the people" as referring "to all members of the political community," *id.* at 580, and describes the Second Amendment as "the right of law-abiding, responsible *citizens*," *id.* at 635 (emphasis added).

However, as the majority recognizes, *Heller* only addressed the question whether the right protected by the Second Amendment is an individual or a collective one, not which individuals possess the right. *See Heller*, 554 U.S. at 635 ("[S]ince this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field … ."). In any event, the question of who possesses the right need not be answered to reach our outcome here, because regardless of the answer 18 U.S.C. § 922(g)(5) satisfies intermediate scrutiny and thus passes constitutional muster.

Accordingly, I would refrain from addressing the scope of the Second Amendment and, further, creating a conflict with the law of the Fourth, Fifth, and Eighth Circuits.